# EXHIBIT G

# SECURITY AGREEMENT

Date:  AUGUST 1, 2012

WHEREAS, **CAPITAL ONE TAXI MEDALLION FINANCE** ("Secured Party") is extending a loan (the "Loan") to BRACHA CAB CORP. (the "Debtor"), in the principal amount of  $1,210,000.00  ; and

WHEREAS, Debtor has agreed in consideration of the aforesaid Loan and the other consideration set forth below, to grant the Secured Party a security interest in the collateral described herein to secure the Loan and the other obligations described herein;

NOW, THEREFORE, in consideration of the mutual premises and covenants contained herein, the parties agree as follows:

1.    **SECURITY INTEREST:** In consideration of the Loan, and other financial accommodations at any time made or extended by the Secured Party to Debtor, directly or indirectly, as principal, guarantor, or otherwise, Debtor hereby grants to the Secured Party, a security interest in, a continuing lien upon, and a right of set-off against, and Debtor hereby assigns to the Secured Party, the Collateral described in Paragraph 2 to secure the payment, performance and observance of all loans, advances, debts, liabilities, obligations, covenants and duties of any kind or nature, present or future, absolute or contingent, whether or not evidenced by any note, guaranty or other instrument, due or to become due, to Secured Party from Debtor (all of the foregoing being herein referred to as the "Obligations").

2.    **THE COLLATERAL:** The Collateral is described on Schedule A annexed hereto and shall also include:

(a)    all attachments, accessions and equipment now or hereafter affixed to the Collateral or used in connection therewith,

(b)    substitutions and replacements thereof,

(c)    all of Debtor's New York City Taxicab License and Medallions whether now owned or hereafter acquired, including, but not limited to, Medallion Number(s) **2L35** and **2L36**; all items of Collateral both now owned or existing and hereafter acquired, created or arising,

(d)    any and all products and proceeds thereof (including, without limitation, any claims of Debtor against third parties, for loss or damage to or destruction of any or all of the Collateral and insurance proceeds with respect thereto); and

(e)    all right, title and interest of Debtor in and to any lease, rental agreement, or another agreement(s) respecting any of the Collateral, including, but not limited to, Debtor's right to receive, either directly or indirectly, from any party or person, any rents or other payments due under such agreement(s).

As further security for the Obligations, Debtor hereby grants to the Secured Party a security interest in and to any and all monies, securities, drafts, notes, items and other property of such Debtor and the proceeds thereof, now or hereafter held or received by or in transit to, Secured Party from or for Debtor, whether for safe-keeping, custody, pledge, transmission, collection or otherwise, and any and all deposits (general or special), balances, sums, proceeds, and credits of Debtor with, and any and all claims of Debtor against Secured Party, at any time existing.

3.    **DEBTOR'S OBLIGATIONS:**    Debtor will perform, or will cause to be performed, upon the request of Secured Party, each and all of the following:

(a)    Record, register and file this Agreement and any supplements hereto, as well as such notices, financing statements, and/or other documents or instruments as may, from time to time, be requested by Secured Party to fully carry out the intent of this Agreement, with all administrations or governmental agencies, whether domestic or foreign, as may be determined by Secured Party to be necessary or advisable in order to perfect, establish, con-firm, maintain and/or perfect the security interest and lien created hereunder, as a legal, valid, and binding, first priority security interest and lien upon the Collateral.

(b)    Furnish to Secured Party copies of all documents or other evidence of every such recording, registering and filing.

(c)    Execute and deliver or perform, or cause to be executed and delivered or performed, such further or other instruments and/or acts as Secured Party determine are necessary or required to fully carry out the intent and purpose of this Agreement or to subject the Collateral to the security interest and lien created hereunder, and shall defend the title of Debtor to the Collateral by means of negotiation and, if necessary, appropriate legal proceedings, against each and every party claiming an interest therein contrary or adverse to Debtor's title to same.

4.    **DEBTOR'S REPRESENTATIONS:**    Debtor warrants, represents and covenants that:

(a)    the Debtor shall pay the Obligations and perform all of the obligations contained in this Agreement in accordance with their terms;

(b    the chief and other places of business of Debtor, the books and records relating to the Collateral and the Collateral are located at the addresses set forth below and Debtor will not change any of the same without prior written notice to and consent of the Secured Party.

(c)    the Collateral is and will be used in Debtor's business and not for personal, family, household or farming use.

(d)    the Collateral is now, and at all times will be, owned legally and beneficially solely by Debtor free and clear of all liens, security interests, claims and encumbrances.

(e)    Debtor shall not incur any indebtedness for borrowed money or for the deferred payment price of personal or real property, whether directly or indirectly, whether as borrower, buyer, endorser, guarantor, or otherwise and shall not act as guarantor or surety with respect to the debts or obligations of any other person or entity without the prior written consent of the Secured Party.

(f)    Debtor will not assign, sell, mortgage, lease, transfer, pledge, grant a security interest in or lien upon, encumber, or otherwise dispose of or abandon, nor will Debtor suffer or permit any of the same to occur with respect to, any part or all of the Collateral, without prior written consent of the Secured Party. The inclusion of "proceeds" of the Collateral under the security interest granted herein shall not be deemed a consent by the Secured Party to any sale or other disposition of any part or all of the Collateral except as expressly permitted herein.

2

(g)     Debtor has made, and will continue to make payment or deposit or otherwise provide for the payment, when due, of all taxes, assessments fines, penalties, license fees or contributions required by law which have been or may be levied or assessed against the Debtor, with respect to any of the Collateral, and will deliver to the Secured Party, on demand, certificates or other evidence satisfactory to the Secured Party attesting thereto.

(h)     Debtor will operate and use or cause to be used the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances and regulations, including, but not limited to, the Rules, Requirements and Proceedings Governing Owners of Medallion Taxicabs of the New York City Taxi and Limousine Commission.

(i)     Debtor will keep or cause to be kept the Collateral in good working order, repair, and marketable condition, at Debtor's own cost and expense.

(j)     the Secured Party shall at all times, have free access to and right of inspection of the Collateral and any records pertaining thereto (and the right to make extracts from and to receive from Debtor originals or true copies of such records and any papers and instruments relating to any or all of the Collateral upon request therefor) and Debtor hereby grants to the Secured Party, a security interest in all such records, papers and instruments to secure the payment, performance and observance of the Obligations.

(k)     the Collateral listed on Schedule A is now and shall remain personal property, and Debtor will not permit any of the Collateral to become a part of or affixed to real property without prior written notice to the Secured Party and without first making all arrangements, and delivering, or causing to be delivered, to the Secured Party all instruments and documents, including, without limitation, waivers and subordination agreements by any landlords or mortgagees, requested by and satisfactory to the Secured Party to preserve and protect the primary security interest granted herein against all persons.

(l)     Debtor, at its own expense, will insure the Collateral (i) against loss or damage by fire and other hazards, and extended coverage, theft, burglary, bodily injury and such other risks in such amounts as may be required by the Secured Party at any time; and (ii) with liability insurance, including excess coverage for each of the taxicab vehicles in an amount not less than $100,000/$300,000. Debtor shall promptly notify the Secured Party, of any loss or damage to any of the Collateral or arising from its use.

(m)     Debtor shall, at its expense, perform all acts and execute all documents requested by the Secured Party, at any time to evidence, perfect, maintain and enforce, the Secured Party's primary security interest in the Collateral or otherwise in furtherance of the provisions of this Security Agreement.

(n)     Debtor assumes all responsibility and liability arising from the use of the Collateral.

(o)     upon request of the Secured Party, at any time and from time to time, Debtor shall, at its sole cost and expense, execute and deliver to the Secured Party one or more security agreements or supplements to this Security Agreement, one or more applications for certificate of title and any other papers, documents or instruments requested by the Secured Party in connection with this Security Agreement, and Debtor hereby authorizes the Secured Party to execute and file at any time or times, one or more financing statements with respect to all or any part of the Collateral, signed only by the Secured Party.

3

(p)    The Debtor shall give prompt notice to the Secured Party of any loss or damage to the Collateral and shall properly file proof of loss with the insurer. Debtor shall cooperate with its insurers in the reporting, investigating, prosecuting, and defending any claim on behalf of or against the Debtor. Debtor authorizes the Secured Party to file claims, and adjust, settle, and collect such claims under any policy of insurance with respect to the Collateral in the name of the Debtor and Secured Party upon such terms as Lender may determine, and to execute releases and endorse any instrument for the payment of money in connection therewith.

(q)    in its discretion, the Secured Party may, upon the occurrence of a Default and during its continuance (as hereinafter defined), in its name, in the name of Debtor, or otherwise, notify any account debtor or lessee or obligor of any account, lease, contract, instrument, chattel paper or general intangible included in the Collateral to make payment to the Secured Party.

(r)    the Secured Party may, in its discretion and at any time upon the occurrence of a Default and during its continuance, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable by the Secured Party with respect to, any of the Collateral, and/or extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any of the Collateral or the Obligations, all without notice to or consent by Debtor and without otherwise discharging or affecting the Obligations, the Collateral or the security interest granted herein.

(s)    the Secured Party may, in its discretion, for the account and expense of Debtor, pay any amount or do any act required of Debtor hereunder or requested by Secured Party to preserve, protect, maintain or enforce the Obligations, the Collateral or the primary security interest granted herein, and which Debtor fails to do or pay, and any such payment shall be deemed an advance by Secured Party to Debtor and shall be payable on demand together with interest at the highest rate then payable on any of the Obligations.

(t)    Debtor will promptly pay the Secured Party for any and all sums, costs, and expenses which the Secured Party may reasonably pay or incur pursuant to the provisions of this Security Agreement or in defending, protecting or enforcing the security interest granted herein or in enforcing payment of the Obligations or otherwise in connection with the provisions hereof, including but not limited to all court costs, collection charges, travel, and reasonable attorney's fees, all of which, together with interest at a rate equal to the highest rate then payable on any of the Obligations, shall be payable on demand.

(u)    upon the occurrence of a Default and during its continuance, the Secured Party in its discretion, may transfer to or register in the name of the Secured Party or its nominee all or any of the Collateral consisting of securities, and whether or not so transferred or registered, the Secured Party shall be entitled to receive and retain all income, dividends (including stock dividends and rights to subscribe) and other distributions thereon as part of the Collateral and to exchange any or all such Collateral upon the reorganization, recapitalization, or readjustment of any entity issuing such securities, and to exercise all rights with respect thereto as if it was the absolute owner thereof, provided that until the occurrence of a Default and whether or not the Collateral is transferred to or registered in the name of the Secured Party or its nominee, Debtor alone shall be entitled to exercise the right to vote such Collateral, and if the Collateral has been so transferred or registered, the Secured Party shall take such action as Debtor may reasonably request to enable Debtor to exercise the right to vote such Collateral or any part thereof for any purpose which is not inconsistent with the terms of this Security Agreement or the Obligations or which would not have an adverse effect on the value of the Collateral or any part thereof..

(v)     upon the occurrence and continuance of a Default, any of the proceeds of the Collateral received by Debtor, shall not be commingled with other property of Debtor, but shall be segregated, held by Debtor in trust as the exclusive property of Secured Party, and Debtor shall immediately deliver to the Secured Party the identical checks, monies, or other proceeds of Collateral received, duly endorsed in blank where appropriate to effectuate the provisions hereof, the same to be held by the Secured Party as additional Collateral hereunder or, at the Secured Party's option, to be applied to payment of any of the Obligations, whether or not due and in any order.

(w)     The Debtor shall promptly notify Secured Party if its obtains any substitutions for any of the Collateral.

(x)     The Secured Party shall be entitled to the appointment of a receiver in any action or proceeding to enforce, protect, or foreclose its security interest in the Collateral without notice and without regard to the adequacy of security.

(y)     The Secured Party shall not have any obligation or liability under any license or agreement included within the Collateral, nor shall the Secured Party be obligated to perform any obligation or duty of Debtor.

(z)     The Debtor shall remain in the business of owning and operating New York City Taxicab licenses and respective medallions and taxicab vehicles. Debtor shall give the Secured Party prompt notice of any change in or discontinuance of its business.

5.     **DEFAULT:** The occurrence of any one or more of the following events shall constitute an event of default ("Default") by Debtor under this Security Agreement:

(a)     if at any time the Secured Party shall, in its reasonable judgment consider the Obligations insecure or any part of the Collateral unsafe, insecure or insufficient, and Debtor shall not on demand furnish other collateral or make payment on account, satisfactory to the Secured Party;

(b)     if an "Event of Default" occurs under any of the Obligations or Debtor fails to comply with any obligation or breaches any representation contained in this Agreement; or

(c)     in the event of loss, theft, substantial damage to or destruction of any of the Collateral, or the making or filing of any lien, levy, or execution on, or seizure, attachment or garnishment of, any of the Collateral.

6.     **REMEDIES UPON DEFAULT:**  Upon the occurrence of any Default and during its continuance, the Secured Party may, without notice to or demand upon Debtor, declare any or all Obligations of Debtor immediately due and payable and the Secured Party shall have the following rights and remedies (to the extent permitted by applicable law) in addition to all rights and remedies of a secured party under the UCC, or of the Secured Party under the Obligations, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently: the Secured Party may at any time and from time to time, with or without judicial process or the aid and assistance of others, enter upon any premises in which any of the Collateral may be located and, without resistance or interference by Debtor, take possession of the Collateral; and/or dispose of any part or all of the Collateral on any premises of Debtor; and/or require Debtor to assemble and make available to the Secured Party at the expense of Debtor any part or all of the Collateral at any place and time designated by the Secured Party which is reasonably convenient to both parties; and/or remove any part or all of the

5

Collateral from any premises on which any part may be located for the purpose of effecting sale or other disposition thereof (and if any of the Collateral consists of motor vehicles, the Secured Party may use Debtor's license plates); and/or sell, resell, lease, assign and deliver, grant options for or otherwise dispose of any or all of the Collateral in its then condition or following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels, at the same or different times, with or without having the Collateral at the place of sale or other disposition, for cash and/or credit, and upon any terms, at such place(s) and time(s) and to such persons, firms or corporations as the Secured Party deems best, all without demand for performance or any notice or advertisement whatsoever except that, where an applicable statute requires reasonable notice of sale or other disposition, Debtor hereby agree that the sending of five days notice by ordinary mail postage prepaid, to any address of Debtor set forth in this Security Agreement of the place and time of any public sale or of the time after which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof. If any of the Collateral is sold by the Secured Party upon credit or for future delivery, the Secured Party shall not be liable for the failure of the purchaser to pay for same and in such event the Secured Party may resell such Collateral. The Secured Party may buy any part or all of the Collateral at any public sale and, if any part or all of the Collateral is of a type customarily sold in a recognized market or is of the type which is the subject of widely distributed standard price quotations, the Secured Party, may buy at private sale and may make payment therefor by any means. The Secured Party may apply the cash proceeds actually received from any sale or other disposition to the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like, to reasonable attorney's fees and all travel and other expenses which may be reasonably incurred by the Secured Party in attempting to collect the Obligations or enforce this Security Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Security Agreement; and then to the Obligations in such order and as to principal or interest as the Secured Party may desire; and Debtor shall remain liable and will pay the Secured Party on demand any deficiency remaining, together with interest thereon at a rate equal to the highest rate then payable on the Obligations and the balance of any expenses unpaid, with any surplus to be paid to Debtor, subject to any duty of the Secured Party imposed by law to the holder of any subordinate security interest in the Collateral known to Secured Party. Debtor recognizes that the Secured Party may be unable to effect a public sale of all or a part of the Collateral consisting of securities by reason of certain prohibitions contained in the Securities Act of 1933, but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. Debtor agrees that any such private sales may be at prices and other terms less favorable to the seller than if sold at public sales and that such private sales shall be deemed to have been made in a commercially reasonable manner. The Secured Party has no obligation to delay sale of any such securities for the period of time necessary to permit the issuer of such securities, even if such insurer would agree, to register such securities for public sale under the Securities Act of 1933. The Secured Party may exercise all voting rights with respect to all or any of the Collateral consisting of securities and may exercise all powers with respect hereto as if an absolute owner thereof, none of which shall adversely affect the security interests granted herein or the Obligations. The Secured Party need not proceed against any or all of the Collateral prior to or contemporaneously with seeking recovery from the Debtor or any Guarantor.

Secured Party may appropriate, set off and apply for the repayment of any or all of the Obligations owed it by Debtor, any and all Collateral in or coming into the possession of such Secured Party or its agents and belonging or owing to Debtor, without notice to Debtor, and in such manner as Secured Party may in its discretion determine.

7.    **POWER OF ATTORNEY:** To effectuate the terms and provisions hereof, Debtor hereby designates and appoints the Secured Party and its designees or agents as attorney-in-fact of Debtor, irrevocably and with power of substitution, with authority upon the occurrence and continuance of a Default to receive, open and dispose of all mail addressed to Debtor, to notify the Post Office authorities to change the address for delivery of mail addressed to Debtor to such address as the Secured Party may designate; to endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, instruments or other evidences of payment or proceeds of the Collateral that may come into the Secured Party's possession; to sign the name of Debtor on any invoices, documents, drafts against and notices to account debtors or obligors of Debtor, assignments and requests for verification of accounts; to execute proofs of claim and loss; to execute any endorsements, assignments, or other instruments of conveyance or transfer; to adjust and compromise any claims under insurance policies; to execute releases; and to do all other acts and things necessary and advisable in the sole discretion of the Secured Party to carry out and enforce this Security Agreement. All acts of said attorney or designee are hereby ratified and approved and said attorney or designee shall not be liable for any acts or commission or omission, nor for any error of judgment or mistake of fact or law. This power of attorney being coupled with an interest is irrevocable while any of the Obligations shall remain unpaid.

8.    **DUTY OF CARE:** The Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any securities in its possession included in the Collateral, which duty shall be fully satisfied if the Secured Party maintains safe custody of any such securities, and, with respect to any maturities, calls, conversions, exchanges, redemption, offers, tenders or similar matters relating to any of such securities (herein called "events"), in the exercise of its sole discretion (a) the Secured Party endeavors to take such action with respect to any of the events as Debtor may reasonably and specifically request in writing in sufficient time for such action to be evaluated and taken or (b) if the Secured Party determines that the action requested might adversely affect the value of the securities as collateral, the collection of the Obligations secured, or otherwise prejudice the interests of Secured Party, the Secured Party gives reasonable notice to Debtor that any such requested action will not be taken and if the Secured Party makes such determination or if Debtor fails to make such timely request, the Secured Party takes such other action as it deems advisable in the circumstances. The Secured Party shall have no further obligation to ascertain the occurrence of, or to notify Debtor with respect to, any events and shall not be deemed to assume any such obligation as a result of the establishment by the Secured Party of any internal procedures with respect to any securities in its possession, nor shall the Secured Party be deemed to assume any responsibility for, or obligation or duty with respect to, any part or all of the Collateral, of any nature or kind, or any matter or proceedings arising out of or relating thereto, including, without limitation, any obligation or duty to take any action to collect, preserve or protect Secured Party's or Debtor's rights in the Collateral or against any prior parties thereto, but the same shall be at Debtor's sole risk at all times. Debtor hereby releases the Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Security Agreement, the Obligations, the use of the Collateral and/or any actions taken or omitted to be taken by the Secured Party with respect thereto, and Debtor hereby agrees to hold the Secured Party harmless from and with respect to any and all claims, causes of action and demands other than claims, causes of action and demands arising from the gross negligence of the Secured Party. If the Collateral hereunder includes "stock" as defined in Regulation U of the Federal Reserve Board, it is hereby agreed such "stock" shall not secure Obligations which are "purpose credits", as that term is used in Regulation U, and (i) are secured solely by collateral other than "stock" or (ii) are unsecured.

9.    **MISCELLANEOUS:** This Agreement expresses the entire understanding of the parties with respect to the subject matter hereof. The Secured Party's prior recourse to any part or all of the Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations.  No act, failure or delay by the Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise.  No single or partial waiver by the Secured Party of any Default or right or remedy which it may have shall operate as a waiver of any other Default, right or remedy or of the same Default, right or remedy on a future occasion.  No waiver by the Secured Party hereunder shall be effective unless given in writing. Debtor hereby waives presentment, notice of dishonor and protest of all instruments included in or evidencing any of the Obligations or the Collateral, and any and all other notices and demands whatsoever (except as expressly provided herein).  Debtor agrees to pay, on demand, all reasonable out-of-pocket expenses incurred by the Secured Party in connection with the negotiation, execution, perfection, consummation and enforcement of this Security Agreement, the Obligations, and the transactions contemplated hereunder and thereunder, including but not limited to the reasonable fees and expenses of its  counsel, whether or not an action is commenced, and if an action is commenced, whether at the trial court, appellate court, bankruptcy court, or otherwise.

**In the event of any litigation, with respect to any matter connected with this Security Agreement, the Obligations or the Collateral, Debtor hereby waives to the extent permitted by law the right to a trial by jury and any defense based on any claim of laches, rights of setoff and the rights to interpose counterclaims of any nature.**

Debtor hereby irrevocably consents to the jurisdiction and venue of the New York State Supreme Court, Suffolk County, and to the United States District Court, Eastern District sitting in Suffolk County in connection with any action or proceeding arising out of or relating to the Obligations, this Security Agreement or the Collateral, or any document or instrument delivered with respect to any of the Obligations. Debtor hereby waives personal service of any summons, complaint or other process in connection with any such action or proceeding and agrees that the service thereof may be made by certified or registered mail directed to Debtor at any place of business set forth below, or at such other address as Debtor may designate by written notification by certified or registered mail directed to and actually received by the Secured Party at its office set forth in the financing statements filed hereunder.  Debtor so served shall appear or answer such summons, complaint or other process within thirty days after the mailing thereof.  Should Debtor so served fail to appear or answer within said thirty-day period, unless otherwise agreed by the attorneys for the parties, Debtor shall be deemed in default and judgment may be entered against Debtor for the amount or such other relief as may be demanded in any summons, complaint or other process so served.  In the alternative, in its discretion, the Secured Party may effect service upon Debtor in any other form or manner permitted by laws.

All terms used herein shall have the meanings as defined in the UCC, unless the context otherwise requires.  No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Security Agreement and to such provision, and executed by the party to be charged.  The execution and delivery of this Security Agreement has been authorized by the Board of Directors of Debtor and by any necessary vote or consent of stockholders of Debtor (if a corporation).  This Security Agreement and all Obligations shall be binding upon the heirs, executors, administrators, successors, or assigns of Debtor, and shall, together with the rights and remedies of the Secured Party inure to the benefit of each of the Secured Party, its successors, endorsee and assigns.   This Security Agreement and the Obligations shall be governed in all respects by the internal laws of the State of New York without regard to its conflicts of laws rules. If any term of this Security Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be

affected thereby. This Agreement shall be interpreted without the benefit of any presumption against the drafter hereof. The Secured Party is authorized to annex hereto any schedules referred to herein which schedules shall be made a part hereof. Debtor acknowledges receipt of a copy of this Security Agreement. The term Debtor when used herein shall include all Debtors signatory hereto both jointly and severally.

IN WITNESS WHEREOF, the undersigned has executed or caused this Security Agreement to be executed in the State of New York the date first above set forth.

(DEBTOR): BRACHA CAB CORP.

By_____

President/Secretary: JACOB ELBERG

---

Capital One Taxi Medallion Finance is a trade name of All Points Capital Corp. All Points Capital Corp. is a subsidiary of Capital One Bank. Capital One Bank is a trade name of Capital One, N.A. and does not refer to a separately insured institution. Member FDIC

**Debtor's Chief Place of Business:**

42-42 27TH STREET, LONG ISLAND CITY, NY 11101

**Location of Books and Records Relating to the Collateral:**

42-42 27TH STREET, LONG ISLAND CITY, NY 11101

Vehicles to be garaged at:

31-08 NORTHERN BOULEVARD, LONG ISLAND CITY, NY 11101

Schedule A attached hereto

## SCHEDULE A
## TO SECURITY AGREEMENT AND UCC-1 BETWEEN
## CAPITAL ONE TAXI MEDALLION FINANCE AND BRACHA CAB CORP.

1.      All personal property now owned or hereafter acquired by the Debtor including, but not limited to, all accounts, accounts receivable, other receivables, contract rights, chattel paper, general intangibles, instruments and documents, deposit accounts, and notes; any other obligations or indebtedness owed to Debtor from whatever source arising, now or hereafter existing; all rights of Debtor to receive any performance or any payments in money or kind; all guaranties of the foregoing and security therefor; all of the right, title, and interest of Debtor in and with respect to the goods, services, or other property that gave rise to or secure any of the foregoing or which are described thereto, and all rights of Debtor as an unpaid seller of goods and services, including, but not limited to, the rights to stoppage in transit, replevin, reclamation, and resale; and all of the foregoing whether now or hereafter acquired or arising in the future.

2.      All of the Debtor's now owned or hereafter acquired or created interest in machinery, equipment in all its forms, furniture, furnishings, and fixtures, together with tools, boats and motor vehicles of every kind and description, all parts therefor, and all improvements, accessions or appurtenances thereto and all proceeds thereof.

3.      Any and all now owned or hereafter acquired inventory, goods, merchandise, or other personal property, raw materials, parts, supplies, work-in-process and finished products intended for sale, or intended for inclusion in work in progress, of every kind and description, in the custody or possession, actual or constructive, of Debtor, including insurance proceeds from insurance on any of the above, all of the Debtor's interest in inventory described in invoices, any returns upon any accounts and other proceeds, resulting from the sale or disposition of any of the foregoing, including, without limitation, raw materials, work-in-process, and finished goods.

4.      All general intangibles, choses in action, and causes of action, and all other intangible personal property of Debtor of every kind and nature now owned or hereafter acquired by Debtor, including, without limitation, corporate or other business records, inventions, designs, blueprints, plans, specifications, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, tax refund claims, insurance proceeds thereof, including, without limitation, insurance covering the lives of key employees on which the Debtor is beneficiary, and any letter of credit, guarantee, claim, security interest or other security held by or granted to Debtor to secure payment by an account debtor of accounts owed to Debtor.

5.      All of Debtor's New York City Taxicab License and Medallions whether now owned or hereafter acquired, including, but not limited to, Numbers 2L35 and 2L36.

6.      All of Debtor's vehicles whether now owned or hereafter acquired, together with roof lights and taxicab meters attached thereto.

All of the foregoing is collectively the "Collateral."

All products of Collateral and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering Collateral, all property received wholly or partly in trade or exchange for Collateral, all leases of Collateral and all rents, revenues, issues, profits and proceeds arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition, of the Collateral of any interest therein.