1

2    SUPREME COURT OF THE STATE OF NEW YORK
            COUNTY OF SUFFOLK
3    - - - - - - - - - - - - - - - - - - - - - -x
     CAPITAL ONE TAXI MEDALLION FINANCE,
4
                          Plaintiff,
5
         -against-      Index No:  608014/2015
6
     JEB MANAGEMENT CORP. and RUBEN ELBERG,
7
                          Defendants.
8    - - - - - - - - - - - - - - - - - - - - - -x
9                        875 Third Avenue
                         New York, New York
10
                         June 22, 2017
11                       9:54 a.m.
12        EXAMINATION BEFORE TRIAL of RUBEN ELBERG,
13   the Judgment Debtor in the above-entitled
14   action, held at the above time and place, taken
15   before Alice Schulman, a Notary Public of the
16   State of New York, pursuant to Subpoena and
17   stipulations between Counsel.
18
19
20
21
22
23
24
25

Page 2

```
 1
 2  APPEARANCES:
 3
    TROUTMAN SANDERS LLP
 4      Attorneys for Plaintiff/
        Judgment Creditor CAPITAL ONE
 5      TAXI MEDALLION FINANCE, a trade
        name for All Points Capital
 6      Corp., N/K/A Capital One
        Equipment Finance Corp.
 7      875 Third Avenue
        New York, New York 10022
 8
    BY:  JONATHAN D. FORSTOT, ESQ.,
 9        ANDREW BUCK, ESQ.
10
11
    ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
12  FORMATO, FERRARA & WOLF, LLP
        Attorneys for RUBEN ELBERG
13      3 Dakota Drive - Suite 300
        Lake Success, New York 11042
14
    BY:  BRIAN T. McCARTHY, ESQ.
15
            *    *    *
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2          STIPULATIONS
 3      IT IS HEREBY STIPULATED, by and between the
    attorneys for the respective parties hereto,
 5  that:
 6      All rights provided by the C.P.L.R., and
 7  Part 221 of the Uniform Rules for the Conduct of
 8  Depositions, including the right to object to
 9  any question, except as to form, or to move to
10  strike any testimony at this examination is
11  reserved; and in addition, the failure to object
12  to any question or to move to strike any
13  testimony at this examination shall not be a bar
14  or waiver to make such motion at, and is
15  reserved to, the trial of this action.
16      This deposition may be sworn to by the
17  witness being examined before a Notary Public
18  other than the Notary Public before whom this
19  examination was begun, but the failure to do so
20  or to return the original of this deposition to
21  counsel, shall not be deemed a waiver of the
22  rights provided by Rule 3116, C.P.L.R., and
23  shall be controlled thereby.
24      The filing of the original of this
25  deposition is waived.
```

Page 4

```
 1
 2      IT IS FURTHER STIPULATED, a copy of this
 3  examination shall be furnished to the attorney
 4  for the witness being examined without charge.
 5          *    *    *
 6  R U B E N    E L B E R G, the Witness herein,
 7  having first been duly affirmed by the Notary
 8  Public, was examined and testified as follows:
 9  EXAMINATION BY
10  MR. FORSTOT:
11      Q.   What is your name?
12      A.   Ruben Elberg.
13      Q.   Where do you reside?
14      A.   1523 President Street, Brooklyn,
15  New York 11213.
16      Q.   Mr. Elberg, I'm Jonathan Forstot of
17  Troutman & Sanders on behalf of Capital One.
18  Have you been deposed before?
19      A.   Maybe once before.
20      Q.   Maybe once, you're not sure?
21      A.   Once before, yes.
22      Q.   So you know how this works?
23      A.   Not very well.  If you can explain,
24  I would appreciate it.
25      Q.   I'll be asking you questions and
```

Page 5

```
 1          Ruben Elberg
 2  you're under oath.  The court reporter will take
 3  down a transcript of everything we say, so make
 4  sure your answers are oral, not nods of the
 5  head, no gestures.
 6      A.   No problem.
 7      Q.   We need to have a written
 8  transcript of this.  If you don't understand
 9  anything I ask you, please let me know and I'll
10  try to rephrase it so you understand the
11  question, okay?
12      A.   Yes.
13      Q.   You gave an address to the court
14  reporter, that's where you presently live?
15      A.   Yes.
16      Q.   Do you have any other residences
17  besides that?
18      A.   No.
19      Q.   You are therefore a resident of the
20  State of New York, correct?
21      A.   Yes.
22      Q.   Who else lives at that address with
23  you?
24      A.   My wife and nine children.
25      Q.   Anybody else?
```

2 (Pages 2 - 5)

Page 6

Ruben Elberg

2    A.    No.
3    Q.    What kind of structure, is it a
4  house, an apartment?
5    A.    A private house.
6    Q.    So a stand-alone house?
7    A.    Yes.
8    Q.    On President Street?
9    A.    Yes, sir.
10    Q.    Who owns the house?
11    A.    I do with my wife.
12    Q.    You said nine of your children live
13  there?
14    A.    Yes.
15    Q.    You have a total of 14 children?
16    A.    Yes, I do.
17    Q.    Where are the other children who
18  don't live with you?
19    A.    Some of them are married, and some
20  of them are in Yeshivas, and then when they come
21  back, they live with us for a month or two and
22  then they go back.  They're not steadily in our
23  home, they're in Yashivas.
24    Q.    Are the Yashivas in New York?
25    A.    One was in Westchester, one was in

Page 7

Ruben Elberg

2  Los Angeles, which is shlichus, he's an emissary
3  from higher rabbinical school, and the other one
4  was in France.  S-H-L-I-C-H-U-S, it's a Hebrew
5  word.
6    Q.    Is English your native language?
7    A.    No, I was born in Russia.
8    Q.    What languages do you speak besides
9  English?
10    A.    Russian, Hebrew, I understand
11  Yiddish and Georgian and English.
12    Q.    Do you conduct business in English?
13    A.    Yes, I do.
14    Q.    Do you believe you need an
15  interpreter to understand any of my questioning?
16    A.    I don't believe so.  If I have
17  questions, I'll try to ask you to clarify.
18    Q.    You're involved in several
19  litigations, correct?
20    A.    Yes.
21    Q.    Have you had to have any documents
22  in any of those litigations translated for you
23  into a language other than English?
24    A.    No.
25    Q.    So you've been using English in

Page 8

Ruben Elberg

2  these other litigations, correct?
3    A.    Yes.  I shouldn't say that, forgive
4  me.  There were some documents translated from
5  English to Chinese when we went out to market
6  one of the projects we were involved in, so I
7  want to correct my answer.
8    Q.    Listen carefully to my question.
9  Did you have to have any document translated
10  from English into another language for you to be
11  able to understand if?
12    A.    No, not for me.
13    Q.    Let's go over, why don't you tell
14  me the names, ages of your 14 children and who
15  lives with you and who doesn't.
16    A.    We have Baruch who is nine years
17  old.
18    Q.    He lives where?
19    A.    With us.  Channa who is 12 years
20  old, she lives with us.  We have Ahron, he's 13,
21  he lives with us.  We have Levi who is his twin,
22  also 13.
23    Q.    He lives with you?
24    A.    With us, yes.  We have Yisrael,
25  he's 15.  If I'm off a little bit on the ages,

Page 9

Ruben Elberg

2  forgive me.  I believe I'm telling you
3  everything correctly.  Yisrael, we have Moshe.
4    Q.    Wait, where does Yisrael live?
5    A.    With us.  We have Moshe who is 17.
6  He is in Yashiva in Westchester, and he just
7  came back just recently.  So his summer, he is
8  at home.
9    Q.    Is he going to go back to Yashiva
10  after the summer?
11    A.    I don't know.  I don't know where.
12  We are working on it, we just don't know which
13  Yashiva yet.  We have Shneur, he is 19, and he
14  was in Brunoy, France.
15    Q.    How do you spell that?
16    A.    B-R-O-I-N-O, Brunoy, France, in
17  Yashiva.  And we have Josef, he's 22.  He was in
18  Yashiva in Los Angeles.
19    Q.    You said he was or is he?
20    A.    He is coming back, he was and he's
21  coming back in a week, and I don't know what
22  he's going to do next year.  For the last year
23  he was there.  He's still there, and he's coming
24  back in a week.  Should I continue?
25    Q.    Yes, please.

3 (Pages 6 - 9)

Ruben Elberg

2    A.    Then we have David.  He's supposed
3 to be in Yashiva in Crown Heights.
4    Q.    How old is he?
5    A.    He's 23.
6    Q.    Does he live at home or at the
7 Yashiva?
8    A.    Yes.  And we have Mandel, he's
9 married.  He's 24 and a half I would say.
10    Q.    Where does Mandel live?
11    A.    In Crown Heights.
12    Q.    In his own place?
13    A.    He's renting an apartment.
14    Q.    Next.
15    A.    Then we have Miriam.  She lives
16 with us and she's a teacher.
17    Q.    How old?
18    A.    Twenty-six.
19    Q.    Okay.
20    A.    Then we have Shterna, she is 27 and
21 she lives in her own home, she's married.
22    Q.    Where does she live?
23    A.    Crown Heights.
24    Q.    Okay.
25    A.    Then we have Dina.

Ruben Elberg

2    Q.    Dina you said?
3    A.    Yes, she's 30 years old and she's
4 married.
5    Q.    Where does Dina live?
6    A.    In Crown Heights.
7    Q.    But not with you?
8    A.    No.
9    Q.    The area of Brooklyn you live in,
10 what area is that?
11    A.    Crown Heights.
12    Q.    So the President Street address is
13 in Crown Heights?
14    A.    Yes.
15    Q.    Okay.
16    A.    Then we have Tsipora who is also a
17 teacher and she's living in Crown Heights as
18 well with us, and she's 30 years old.
19    Q.    You said she's a teacher?
20    A.    A teacher, yes.
21    Q.    And lives with you?
22    A.    With us in the house, yes.  She's
23 not married yet.
24    Q.    Is that everybody?
25    A.    Yes.

Ruben Elberg

2    Q.    There's not somebody named Shabtai?
3    A.    Shabtai is Mandel.  Shabtai
4 Menachem, he has three names.
5    Q.    What is your name?
6    A.    Ruben Elberg.
7    Q.    Do you go by any other names?
8    A.    No.
9    Q.    Have you ever gone by any other
10 name?
11    A.    No.
12    Q.    So --
13    A.    Do you have bottled water?
14        MR. BUCK:  He's looking for
15 unopened.
16        THE WITNESS:  I appreciate it.
17 Thank you so much.
18    Q.    Baruch is the youngest?
19    A.    Yes, sir.
20    Q.    He lives with you.  Does he go to
21 school?
22    A.    Yes, he goes to Yashiva.
23    Q.    Is there a tuition for that school?
24    A.    Yes, there is.
25    Q.    Who pays the tuition?

Ruben Elberg

2    A.    For the past two, three years,
3 unfortunately I have not been able to pay the
4 tuition, but I had a good track record in the
5 past years with Yashivas, and they have been
6 patient with me, so they have not been, you
7 know, throwing my kids out of school.
8    Q.    So you haven't paid tuition in
9 three years?
10    A.    Two and a half, three years, yeah.
11 It's unfortunate, but that's the reality.
12    Q.    And Channa?
13    A.    She's also in Yashiva.
14    Q.    Sorry?
15    A.    She's also in Yashiva, in girl's
16 Yashiva.
17    Q.    She lives with you but goes to a
18 girl's Yashiva?
19    A.    Yes.
20    Q.    Who pays her tuition?
21    A.    Also the same thing, the first year
22 maybe I paid a little bit, and the second year I
23 paid something towards it, but I haven't paid
24 anything in the past two years.
25    Q.    Levi and Ahron?

Ruben Elberg

2  A.    The same thing.
3  Q.    They live at home, they go to
4  Yashiva but you're not paying tuition?
5  A.    Unfortunately I'm unable to.
6  Q.    Yisrael?
7  A.    Yisrael, the same thing.
8  Q.    Yisrael lives at home, goes to
9  Yashiva, but you don't pay tuition?
10  A.    Yes, sir.
11  Q.    Moshe?
12  A.    Moshe same thing.  Moshe, the past
13  two years I haven't paid tuition, but the last
14  year now I paid some towards because he's out of
15  town Yashiva, so you have to pay something.  So
16  I paid some money towards the tuition, but I
17  still owe at least half of it, if not more.
18  Q.    So there's tuition and there's also
19  living expenses; is that right?
20  A.    That's part of it, that's all
21  inclusive.
22  Q.    How much is that on an annual basis
23  for Moshe for the last year?
24  A.    I committed to approximately 65 or
25  $6,000 completely.

Ruben Elberg

2  Q.    You committed, is that what they
3  charge or is that what you said you would pay?
4  A.    They generally charge, they wanted
5  eight, and I committed to six, and I paid some
6  of it, I didn't pay all of it yet.
7  Q.    Where did you get the money to pay
8  that?
9  A.    I had borrowed money twice in the
10  last two years because of the litigation, from
11  personal loans and interest and basically paid
12  legal expenses and other expenses that I've had
13  to maintain myself going forward.
14  Q.    Who loaned you the money and how
15  much?
16  A.    There was a friend whose name is
17  Shalom Bahr, and I think his fund is called
18  Kerem Menahem Fund, Kerem Menahem Trust, I
19  think.  I borrowed from him $350,000, interest
20  to be paid at the end of the two-year period,
21  and that would be like 420 by the time I have to
22  pay it back.
23  Q.    When is it due to be repaid?
24  A.    In about six months to a year.
25  Q.    From now?

Ruben Elberg

2  A.    Yes.
3  Q.    But you don't know exactly?
4  A.    I don't have the exact date.  I can
5  check.
6  Q.    You're going to owe how much, 400
7  some odd thousand dollars?
8  A.    420, I'm paying ten percent
9  interest a year which comes to 35,000 a year.
10  So if you multiply by two, that's 70,000.
11  Q.    Have you made any repayments yet?
12  A.    No.
13  Q.    When you say you have to pay him in
14  six months to a year, is that the entire
15  repayment --
16  A.    He knows --
17  Q.    Let me finish the question.  Is it
18  the first of a number of repayments?  I'm not
19  following what you're going to be doing in six
20  months to a year.
21  A.    I got the loan for litigation
22  purposes, and he is flexible with me.  He gave
23  me a two-year period, but he can extend it for
24  another year if it's necessary.  I'm in
25  discussions with him now, so there's no final

Ruben Elberg

2  date that I have right now.
3  Q.    Originally, did you sign a note?
4  A.    Yes, I did.  My house is good as a
5  guarantee.
6  Q.    Is there a due date on the note?
7  A.    Yes, there are two stages.  One was
8  250 and another hundred was given to me.  The
9  first loan was January, and the second loan was
10  September of 2016, so it was two years per.
11  Q.    So the first note is due if there's
12  no extension in January of 2018, and then the
13  next note is due --
14  A.    In September.
15  Q.    -- September of 2018; is that
16  correct?
17  A.    Yes.
18  Q.    You said you guaranteed with the
19  house, the house you live in?
20  A.    I gave him my house as a guarantee
21  to repay the loan because I have equity in the
22  house, so I gave him that as a guarantee.
23  Q.    Did you give him a mortgage on the
24  house?
25  A.    Yes, a second mortgage, I signed a

Ruben Elberg

2 note.

3    Q.    You say a few thousand of that
4 you've paid to the Westchester Yashiva?
5    A.    Yes.
6    Q.    You still owe them more money?
7    A.    Yes.
8    Q.    Shneur is in France you say?
9    A.    Yes.
10    Q.    Studying in Yashiva there?
11    A.    Yes.
12    Q.    Who is paying for that?
13    A.    That's also a similar situation as
14 Moshe. I paid some of it, I owe substantial
15 money toward Yashiva tuition. And he's back and
16 he won't be going back because I don't have the
17 means to continue the Yashiva there, I don't
18 have the money to keep the payments up.
19    Q.    He's home now?
20    A.    He came back yesterday, so he will
21 be staying for now.
22    Q.    How long was he in France for?
23    A.    Just one year.
24    Q.    How much did you pay for that?
25    A.    That would be in the seven or

Ruben Elberg

2 $8,000 range plus travel expenses with the
3 tickets back and forth. And I didn't pay it in
4 full. I still owe money towards that as well.
5    Q.    You paid seven or eight or you owe
6 seven or eight?
7    A.    The amount was, I believe, eight or
8 nine if I remember correctly, and I paid maybe
9 six towards it, five and a half.
10    Q.    Where did you get that money from?
11    A.    Part of the loan that I borrowed
12 before.
13    Q.    The moneys that you got from the
14 loans, you got the proceeds from them. What did
15 you do with the proceeds when you first received
16 each of those loans?
17    A.    I paid some of it in legal fees.
18 Some of it I paid old debts that I had accrued
19 before I had from someone else, I paid that off.
20 And some of it I paid for ongoing expenses that
21 I had.
22    Q.    That's not what I meant. Let me
23 clarify. When you got the first loan, the first
24 loan was how much?
25    A.    250.

Ruben Elberg

2    Q.    When you literally got the money,
3 did you put it in a bank or was it in cash, how
4 did you get it?
5    A.    I put it in a bank. I didn't get
6 it in cash, of course not.
7    Q.    Was it a check?
8    A.    Check.
9    Q.    Where did you deposit the check?
10    A.    To my recollection, my account, my
11 personal account.
12    Q.    Where is that?
13    A.    Capital One.
14    Q.    Any other account that you have,
15 any other bank accounts that you have?
16    A.    I might have deposited it in a
17 business account.
18    Q.    I'm sorry?
19    A.    In a business account.
20    Q.    You might have deposited that money
21 in a business account?
22    A.    Or a portion of it. I can't be
23 sure now exactly where I deposited it. Some of
24 it I deposited in personal, some of it I
25 deposited in business. I can get that

Ruben Elberg

2 information for you if it's necessary.
3    Q.    Where was that business account?
4    A.    It was in Capital One.
5    Q.    Both accounts are in Capital One?
6    A.    Yes, and then I have another
7 business account in Bank of America.
8    Q.    So we're talking three accounts
9 now?
10    A.    Yes. It's a business account.
11    Q.    The account that you said, the
12 personal account, is that in your name?
13    A.    Yes, I supplied the personal
14 account information to you.
15    Q.    That's in the name of Ruben Elberg?
16    A.    Yes.
17    Q.    Anybody else a signatory on that?
18    A.    No.
19    Q.    Just you?
20    A.    Yes.
21    Q.    The business account at Capital
22 One, whose name is that in?
23    A.    Business account, Capital One, it's
24 in my name.
25    Q.    Ruben Elberg?

Ruben Elberg

1
2    A.    Three accounts are the Capital,
3 those are Merill, Spindle and Jerub, those are
4 in Capital One.
5    Q.    J-E-R-U-B, Merill and Spindle.  All
6 right, let's take this a little more slowly.
7 You got 250, $250,000 in a check?
8    A.    Yes.
9    Q.    When was this?
10    A.    January of 2016.
11    Q.    And you took that check and you
12 deposited it where?
13    A.    Into a business account, business
14 account.
15    Q.    Which business account?
16    A.    N. Minue, Inc.
17    Q.    N. Minue, Inc., N. M-I-N-U-E, Inc.
18 Where was that account?
19    A.    It was, one was in Capital One and
20 I had also in Bank of America.
21    Q.    Which of those two accounts did you
22 deposit that $250,000 check in?
23    A.    I don't remember.  I believe it
24 should have been -- I don't have the exact
25 information.  I would have to check back and

Ruben Elberg

1
2 give you that information.
3    Q.    Where would you check?
4    A.    The bank, which bank account I
5 deposited it in and how much and when, I would
6 have to check it.
7    Q.    When you said you would check in
8 the bank, what does that mean?
9    A.    I have to check which deposits were
10 made in which banks.
11    Q.    I know that.  How would you do
12 that, would you go to a document, would you ask
13 somebody, how would you find out?
14    A.    I would go to the bank.
15    Q.    You would literally physically go
16 to the bank and ask them?
17    A.    Or look at my statements and see
18 where the deposits would be.
19    Q.    So you do have statements for your
20 bank accounts, correct?
21    A.    Do I have statements from the bank
22 accounts, yes, I do.
23    Q.    Where do you keep those?
24    A.    I have them in my home, I believe.
25    Q.    I mean, do you have them in a

Ruben Elberg

1
2 special place like a file cabinet, do you keep
3 them all together in an organized way?
4    A.    I wouldn't say, it's not the most
5 organized way.
6    Q.    You would be able to find them
7 without much trouble if you needed to?
8    A.    I can always get a copy if I need
9 to.
10    Q.    I know that, but if you have it
11 somewhere in your home, you know where to go to
12 look to find it, correct?
13    A.    Again, I don't have it in an
14 organized way.  I have to look for it.  If it's
15 in my home, I will give it to you.  If it's not,
16 I will locate it and give it to you.  I will get
17 a copy from the bank.
18    Q.    It's not a big deal to do?
19    A.    It's something that I would have to
20 do.
21    Q.    But you would be able to do it
22 easily, correct, you can get me those
23 statements, correct?
24    A.    I will work on it.
25    Q.    That's not my question.  My

Ruben Elberg

1
2 question is, is it difficult for you to get
3 these bank statements for me?
4    A.    Why would you say it's difficult?
5 I don't understand the question.
6    Q.    I'm asking if you think it's a
7 difficult task to get these bank statements.
8    A.    No, I don't think so.
9    Q.    So you would have to do that in
10 order to tell me which of the accounts, which of
11 the business accounts you deposited the $250,000
12 check into, correct?
13    A.    Right.
14    Q.    The loan that you took out, was it
15 taken out in the name of some business or in
16 your individual name?
17    A.    I gave a personal guarantee.  He
18 gave it to me on my personal name.
19    Q.    So the note you signed was you as
20 an individual, not on behalf of N. Minue or any
21 other entity, correct?
22    A.    I don't believe so, no.
23    Q.    Whatever account you put it into,
24 how much of that $250,000 is still available to
25 you somehow?

Page 26

Ruben Elberg

1
2    A.    I have $4,000 in the account.
3    Q.    I'm not asking about the account.
4  I'm asking about the sum of money.  You had
5  $250,000, you deposited it into some account.
6  Whatever happened to the money, whether it moved
7  to other accounts or you used it, how much of
8  that sum is left to you available today?
9    A.    $4,000.
10    Q.    So you've paid 246,000 of it to
11  various --
12    A.    Yes.
13    Q.    -- payees?
14    A.    Yes.
15    Q.    And you've told me that you used
16  some to pay legal fees; is that right?
17    A.    Yes.
18    Q.    Do you know how much of that
19  246,000 went to legal fees?
20    A.    I have to get a record from my
21  lawyer to see how much I paid which law firm and
22  when.
23    Q.    Do you have any idea how much?
24    A.    I would say more than $300,000.
25  Remember, I told you I took an additional

Page 27

Ruben Elberg

1
2  $100,000, so I would say more than $300,000 has
3  gone to legal fees.
4    Q.    I just want to know about that 250,
5  where it went.  I would assume most of it had to
6  go to legal fees?
7    A.    Most of the money went to legal
8  fees.
9    Q.    Which law firm did it go to?
10    A.    It went to Kaye Scholer, Levi
11  Huebner & Associates.
12    Q.    What was it?
13    A.    Kaye Scholer, Levi Huebner &
14  Associates, some to Abrams & Fensterman.  Again,
15  I'm telling you this is all including the
16  additional funds I took.
17    Q.    Because you can't divide in your
18  mind exactly how much you sent to each of one, I
19  understand.
20    A.    Yes.
21    Q.    Anybody else?
22    A.    Those are the three legal firms
23  that I associated with.
24    Q.    Are they all three still your
25  lawyers?

Page 28

Ruben Elberg

1
2    A.    Two of them are.  One of them I
3  would say partially still advises me.
4    Q.    So they're all still your lawyers?
5    A.    Yes.
6    Q.    Any other law firm besides those
7  three?
8    A.    No.
9    Q.    I know you can't tell me exactly
10  between the two loans, but where else did the
11  money go besides you told me law firms, and you
12  used it to pay for Shneur, sorry, I can't
13  pronounce his name.
14    A.    Shneur.
15    Q.    Shneur, his expenses in France,
16  Yashiva and so on?
17    A.    Yes.
18    Q.    Did you use some of that money to
19  pay for some of the other Yashivas you've talked
20  about?
21    A.    Just a minor portion, yes.
22    Q.    Anything else that money was used
23  for?
24    A.    Well, my wife works, so we don't
25  have enough income.  So if there's anything to

Page 29

Ruben Elberg

1
2  offset the living expenses that we need, I used
3  some of it towards that.
4    Q.    Did any of it go to Capital One to
5  reduce the judgment that Capital One has against
6  you?
7    A.    No, I made multiple efforts to meet
8  with Capital One because I have over $100,000
9  sitting in the bank account.  I wanted to offer
10  to pay those funds in the three corporations,
11  and Capital One refused to meet me.
12         They actually not only refused to
13  meet but they colluded with my sister in order
14  to deny me my right to access my bank accounts
15  and be able to function properly, to be able to
16  pay my bills.
17    Q.    The second $100,000 installment of
18  the loan, of the second loan, I'm not sure if
19  it's a second loan, did you get that in cash or
20  a check?
21    A.    Check.
22    Q.    What did you do with that check?
23    A.    The same thing.
24    Q.    You deposited it?
25    A.    I deposited it in the bank.

8 (Pages 26 - 29)

Page 30

Ruben Elberg

2  Q.    Which bank account did you deposit
3  it in?
4  A.    I would have to check, I don't
5  remember exactly.
6  Q.    You would have to check the bank
7  statements you have at home?
8  A.    Yes.
9  Q.    Again, that was used, as far as you
10  know, for paying legal fees --
11  A.    Yes.
12  Q.    -- and some other expenses; is that
13  right?
14  A.    Yes.
15  Q.    You just mentioned $100,000 sitting
16  in three accounts?
17  A.    Yes.
18  Q.    Or an account for three companies,
19  I couldn't quite get what you said.
20  A.    Yes, Merill, Spindle and Jerub has
21  been accruing income from the medallions in the
22  taxi corporations, and I made an attempt to meet
23  with Capital One.  Judge Catterson reached out
24  to meet with them, to set up a meeting and try
25  to work something out.

Page 31

Ruben Elberg

2  Q.    What's the name?
3  A.    James C-A-T-T-E-R-S-O-N.
4  Q.    The money that's sitting in those
5  accounts, you're talking about that's income
6  from medallions owned by those entities?
7  A.    Correct.
8  Q.    That's the money that you were
9  going to, you were proposing if you were able to
10  meet with Capital One to pay to Capital One?
11  A.    Pay and also negotiate some kind of
12  a direction of resolution with these judgments
13  because, you know, it's very difficult to
14  function under a scenario where you have my
15  sister saying she owns the assets of, not she,
16  but the estate owns the assets of Jerub, Spindle
17  and Merill, but the liabilities are mine.
18  And basically she's taking the
19  position that those companies belong to the
20  estate, and I have to pay the judgments on these
21  accounts.
22  Q.    Because you guaranteed their debt,
23  correct?
24  A.    Not only because I guaranteed it,
25  but I actually borrowed money from these

Page 32

Ruben Elberg

2  medallion companies, and I paid investments in
3  other businesses.  I have that money, the money
4  that's owed us that was sold, and the money is
5  available to be repaid but it's stuck in this
6  unfortunate mess that we're in.
7  Q.    Now, you say you borrowed money
8  from these entities.  You're talking about the
9  entities that own the medallions?
10  A.    Merill, Spindle and Jerub.
11  Q.    So we don't have to say Merill,
12  Spindle and Jerub every time, can we call them
13  the medallion companies?
14  A.    Yes.
15  MR. McCARTHY:  I want to object.
16  Potentially there may be confusion among
17  other medallion companies, but for now you
18  can do it.
19  A.    I would say Spindle and Merill are
20  solely owned by me, so I would rather focus when
21  I speak about my total ownership with that, and
22  Jerub is owned 50/50 with my father.  One of
23  those cabs have to be associated with the other
24  company that you just mentioned.
25  Q.    That's fine.  Any time it becomes

Page 33

Ruben Elberg

2  important to distinguish, please do so.  We
3  don't have to use a definition to override what
4  you think the facts are.
5  So you said you borrowed money from
6  these entities, these medallion entities.  Which
7  of them did you borrow money from?
8  A.    Spindle, Merill and Jerub.
9  Q.    All three?
10  A.    All three, yes.
11  Q.    When did you do that?
12  A.    From 2003 through 2012 when we
13  started diversifying into the real estate
14  sector.
15  Q.    So from 2003 to 2012, you borrowed
16  money from each of those entities?
17  A.    Yes.
18  Q.    How did you do that?
19  A.    We refinanced with Capital One, and
20  we took some equity out and we invested it in
21  real estate.
22  Q.    So you took equity out?
23  A.    Yes.
24  Q.    But you view that as a loan from
25  the company to you or as a capital distribution?

9 (Pages 30 - 33)

Ruben Elberg

1
2    A.    No, it was a loan, it was loans.
3    Q.    How much did Merill loan you?
4    A.    In total from 2003 to 2014, Merill,
5 Spindle and Jerub lent $2,450,000 roughly.
6    Q.    It lent that to you?
7    A.    Lent, lent it to me, and my father
8 was handling actually the finances.  So we made
9 those investments, we deposited them either in
10 their own accounts directly, Mandel, Spindle or
11 Jerub.
12        I can tell you the way the money
13 was used, or it was deposited directly into the
14 Royal One Real Estate Account or Royal Real
15 Estate Management account, or it was directly
16 wired to Rosenthal & Rosenthal who was a lender
17 on some of those properties.
18        For example, a million dollars in
19 2011, 2012 was directly wired to pay a loan down
20 on these two entities that I just described,
21 RORE and RREM.  Let's just abbreviate the
22 companies, Royal One Real Estate will be
23 abbreviated to RORE and Royal Real Estate
24 management will be abbreviated to RREM, R-R-E-M.
25    Q.    You said you borrowed the money.

Ruben Elberg

1
2 Is there a loan agreement between you and these
3 entities?
4    A.    Yes.
5    Q.    Do you have a copy of that?
6    A.    Yes, the Capital One, the last 2012
7 loan agreement, we have it, sure, we can supply
8 it.
9    Q.    No, no, the loan from Merill,
10 Spindle and Jerub to you of $2,450,000?
11    A.    No.
12    Q.    You said you borrowed money from
13 these entities.
14    A.    We borrowed it from Capital One.
15    Q.    The loans, there were loans made to
16 each of these medallion owning entities by
17 Capital One, correct?
18    A.    Correct.
19    Q.    You said, and tell me if this is
20 not what you meant, that then you borrowed
21 money, you took money out --
22    A.    We took money out.
23    Q.    Who is we?
24    A.    My father and me because Jerub is
25 owned by Jacob and Ruben.

Ruben Elberg

1
2    Q.    But as far as Merill and Spindle
3 go, you're the only owner?
4    A.    Correct.
5    Q.    So you took a loan from each of
6 those entities?
7    A.    Correct.
8    Q.    So you have three loans?
9    A.    Correct.
10    Q.    Is there any loan documentation, a
11 loan agreement or any other documents --
12    A.    No.
13        MR. McCARTHY:  Let him finish his
14    question.
15    A.    I apologize.
16    Q.    That's all right.  Otherwise, if we
17 speak over each other, it's not going to come
18 out in the transcript.
19    A.    Please finish.
20    Q.    Is there any document reflecting
21 the loan between those entities and you and in
22 one case those entities between you and your
23 father?
24    A.    No.
25    Q.    Who made the decision to borrow

Ruben Elberg

1
2 money from Merill?
3    A.    I did.
4    Q.    Who made the decision to borrow the
5 money from Spindle?
6    A.    I did.
7    Q.    And who made the decision to borrow
8 the money from Jerub?
9    A.    Jacob and I.
10    Q.    So you owe each of those entities
11 moneys to pay back those loans?
12    A.    Yes, sir.
13    Q.    When is that due?
14    A.    There was a problem that created
15 the dispute between my sister and myself.  The
16 problem is very simple, in 2001 when we changed
17 accountants, my father found a new accounting
18 firm.
19        He was running the taxi medallion
20 business, and he was operating it, and I gave
21 him power of attorney to do everything, he was
22 signatory on the bank accounts.
23        I was not involved day to day with
24 those operations.  I was handling the real
25 estate end of the operations.  So what happened

Page 38

1          Ruben Elberg
2 was, when we changed from one accounting firm to
3 another, the new accountant filed all the tax
4 returns under Jacob Elberg 100 percent owner.
5          When we were borrowing money, it is
6 reflected in the tax return as if Jacob borrowed
7 the money from Spindle, Merill and Jerub as 100
8 percent owner, but all the loan documents and
9 everything else, I borrowed it.  I signed for
10 it, I personally guaranteed for it.
11          Jacob also personally guaranteed
12 the companies I owned because he was running it,
13 and the money was being processed through JEB
14 Management.
15          And because he was in control of
16 the moneys, Capital One made JEB Management as
17 an additional guarantor and Jacob Elberg as an
18 additional guarantor on all those loans.
19          But I'm not a guarantor on any of
20 Jacob Elberg's other medallion loans.  He was a
21 guarantor on mine.
22      Q.    That's not my question.  My
23 question is when is the money that was borrowed
24 by you from Merill and Spindle and borrowed by
25 you and your father from Jerub, when is that due

Page 39

1          Ruben Elberg
2 to be paid back to those entities?
3      A.    It was due to be paid back after a
4 refinancing of the hotel project that we were
5 going to stabilize or a sale of the hotel
6 project that we were going to stabilize.
7      Q.    Is there anything in writing that
8 says that's when it's due back?
9      A.    No.
10      Q.    Is there an interest rate?
11      A.    The accountant was imputing two
12 percent interest in the tax returns.
13      Q.    How do you know that?
14      A.    I know that.
15      Q.    But how do you know that?
16      A.    The accountant told me.
17      Q.    Which accountant is that?
18      A.    Fred Roth.
19      Q.    Who negotiated the loan on behalf
20 of Merill?
21      A.    What do you mean by that?  Please
22 clarify.
23      Q.    Who took Merill's interest into
24 account and said I'm going to loan you money, to
25 you Ruben?

Page 40

1          Ruben Elberg
2      A.    I don't understand who would
3 negotiate that.  I don't understand what you're
4 saying.
5      Q.    Did anybody take Merill's side of
6 that discussion and the decision from Merill to
7 loan you Ruben Elberg money?
8      A.    No.
9      Q.    That was just you, right?
10      A.    Yes.
11      Q.    You just made the decision all on
12 your own?
13      A.    Yes.
14      Q.    You took money out and you decided
15 there would be a loan?
16      A.    I borrowed money from my
17 corporation, and my father borrowed from his
18 corporation, and actually we did capital
19 contributions into the RORE and RREM.
20          And from there they were to be
21 capital contributions to Royal CP and Royal HI
22 entities.
23      Q.    But my question is, who decided
24 that it would be, for example, in the form of a
25 loan as opposed to a distribution of equity?

Page 41

1          Ruben Elberg
2      A.    My father and I, we discussed it
3 and we said that we were going to take this as a
4 loan and then repay it back when we could to the
5 companies.
6      Q.    Why did you decide it would be a
7 loan as opposed to an equity distribution?
8      A.    I don't remember the reason behind
9 it, but it was to be paid back to those
10 companies.
11      Q.    You said in a prior answer that
12 Capital One colluded with your sister.  What
13 evidence do you have of the collusion?
14      A.    My sister had a tendency to record
15 people, and she basically recorded Mark
16 Gallagher who was Capital One Bank's lawyer
17 basically.  I have a transcript of it, I
18 submitted it in the case, and it's --
19      Q.    Any evidence you had of what you
20 call collusion you submitted to the court; is
21 that right?
22      A.    I'm sorry?
23      Q.    Any evidence that you have of what
24 you call collusion, did you submit that to the
25 court in opposition to the summary judgment

11 (Pages 38 - 41)

Ruben Elberg

1     motion made by Capital One?
2
3     A.    Yes, I did.
4         MR. McCARTHY:  Sorry, can you just
5     read back the question, and I want to make
6     sure the answer is correct.
7         (The record was read.)
8         MR. McCARTHY:  Thank you.
9     Q.    So there's no other facts or what
10    you would think of as evidence of this collusion
11    that you could point me to, other than what's
12    already been submitted to the court?
13    A.    There is an appeal on this case
14    that is going to be perfected by the 29th of
15    this month.  So that's going to be filed by the
16    29th, and we'll see what happens.
17    Q.    That's not my question.  My
18    question is, do you have any other facts you can
19    point me to other than something --
20    A.    I'm not going to get into the
21    details of that litigation.
22    Q.    Let me finish the question.  Do you
23    have any other fact which you can point me to,
24    other than what you've already submitted to the
25    court, not a legal argument, any other fact of

Ruben Elberg

1
2     what you call collusion?
3     A.    I choose not to go into that aspect
4     because I'm not ready for it, for the discussion
5     at this moment.  My mind is not settled with
6     those details right now.
7     Q.    Who is your lawyer on that case?
8     A.    I'm pro se right now.
9     Q.    Do you get statements of the
10    Merill, Spindle and Jerub accounts where this
11    money has been building up?
12    A.    Yes.
13    Q.    I'm sorry, where are those
14    accounts?
15    A.    Capital One.
16    Q.    So you're aware of how much is
17    sitting in each one?
18    A.    Yes.
19    Q.    Do you know roughly how much is
20    sitting in there right now?
21    A.    I would say around 120,000 between
22    the three accounts, if not more.
23    Q.    That is income paid by --
24    A.    Jerub, Spindle --
25        MR. McCARTHY:  You just have to let

Ruben Elberg

1
2     him finish his question.
3         THE WITNESS:  I thought he was
4     finished, I apologize.
5         MR. McCARTHY:  I'm sorry.
6         MR. FORSTOT:  Thanks.
7     Q.    The income that goes into that
8     account is from running the medallions, right?
9     A.    Yes, sir.
10    Q.    Who pays the money into each of
11    those accounts?
12    A.    Napersay Management is one, and if
13    you give me a minute, I'll tell you the exact
14    names, I apologize.
15        THE WITNESS:  Is that okay?
16        MR. McCARTHY:  He just wants to get
17    the spelling.
18        MR. FORSTOT:  That's fine.
19    A.    It will take me a minute because I
20    shut this off.
21    Q.    That's all right.  All you're
22    trying to do is get the spelling of Napersay?
23    A.    The two companies we get rental
24    income from, that's what I'm searching.
25    Q.    You can do that at a break and add

Ruben Elberg

1
2     that.  There are management companies to whom
3     Merill, Spindle and Jerub lease the medallions;
4     is that right?
5     A.    Right.  Merill and Spindle are
6     leased with one organization, and Jerub is
7     leased to Napersay Management.
8     Q.    Is there a set monthly amount that
9     gets deposited from running the medallions?
10    A.    Yes.
11    Q.    How much is it?
12    A.    Right now it's 1,600.
13    Q.    Per medallion per month?
14    A.    Per medallion per month.
15    Q.    Is that the money that has created
16    this hundred and some odd thousand dollars?
17    A.    Yes, sir.
18    Q.    And is there any other income that
19    those entities have besides those rental
20    amounts?
21    A.    No, they don't.
22    Q.    Those leases, how long do they run
23    for?
24    A.    They are two- to three-year lease
25    agreements and, you know, they have an option in

Ruben Elberg

1
2 the lease where they can, if the market
3 conditions are not proper, originally these
4 leases, we were generating $3,500 a month per
5 medallion. And they started dropping, dropping
6 to a point where it's reached 1,600.
7        So they have a way where they can
8 renegotiate with us. They will give us three
9 months and they return to us the medallions, if
10 we don't agree to the negotiated terms.
11    Q.    Who is managing those medallion
12 entities today?
13    A.    I just told you, I can give you --
14    Q.    I don't mean the managing
15 companies. Let's say there's a renegotiation or
16 a discussion about the medallion lease rates
17 between whatever company it is and any of the
18 three medallion entities, who talks to these
19 companies on behalf of the medallion entities?
20    A.    I was speaking to them until about
21 a year ago, and a year ago, I think less than a
22 year ago --
23        THE WITNESS: Excuse me.
24        (Witness and counsel confer.)
25    A.    Recently one of the management

Ruben Elberg

1
2 companies, my two companies told me that
3 Pewzner's lawyer told her not to communicate
4 with me any more under any negotiation terms,
5 and to speak with Tamara in reference to those
6 negotiations, because they had sent me a letter
7 that they were returning those medallions to me
8 because the market was not, you know,
9 sustaining, they were paying me 2,500.
10        And when they sent me a letter, I
11 said okay, I'll take them back because I had
12 someone else who was willing to give us in the
13 2,000, $2,200 range. This was like six months
14 ago, maybe more.
15        At that time, I was waiting for
16 them to return the asset so I could give it to
17 the new company which I had preliminary
18 discussions with.
19        And my sister's lawyer interjected
20 and told them not to give the taxicabs back, and
21 they renegotiated the terms to 1,600 without my
22 permission.
23        Now, I could start another
24 litigation with these people, but I just don't
25 have the means to litigate with all these

Ruben Elberg

1
2 people. So I asked my lawyer to be in contact
3 with them to see how we can work something out
4 without -- I can't have my sister setting the
5 terms on my medallions with what income I'm
6 going to get, because I have obligations to
7 Capital One and I can't do that. She
8 interjected again like everywhere else to try to
9 undermine my ownership.
10    Q.    Is there a court order that says
11 that she's got the right to do that as opposed
12 to you?
13    A.    No, there is no such court order.
14        THE WITNESS: Brian, can you
15 explain the court order because I'm not
16 legally savvy with what court orders there
17 are.
18        MR. McCARTHY: We're here for your
19 deposition, so if you don't understand it,
20 that's fine.
21    Q.    Other than receiving income and
22 negotiating lease rates, is there anything else
23 that needs to be done with regard to those
24 entities as far as management of the companies
25 go?

Ruben Elberg

1
2    A.    No, these are management companies.
3 They do everything from A to Z.
4    Q.    Do they file tax returns for each
5 of the entities?
6    A.    No, they do not.
7    Q.    Who does that?
8    A.    JEB Management, my father and I.
9 Unfortunately, that's where the problem started.
10 So in 2013, I found out that the tax returns
11 were being written as my father as 100 percent
12 owner, I challenged the accountant.
13        I said why are you doing this, you
14 knew Mark Gallagher was clearly saying these are
15 the assets. He said I'm sorry, I didn't know.
16 From now on going forward, we're going to
17 correct it.
18        I said I don't want to do it going
19 forward. Now it's 2013, tax returns have to be
20 filed. I want to file it the correct way.
21        He said no, I can't do that, I've
22 already done, it's done and I can't change it
23 and the next year we're going to do it the way
24 you want it.
25        I said I don't want to file

13 (Pages 46 - 49)

Ruben Elberg

1 
2 anything for 2013. I wrote him a letter from my
3 lawyer not to file those returns as a mistake in
4 the past.
5       And my lawyer asked him, he had
6 claimed that Jacob Elberg had given him
7 authority for E-filing, and my lawyer asked him
8 to give him the E-filing notices for Spindle,
9 Merill and Jerub that Jacob owns 100 percent,
10 and he could not deliver on his words, whatever
11 he said that Jacob gave him that authority and
12 direction.
13       So I believe he never got that
14 authority from my father. My father never
15 claimed those assets to be his. He signed
16 papers to the contrary of what my sister is
17 claiming, and I just don't understand what I'm
18 facing these challenges with. But I'm trying to
19 work this through with the legal system. It's
20 very costly and time consuming.
21    Q.    Joseph Elberg, Josef Elberg, he's
22 in Los Angeles?
23    A.    Yes, he was sent by the Yashiva as
24 an emissary. So that expense, there is no
25 tuition there on my part, and even his travel

Ruben Elberg

1 
2 expenses is paid by the Yashiva because he is
3 sitting in a hall, and he's basically helping
4 younger students with their learning process.
5    Q.    Does he get paid for that?
6    A.    No.
7    Q.    But his expenses are covered. He's
8 coming back you said from LA?
9    A.    Yes.
10    Q.    Is he going to continue to work in
11 that role where he gets his expenses covered?
12    A.    Probably, probably. He's just
13 finishing his rabbinical ordination.
14    Q.    What about David Elberg?
15    A.    David Elberg is finishing, he's
16 also finished his rabbinical ordination, and
17 he's going to be starting out on his life now.
18 He's going to start.
19    Q.    He's been in the Yashiva for the
20 last two to three years?
21    A.    Yes.
22    Q.    Who's been paying for that?
23    A.    He had the same circumstances like
24 Josef where he was an emissary for the last two,
25 three years in Yashivas, and he was not paying

Ruben Elberg

1 
2 anything. His expenses were being paid by the
3 Yashiva.
4    Q.    You say Mandel is married?
5    A.    Yes.
6    Q.    He's living elsewhere in Crown
7 Heights?
8    A.    Yes.
9    Q.    Miriam lives at home with you?
10    A.    Yes.
11    Q.    She's a teacher?
12    A.    Yes.
13    Q.    She gets paid for that?
14    A.    Yes.
15    Q.    Does she use that money to support
16 you and your children?
17    A.    Yes, she helps us.
18    Q.    Your other children?
19    A.    Yes, she helps us a little.
20    Q.    And Shterna?
21    A.    Shterna is married.
22    Q.    She lives elsewhere?
23    A.    She lives elsewhere.
24    Q.    Dina is married and lives
25 elsewhere?

Ruben Elberg

1 
2    A.    Yes.
3    Q.    Tsipora is married and lives at
4 home?
5    A.    Yes.
6    Q.    She's also a teacher?
7    A.    Yes.
8    Q.    She gets paid for doing that?
9    A.    Yes.
10    Q.    Does she use part of that income to
11 support you and your other children?
12    A.    Yes.
13    Q.    You said your wife works?
14    A.    She's a teacher.
15    Q.    She gets paid for that?
16    A.    Yes.
17    Q.    How much?
18    A.    Less than 2,000 a month, around
19 that range.
20    Q.    Where does she work?
21    A.    Beth Rifka schools in Crown
22 Heights.
23    Q.    How long has she worked at that
24 school?
25    A.    The past year.

Page 54

Ruben Elberg

1
2    Q.    So that's a new job?
3    A.    She did part-time work before and,
4  you know, recently we needed the income so she
5  went out and started working.
6    Q.    You said it's $2,000 a month?
7    A.    Approximately.
8    Q.    What about you, do you work?
9    A.    No, I do not.
10    Q.    You don't have a job?
11    A.    No, I do not.
12    Q.    What are your monthly expenses for
13  you and all your children you support?
14    A.    I have rent which is about, it's
15  not rent, I apologize, it's a mortgage.  I have
16  a $400,000 mortgage on the house, and that's
17  about $2,600 per month for mortgage.  I have
18  electric, gas, you know, basic household
19  expenses, another five, $600 a month,
20  approximately.
21    Q.    And you need food?
22    A.    We have food stamps.
23    Q.    You qualify for food stamps?
24    A.    Yes.
25    Q.    Have you ever had a job?

Page 55

Ruben Elberg

1
2    A.    Yes.
3    Q.    What jobs have you had?
4    A.    I worked in the beginning of my
5  career, I was a gemologist and mineralogist.  I
6  worked in the diamond district as a gemologist.
7    Q.    Do you have some certification in
8  that area?
9    A.    I'm a certified gemologist.
10    Q.    Okay, go ahead.
11    A.    Thereafter I worked five years with
12  my father in the taxi industry.
13    Q.    In the taxi industry?
14    A.    Managing the day-to-day operations
15  of the medallions.  It wasn't always leased to
16  third parties like it is now.
17    Q.    Any other jobs you've had?
18    A.    I had a restaurant at one time.
19    Q.    You owned a restaurant?
20    A.    Yes.
21    Q.    When was that?
22    A.    '93 to 2000.
23    Q.    You sold that business?
24    A.    We got out of the business.  It was
25  not profitable.

Page 56

Ruben Elberg

1
2    Q.    Go ahead, so you managed the
3  restaurant, is that what you did?
4    A.    I was a partner in one of the
5  restaurants.
6    Q.    Did you actually manage it?
7    A.    Yes, I worked there day to day.
8    Q.    Go ahead, any other jobs?
9    A.    In 2001 roughly we started
10  diversifying into real estate, trying to find
11  investment opportunities in real estate, and
12  tried to build a portfolio in real estate.
13    Q.    You managed that?
14    A.    My father and myself.
15    Q.    You said you were managing, what
16  were you managing?
17    A.    I was finding the assets, doing all
18  the approvals that were needed, if it was a
19  development site, raising capital, everything
20  that needed to be done day-to-day to bring the
21  project to fruition I was handling.
22    Q.    Any other jobs?
23    A.    No.
24    Q.    Have you attempted to go back to
25  work as a gemologist?

Page 57

Ruben Elberg

1
2    A.    I've looked into it, and all the
3  people in the diamond industry are telling me
4  don't waste your time, this is not an industry
5  that you want to go back into.
6    Q.    Have you looked for a job in any
7  way recently in the last couple of years?
8    A.    I'm contemplating going into
9  brokerage because I do know the real estate
10  sector very well, and I'm working on getting a
11  license there.  I'll see if that succeeds.
12    Q.    Is there some kind of course?  How
13  do you get a license?
14    A.    There are two stages.  One is
15  either you're a salesman and then you become a
16  broker, or if you have had or you still have
17  real estate holdings or interests in real estate
18  holdings, you can get a broker's license without
19  having to go through the steps of being a
20  salesman and then going to brokerage.
21    Q.    Where are you in that process?
22    A.    In the beginning stages.
23    Q.    Have you gotten any income from the
24  real estate business other than when you were
25  working with your father?

15 (Pages 54 - 57)

Ruben Elberg

1
2    A.    No.
3          MR. FORSTOT:  We've gone about an
4   hour or so.  Do you want to take a
5   five-minute break?
6          MR. McCARTHY:  That's fine.
7          (A recess was taken.)
8          (Subpoena duces tecum was hereby
9   marked as Plaintiff's Exhibit 3 for
10  identification, as of this date.)
11   A.    Weiling Management.
12   Q.    Weiling, how do you spell that?
13   A.    W-E-I-L-I-N-G, Management and the
14  principals are Rod and Steve Newman.  I'm having
15  a problem with Napersay Management.
16          I'll tell you what it is.  My
17  sister negotiated the deal terms with Napersay
18  Management, and that was negotiated at $2,500
19  per month, and all the funds were supposed to go
20  into the Jerub account at Capital One.
21          Only a small portion, a third of
22  those funds are going into the mutual account
23  that my mother and I have, and the balance of
24  the money she redirected into another account
25  that I have no understanding or knowledge of

Ruben Elberg

1
2   where it is.
3          That is moneys that belong to
4   Jerub, and I have personal liabilities, as I see
5   her here, being challenged by Capital One.
6          I just don't have the means to
7   litigate about every little thing with
8   everybody, you know what I mean.  But I want to
9   be clear that there are funds that are being
10  diverted by Pewzner from Jerub that I have no
11  knowledge of where it's going.
12          So the full 2,500 that the lease
13  agreement was agreed to is not being deposited
14  into the account, and I don't know where the
15  money is going.
16   Q.    How do you know that it's being
17  diverted?
18   A.    Because I looked at the account and
19  I see the amount that's being deposited, and
20  it's not the full amount that we're supposed to
21  get.
22   Q.    Do you see money going out of the
23  account?
24   A.    I just don't see the money coming
25  in.

Ruben Elberg

1
2    Q.    You used the name Pewzner, and
3   that's your sister?
4    A.    Tamara Pewzner, she's my
5   co-executor.
6    Q.    And your sister?
7    A.    Yes.
8    Q.    I just want to clarify something.
9   Earlier I had asked you how much of the $250,000
10  was left, still available to you, and you said
11  about $4,000.
12          Now I just want to make sure I get
13  the whole $350,000 amount that you borrowed.
14  How much of that whole amount is left and
15  available to you somewhere?
16   A.    $4,000.
17   Q.    So it's the same 4,000?
18   A.    Yes.
19   Q.    So out of $350,000, 346,000 is out
20  the door, being used to do something?
21   A.    Yes.
22   Q.    Being used to pay legal fees and
23  other things you testified about?
24   A.    Yes, yes.
25   Q.    Your deposition was originally

Ruben Elberg

1
2   noticed for a subpoena of March 7th and you
3   didn't show up.  Why didn't you show up?
4    A.    I had counsel communicating --
5          MR. McCARTHY:  Sorry, I don't want
6     him to disclose any communications he had
7     between his counsel and himself.  Other
8     than conversations, please do not state any
9     communications you had with counsel.
10          THE WITNESS:  All right.
11   A.    There was a demand that was sent to
12  me, the response was supposed to be 2107, not
13  2017.  So the year was 2107, I don't know if it
14  was on the deposition or one of the other
15  documents that you requested some response on
16  it.  The date was 100 years later, so I just
17  didn't think it was timely.
18          You weren't asking me to come at a
19  certain time and date.  I don't remember which
20  one of those documents was there, and I was not
21  ready for whatever reason and I'm here now.
22   Q.    It's your testimony under oath,
23  sir, that because the date was 2107, you didn't
24  have to comply with the subpoena for 100 years?
25   A.    No, that's not my testimony.

16 (Pages 58 - 61)

Ruben Elberg

1
2    Q.    So the date had nothing to do with
3 it, did it --
4         MR. McCARTHY:  Objection.
5    Q.    -- why you didn't show up?
6         MR. McCARTHY:  Objection.
7    Q.    Is that right?  You can answer.
8    A.    I have nothing else to add.
9    Q.    Let me ask you once again.  Why
10 didn't you show up on March 7th, what was the
11 reason?
12    A.    I misunderstood the document.  I
13 really didn't understand that I had to come on a
14 certain date for some reason.
15    Q.    We've already had two exhibits
16 marked when you didn't show up, so we're going
17 in sequence.  This is Plaintiff's Exhibit 3,
18 that's why it's 3 and not starting with 1.
19         MR. FORSTOT:  Do you have a copy
20    for counsel?
21         MR. McCARTHY:  I'll take it.
22    Q.    Exhibit 3 is a subpoena you were
23 served with in this matter, and it requested
24 that you produce documents.  Do you see that
25 document in front of you?  Take your time and

Ruben Elberg

1
2 look at it.  Have you looked at it?
3    A.    Yes.
4    Q.    And the date's right on that one,
5 right?
6    A.    No, that's the one 2107.
7    Q.    But you understood that that was
8 just a typo, correct?
9    A.    No.
10    Q.    You really didn't?
11    A.    I understood what it said here.
12    Q.    I'm sorry?
13    A.    I understood what it said here.
14    Q.    Did you read that you were supposed
15 to produce documents, did you understand that
16 part?
17    A.    I read this document, yes, I did.
18    Q.    Now, let's go through this.  First,
19 tax returns, federal and state for the years
20 2012 through 2015 and 2016 if available, do you
21 see that?
22         MR. McCARTHY:  I just want to, I
23    know it's part of the record, but I just
24    want to ask, the paragraph you're reading
25    from starts with a sentence that says:

Ruben Elberg

1
2    "Now, therefore, we command you to produce
3    for examination on February 27, 2107, at
4    12:00 p.m., at the offices of Troutman
5    Sanders LLP, 875 Third Avenue, New York,
6    New York 10022."
7         I just want the record to be clear,
8    and I also want the record to reflect at
9    this time that I've not been provided with
10    copies of Exhibits 1 or 2.  I would ask if
11    I could see them.
12    Q.    Anyway, you see where I'm talking
13 about, the tax returns, do you see that?
14    A.    Please refer to the paragraph,
15 clarify what you're asking.
16    Q.    Number 1 at the bottom of the first
17 page.  Tell me when you're there.  Are you
18 there?
19    A.    I'm reading.  Could I have a
20 moment, please.
21    Q.    Let me know when you're done.  Have
22 you read Number 1?  You're on the second page.
23    A.    Yes, I have.
24    Q.    You understand it says tax returns,
25 federal and state for the years 2012 through

Ruben Elberg

1
2 2015 and 2016 if available, correct?
3    A.    Yes.
4    Q.    Did you produce your tax returns?
5    A.    I believe I've supplied one tax
6 return for 2012.
7    Q.    You produced it in response to this
8 subpoena?
9    A.    I don't know if it was this
10 subpoena or some other subpoena, but I supplied
11 it.
12    Q.    Why else would you have supplied
13 it?
14    A.    Again --
15    Q.    You supplied a tax return in
16 response to this subpoena; is that right or not?
17    A.    I don't know if it was to this
18 subpoena.  But I had discussions, again, I don't
19 want to get into my discussions with my legal
20 counsel, and I gave whatever I had available.
21    Q.    You didn't think you had to wait
22 100 years for that?
23    A.    (No verbal response.)
24    Q.    You didn't think you had to wait
25 100 years for that, right?

Ruben Elberg

1
2    A.    I supplied what I had.
3    Q.    Which was a tax return for 2012?
4    A.    Yes.
5    Q.    What about 2013, where is that tax
6 return?
7    A.    We spoke before that I didn't, I
8 don't know if I mentioned it, that I did not
9 file starting 2013 because there was a problem
10 with my accountant not giving me the proper
11 documentation to file the tax returns.
12        So when I wanted to file 2013, I
13 needed the K-1s for three corporations that I
14 had interests in, and he said he already had
15 filed it. I told him I wanted it corrected, and
16 he would not cooperate.
17        So at that point I didn't want to
18 file tax returns saying when I found out that
19 there was a problem with his filing, I didn't
20 want to continue filing with a mistaken filing
21 that my father, he claims my father guided him
22 to file in the past, Fred Roth claims he guided
23 him to file in the past. So 2013 on, I have not
24 filed anything.
25    Q.    No federal tax returns?

Ruben Elberg

1
2    A.    Nothing.
3    Q.    No state tax returns?
4    A.    Nothing.
5    Q.    Because of that reason?
6    A.    I just wanted to clarify when I
7 file, I want to file it properly. There is a
8 dispute about these corporations and all the
9 income. I don't know how to file, who is the
10 income to if it's not going to be decided in my
11 favor or not. I don't know exactly what's going
12 on, and I did not file based on that.
13    Q.    Is there any other reason you
14 haven't filed tax returns for 2013, '14, '15 or
15 '16?
16    A.    '14, '15 and '16, there was no
17 income, I had no income, so I had really nothing
18 to file, I wasn't working. But '13 to '14, I
19 had what to file, you know, and this was the
20 correction that I needed done, and my only
21 accountant would not cooperate to do whatever
22 was right.
23    Q.    '14, '15 and '16 you had no income?
24    A.    I haven't worked.
25    Q.    Your wife didn't work in 2016?

Ruben Elberg

1
2    A.    My wife did not work, she started
3 working the last year now.
4    Q.    In 2017?
5    A.    2016.
6    Q.    How much income did she make in
7 2016?
8    A.    She went to an accountant. She's
9 dealing with that. I don't know exactly what's
10 with her, if she's going to be filing alone or
11 what's the situation with that.
12    Q.    Before that, you filed joint
13 returns with your wife?
14    A.    Yes.
15    Q.    You got an extension from both the
16 State of New York and the federal government to
17 file your 2013 and 2014 taxes?
18    A.    I got a 2013 extension, but not the
19 years after.
20    Q.    When was the 2013 extension until?
21    A.    I don't have the date, I don't
22 remember.
23    Q.    Is it still extant?
24    A.    No, it's not.
25    Q.    You just didn't file a tax return?

Ruben Elberg

1
2    A.    I did not file it yet, no.
3    Q.    And 2014, did you get an extension
4 for that?
5    A.    There was nothing to file in those
6 years, I had no income to file.
7    Q.    Number 2 on Page 2, records of
8 banks accounts owned by you for the years 2012
9 to date. So have you produced all bank accounts
10 from 2012 to date?
11    A.    Yes, I gave whatever I had.
12    Q.    For all bank accounts?
13    A.    What do you mean all bank accounts?
14    Q.    All bank accounts opened by you.
15    A.    Personal, are you talking about
16 personal?
17    Q.    Anything in your name.
18    A.    In my name personally, yes.
19    Q.    In any way, I don't care.
20    A.    Yes.
21    Q.    You have?
22    A.    Yes.
23    Q.    How many did you produce?
24    A.    Whatever I had, I produced.
25    Q.    Do you know?

Page 70

Ruben Elberg

2  A.    Please clarify what you're asking.
3  Q.    How many statements did you produce
4  for how many months for how many accounts?
5  A.    I don't remember the amounts of
6  statements, but whatever I had, I produced.
7      MR. FORSTOT:  That's it?
8      MR. BUCK:  That's it.
9      MR. FORSTOT:  Mark that as the next
10  exhibit.
11      (Eight pages of Capital One bank
12      statements were hereby marked as
13      Plaintiff's Exhibit 4 for identification,
14      as of this date.)
15  Q.    Take a look at Exhibit 4, and let
16  me know when you're done.
17  A.    Yes.
18  Q.    Are those pages, those are the bank
19  statements you produced, correct?
20  A.    It's some of the bank statements.
21  I also submitted, if I'm not mistaken, Capital
22  One accounts possibly for the taxi corporations.
23  If I did not, I have them, and what I described
24  before, there is over $100,000 in three
25  accounts, I can supply those accounts also.

Page 71

Ruben Elberg

2  Q.    What period of time are the
3  statements in your hand from?
4  A.    January 14th to February 13th.
5  Q.    Of what year?
6  A.    2017.
7  Q.    For what account?
8  A.    Ruben Elberg.
9  Q.    It's one account?
10  A.    Yes.
11  Q.    Do you remember how you testified
12  earlier that it's not a problem to get copies of
13  these accounts, statements, do you remember
14  that, do you remember that?
15  A.    Do I remember what?
16  Q.    Testifying that it's not a problem
17  for you to get copies of account statements for
18  your accounts.
19  A.    Okay.
20  Q.    You have them either at home,
21  correct; is that correct?
22  A.    I don't know if I have all the
23  records.
24  Q.    Or you could easily ask the bank
25  for them, right?

Page 72

Ruben Elberg

2  A.    Yes.
3  Q.    What did you do to find all the
4  records at home or ask the bank for your account
5  statements to comply with this subpoena?
6  A.    I gave you whatever I had handy and
7  I supplied it.
8  Q.    One month from this year, that's
9  what you had, those are the only account
10  statements you have in your house, bank
11  accounts?
12  A.    The ones I had recently.
13  Q.    That's not my question.  Those are
14  the only account statements you have in your
15  house for your bank account, right?
16  A.    I have to check what else I have.
17  Q.    What did you do to check to make
18  sure you didn't have any others?
19  A.    What do you mean what did I do to
20  check?
21  Q.    Did you look throughout your house,
22  did you ask somebody else to look, what did you
23  do?
24  A.    The ones I had handy, I gave you.
25  Q.    When you say handy, what does that

Page 73

Ruben Elberg

2  mean?
3  A.    Without having to make a major
4  search.  Whatever I had available at that time,
5  I gave you.
6  Q.    Did you make any search besides
7  finding whatever you had handy?
8  A.    I wouldn't say I made an extensive
9  search, no.
10  Q.    Did you ask the bank for any copies
11  of statements from 2012 through today?
12  A.    No.
13  Q.    Why not?
14  A.    I didn't understand that you wanted
15  all the bank accounts from 2012 to now.
16  Q.    Look at Page 1, sorry, Page 2,
17  Number 2, records of all bank accounts owned by
18  for the years 2012 to date, do you see that?  Is
19  that confusing to you?
20  A.    No, it's not.
21  Q.    You mentioned a Bank of America
22  account, where are those statements?
23  A.    I should have some at home.
24  Q.    Why didn't you produce those?
25  A.    Because it's a business account.

19 (Pages 70 - 73)

Page 74

Ruben Elberg

1
2    Q.    Is that in your name?
3    A.    It's a business name.
4    Q.    Any other accounts besides the
5    account you produced one month's statement for
6    and the Bank of America account that you have
7    any control over?
8    A.    No, I don't have any other moneys
9    elsewhere in any other bank.
10        MR. McCARTHY:  Can I just make one
11    clarification and I'll just say, Exhibit 4
12    speaks for itself, and the number of months
13    that are covered within the bank account
14    statements.
15        I think the testimony for the
16    questioning has been one month, but I
17    believe there are multiple months.
18        MR. FORSTOT:  How many months are
19    there?
20        MR. McCARTHY:  January 14, 2017 to
21    February 13, 2017, two pages.  February 14,
22    2017 to March 13, 2017, two pages.  October
23    15, 2015 to November 13, 2015, four pages,
24    and these are all Capital One bank account
25    statements.

Page 75

Ruben Elberg

1
2        MR. FORSTOT:  Thank you.
3    Q.    Have you owned any securities since
4    2012?
5    A.    No.
6    Q.    Any investments in mutual funds,
7    stocks, bonds, anything?
8    A.    No.
9    Q.    Number 4 on the subpoena, you see
10    that second page there, Number 4, records
11    reflecting the ownership and/or transfer by you
12    of any interest in real property, do you see
13    that?
14    A.    Yes.
15    Q.    You own your house, correct?
16    A.    Yes.
17    Q.    You say you own it with your wife;
18    is that right?
19    A.    Yes.
20    Q.    Since 2012, have you owned any
21    other real estate besides that property?
22    A.    I have partnership interests in
23    RORE and RREM, and I have partnership interests
24    in Royal CP and Royal HI.
25    Q.    Got it.

Page 76

Ruben Elberg

1
2    A.    So other than my home, there's
3    business interests that I have that I discussed
4    with you before.
5    Q.    Any other properties?
6    A.    No.
7    Q.    You never had an interest in the
8    Crescent Street in Queens property, is that what
9    you own through those?
10    A.    Yes.
11    Q.    Have you had a car since 2012?
12    A.    Yes.
13    Q.    Do you still have a car?
14    A.    Yes.
15    Q.    Did you produce ownership documents
16    for owning that car?
17    A.    I believe so.  I notified -- I
18    could be mistaken, a 2004 Honda Odyssey.
19    Q.    You own that, do you pay any loans
20    on that?
21    A.    No, no loans.
22    Q.    How much is the mortgage, the two
23    mortgages on your house?
24    A.    There is one mortgage that is being
25    paid which is $2,600, and the other mortgage,

Page 77

Ruben Elberg

1
2    the interest is due when the loan is due.
3    Q.    Let me clarify.  What I meant is
4    how much is the entire amount of each mortgage.
5    A.    There's $400,000 for, approximately
6    $400,000 on the first mortgage, and there's
7    another 420,000 roughly by the time it's due on
8    the second mortgage.
9    Q.    The second mortgage you told me
10    about, that's from the loans you got in 2016,
11    correct; is that correct?
12    A.    Yes.
13    Q.    The $400,000 mortgage --
14    A.    It's 350 plus the interest that is
15    being accrued that's going to be due upon --
16    Q.    That's not my question.  The first
17    mortgage, the first lien.
18    A.    Approximately 400, 390 maybe,
19    something in that range, 390 to $400,000, I
20    don't remember exactly.
21    Q.    Who holds that mortgage presently?
22    A.    Nation Star Mortgage is servicing
23    it.  It's probably Wells Fargo, if I'm not
24    mistaken, but I could be wrong.
25    Q.    Are you in default on that?

20 (Pages 74 - 77)

Ruben Elberg

2  A.  No.
3  Q.  What's the source of payment of the
4  2,600 you said per month, where do you get the
5  money to pay that?
6  A.  My wife works, my daughters help me
7  a little bit, my, one of my other daughters,
8  Shterna lent me over $30,000, a substantial
9  amount of money over a period of time to help me
10  pay my mortgage and, you know, some money that I
11  borrowed, if I'm short, completed whatever the
12  balance is.
13      But I didn't want to default on my
14  home.  I just don't want my credit to go bad
15  because I've paid Capital One, I've been with
16  Capital One for years.
17      I paid Capital One all along when
18  my father was alive, and I never defaulted on
19  anything, and I never had any bankruptcies or
20  anything in my life.
21      The only thing, when my father
22  passed away and my sister started causing all
23  this trouble, and it's at a point that it's
24  unbearable.  So this is what I'm facing right
25  now unfortunately.

Ruben Elberg

2  Q.  You used to own the address, I'm
3  sorry, the property at 1523 President Street in
4  your own name, correct?
5  A.  No, it was initially in my wife's
6  name alone when we purchased it.  It was in 1999
7  or 2000, we purchased it and it was in my wife's
8  name alone, it was Yocheved Michaelashvilli, it
9  was under her name alone.
10      What happened in 2003, there was
11  some financial difficulties and we had delays in
12  payments on the mortgage, so my wife could not
13  renew the mortgage.  So she asked me to put it
14  on my name and put her on the title as well when
15  I get the refinancing done because I had good
16  credit, so I did that.
17      But I never really corrected the
18  deed to add her to the name, and then I added
19  her name because it originally was hers and mine
20  together.
21  Q.  You're saying she owned the house?
22  A.  Totally, her father gave her the
23  money to buy the house.
24  Q.  And she gave it to you in 2003?
25  A.  2003 I refinanced it, yes.

Ruben Elberg

2  Q.  But she transferred title to you?
3  A.  What do you mean she transferred
4  title?
5  Q.  You owned the house after that.
6  A.  No, she did not give me the house.
7  She wanted me to refinance, to refinance to have
8  current payments on the house.
9  Q.  You are the hundred percent owner
10  of the house from 2003 to 2016?
11  A.  That was not the intent, that was
12  not her intent.  She did not give me the house
13  as a gift, no.
14  Q.  So when you look at the real estate
15  records, who is the owner from that period of
16  time?
17  A.  It was under my name because the
18  mortgage was under my name, but I'm telling you
19  that she never gave me the house as a gift, no.
20  Q.  And you only put her name on the
21  title after you had already defaulted to Capital
22  One, correct?
23  A.  I don't think so.  I corrected the
24  deed.  I don't think so, but I can check the
25  record.  That was a deed correction clearly.

Ruben Elberg

2  Q.  When did you do that?
3  A.  I don't remember the date.  I have
4  to check.
5  Q.  In fact, it was in September of
6  2016, wasn't it?
7  A.  Again, I can't tell you the date.
8  If you have the date, then you know for sure.  I
9  can't tell you, I would have to check.
10  Q.  Do you know how much the house is
11  appraised for, how much you could sell it for?
12  A.  No.
13  Q.  Do you think you have equity over
14  and above the two mortgages in the house?
15  A.  I don't know.  I would have to
16  check.
17  Q.  Sorry, when were the financial
18  troubles that you said your wife had or there
19  were financial troubles, I forget how you put
20  it, that caused her to transfer the title to
21  you?
22  A.  It was 2003, 2004, I don't remember
23  exactly.
24  Q.  When did the financial troubles
25  end, if they did, that allowed you to put her

Page 82

Ruben Elberg

1
2 name back on?
3    A.    I don't understand the question,
4 why are you insinuating I had financial
5 troubles?
6    Q.    Why did you transfer -- maybe I
7 misunderstood your testimony.  Why did she
8 transfer the title from her name to your name,
9 why did that happen?
10    A.    She had late payments on the
11 mortgage, and basically we wanted to refinance
12 the house because I don't know if the payment
13 was coming due or I don't know exactly.  I don't
14 remember the reason why.
15        And when she tried to get the
16 refinancing, she did not have the proper income
17 or information, so she asked me to put it on my
18 name and put her on and refinance because I had
19 better credit.
20    Q.    When you say add her on, what does
21 that mean?
22    A.    To put her together with me.
23    Q.    On what?
24    A.    On the deed.
25    Q.    But you didn't do that?

Page 83

Ruben Elberg

1
2    A.    I did not do that, I failed, yes.
3    Q.    For quite awhile, years?
4    A.    Whatever time, but I corrected it.
5 In my mind, I corrected it.  When the time came,
6 I corrected it.
7    Q.    You didn't think about it?
8    A.    There was no need for it.  I don't
9 remember what was the reason why, but I failed
10 to do whatever she had asked me, and I put her
11 back on.
12        MR. FORSTOT:  Mark that.
13        (Alma Bank Personal Financial
14        Statement was hereby marked as Plaintiff's
15        Exhibit 5 for identification, as of this
16        date.)
17    Q.    Here's Exhibit 5.  Why don't you
18 look at that and let me know when you're done.
19    A.    Yes.
20    Q.    This is a personal financial
21 statement that you gave to Alma Bank in 2012,
22 correct; is that correct?
23    A.    Yes.
24    Q.    You signed it, right?
25    A.    Yes.

Page 84

Ruben Elberg

1
2    Q.    And on Page 3 of this document, you
3 list the President Street address, correct?
4    A.    Yes.
5    Q.    And you list it as 100 percent
6 owned by you, right?
7    A.    That's an error.
8    Q.    But you list it as 100 percent
9 owned by you, correct?
10    A.    I didn't fill this out.
11    Q.    You signed this document, right?
12    A.    Yes.
13    Q.    You wouldn't have signed a document
14 you thought was incorrect, would you?
15    A.    I didn't notice this.  This is an
16 error.
17    Q.    The purpose of that financial
18 statement was what?
19    A.    We were trying to get financing for
20 Royal HI Hotel Holdings LP.
21    Q.    Who is we?
22    A.    My father, Jacob Elberg and I.
23    Q.    So looking at the same page on that
24 personal financial statement, you have the value
25 of your house as 900,000, right?

Page 85

Ruben Elberg

1
2    A.    Yes.
3    Q.    Again, it says 100 percent owned by
4 you, correct, that's what it does say, right?
5    A.    It's an error.  I didn't fill this
6 out.  I signed it hoping that whatever the
7 office manager filled out was correct, but it
8 seems that she made an error.  She actually
9 never asked me that question.
10        (Capital One Bank Personal
11        Financial Statement was hereby marked as
12        Plaintiff's Exhibit 6 for identification,
13        as of this date.)
14    Q.    Here's Exhibit 6.  Take a look at
15 that.
16    A.    Yes.
17    Q.    This is also a personal financial
18 statement from you, correct?
19    A.    Yes.
20    Q.    That's your handwriting?
21    A.    No, Mark Gallagher's handwriting,
22 Capital One's handwriting.
23    Q.    You signed it?
24    A.    Yes.
25    Q.    Mark Gallagher's handwriting.  Who

22 (Pages 82 - 85)

Page 86

Ruben Elberg

1           Ruben Elberg
2 is Mark Gallagher again?
3    A.    Capital One Bank's lawyer.
4    Q.    Why would he fill this out with all
5 this information, how did he get that
6 information?
7    A.    I don't remember if Brenda gave it
8 to him, our office manager or I did.  The same
9 person that filled this out probably gave him
10 this information.
11    Q.    This is 2013, correct?
12    A.    Yes.
13    Q.    The year after the last one we just
14 looked at, right?
15    A.    Yes.
16    Q.    You signed it?
17    A.    Yes.
18    Q.    And on here it's got the $900,000
19 real estate value, right?
20    A.    Yes.
21    Q.    That's your house?
22    A.    Yes.
23    Q.    That's not half your house, that's
24 the entire house, right?
25    A.    Again, it was in my name so I

Page 87

Ruben Elberg

1           Ruben Elberg
2 listed it as a home that I own, but it wasn't
3 all mine.  And I don't know that I had to add my
4 wife to this personal financial statement to
5 show her interest in the house.  I was not aware
6 of that information.
7    Q.    In fact, you filled out a number of
8 personal financial statements where you list the
9 value of your house as $900,000, and you never
10 once mention anything about your wife's
11 interest, do you?
12    A.    I didn't think that I had to, you
13 know, outline that information here.  What
14 Brenda wrote is definitely a mistake.  I did not
15 tell her to put in 100 percent owned by me, and
16 here --
17    Q.    Why would she have done that?
18    A.    I don't know.
19    Q.    She guessed?
20    A.    She guessed, I guess.
21    Q.    She didn't ask if you and your wife
22 owned it?
23    A.    She did not ask me, no.
24    Q.    How do you know, do you recall the
25 conversations from 2012?

Page 88

Ruben Elberg

1           Ruben Elberg
2    A.    I remember when someone asks me
3 about my home ownership, yes, she did not ask
4 me.  I don't remember her asking me, honestly.
5        (Wilshire State Bank Personal
6        Financial Statement was hereby marked as
7        Plaintiff's Exhibit 7 for identification,
8        as of this date.)
9        (Capital One Bank Personal
10        Financial Statement was hereby marked as
11        Plaintiff's Exhibit 8 for identification,
12        as of this date.)
13    Q.    Just look at 7 and 8 also, they are
14 both financial statements.  Let me know when
15 you're finished.
16    A.    Yes.
17    Q.    Each one of those you signed,
18 correct; is that right?
19    A.    Yes.
20    Q.    And they also list your real
21 property value at 900,000, correct?
22    A.    Yes.
23    Q.    Those are references to your house,
24 correct?
25    A.    Yes.

Page 89

Ruben Elberg

1           Ruben Elberg
2    Q.    There's nothing in there that says
3 anything about your wife's interest in the
4 house, right?
5    A.    No, but it was solely owned by her.
6    Q.    Now it's solely owned by her?
7    A.    It was solely owned by her in the
8 beginning.
9    Q.    But she transferred it to you,
10 right?
11    A.    She transferred, as I explained, it
12 was done for refinancing.
13    Q.    It may have been for a purpose, but
14 she transferred the title to you, is that right
15 or not?  You don't know, do you?
16    A.    That was not her intent, to give
17 the house to me, if that's what you're
18 insinuating.
19    Q.    I'm not asking her intent.  Did she
20 transfer the title of the house to you?
21    A.    Not really, no.  She allowed me to
22 refinance the house, but she didn't mean to give
23 me the house as a gift, no.
24    Q.    You're under oath.  Is it your
25 testimony that the title, the name on the deed

Ruben Elberg

1
2 for your house was never solely in your name?
3     A.    No, that's not my testimony.
4     Q.    What is your testimony, was it ever
5 solely in your name?
6     A.    Yes, there was a period of time it
7 was solely in my name.
8     Q.    And before that, it was solely in
9 your wife's name, is that what you're saying?
10     A.    Yes.
11     Q.    So she transferred on the deed at
12 least, whatever her intent, I'm not asking you
13 about that, she transferred it solely to your
14 name, correct?
15     A.    That's what your understanding is,
16 yes.
17     Q.    How did your name get on the deed
18 all by itself if not from her?
19     A.    I did not buy the house from her.
20 I did not pay her to give, put the house in my
21 name.  I did not pay her a penny, you can prove
22 that there's no transaction of funds.
23     Q.    She transferred it to you during
24 times of financial problems that she was having;
25 is that right?

Ruben Elberg

1
2     A.    She did not make payments.  She
3 could not refinance, so she allowed me to
4 refinance the house, and I was supposed to put
5 her back on the house, I did not.
6     Q.    During financial problems with your
7 wife, she transferred the house solely to your
8 name, correct?
9         MR. McCARTHY:  I'm going to object.
10     Q.    Is that correct or not?
11         MR. McCARTHY:  It's a
12 mischaracterization of his testimony.
13     A.    I said what I have to say.  I don't
14 have anything to add about what transpired, and
15 I'm being clear as to what happened.  You're
16 trying to get to something that I don't
17 understand what you're trying to get.
18     Q.    The facts are that she transferred
19 the title on the deed to your name and then --
20     A.    I can't explain.
21     Q.    And then in 2016, you put her name
22 back on it; is that correct?
23     A.    I did a correction.
24     Q.    And in the meantime, you signed
25 financial statements that referred to, at least

Ruben Elberg

1
2 one that says you're the hundred percent owner;
3 is that correct?
4     A.    That was in error.  I did not type
5 that in.
6     Q.    You also signed other financial
7 statements that we've seen that are exhibits
8 here that has the value of the house at $900,000
9 listed, right, that you gave to banks to show
10 your assets, correct?
11     A.    Yes, those are financial
12 statements, yes.
13     Q.    And you didn't say anything about
14 that you owned it jointly with your wife,
15 correct?
16     A.    I didn't think that was part of the
17 discussion.
18     Q.    Why is your name on the deed if
19 it's her house and she owned it and you didn't
20 pay for it, why is your name still on the deed
21 at all?
22     A.    Why is my name on the deed?
23     Q.    Why didn't you transfer it back to
24 her?
25     A.    We own it jointly.

Ruben Elberg

1
2     Q.    So she did transfer it with the
3 intention to give you title?
4     A.    She did not intend that.
5     Q.    So I ask you again, why is your
6 name still on there is my question.
7     A.    Because we're husband and wife and
8 it's both of our house.
9     Q.    Were you husband and wife before
10 she transferred the house to you?
11     A.    Yes.
12     Q.    How long were you -- when were you
13 married?
14     A.    We bought the house in '99.
15     Q.    We bought the house?
16     A.    I mean, my wife's father gave her
17 the money to buy the house, so together we
18 bought the house in '99.  And since then, until
19 2003, my wife had it in her name under Yocheved
20 Michaelashvilli, that's her maiden name.
21         And in 2004, as I told you, there
22 was a time that she did not make payments on
23 time and we needed to refinance, so we did it
24 under my name in order to be able to have a
25 creditworthy borrower.

Ruben Elberg

1
2    MR. McCARTHY:  Just one thing,
3    Ruben, just for purposes of this particular
4    question, he asked you when you were
5    married.
6    A.    Oh, I apologize.
7        MR. McCARTHY:  Can you provide when
8    you got married?
9    A.    We got married in 1985, I
10   apologize.
11   Q.    Do you have Exhibit 5 still in
12   front of you, the personal financial statement
13   to Alma Bank?
14   A.    Yes.
15   Q.    Fred Roth is listed as your
16   accountant.  Is he still your accountant?
17   A.    No, he's not anymore.
18   Q.    When did he stop being your
19   accountant?
20   A.    In 2013 when he stopped, when I
21   found out he made major mistakes, and I just
22   could not continue with him.
23   Q.    Do you have an accountant today?
24   A.    No, not yet.
25   Q.    Have you had any accountant since

Ruben Elberg

1
2    2013?
3    A.    No.
4    Q.    You filed for the extension
5    yourself?
6    A.    No, he did it, and since then he
7    gave me tax returns without the proper
8    information.  And once I found out there were
9    mistakes, I didn't want to file it.
10   Q.    On Page 2 of that document, it says
11   you have a Citibank checking account with $5,000
12   in it at that point, do you see that?
13   A.    Yes.
14   Q.    What became of that account?
15   A.    We transferred it to Capital One.
16   We don't have that anymore.
17   Q.    Who is we?
18   A.    I did.
19   Q.    When did you transfer it to Capital
20   One?
21   A.    When I opened up at Capital One.  I
22   don't remember the date.
23   Q.    Do you remember the year?
24   A.    No.
25   Q.    104,000 consulting income, you see

Ruben Elberg

1
2    that?
3    A.    Yes.
4    Q.    What is that, why did you get
5    $104,000, what year was that?
6    A.    What year is this, this is 2012.
7    Q.    Right.  So in the 12 months before
8    you signed this, you had $104,000 in consulting
9    income?
10   A.    I was working for JEB Management
11   and running the real estate.  Now, the income
12   was for my portion of the cabs above and beyond
13   Jacob's management fees that he was taking.
14       He was running JEB Management, my
15   two and a half cab corporations, and some of
16   that income that was above and beyond our
17   mortgages that we had to pay for, you know, the
18   Capital One mortgages that we had, I was getting
19   the additional funds that was coming from JEB
20   Management.
21   Q.    This says it's for consulting.
22   A.    There was a portion for like a W-2,
23   a small portion of it, and that was for
24   consulting, but most of the money was coming
25   from is the taxicab companies from JEB

Ruben Elberg

1
2    Management.
3    Q.    You have, a little higher on the
4    page it says other investments, $703,000, you
5    see that?
6    A.    Yes.
7    Q.    What's that?
8    A.    I had purchased a ferry boat in N.
9    Minue, Inc., the company I mentioned before, and
10   I paid $126,000 for that.  And originally it was
11   destined to go back into service at Governors
12   Island because it was the former ferry boat for
13   Governors Island, but that got delayed in
14   negotiations with the operator and did not come
15   to fruition.
16       So we were looking for other uses,
17   potentially to do a dockside for a food and
18   beverage operation, restaurant, catering.
19   Q.    What was the source of the
20   $800,000?
21   A.    I said I paid 126,000.
22   Q.    I'm sorry, you said you paid
23   $126,000 for it?
24   A.    That's what I said.
25   Q.    That was your money?

25 (Pages 94 - 97)

Ruben Elberg

2 A. That was my money.

3 Q. Where did you get that money?

4 A. It was either 1998, my father and I
5 were thinking of investing in this venture, and
6 my father had refinanced and he had given me the
7 money to invest in this venture at that time.

8 Q. Your father gave it to you?

9 A. He gave it to me, and he was
10 supposed to be a partner in this deal, but for
11 whatever reason, he never came through in doing
12 whatever the original plans were with it.

13 Q. You owned a ferry boat through N.
14 Minue, Inc.?

15 A. Yes.

16 Q. You were the sole shareholder of N.
17 Minue, Inc.?

18 A. Yes.

19 Q. Where did you get the value for the
20 ferry boat for $703,000 in 2012?

21 A. When there was, you see a ferry
22 boat is like, it's an asset. If you have a use
23 for it and if it has a need, it has a value. If
24 it has no need, it's a liability, right.

25 So at one time there was about 450

Ruben Elberg

2 or $500,000 offer from people at Governors
3 Island, the operators of the other vessel, the
4 sister vessel at Governors Island.

5 And for some reason, we were told
6 that it was worth in the $700,000 range by other
7 people who knew the market. We took basically
8 what we were told by others in the industry, but
9 we had a range of a $400,000 offer.

10 And now we have no offers, so it's
11 just been sitting, unfortunately rotting away
12 until we get a use service for it.

13 Q. Where is it?

14 A. Staten Island.

15 Q. Do you have to pay any money to
16 keep it up?

17 A. Yes, I owe the dock alone over
18 $100,000 just in dockage fees.

19 Q. Any other amounts you need to pay
20 to keep it up?

21 A. No.

22 Q. Just dockage fees?

23 A. Yes.

24 Q. There's no maintenance or anything
25 that needs to be done on it?

Ruben Elberg

2 A. No. I wouldn't put any money into
3 it because it's just not productive. Even if I
4 had money, I wouldn't put money into it.

5 Q. Do you own it personally now?

6 A. No, it was purchased in the
7 corporate name.

8 Q. What's the status of that
9 corporation?

10 A. What do you mean?

11 Q. Is it in good standing, is it an
12 operating company?

13 A. There was no income in the company,
14 so there's really nothing happening with it.

15 Q. But it's still an existing
16 corporation?

17 A. I have to check that, if it was, if
18 it was dissolved or it's still an existing
19 corporation. I don't know, I haven't checked it
20 recently.

21 Q. Did you take any steps to dissolve
22 it?

23 A. No.

24 Q. Do you think it may be dissolved
25 for failure to pay some tax or anything?

Ruben Elberg

2 A. I don't think so. I didn't have
3 anything that I had to pay that I didn't pay,
4 no.

5 Q. So why do you think it may be
6 dissolved?

7 A. I just don't know.

8 Q. You're the sole shareholder of that
9 company, right?

10 A. Yes.

11 Q. Does the owner of the dock have
12 some kind of lien on the ferry?

13 A. Yes, he owed all this money, so he
14 tells me all the time, the ferry is not worth
15 anything, it's mine practically. He jokes
16 around with me.

17 There's no official lien. We're on
18 friendly terms. He knows when things turn
19 around for me I'll pay him. I don't have any
20 interest in hurting him. When I had money, I
21 paid whatever I could. I've never hurt the man.

22 Q. You never what?

23 A. I never hurt the man.

24 MR. FORSTOT: Why don't we, since
25 lunch has been brought in. We're going for

26 (Pages 98 - 101)

Page 102

Ruben Elberg

1
2  about an hour, let's take a break.
3      MR. McCARTHY:  Before we go off the
4  record, there's a Social Security number
5  that hasn't been redacted.  Whenever we do
6  the final exhibits, can we just redact it
7  for future use?
8      MR. FORSTOT:  I guess.  All right.
9  You brought your own lunch, I understand.
10     THE WITNESS:  Yes.
11     MR. FORSTOT:  And you want to grab
12 something?
13     MR. McCARTHY:  Sure.
14     MR. FORSTOT:  There's a breakout
15 room if you want to sit in there.  We can
16 go off the record.
17     (Whereupon at 12:09 p.m. a luncheon
18 recess was taken.)
19     (1040 U.S. Individual Tax Return
20 for 2012 was hereby marked as Plaintiff's
21 Exhibit 9 for identification, as of this
22 date.)
23     AFTERNOON SESSION
24     (Time noted:  12:46 p.m.)
25 Q.    Tell me about your education.

Page 103

Ruben Elberg

1
2  A.    What specifically would you like to
3  know?
4  Q.    Did you go to school?
5  A.    Yes.
6  Q.    Tell me about where you went, when
7  and for how long?
8  A.    Until 13 years old I was, actually,
9  until 11, 1973, so until 12 I was in Russia, and
10 we came here in 1973, approximately.
11     I went to Yashiva here in Ocean
12 Parkway.  Then I went to Yashiva University on
13 Avenue M thereafter.
14     MR. McCARTHY:  Yashiva University
15 you said?
16     THE WITNESS:  Yes.
17 Q.    Did you get a degree?
18 A.    No.
19 Q.    What did you study at Yashiva
20 University?
21 A.    I didn't get a degree.  I left to
22 go to 47th Street to start learning gemology and
23 mineralogy to become a gemologist in 1977, early
24 on, you know, in my life.  And I became a
25 gemologist and started working in the jewelry

Page 104

Ruben Elberg

1
2  industry.
3  Q.    Right, my question was, you said --
4      MR. McCARTHY:  Yashiva University
5  at Avenue M.
6  A.    And East 14th Street.  It was
7  called BTA, but it was part of Yashiva
8  University.
9  Q.    What did you study when you were
10 there?
11 A.    It's a high school.
12 Q.    Oh, it's a high school?
13 A.    It's called the Yashiva University
14 High School.
15 Q.    I didn't understand that.  Did you
16 graduate?
17 A.    No.
18 Q.    Did you get a GED?
19 A.    I don't think so.  I don't have, I
20 didn't need it for what I was doing.
21 Q.    How long did you work in the
22 jewelry or gem industry?
23 A.    '77 to '88.
24 Q.    So 11 years.  Did you work at one
25 place?

Page 105

Ruben Elberg

1
2  A.    No, initially I worked in 30 West
3  -- I don't remember.  EGL, EGL which was
4  European Gem Labs, and I started out being
5  trained as a gemologist, and then I became -- it
6  was an important position there.
7  Q.    A what?
8  A.    I took an important position there.
9  I was practically managing.
10 Q.    Managing what?
11 A.    The gem lab.
12 Q.    What do they do at a gem lab?
13 A.    They examine diamonds and colored
14 stones and they give certifications.
15 Q.    When did you leave there?
16 A.    So three years, I would say '80,
17 '81.
18 Q.    What did you do after that?
19 A.    '81 I became, I worked, I had Ruben
20 Elberg Diamond Company.
21 Q.    You had your own diamond company?
22 A.    I was trying to broker and, you
23 know.
24 Q.    How long did you do that for?
25 A.    '88, until 1988.

27 (Pages 102 - 105)

Page 106

1        Ruben Elberg
2      Q.   So from '77 through '88, you were
3  in the gem industry.  From '77 to '81, you
4  worked for EGL?
5      A.   EGL.
6      Q.   And then from '81 to '88 you had
7  your own business; is that right?
8      A.   Yes, sir.
9      Q.   How much was your salary,
10  approximately, when you left EGL?
11      A.   I don't remember the details now.
12      Q.   Do you have any idea, a vague idea
13  even of how much you were making, do you know
14  how much?
15      A.   Is it relevant here in this case?
16          MR. McCARTHY:  If you have a
17  recollection.
18      A.   I don't have a recollection.
19      Q.   For somebody with your experience,
20  how much do you think you could make if you got
21  a job in that area in the gem business today?
22      A.   I don't know.  I have not been in
23  the industry since '88, so I don't know.
24      Q.   Why did you stop being a broker of
25  your own business Ruben Elberg Diamonds, was

Page 107

1        Ruben Elberg
2  that what it was called?
3      A.   Yes.
4      Q.   Why did you stop doing that?
5      A.   My father said it's not enough when
6  you help someone with money, I need physical
7  help.  So I'm not managing here with the, you
8  know, taxi business, and I need you to come in
9  and help me physically.
10          Because all along, from '77 to '88,
11  I was helping him financially to get started in
12  the yellow cab business, and when anything,
13  either to buy some of these corporations or
14  whether they were, you know, short in his
15  day-to-day operations, because he was always
16  trying to grow, refinance and grow, that was the
17  approach.
18          And he was always short in making
19  payments, so I had income from the diamonds, and
20  I was trying to help as much as I could
21  throughout these years.
22      Q.   How much did you make annually if
23  you could estimate from your --
24          MR. FORSTOT:  Let me withdraw that.
25      Q.   The last year you worked in your

Page 108

1        Ruben Elberg
2  own business, Ruben Elberg Diamonds, how much
3  was your income?
4      A.   I don't remember.  It was too many
5  years ago.
6      Q.   No idea?
7      A.   I don't remember it now.
8      Q.   A million dollars?
9      A.   No.
10      Q.   Half a million?
11      A.   No, less, less.
12      Q.   10,000, you have no idea?
13      A.   It wasn't, it was somewhere in what
14  I was making in 2012 tax return or slightly
15  more, maybe.  I can't remember, I can't say that
16  for sure.
17      Q.   Do you own any gems today?
18      A.   No, I wish I did.
19      Q.   Any kind of precious stones or
20  metals at all?
21      A.   No.
22      Q.   Does your wife?
23      A.   No.
24      Q.   She doesn't even have a ring?
25      A.   An engagement ring, but that's it.

Page 109

1        Ruben Elberg
2      Q.   Do you have a safe deposit box
3  anywhere?
4      A.   No.
5      Q.   Does your wife?
6      A.   No.
7      Q.   Do any of your children have safe
8  deposit boxes that you're aware of?
9      A.   No, not that I know of.  I should
10  not say that.  Not that I know.
11      Q.   This is Exhibit 9.  Exhibit 9 is
12  your 2012 tax return, correct?
13      A.   Yes.
14      Q.   You just referenced that as a way
15  to understand how much you were making when you
16  had your own business.  So does that mean you
17  were bringing in roughly $86,000?
18      A.   Maybe more, maybe more in diamonds.
19  I don't remember, I can't tell you for sure.
20      Q.   Is this the last tax return you
21  filed?
22      A.   Yes.
23      Q.   What is the source of the
24  miscellaneous compensation of $86,000 reflected
25  in this tax return?

28 (Pages 106 - 109)

Ruben Elberg

A. I told you that JEB Management had income from my cabs, he was giving me distribution from my three cab companies.

Q. You said he was giving, who he is?

A. My father through JEB Management, because I told you all the moneys were going into JEB Management, and JEB Management was the co-guarantor for these corporations.

So all the money was being funneled from the taxi companies into JEB Management, and it was all being distributed, mortgage payments and whatever had to be done. I don't know exactly, I can't tell you for sure how the money was being paid to Capital One.

I believe my father was transferring moneys from one account to another. He always had computer transfers that he was always doing, that's how he handled it.

Q. Did that amount stay the same, did it vary from year to year?

A. It ranged between 80 to $100,000, in that range, 120 maybe, I don't remember.

Q. That has now ended because of what you testified before --

Ruben Elberg

A. Yes.

Q. -- the dispute you're having with your sister about whether the estate owns those medallion entities or you do?

A. Yes.

Q. Just to be clear, is there a court order that says you can't be involved in the management at this point of those companies?

A. I don't want to misstate anything, but to my recollection, they said I can act as an executor, but not as a sole decision maker, if I understand correctly the court's recommendation or decision, whatever it was then.

Q. The court, meaning the Probate Court?

A. Yes, the Probate Court.

Q. Let's talk about the litigations then. You're involved in a litigation in Probate Court; is that right?

A. I don't know.

MR. McCARTHY: Surrogate's Court.

Q. Sorry, Surrogate's Court.

A. Forgive me, I don't know the

Ruben Elberg

difference between Surrogate's, is it the same thing?

Q. I'm using the wrong term. Surrogate's Court, the court that handles your father's estate.

A. Correct.

Q. And you're also involved in a litigation in Supreme Court with your sister?

A. Yes. Unfortunately, when she took control of these companies --

MR. McCARTHY: I'm going to, Ruben, to move it along, just answer the question that he's asking.

A. Just repeat the question.

Q. I'm trying to get the lay of the land on how many litigations you're involved with where the issue is who owns the medallion companies and whether you're entitled to a certain percentage interest in the entities that own the real estate where the hotels would be developed. Tell me how many litigations are involved there.

A. There is one litigation in the Surrogate's Court or maybe the second one she

Ruben Elberg

started to remove me as an executor, that's in the Surrogate's.

And then in the Supreme Court, there was one litigation that was not started by me, it was started by the limited partnership partners against me and the LLCs.

And there was a decision by Ramos, Judge Ramos to give control to a person that's not a member nor a partner in the limited partnerships, and that's on appeal with Judge Catterson in the First Department.

So those are the cases I can point to right now, other than the Capital One judgment that I have that's on a personal guarantee.

Q. Right. I'm just talking about the cases where there's, where it may be decided whether you have an interest or not in these entities or whether the estate is the right party, and then whether you have a 40 percent interest as a Class D member of these LLCs, sorry, LLPs.

A. I have to clarify that.

Q. Sure.

Page 114

Ruben Elberg

2   A.    In the Surrogate's Court, my sister
3 moved for a turnover proceeding.  Initially,
4 Jacob was the sole owner of the taxicab
5 corporations and Jacob was also the sole owner
6 of RORE and RREM.
7        If you remember when I said before
8 that the yellow cabs that took the loans to
9 RORE, capital contributions or loans to RORE,
10 RORE and RREM are the sole owners of everything.
11 There is no new limited partnerships that I'm
12 going to describe in a second.
13        So having said that, she said the
14 Class C interest is all owned by Jacob, there is
15 no 60/40.  She claims the same thing in the
16 limited partnership litigation as well.
17        So there's documentation, many
18 documents on the level of RORE and RREM, that's
19 where the money actually went, and she actually
20 did not deposit those moneys into the RORE and
21 RREM accounts, she took it to the estate account
22 which is also inappropriate.  That was not the
23 intent of the Judge when he gave her that power.
24   Q.    So in the Probate Court --
25   A.    It's an LLC litigation about the

Page 115

Ruben Elberg

2 LLC ownership.
3   Q.    In the Probate Court?
4   A.    In the Surrogate's Court.
5   Q.    The Surrogate's Court.  In the
6 Surrogate's Court, what is the status of the
7 litigation?  And what I mean by that, you know,
8 do you have any hearings coming up, is there a
9 trial coming up, how and when is it going to be
10 decided who owned these entities?
11   A.    Pewzner moved that I should move
12 for a turnover proceeding on these assets.  The
13 Judge said that I've shown prima facie evidence
14 of my 40 percent ownership and the taxicab
15 ownership.  So she has to come and on law prove
16 why I don't own these interests, and she has not
17 pursued it further.
18        But what she had done, she moved
19 then to remove me as an executor for using some
20 of the proceeds from two taxi corporations to
21 pay for legal fees.
22        The Judge allowed me to pay, to act
23 as an executor and pay whatever fees are
24 necessary as an executor.
25        So I said, I'm using my power as an

Page 116

Ruben Elberg

2 executor to pay legal fees to protect the
3 interests of Merill and Spindle.  When I started
4 using funds to pay for legal fees, she moved to
5 remove me as an executor for spending moneys
6 that don't belong to me.  Those are the
7 litigations in the Surrogate's Court, and that's
8 the status, to my understanding.
9   Q.    What has to be done to move that
10 forward to a decision?  I assume you're anxious
11 to get a decision on that, aren't you?
12   A.    I am, and I just changed my legal
13 team, and I'm trying to get resolutions on these
14 issues.
15   Q.    You said you changed your legal
16 team, what do you mean?
17   A.    I had a single practitioner who was
18 devoted and hard working, but he had limits.  He
19 told me, he was a friend --
20        MR. McCARTHY:  Don't discuss what
21    you discussed with him.  Just again, answer
22    the question as was asked.
23   Q.    So did you replace -- who was the
24 sole practitioner?
25   A.    Levi Heubner.

Page 117

Ruben Elberg

2   Q.    You said he's still giving you
3 advice even though he's no longer your counsel
4 on the case; is that right?
5   A.    I still talk to him because he's a
6 friend, and he might be representing me in other
7 things now.
8   Q.    Who is representing you now in the
9 Surrogate's Court?
10   A.    Abrams Fensterman.
11   Q.    Are there any court dates coming up
12 in that case?
13   A.    I don't have the records of that in
14 front of me, but there's an appeal and a
15 decision of the judge in Surrogate's Court, and
16 I don't know if that's, how that's going to play
17 out.  I'm not sure on the status.
18        I'm still in discussions with my
19 legal team how to proceed there, but we just
20 gave an answer on the removal as an executor, we
21 just responded to the documents.
22   Q.    As of now, you're still an
23 executor?
24   A.    Yes.
25   Q.    As of this point, you don't know if

30 (Pages 114 - 117)

Page 118

Ruben Elberg

1
2 there is some end of sight by date when all this
3 will be resolved in the Surrogate's Court?
4      A.    In the Surrogate's Court, it's
5 difficult to say because that looks like a more
6 complicated issue, but that's where all the
7 money is, and that's where she claims that only
8 Class C exists.
9          So whether it's Class C or not,
10 moneys were borrowed from taxi corporations.  It
11 was put in the capital contributions into these
12 companies, and it has to be paid back to these
13 taxi corporations.  She took it, she didn't even
14 deposit it.
15          She represented in front of Ramos
16 that she was going to put it in escrow, the
17 whole amount of the sale she was going to put in
18 escrow.  She didn't do that.
19          She took the money and she put it
20 into three, four different places, I don't know
21 where exactly and how she distributed the money.
22 I don't have the full detailed information.  But
23 she did not -- her lawyer made clear
24 representations in front of Judge Ramos that she
25 was going to put it all in escrow until this

Page 119

Ruben Elberg

1
2 issue is resolved.
3          She paid a substantial amount of
4 money in taxes.  She put moneys in escrow with
5 the buyer because the buyer -- the seller, the
6 buyer actually, he feels he's got exposure
7 because the Judge never gave her authority to
8 sell the Class D interests and she sold it
9 anyway.
10          Also, we submitted a dissent letter
11 not to allow her to sell the Class C interest or
12 Class D as a 40 percent interest holder, and she
13 went ahead and did it anyway.
14      Q.    Let's put that on hold for a
15 minute.  I just want to get back to Surrogate's
16 Court for a second.  So in Surrogate's Court, is
17 it your understanding that the issue of who owns
18 the medallion entities we've been talking about
19 today, is that one of the issues that the
20 Surrogate's Court will decide, is being asked to
21 decide?
22      A.    She asked them to decide that, yes.
23      Q.    As far as you know, there is no
24 date by which that's going to happen, either
25 through an argument on a motion or a trial?

Page 120

Ruben Elberg

1
2      A.    I can't discuss our plans right now
3 with our new team, but there are plans to get
4 that resolved sooner rather than later.
5      Q.    It's in your interest to get it
6 resolved as soon as possible, right?
7      A.    Yes.
8      Q.    Because right now you have no
9 income from them?
10      A.    You see my position, I'm telling
11 you the truth.
12      Q.    You have to, you're under oath.  So
13 the issue of who owns or who did own or --
14          MR. FORSTOT:  Let me withdraw that.
15      Q.    The issue of whether you were
16 entitled to a 40 percent interest in these
17 entities that own the real estate --
18      A.    The LLCs.
19      Q.    The LLCs, LLPs?
20      A.    There are two levels.  Let's be
21 clear.  The LLC is very important because she
22 claims that's the company that owns everything,
23 right, and that's where the money was supposed
24 to go but it didn't go there.  It went into an
25 estate account, it went into another account.

Page 121

Ruben Elberg

1
2      Q.    Understood.  Is that also something
3 that the Surrogate's Court is being asked to
4 decide?
5      A.    Yes.
6      Q.    Is there a date, either through
7 argument or trial, argument on a motion or trial
8 by which that is going to be decided?
9      A.    I don't have a clear date, and I
10 don't know.
11      Q.    That's also in your interest to get
12 if resolved quickly, right?
13      A.    Yes.
14      Q.    Although not quite as pressing
15 because it's not the income, it's something in
16 addition to what used to be the income you lived
17 on?
18      A.    Correct.
19      Q.    So there's also the issue of
20 whether you should be continued as co-executor,
21 right?
22      A.    Yes.
23      Q.    Are there any other issues that you
24 are aware of that would be decided by the
25 Surrogate's Court?

31 (Pages 118 - 121)

Page 122

Ruben Elberg
2    A.    No.
3    Q.    Assuming you lose on all these
4  things and it's decided that the estate is the
5  real owner of the medallion entities and you're
6  not entitled to 40 percent of the proceeds of
7  the sale, you're still a beneficiary of the
8  estate; is that right?
9    A.    Yes.
10   Q.    That's your understanding?
11   A.    Yes.
12   Q.    And you would be sharing pro rata
13 with how many people?
14   A.    Four.
15   Q.    So there is a distribution that you
16 think would be made to you?
17   A.    Yes.
18   Q.    It doesn't all go to your mother?
19   A.    Well, the will was structured in
20 such a manner that the yellow cabs, only the
21 cabs that my father owned goes to my mother.
22      There are two trusts that were
23 created simultaneously, one is a Q-tip trust,
24 and I don't remember the second name, but it's
25 in the will, it's in the papers.

Page 123

Ruben Elberg
2      The real estate holdings were
3  supposed to be going into trusts, and the income
4  from the real estate, 60 percent interest income
5  of those real estate assets were supposed to go
6  to my mother.  And after 120 of hers, goes to
7  the four siblings, the 60 percent is split four
8  ways.
9    Q.    After 120, what does that mean?
10   A.    After she passes on.  I hope she
11 lives for a long time.
12   Q.    So you wouldn't actually be
13 entitled to any distribution until after that?
14   A.    From the 60 percent interest, no.
15 From the 40 percent interest, definitely right
16 away.
17   Q.    Right away, okay.
18      MR. McCARTHY:  Are you claiming
19    that the 40 percent interest is within the
20    estate or that you own it personally?
21      THE WITNESS:  Personally.
22   Q.    The premise of my question is you
23 lose on everything.  I'm just trying to find out
24 if you're still entitled to something.
25   A.    Yes, there's a 25 percent interest

Page 124

Ruben Elberg
2  in the real estate portion of the estate.
3    Q.    Because you're one of four?
4    A.    Four siblings on Jacob's will.
5    Q.    That's supposed to happen, that
6  doesn't have to await your mother passing away?
7    A.    It does.
8    Q.    It doesn't?
9    A.    It does.
10   Q.    Oh, it does.  So if you lose on
11 everything, you're not going to be entitled to
12 anything until that happens?
13   A.    Right.
14   Q.    That's your understanding?
15   A.    Yes.
16   Q.    Now, let's move to the Supreme
17 Court action before Justice Ramos.  What, if
18 anything, is still to be decided there?
19   A.    There was a decision by Judge Ramos
20 that was decided that Pewzner becomes the
21 manager of the LLCs, the limited partnerships,
22 and she has to do -- he gave her broad rights
23 without admitting in the court, the first thing
24 he said, I didn't read the papers, I thought
25 this was settled.

Page 125

Ruben Elberg
2      And then after 15 minutes of
3  discussions, he just says, you guys are
4  hindering the sale, and he gave her, he signed
5  the order without reading the papers.
6    Q.    That was an issue of whether she
7  could go ahead with the sale or not?
8    A.    Correct.
9    Q.    Is there anything else in that case
10 other than that, any other issue to be decided
11 that you know of?
12   A.    That case was brought by Crabapple,
13 Inc. who was an EB-5 capital bundler who sued
14 RORE or RREM for performance to make capital
15 contributions to the limited partnerships that
16 Crabapple invested $4 million of EB-5 funds
17 brought in from China.
18      There was another lawsuit, there
19 was another $50 million in another bank trying
20 to build these projects, and those investors
21 wanted us to perform, and Pewzner decided in
22 Jacob's lifetime she was not interested in these
23 projects to go forward.
24      Definitely when he's not here, she
25 had some say.  She did everything she could to

32 (Pages 122 - 125)

Page 126

Ruben Elberg

1 try to undermine the projects.
2 Q.    My question is, is there anything
3 else to be decided on that case other than the
4 issue that has been decided?
5 A.    If it's overturned and brought back
6 to Ramos, then this litigation, I guess, would,
7 depending on what the decision is, would go back
8 and be adjudicated either by Ramos or by someone
9 else.
10 Q.    Has that been fully briefed up at
11 the Appellate Division?
12 A.    Yes.
13 Q.    Has there been an argument that's
14 happened?
15 A.    It's happened already and we're
16 waiting.
17 Q.    When was the argument?
18 A.    On the 25th, not last month.  I
19 believe it was April 25th maybe.
20 Q.    Any other litigation going on that
21 will affect the issue of your ownership in the
22 medallion entities or the LLCs?
23 A.    No.  I'm sorry, Judge Catterson
24 brought a, I misspoke, I don't know if it's
25

Page 127

Ruben Elberg

1 turnover, declaratory judgment in front of Ramos
2 and the Class D does exist.  She claims it does
3 not exist.
4 And the partners, everybody claims
5 it exists except her.  She has no knowledge, she
6 is not involved, but she claims it does not
7 exist.
8 Q.    That's a lawsuit that you started?
9 A.    That's a lawsuit we started with
10 Judge Catterson.
11 Q.    What does that mean?
12 A.    He is a former judge, I call him
13 Judge Catterson, he is James Catterson.
14 Q.    But he's acting as a lawyer?
15 A.    He's acting as a lawyer, correct.
16 He went in for a declaratory judgment, and
17 Pewzner and the other party tried to avoid
18 service on the EB-5 investors.
19 So Judge Ramos said you received
20 the benefit in my court in your favor, and now
21 you're trying to say that you're not going to
22 accept the service for these foreign nationals
23 who cannot be found and they're elsewhere.
24 So Judge Ramos forced Crabapple to
25

Page 128

Ruben Elberg

1 accept the service for these nationals, but
2 James Catterson is waiting for a decision in the
3 First Department before he decides whether to go
4 forward with the declaratory judgment or whether
5 it's going to be a different circumstance after
6 it's overturned.
7 Q.    I see.  So in that case that you
8 brought, there were two separate cases, one in
9 which there's an appeal and then the one you've
10 brought by complaint.  One's waiting the appeal
11 outcome, and the other is stayed pending the
12 appeal?
13 A.    There's no stay.  He wants to see
14 if the appeal is done, then he can make a
15 decision on how to proceed, because it doesn't
16 make sense to pursue it until he gets the final
17 decision in the First Department.
18 Q.    Is there anything else, any other
19 litigations where those issues are at issue?
20 A.    No, not to my recollection.  It's
21 been so overwhelming that if I forget something,
22 forgive me, it's not intentional.
23 Q.    Mr. Catterson, what firm is he at?
24 A.    He's at Kaye Scholer.
25

Page 129

Ruben Elberg

1 Q.    Kaye Scholer, right.  Are you able
2 to pay them their fees?
3 MR. McCARTHY:  Objection.
4 A.    I owe them money.
5 Q.    Have you paid them?
6 A.    Yes.
7 Q.    You've already paid them?
8 A.    Yes.
9 Q.    You say you owe them.  There's an
10 outstanding bill that you owe?
11 A.    Yes.
12 Q.    Do you know whether they're not
13 going to go forward with your case because of
14 that?
15 MR. McCARTHY:  Objection.
16 A.    They're going forward, so far
17 they're going forward.
18 Q.    Has there been any settlement
19 discussion between you and your sister about the
20 issue of who owns the medallion entities or
21 whether you have an interest in the LLCs?
22 MR. McCARTHY:  Objection.
23 A.    There have been many discussions.
24 Unfortunately, she was committed to settle

33 (Pages 126 - 129)

Page 130

1              Ruben Elberg
2 things, and then she, at the last minute she
3 undermines the deal.  Whatever settlement comes,
4 she undermines it.  And I've tried at least
5 five, six times.
6      Q.    Are there any discussions ongoing
7 now?
8          MR. McCARTHY:  Objection.
9      A.    No.
10     Q.    Other than Capital One and the two
11 mortgage holders on your house, do you have any
12 other creditors, do you owe money to anybody
13 else, you have the Yeshivas, right?
14     A.    I have many creditors, I can't even
15 think about them.
16     Q.    You have the law firms, who else?
17     A.    I have many creditors.  I don't
18 have a settled head to remember all the details.
19     Q.    Do you have any plans to file
20 bankruptcy?
21     A.    No.
22     Q.    Have you considered doing so?
23     A.    No.
24     Q.    Do you have any claims against
25 anybody, any legal claims where you are seeking

Page 131

1              Ruben Elberg
2 payment from them?  I'm not talking about the
3 litigations between you and your sister.  I'm
4 talking about whether you have asserted -- well,
5 it could be your sister, where you've asserted
6 that somebody has broken a contract or harmed
7 you in some way where you're suing them?
8      A.    No, not yet.
9          MR. McCARTHY:  Just to be clear,
10        other than the estate litigation and the
11        litigation against your sister and other
12        entities.
13          THE WITNESS:  No, nothing.
14     Q.    Well, you could have a claim
15 against your sister if you feel she's harmed
16 you.
17     A.    I have not asserted those claims
18 yet.  I have many claims, but I have not
19 asserted.
20     Q.    Do you have any claims against your
21 sister?
22     A.    Against my sister, estate, the EB-5
23 purchasers who are actually inside buyers.
24     Q.    Are you saying you have a claim
25 against the EB-5 investors, the people in China?

Page 132

1              Ruben Elberg
2      A.    No, the EB-5 bundler.
3      Q.    Oh, the bundler.
4      A.    Who actually worked the deal.
5      Q.    Crabapple?
6      A.    Crabapple, NYC MRC West Lead
7 Capital.
8      Q.    So you think you have claims
9 against them?
10     A.    That's for my legal team to decide,
11 but I believe so.
12     Q.    Are you going to assert them soon?
13     A.    We'll make that decision when we
14 get clarity on what's going on further.
15     Q.    How much do you think they owe you
16 or have harmed you by, how much money would you
17 seek from them?
18     A.    I don't have that number yet.  I
19 have to decide that with my legal team.
20     Q.    Any other claims against anybody
21 else that you can think of?
22     A.    No.
23     Q.    Whether you've asserted them or
24 not.
25     A.    No.

Page 133

1              Ruben Elberg
2      Q.    Do you have any 401-Ks or IRAs?
3      A.    No.
4      Q.    Any kind of retirement accounts?
5      A.    No.
6      Q.    Have you set up any trusts?
7      A.    No.
8      Q.    Have you transferred any assets
9 that you haven't already talked about today?
10     A.    No.
11          MR. McCARTHY:  On the prior
12        question, we're not talking about trusts
13        that were created under the estate, we're
14        talking about trusts he personally created?
15          MR. FORSTOT:  Yes.
16     A.    No.
17     Q.    Have you in the last couple of
18 years made any charitable contributions?
19     A.    Practically none, very little, if
20 any.  I do the best I can, but nothing, nothing
21 much.
22     Q.    Have you transferred any assets to
23 any family members in the last, say since 2012
24 that you can recall?
25     A.    No.

34 (Pages 130 - 133)

Ruben Elberg

1
2    Q.    Let's look back at the subpoena
3  which is Exhibit 3.  Now, there's a list as we
4  started to look at on the second page, starting
5  on the second page or the first page, and it
6  goes on to the second page, you see that?
7    A.    Yes, I'm looking.
8    Q.    A list of documents.  Hold on, let
9  me get my copy.  I've got it.  Now, we talked
10 about your bank account records.
11       What I want to know is what you
12 did, what you've done or if more needs to be
13 done to be able to find any of these documents.
14 The bank account records you told me you still
15 need to look in your house and to ask the banks
16 for those records, right?
17    A.    Yes.
18    Q.    What about Number 3, balance sheets
19 or other financial statements reflecting your
20 assets and liabilities.  What did you do to find
21 any of those documents?
22    A.    I gave you whatever I had, I
23 believe so, but there's nothing else that I have
24 that I can produce.
25    Q.    I want to know what did you do, did

Ruben Elberg

1
2  you look in your house, do you have computers
3  that have records?
4    A.    Yes, I have a computer.
5    Q.    Did you search your computer
6  records?
7    A.    I can search further, but financial
8  statements and liabilities prepared for any
9  reason from 2012 to date, I mean, you have some
10 here that you showed us.
11    Q.    Let me ask you this, did you go
12 through this list very carefully and make sure
13 you looked for everything that's on this list as
14 best you could?
15    A.    I did the best I could to supply
16 you whatever I had.
17    Q.    So is there anyplace that you still
18 need to look to find anything in Number 3?
19    A.    I don't think so.
20    Q.    What about Number 4, records
21 reflecting your ownership or transfer of your
22 interest in real property or interest in any
23 entity which owned real property?
24    A.    Other than the assets that are
25 outlined in 5?

Ruben Elberg

1
2    Q.    I guess it's subsumed in that, but
3  it's broader than that.
4    A.    Well, I don't own anything but what
5  is in Number 5.
6    Q.    Okay.
7    A.    So I believe those documents you
8  have, and if you don't, I can supply those
9  again.
10    Q.    When you looked for records, where
11 did you look for Number 4 or 5?
12    A.    Whatever documents I gathered from
13 my business relationship with my father, and I
14 had records in my office of those documents.
15    Q.    In your office, where is your
16 office?
17    A.    In my home office.  I don't have an
18 office now, I have a home office now.  I work
19 out of my home.
20    Q.    What you did was you looked through
21 your --
22    A.    My documents and I supplied them.
23    Q.    You looked through documents in
24 your home office, and did you look on your
25 computer?

Ruben Elberg

1
2    A.    Yes.
3    Q.    You gave us everything you had
4  there?
5    A.    Yes.
6    Q.    Number 6, records reflecting the
7  sale of property located at 42-31 and 42-37
8  Crescent Street, is that subsumed in Number 5?
9    A.    Yes, she actually made, she took
10 power from Judge Ramos, and she sold everything.
11 So since she got that power, I have no
12 knowledge.
13       I have very little knowledge of
14 anything that she did, whether the sale and
15 transfer of funds, and anything that she did,
16 transferred assets, I have very little records.
17       MR. McCARTHY:  Could you clarify
18 who she is.
19       THE WITNESS:  Tamara Pewzner.
20    Q.    You talked about earlier that she
21 was supposed to set up escrow.
22    A.    Yes.
23    Q.    Why don't you explain that.
24    A.    If you look into the motion five, I
25 believe it was, in front of Judge Ramos, and

Page 138

Ruben Elberg

1 
2 Pewzner's counsel Mr. Lehman made
3 representations to Judge Ramos that we're not
4 taking this money, we're going to sell this and
5 we're just going to put it in an escrow that's
6 controlled by both of us.
7         And in the merger documents, she
8 outlined it was supposed to go into an escrow
9 account by Chase, JPMorgan Chase.
10        And I checked with JPMorgan Chase,
11 and they have no records of any escrow accounts
12 opened.
13    Q.    These are the proceeds from the
14 sale of the real property?
15    A.    Of the real assets, yes, of the
16 limited partnership.
17    Q.    Was it the real property or the
18 entities?
19    A.    Of the limited partnerships and of
20 the LLCs which she claimed is the owner of
21 everything.
22    Q.    That sale is done and closed,
23 right?
24    A.    She closed on it.  She actually did
25 a merger.  It's really a sale, but she merged

Page 139

Ruben Elberg

1 
2 the entities into a new corp that are called
3 instead of Royal CP Hotel Holdings LP, Royal CP
4 Two Hotel Holdings LP.
5         And instead of Royal HI Hotel
6 Holdings LP, Royal HI Two Hotel Holdings LP.
7 And the same thing, I think she did, Pewzner
8 transferred the interests of the limited
9 liability companies into RORE Two and RREM Two
10 in the merger.
11    Q.    The estate, when you say she, she
12 was acting on behalf of the estate?
13    A.    Right.
14    Q.    The estate doesn't retain any
15 interest in these entities, right?
16    A.    Not to my knowledge.  She was
17 controlling the deal.  She might have had side
18 deals, I don't know, I can't say that.
19    Q.    The proceeds of that were supposed
20 to have been distributed to return the
21 investments made by capital contributions made
22 by the ultimate partners, and then the net
23 proceeds were supposed to be distributed, either
24 to you and your father or to your father after
25 payment of the EB-5 investors and Crabapple,

Page 140

Ruben Elberg

1 
2 whatever, right; is that right?
3    A.    So let's start with the limited
4 partnerships where there's a declaratory
5 judgment on the Class D, okay.  That's the
6 binding partnership that is in place now and
7 effective.  If it does get overturned, that will
8 be the binding partnership.
9         There, if the sale happened, first
10 the sale proceeds would be distributed to, there
11 are four classes, Class A, B, C and D.  Class A
12 are the EB-5 investors.  Class B is the EB-5
13 bundler.  Class C was RORE and RREM, and Class D
14 was Ruben Elberg.
15        So the first sale that transpired,
16 the funds would have to go into the limited
17 partnerships and then distributed accordingly
18 how I just described.
19    Q.    When you say the funds, does that
20 mean all proceeds or the net proceeds of the
21 original capital contributions?
22    A.    All proceeds would go into this
23 company, and this company would pay its
24 liabilities, this limited partnership would pay
25 its liabilities, and then each partner would get

Page 141

Ruben Elberg

1 
2 their share of the proceeds.
3    Q.    But that's a net number before the
4 partners get their share, right, it's net of
5 liabilities?
6    A.    Can you clarify what you're saying?
7    Q.    I understood that the proceeds that
8 would get distributed to these different classes
9 was net of return of original investments.
10    A.    Correct.
11    Q.    Is that correct?
12    A.    Correct.
13    Q.    And there may be other liabilities.
14    A.    Correct, correct.
15    Q.    So those things have to get paid
16 first?
17    A.    Yes, that's what I said.
18    Q.    Then there's a net amount that is
19 disputed to how that gets distributed.
20    A.    Correct.
21    Q.    Do you know what that net amount
22 is, the total net amount was?
23    A.    Well, there were two capital
24 contributions, RORE contributed into Royal CP
25 and Royal HI, and I believe it was about

36 (Pages 138 - 141)

Page 142

Ruben Elberg

1
2 $11,800,000 that RORE and RREM contributed into
3 the limited partnerships, the Class C partner.
4       When those contributions were paid
5 back to RORE and RREM, and the $4 million
6 invested by the EB-5 Class A partners got paid
7 back, and the interest that was being charged by
8 the Class B partner for bundling these Chinese
9 investors was paid to the Class B partner,
10 right, the profit proceeds were split.
11       If there was a consent on my part
12 to sell my interest, which there was no consent,
13 neither by me nor by Judge Ramos to sell the
14 Class D interest in the limited partnership,
15 then the profits proceeds would be split 60/40
16 between Class C and Class D interest.
17    Q.    Understood.  My question though is,
18 what is that amount, the total amount, not the
19 60/40, the total amount of net proceeds, the
20 profit proceeds you called them.
21    A.    I don't know, I don't know what she
22 did so I can't say for sure.  She took power and
23 did whatever she wanted, Pewzner.
24    Q.    You have no idea?
25    A.    I have no idea what she did.

Page 143

Ruben Elberg

1
2    Q.    500 million, 50 million, two
3 million?
4    A.    I don't know what she did.
5    Q.    You don't know the magnitude at
6 all?
7    A.    I don't know what she did.  I know
8 she claims to have gotten $27 million.
9    Q.    Total?
10    A.    Total.
11    Q.    And from there, that was used to
12 repay capital contributions and liabilities?
13    A.    No.  Liabilities and EB-5 investors
14 and, liabilities, EB-5 investors and Class B
15 interests were above and beyond that number.
16    Q.    So 27 was the net amount the estate
17 took in?
18    A.    That's what I would say.
19    Q.    Leaving aside whether that's where
20 it ultimately should go.
21    A.    That's what she insinuated in the
22 merger documents and in front of Judge Ramos.
23    Q.    So your claim is for 40 percent of
24 that number, whatever that actually is?
25    A.    Class D has a 40 percent profit

Page 144

Ruben Elberg

1
2 sharing interest after the Class C gets paid.
3    Q.    Right.
4    A.    So the Class C has to get paid
5 first.
6    Q.    Sixty percent?
7    A.    No, $11.8 million, and then the
8 profit sharing would be there.
9    Q.    So the 27 is not net of all return
10 of capital?
11    A.    No.
12    Q.    So it really, the profit is, if 27
13 million is correct, you're talking about you're
14 fighting over 16 million roughly; is that right?
15    A.    (No verbal response.)
16    Q.    You have to answer orally.
17    A.    Yes.
18    Q.    So the 40 percent would be 40
19 percent of that, what that actual number is?
20    A.    Yes, but again, I did not authorize
21 that sale, so I did not consent to that number
22 or that sale.
23    Q.    I'm just trying to get an
24 understanding --
25    A.    I don't know what she did.  I don't

Page 145

Ruben Elberg

1
2 want to put myself in a position where I agreed
3 to that number, I did not.
4    Q.    I understand.  I'm not suggesting
5 you agreed to it.  I just want to know the
6 number you're fighting over.
7       You say that you did not, that she
8 sold the Class D interests without your
9 permission, correct?
10    A.    Correct.
11    Q.    Are you saying that there's an
12 actual document somewhere that says the Class D
13 interest is being sold?
14    A.    What the outrageous thing is that,
15 she, Pewzner and the EB-5 bundlers who actually
16 bought out under a third-party corporation, not
17 associated directly with them, they basically
18 claimed they're buying 100 percent of all
19 interests of the limited partnerships.
20    Q.    So they just made a general
21 statement without --
22    A.    Without referring to Class D.
23    Q.    And you think that was essentially
24 a clever way of making sure they got everything
25 without admitting there was a Class D?

37 (Pages 142 - 145)

Page 146

Ruben Elberg

2    A.    That's what they thought.

3    Q.    Okay, so back to where we started

4 this conversation.  You said that it was

5 represented to Justice Ramos that that 16

6 million, let's call it --

7    A.    No, they said the total amount, all

8 the 27 million would go into.

9    Q.    Are you disputing that the 11

10 million roughly contribution by RORE should not

11 be taken off the top?

12    A.    I'm not disputing that.  All I'm

13 saying is, since I'm a Class C partner -- I'm a

14 partner in RORE and RREM as well, those moneys

15 are in dispute in the Surrogate's level.

16    Q.    But you're not only asking for 40

17 percent for the Class D interest, you're saying

18 that part of the RORE and RREM moneys should

19 also come into play?

20    A.    Because that's where actual moneys

21 were put from the taxi corporations to buy the

22 real estate.

23    Q.    And so you're actually therefore

24 disputing and claiming part of the 11 million

25 return?

Page 147

Ruben Elberg

2    A.    I have to pay back Capital One.

3    Q.    That I agree with.

4    A.    I'm not hiding here.  I'm trying to

5 pay everybody, but I'm facing a problem.

6    Q.    Understood.  I'm just trying to

7 figure out what you're fighting over and what

8 your claim is.

9         Back again to where we started this

10 discussion.  You don't know where those moneys

11 are right now, the $27 million?

12    A.    I have a vague idea.

13    Q.    What's the vague idea that you

14 have?

15    A.    Well, I'm an executor, so she put

16 some of the moneys in the Chase accounts that is

17 an estate account, and a small portion in a

18 Shefa account, that's another estate account,

19 really it was part of the transaction, but she

20 put it in that account as well.

21    Q.    Shefa, what's that?

22    A.    Shefa Funding.

23    Q.    Shefa Funding?

24    A.    Yes, S-H-E-F-A.

25    Q.    You're saying that's the name of an

Page 148

Ruben Elberg

2 account holder or the place where the account

3 is?

4    A.    It's a corporation.  So in order

5 for you to better understand the way the funds

6 transferred from the taxi corporations into the

7 LLCs, and then the LLCs were supposed to put

8 capital contributions to the limited

9 partnerships, so that's what I want to clarify.

10 I think it's important.

11         MR. McCARTHY:  To the extent you

12    can, you're writing, to the extent you can,

13    please make it oral so it's in the record.

14    A.    So the $11.8 million, let's just

15 call it $12 million, were borrowed from the taxi

16 corporations.  2.4 was borrowed from the three

17 corporations that I'm, my judgment is on, 2.450,

18 and the balance was borrowed from my father's

19 corporations.

20         So these moneys were capital

21 contributions to RORE and RREM and to Shefa.

22 And these three companies, there is a chart that

23 outlines exactly these three companies, who owns

24 exactly how much interest in the limited

25 partnerships.

Page 149

Ruben Elberg

2         These companies were supposed to do

3 capital contributions to the limited

4 partnerships.

5    Q.    Right.

6    A.    So basically, she, Pewzner refused

7 to put it in escrow as she agreed as she

8 represented in front of the Judge, and she put

9 it into an estate account, into a Shefa account.

10         She left about $5 million with the

11 buyer because the buyer felt they had exposure

12 and they wanted to secure their situation.  And

13 she paid about five or $6 million in taxes, I

14 don't know exactly how much.

15    Q.    How do you know all this?

16    A.    This is information that I found

17 out through friends who are close.  But the two

18 accounts I have access to.

19    Q.    Friends that are close to who?

20    A.    To the family.

21    Q.    All right, so the only accounts you

22 have access to would be the escrow?

23    A.    The estate account and Shefa.

24 Those I found going through the bank and finding

25 those.

38 (Pages 146 - 149)

Ruben Elberg

1
2    Q.    Are you a signatory, do you have
3 access to the Shefa account?
4    A.    I am a signatory, but I am not
5 allowed to write alone a check from that
6 account.  She's actually written it alone, but I
7 cannot myself.
8    Q.    Who else?
9    A.    Pewzner.
10    Q.    Just your sister?
11    A.    Yes.
12    Q.    The Shefa account, that's not
13 considered an estate account?
14    A.    It's part of the estate's assets.
15    Q.    Because your father owned Shefa?
16    A.    Yes.
17    Q.    Did you own Shefa, part of Shefa?
18    A.    Shefa had received the moneys from
19 the cab companies, from my refinancing, my
20 father's refinancings, and that money was put
21 into Shefa in order for us to buy a note back
22 from Rosenthal & Rosenthal and to avoid paying
23 double taxes on -- when you borrow money and you
24 pay tax, like two and a quarter or two and
25 three-quarter percent for loans that you take,

Ruben Elberg

1
2 there is a tax that you pay when you borrow
3 money.  I don't remember exactly.
4         But we tried to avoid that by
5 buying the note back through Shefa by paying
6 double taxes when we borrow money again.
7    Q.    Okay.
8    A.    It was supposed to be part of the
9 capital contributions, so I actually own the
10 interest of Shefa, but I don't have documents
11 because my father and I trusted each other.  We
12 never nickel and dimed each other on paper, we
13 trusted each other.  He passed away suddenly and
14 this situation became out of hand.
15    Q.    How much money is in the two
16 accounts you do have access to, the estate
17 account and the Shefa account?
18    A.    Around 15, $16 million.
19    Q.    The rest is --
20    A.    I don't know.
21    Q.    Well, there's five million in the
22 hands of the buyer.
23    A.    They gave the buyer.  They left
24 that with the buyer.
25         MR. McCARTHY: Just to be clear,

Ruben Elberg

1
2 that's your understanding.
3    A.    They left it with the buyer.
4         MR. McCARTHY:  Were you a party to
5 the sale?
6         THE WITNESS:  No, I was not.
7    Q.    And the rest?
8    A.    I was told she paid some taxes.
9    Q.    Do you know if those were estate
10 taxes?
11    A.    I don't know what they were for.  I
12 was not involved in the transaction so I can't
13 say.  I'm just giving you things that I have
14 gotten, you know, really not full.
15    Q.    The representation made to Justice
16 Ramos that these would be in escrow, what was
17 supposed to be the terms of the escrow?
18    A.    That we were both controlling of
19 those interests, and that once upon a decision
20 came up, that's what the LOI said, that's what
21 the merger document said, then we would
22 distribute it accordingly.  But as she did, she
23 did not follow it.
24    Q.    Have you gone back to Justice Ramos
25 to complain that that wasn't done?

Ruben Elberg

1
2    A.    We had mentioned it in front of
3 Justice Ramos in one of our proceedings, and
4 Justice Ramos, it was as if he didn't hear it.
5         She had a former law clerk of
6 Justice Ramos working for her as a lawyer.  She
7 brought him on when she saw herself getting into
8 trouble.  And she brought in a law clerk, his
9 name is Andrew Tulloch, T-U-L-L-O-C-H, and the
10 Judge trusted his former law clerk to a point
11 where whatever he said, he did for them.
12    Q.    Do you have a transcript where a
13 representation was made of the escrow?
14    A.    Yes.
15    Q.    Has that been shown to Justice
16 Ramos?
17    A.    I don't believe it was brought to
18 his attention to show him the transcript, no,
19 but he was told in a hearing.  Clearly I
20 remember, I was present at the hearing, that,
21 the hearing after the sale -- I remember now.
22         They tried to discontinue the case,
23 they said that now that everything is sold, they
24 wanted to discontinue the case.
25         We argued against discontinuing the

Page 154

```
1            Ruben Elberg
2  case, and one of the things we brought was that
3  escrow was not established, and Judge Ramos did
4  not even pay attention to it.  And he
5  discontinued the case, he gave them what they
6  wanted.
7      Q.   Even though it's not being held in
8  escrow, do you have an understanding of the
9  circumstances under which it will be distributed
10 in the future?  Is it still the same thing when
11 there's a decision on what you're entitled to?
12     A.   Can you clarify?
13     Q.   The money is sitting there in an
14 estate account and a Shefa account.  Do you
15 understand under what situation those moneys are
16 to be distributed?
17     A.   Well, I can't say there will be any
18 distribution unless the court makes the decision
19 or she comes to a settlement, Pewzner comes to a
20 settlement.
21     Q.   Let's say the court makes a
22 decision.  Is it your understanding that those
23 moneys would then get paid to you from those
24 accounts?
25     A.   I don't know what the court will
```

Page 155

```
1            Ruben Elberg
2  decide.  I hope there is a favorable decision in
3  my interests.
4      Q.   Have you sent or anyone on your
5  behalf sent any writings to your sister, a
6  letter, anything saying the moneys have to be
7  held in escrow?
8      A.   We made the representations in
9  court, they knew.  They made the
10 representations, we made representations the
11 money is not in escrow, and it was ignored.
12     Q.   My question is, did somebody send a
13 letter or any other writing on your behalf to
14 your sister or her representatives saying this
15 money was supposed to be held in escrow?
16     A.   No.  I can't say for sure, I don't
17 remember, possibly.
18     Q.   Or demand they be put into escrow?
19     A.   I don't remember.  I can't say for
20 sure.
21     Q.   Can I get a copy of that transcript
22 where they made that representation to Justice
23 Ramos?
24     A.   It's online, it's in Motion 6.
25 Wait, I apologize.  It should be online, Motion
```

Page 156

```
1            Ruben Elberg
2  5 or Motion 6 or 7.  These last three motions,
3  there should be transcripts there, and there
4  should be definitely clear understanding.
5      Look at the LOI, letter of intent,
6  it's spelled out clearly that the money would be
7  put in escrow.  And it's also spelled out in the
8  merger documents.  It's spelled out in the
9  transcript, Lieberman made a representation in
10 front of the Judge.
11     Q.   Has there been any statement by
12 your sister as to why it's not in escrow?
13     A.   Not to my knowledge.
14     Q.   Has there been any statement --
15     A.   They ignored it.  When we brought
16 it up in front of Judge Ramos, they didn't even
17 address that issue.
18     Q.   Well, when you say in escrow, what
19 do you mean by that, are you talking about in a
20 special type of account?
21     A.   JPMorgan Chase was supposed to
22 establish an account with all the money that's
23 in dispute, and once there is a court decision,
24 that the moneys would be distributed
25 accordingly.
```

Page 157

```
1            Ruben Elberg
2      She paid $5 million in taxes.  She
3  left a substantial amount of money with the
4  buyers.  She put the estate and me in jeopardy,
5  and I don't know what else I can say, and all
6  the people we owe money to.
7      Q.   Somewhere you gone to the
8  Surrogate's Court to complain about the issue?
9      A.   I can't discuss that matter, but we
10 will be taking action, whatever is necessary in
11 due time.
12     Q.   Well, back to my other question.
13 What kind of account did you expect it to be in,
14 one where you were a signatory?
15     A.   Where I had control and she had
16 control for the total amount of money.
17     Q.   But you both had to sign for any
18 money to come out?
19     A.   Yes.
20     Q.   But that hasn't been done?
21     A.   No.
22     Q.   What's your understanding of the
23 money in the hands of the buyers, when will that
24 be released?
25     A.   They're concerned that they have
```

40 (Pages 154 - 157)

Page 158

Ruben Elberg

1    liabilities.
2        Q.    I understand, but that could be
3    just for a limited period?
4        A.    I would say for a year or two or
5    three, I don't know.
6        Q.    You don't know?
7        A.    I don't have what she agreed with
8    them, this is not with my consent.
9        Q.    Have you asked your sister, have
10   you asked the buyer?
11       A.    I have no communications with her.
12       Q.    Have you asked the buyer?
13       A.    I have no communications with them.
14       Q.    Have you tried?
15       A.    No, I have not.
16       Q.    Going back to Exhibit 3, the one in
17   front of you, the subpoena. Now, Number 7, I
18   assume you didn't look for anything because you
19   didn't have any securities?
20       A.    I do not have any securities.
21       Q.    You never had any securities?
22       A.    I can't say that.
23       Q.    Not since 2012?
24       A.    No.

Page 159

Ruben Elberg

1        Q.    Did you give us --
2        A.    Excuse me, I might correct that,
3    forgive me. Isn't a share ownership in a
4    company a security?
5        Q.    Yes.
6        A.    Isn't that security? Well, then I
7    do have, I don't want to misstate anything or
8    deny my ownership. I own 200 shares in Merill,
9    I own 200 shares in Spindle, and I own 100
10   shares in Jerub. So those are securities I
11   believe I supplied you information on or you
12   have that information because Capital One is the
13   lender.
14       Q.    Any other securities?
15       A.    Nothing other than that, no.
16           MR. McCARTHY: Your ownership in
17       the entities in Paragraph 5, if that is
18       deemed a security.
19       A.    Is that, they are not in share
20   ownership, I don't know, is that deemed as
21   securities?
22       Q.    I think you could argue that.
23       A.    What?
24       Q.    I think you could argue that, but

Page 160

Ruben Elberg

1    I'm not asking that.
2        A.    I don't want to deny my ownership
3    of RORE or, RREM.
4        Q.    I'm not asking you to that.
5        A.    No, I just want to be clear.
6        Q.    Records reflecting ownership of any
7    vehicle, have you given us that?
8        A.    I gave you the 2004 Honda Odyssey.
9        Q.    You gave us documents on that?
10       A.    I don't know if I did. If I
11   didn't, I'll provide that I own the car.
12       Q.    So you need to go back and find
13   anything about any vehicles you've owned from
14   2012 to date?
15       A.    That's my only vehicle.
16       Q.    Records reflecting receipt of any
17   dividend, partnership distribution, or any other
18   form of income, including salary from 2012 to
19   date. You gave us your 2012 tax return. What
20   about any other documents showing, any other
21   kind of income since then?
22       A.    No, nothing.
23       Q.    You've had zero, not one penny of
24   income?

Page 161

Ruben Elberg

1        A.    I told you I've been borrowing
2    money from my family, my children unfortunately,
3    and this $350,000.
4        Q.    There have been no distributions
5    out of the estate yet?
6        A.    No.
7            MR. FORSTOT: Why don't we take a
8        five-minute break and organize. I'm pretty
9        much done, but I have a few more things.
10       We'll go off the record.
11           (Whereupon, a discussion was held
12       off the record.)
13       Q.    Do you have to pay real estate
14   taxes on your house?
15       A.    Yes.
16       Q.    How much is that per year?
17       A.    It's part of the $2,600 payment.
18   Insurance and taxes are part of the $2,600
19   payment.
20       Q.    The mortgage servicer --
21       A.    Collects that.
22       Q.    -- collects that and pays it?
23       A.    Yes.
24       Q.    As far as you know, that's all

41 (Pages 158 - 161)

Page 162
1          Ruben Elberg
2  up-to-date, no arrearages there?
3      A.    No.
4      Q.    You're still co-executor of the
5  estate of your father, right?
6      A.    Yes.
7      Q.    The medallion entities that you
8  don't claim an interest in, are those all out on
9  the street and working?
10     A.    Yes.
11     Q.    Bringing in an income?
12     A.    Yes.
13     Q.    Do you know how much that is in
14 total per month?
15     A.    I want to address that. I'm not,
16 just like she took the interests of, Pewzner
17 took the interest of the real estate and sold it
18 without my permission, when my father passed
19 away, there was no borrower.
20         Since there was no borrower, I had
21 to right away, as an executor, I had the
22 obligation not to be in default with Capital One
23 to transfer the medallions to my mother's name.
24         When I did that, I'm facing now a
25 problem with potentially Capital One coming

Page 163
1          Ruben Elberg
2  after the estate that I'm an executor of for
3  transferring those assets that were, that had
4  Jacob Elberg's personal guarantees of the loans
5  of those assets.
6          She's been spending all those
7  moneys for legal fees and all kinds of things
8  that I don't know. I don't know if she's paying
9  Capital One, I don't know what she's doing
10 there. My mother is --
11         MR. McCARTHY:  The question was, do
12     you know what the medallions are
13     generating.
14     A.    No, I have no control over those
15 assets, that's the problem.
16     Q.    Are you aware of any of them that
17 aren't actually on a car and producing income?
18     A.    I don't have that information.
19     Q.    Is your mother supervising that?
20     A.    My mother has a very poor
21 understanding of the real reality with the
22 documents and understanding loans. She believes
23 whatever she's being fed by my sister,
24 unfortunately.
25     Q.    I'm asking, is somebody overseeing

Page 164
1          Ruben Elberg
2  that?
3      A.    Except Pewzner, nobody.
4      Q.    Is it your understanding as a
5  co-executor of the estate that those other
6  medallion entities are no longer part of the
7  estate, they're owned by your mother?
8      A.    They're owned by my mother, but if
9  the estate as a guarantor owes something, I
10 think those medallions are part of the
11 guarantee, because if they owed money -- I don't
12 know if I'm understanding you correctly what
13 you're asking me.
14     Q.    Those medallions are in individual
15 companies?
16     A.    Correct.
17     Q.    The company equity is owned
18 presently by the estate or your mother?
19     A.    My mother.
20     Q.    I understand the guarantee
21 obligation is still with the estate, of course,
22 is that what you're confusing?
23     A.    I just don't want to be personally
24 liable for anything for transferring those
25 assets early to my mother, but I had to because

Page 165
1          Ruben Elberg
2  I had no choice. There had to be a borrower or
3  else those assets were in default. That's why I
4  transferred it to my mother early on.
5      Q.    Maybe that's why there's a
6  confusion. What do you mean there had to be a
7  borrower?
8      A.    Capital One when my father died
9  sent us a letter stating that we are in default
10 because there is no borrower and there's no
11 guarantor.
12         My father was the sole borrower and
13 guarantor on those medallions. So in order to
14 have a face behind the loans, it was eventually
15 supposed to be transferred to my mother.
16         So we transferred them to my mother
17 just to make sure there's a borrower and a
18 guarantor for those loans.
19         And I don't have control over what
20 transpires with expenditures, how Pewzner runs
21 those companies.
22     Q.    So that transfer was something you
23 were involved with and you were okay with doing
24 it at the time?
25     A.    I consulted with Mark Gallagher who

42 (Pages 162 - 165)

Page 166

Ruben Elberg

1
2 is Capital One's attorney, and he advised me we
3 had to do this, so I followed his advice because
4 I didn't want to be in default.
5     Q.    Is there something he gave you in
6 writing that shows that?
7     A.    I might have emails.  I would have
8 to check.
9     Q.    Other than Capital One, we know
10 Capital One is a creditor of your father's
11 estate.  Are there any other creditors that you
12 know of of your father's estate?
13     A.    I have no control of what Pewzner
14 paid or didn't pay.  While I was involved, there
15 were some creditors.  I don't know what of those
16 loans or obligations were paid or not, so I
17 don't have control over that.
18     Q.    I'm not asking you about control.
19 What do you know of whether it's been paid or
20 not, what did you know of the other creditors of
21 the estate?
22     A.    I don't have a recollection now.  I
23 might have a spreadsheet, but there were, as I
24 told you, EB-5 investors, there were loans for
25 the real estate with Rosenthal & Rosenthal.

Page 167

Ruben Elberg

1
2         There were moneys that had to be
3 paid back to the medallion companies once a sale
4 or a refinancing took place in the real estate.
5 Eventually some money had to go back to the taxi
6 companies that were borrowed.
7     Q.    You say the taxi companies, you
8 mean the companies that owned the medallions?
9     A.    Yes.  I would say those are
10 creditors.
11     Q.    Any other creditors you're aware
12 of?
13     A.    I'm just telling you off the top of
14 my head what I remember, but there might be
15 more, I don't know.
16     Q.    Do you have an amount in mind or
17 did you understand what was owed in total to
18 creditors other than Capital One of your
19 father's estate?
20     A.    I don't have a number, no.  I don't
21 remember.
22     Q.    Did you ever know that?
23     A.    Possibly, yes, I might have some
24 information on that.
25     Q.    Can you recall any information now?

Page 168

Ruben Elberg

1
2     A.    I don't recall right now.  I'm just
3 not settled, forgive me.
4     Q.    The entities, the medallion
5 entities you claim an ownership interest in, do
6 they own any assets other than the medallions?
7     A.    No.
8     Q.    They don't own any vehicles?
9     A.    Nothing, no.
10     Q.    Do they have creditors other than
11 Capital One?
12     A.    No.
13     Q.    Do you have an understanding how
14 much the judgment Capital One has against you?
15     A.    Yes.
16     Q.    What do you understand that amount
17 to be?
18     A.    Eight percent, 4.4.
19     Q.    And you understand interest, post
20 judgment interest is running on that?
21     A.    I want to pay you.  Help me pay
22 you.
23     Q.    I'm asking if you know that.
24     A.    I understand.
25     Q.    Assuming you don't win on the

Page 169

Ruben Elberg

1
2 contested issues between you and your sister,
3 what's your thinking about how you might be able
4 to pay your debt off to Capital One?
5     A.    Whether I win or not, the fact is
6 there's a trail that the medallions lent money
7 to the LLCs, and the moneys were supposed to go
8 back to the medallion companies.
9         So one way or another, Capital One
10 has to get paid, and nobody is trying to duck.
11 I want to make sure you get paid, but I need
12 your help to be able to achieve that.
13         I've never defaulted with Capital
14 One with anything until my father passed away,
15 and I was continuing to make the payments.
16         Capital One sent me emails they
17 were going to extend the loans, and instead of
18 extending the loans, they started the
19 foreclosure action.
20     Q.    You say you have emails from
21 Capital One?
22     A.    From Capital One, clearly they were
23 going to extend the loans, it was supposed to go
24 through 2017.  They sent me emails.
25     Q.    Where are those emails today?

43 (Pages 166 - 169)

Page 170

Ruben Elberg

2   A.   I have them.
3   Q.   Anything else as far as you're
4 thinking about being able to pay the debt back?
5   A.   Irrelevant of who owns those
6 assets, whether the estate or Class C interest
7 or RORE or RREM or the medallion companies,
8 there's a track record how the money was flowed,
9 the money has to be paid back.  I have an
10 interest to do that, but I'm being hindered.
11   Q.   Do you have any thoughts about
12 getting a job and paying part of your income
13 toward your debts?
14   A.   I don't think that's going to pay
15 you so fast.
16   Q.   It may not, but I'm asking if you
17 have any thoughts about that.
18   A.   I'm looking at potentially getting
19 into the brokerage business, and I have a good
20 understanding of real estate.  And I'm seriously
21 thinking of going into the brokerage, but the
22 licensing has not been achieved yet, it's going
23 to take a couple of months.
24      And I think sooner than that we can
25 resolve these issues if we work together in a

Page 171

Ruben Elberg

2 fair and amicable way to get the truth, and to
3 get to the truth and to get you what you
4 deserve.
5   Q.   Have you asked for any loans from
6 anybody to try to help pay the debt down?
7   A.   No.  I don't have any, all my
8 assets are tied up.  When people lend you money,
9 they lend you money on assets.  All my assets
10 are tied up.
11   Q.   You still have equity in your
12 house, right?
13   A.   Not really, it's practically gone.
14   Q.   How do you know that if you don't
15 know the value of the house?
16   A.   It's somewhere in the million
17 dollar range, you know.  What equity do I have
18 if I owe $800,000, what kind of equity do I have
19 there, there's practically nothing left.
20   Q.   Have you asked for a loan to be
21 secured by whatever equity you have left?
22   A.   No, I cannot, and that's because I
23 don't have income to prove.  I can't even
24 refinance my house to prove that I have
25 additional income so I can borrow against the

Page 172

Ruben Elberg

2 house.  I can't even borrow against the house
3 now.
4   Q.   Getting a job would get you some
5 income.
6   A.   That's what I'm working on.
7 Unfortunately, being tied up with all these
8 litigations, I don't want to start working for a
9 few thousand dollars a month and not pay four
10 and a half million dollars in debt that I have.
11 And I have money that's sitting in an account
12 that's eventually supposed to be repaying those
13 loans.
14   Q.   You're not going to get a job
15 because?
16   A.   The moneys are in the estate
17 account and in the Shefa accounts.  I want to
18 resolve my obligations.  I don't want to be
19 haunted by people because I have never, ever,
20 ever not paid my bills.
21   Q.   But getting a job would actually
22 help you by starting to reduce the debt a little
23 bit.
24   A.   I'm working on it, I'm working on
25 it.  Unfortunately, I've been overwhelmed with

Page 173

Ruben Elberg

2 these things.
3   Q.   When you say overwhelmed with these
4 things --
5   A.   With the litigations.
6   Q.   It doesn't take up all day every
7 day, you can actually work, right, do you agree?
8   A.   I will work on that.  Thank you for
9 the recommendation, I will work on it.
10   Q.   So there are documents you still
11 need to get to us.  I mean, I don't want to get
12 into a dispute whether you made a good faith
13 effort to find them.
14      MR. FORSTOT:  So what I'll do then
15      is hold this deposition open.
16   Q.   When do you think you can get all
17 the documents we talked about, the bank
18 statements and the other documents to us?
19   A.   Tell us what you need, and I'll try
20 to work on getting it.
21   Q.   We did send you a letter.
22      MR. FORSTOT:  I'll send your
23      counsel a letter saying these are the
24      documents we talked about in the
25      deposition.  If you like, I can tell you we

44 (Pages 170 - 173)

Page 174

1          Ruben Elberg
2    would like them in a week.
3          MR. McCARTHY:  For scheduling
4    purposes, I'm going to be out of the
5    country from July 8th to July 18th, so we
6    would like some time beyond that.  If I can
7    get them to you before --
8          MR. FORSTOT:  If we get the letter
9    to you this week, we can get some, if not
10   all of them.
11         MR. McCARTHY:  I'll try to get them
12   to you.
13         MR. FORSTOT:  What I'll do is I'll
14   look at them, and if we don't really have
15   any questions or any questions, we don't
16   have to get together again.  But if we do,
17   then we do, just to finish this, all right.
18         Do you have any questions for your
19   client?
20         MR. McCARTHY:  No, I don't have any
21   questions.  I'm just going to put on the
22   record that I'm going to state my objection
23   to holding it open, but obviously we can
24   come to an agreement.
25         MR. FORSTOT:  That's it, we're off

Page 175

1          Ruben Elberg
2    the record.
3
4          [TIME NOTED:  2:19 p.m.]
5    _____
6          RUBEN ELBERG
7
8    Subscribed and sworn to before me
9    this _____ day of _____, 2017.
10
11   _____
12         NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 176

1
2               I N D E X
3    WITNESS        EXAMINATION BY         PAGE
4    Ruben Elberg    Mr. Forstot        4
5
6             E X H I B I T S
7    PLAINTIFF'S      DESCRIPTION        PAGE

     Exhibit 3     Subpoena duces tecum    58
8
     Exhibit 4     Eight pages of Capital One
9               bank statements       70
10   Exhibit 5     Alma Bank Personal
               Financial Statement     83
11
     Exhibit 6     Capital One Bank Personal
12              Financial Statement    85
13   Exhibit 7     Wilshire State Bank
               Personal Financial
14              Statement       88
15   Exhibit 8     Capital One Bank Personal
               Financial Statement    88
16
     Exhibit 9     2012 1040 U.S. Individual
17              Income Tax Return     102
18
             REQUESTS
19
         PAGE      LINE
20
          155      22
21
22
23
24
25

Page 177

1
2          CERTIFICATION
3
4        I, Alice Schulman, a Notary Public for and
5    within the State of New York, do hereby certify:
6        That the witness whose testimony as herein
7    set forth, was duly sworn by me; and that the
8    within transcript is a true record of the
9    testimony given by said witness.
10       I further certify that I am not related to
11   any of the parties to this action by blood or
12   marriage, and that I am in no way interested in
13   the outcome of this matter.
14       IN WITNESS WHEREOF, I have hereunto set my
15   hand this 27th day of June, 2017.
16
17
18
19       ALICE SCHULMAN
20
21
22
23
24
25

45 (Pages 174 - 177)