SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - - - - - - - - -x

CAPITAL ONE TAXI MEDALLION FINANCE,

Plaintiff,

-against- Index No: 608014/2015

JEB MANAGEMENT CORP. and RUBEN ELBERG,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

875 Third Avenue
New York, New York

June 22, 2017
9:54 a.m.

EXAMINATION BEFORE TRIAL of RUBEN ELBERG, the Judgment Debtor in the above-entitled action, held at the above time and place, taken before Alice Schulman, a Notary Public of the State of New York, pursuant to Subpoena and stipulations between Counsel.

APPEARANCES:

TROUTMAN SANDERS LLP
Attorneys for Plaintiff/
Judgment Creditor CAPITAL ONE
TAXI MEDALLION FINANCE, a trade
name for All Points Capital
Corp., N/K/A Capital One
Equipment Finance Corp.
875 Third Avenue
New York, New York 10022

BY: JONATHAN D. FORSTOT, ESQ.,
ANDREW BUCK, ESQ.

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
FORMATO, FERRARA & WOLF, LLP
Attorneys for RUBEN ELBERG
3 Dakota Drive - Suite 300
Lake Success, New York 11042

BY: BRIAN T. McCARTHY, ESQ.

* * *

STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116, C.P.L.R., and shall be controlled thereby.

The filing of the original of this deposition is waived.

IT IS FURTHER STIPULATED, a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

* * *

R U B E N E L B E R G, the Witness herein, having first been duly affirmed by the Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. FORSTOT:

Q. What is your name?
A. Ruben Elberg.
Q. Where do you reside?
A. 1523 President Street, Brooklyn, New York 11213.
Q. Mr. Elberg, I'm Jonathan Forstot of Troutman & Sanders on behalf of Capital One. Have you been deposed before?
A. Maybe once before.
Q. Maybe once, you're not sure?
A. Once before, yes.
Q. So you know how this works?
A. Not very well. If you can explain, I would appreciate it.
Q. I'll be asking you questions and

you're under oath. The court reporter will take down a transcript of everything we say, so make sure your answers are oral, not nods of the head, no gestures.
A. No problem.
Q. We need to have a written transcript of this. If you don't understand anything I ask you, please let me know and I'll try to rephrase it so you understand the question, okay?
A. Yes.
Q. You gave an address to the court reporter, that's where you presently live?
A. Yes.
Q. Do you have any other residences besides that?
A. No.
Q. You are therefore a resident of the State of New York, correct?
A. Yes.
Q. Who else lives at that address with you?
A. My wife and nine children.
Q. Anybody else?

Ruben Elberg

A. No.

Q. What kind of structure, is it a house, an apartment?

A. A private house.

Q. So a stand-alone house?

A. Yes.

Q. On President Street?

A. Yes, sir.

Q. Who owns the house?

A. I do with my wife.

Q. You said nine of your children live there?

A. Yes.

Q. You have a total of 14 children?

A. Yes, I do.

Q. Where are the other children who don't live with you?

A. Some of them are married, and some of them are in Yeshivas, and then when they come back, they live with us for a month or two and then they go back. They're not steadily in our home, they're in Yashivas.

Q. Are the Yashivas in New York?

A. One was in Westchester, one was in

Ruben Elberg

Los Angeles, which is shlichus, he's an emissary from higher rabbinical school, and the other one was in France. S-H-L-I-C-H-U-S, it's a Hebrew word.

Q. Is English your native language?

A. No, I was born in Russia.

Q. What languages do you speak besides English?

A. Russian, Hebrew, I understand Yiddish and Georgian and English.

Q. Do you conduct business in English?

A. Yes, I do.

Q. Do you believe you need an interpreter to understand any of my questioning?

A. I don't believe so. If I have questions, I'll try to ask you to clarify.

Q. You're involved in several litigations, correct?

A. Yes.

Q. Have you had to have any documents in any of those litigations translated for you into a language other than English?

A. No.

Q. So you've been using English in

Ruben Elberg

these other litigations, correct?

A. Yes. I shouldn't say that, forgive me. There were some documents translated from English to Chinese when we went out to market one of the projects we were involved in, so I want to correct my answer.

Q. Listen carefully to my question. Did you have to have any document translated from English into another language for you to be able to understand if?

A. No, not for me.

Q. Let's go over, why don't you tell me the names, ages of your 14 children and who lives with you and who doesn't.

A. We have Baruch who is nine years old.

Q. He lives where?

A. With us. Channa who is 12 years old, she lives with us. We have Ahron, he's 13, he lives with us. We have Levi who is his twin, also 13.

Q. He lives with you?

A. With us, yes. We have Yisrael, he's 15. If I'm off a little bit on the ages,

Ruben Elberg

forgive me. I believe I'm telling you everything correctly. Yisrael, we have Moshe.

Q. Wait, where does Yisrael live?

A. With us. We have Moshe who is 17. He is in Yashiva in Westchester, and he just came back just recently. So his summer, he is at home.

Q. Is he going to go back to Yashiva after the summer?

A. I don't know. I don't know where. We are working on it, we just don't know which Yashiva yet. We have Shneur, he is 19, and he was in Brunoy, France.

Q. How do you spell that?

A. B-R-O-I-N-O, Brunoy, France, in Yashiva. And we have Josef, he's 22. He was in Yashiva in Los Angeles.

Q. You said he was or is he?

A. He is coming back, he was and he's coming back in a week, and I don't know what he's going to do next year. For the last year he was there. He's still there, and he's coming back in a week. Should I continue?

Q. Yes, please.

Ruben Elberg

A. Then we have David. He's supposed to be in Yashiva in Crown Heights.
Q. How old is he?
A. He's 23.
Q. Does he live at home or at the Yashiva?
A. Yes. And we have Mandel, he's married. He's 24 and a half I would say.
Q. Where does Mandel live?
A. In Crown Heights.
Q. In his own place?
A. He's renting an apartment.
Q. Next.
A. Then we have Miriam. She lives with us and she's a teacher.
Q. How old?
A. Twenty-six.
Q. Okay.
A. Then we have Shterna, she is 27 and she lives in her own home, she's married.
Q. Where does she live?
A. Crown Heights.
Q. Okay.
A. Then we have Dina.

Ruben Elberg

Q. Dina you said?
A. Yes, she's 30 years old and she's married.
Q. Where does Dina live?
A. In Crown Heights.
Q. But not with you?
A. No.
Q. The area of Brooklyn you live in, what area is that?
A. Crown Heights.
Q. So the President Street address is in Crown Heights?
A. Yes.
Q. Okay.
A. Then we have Tsipora who is also a teacher and she's living in Crown Heights as well with us, and she's 30 years old.
Q. You said she's a teacher?
A. A teacher, yes.
Q. And lives with you?
A. With us in the house, yes. She's not married yet.
Q. Is that everybody?
A. Yes.

Ruben Elberg

Q. There's not somebody named Shabtai?
A. Shabtai is Mandel. Shabtai Menachem, he has three names.
Q. What is your name?
A. Ruben Elberg.
Q. Do you go by any other names?
A. No.
Q. Have you ever gone by any other name?
A. No.
Q. So --
A. Do you have bottled water?
MR. BUCK: He's looking for unopened.
THE WITNESS: I appreciate it. Thank you so much.
Q. Baruch is the youngest?
A. Yes, sir.
Q. He lives with you. Does he go to school?
A. Yes, he goes to Yashiva.
Q. Is there a tuition for that school?
A. Yes, there is.
Q. Who pays the tuition?

Ruben Elberg

A. For the past two, three years, unfortunately I have not been able to pay the tuition, but I had a good track record in the past years with Yashivas, and they have been patient with me, so they have not been, you know, throwing my kids out of school.
Q. So you haven't paid tuition in three years?
A. Two and a half, three years, yeah. It's unfortunate, but that's the reality.
Q. And Channa?
A. She's also in Yashiva.
Q. Sorry?
A. She's also in Yashiva, in girl's Yashiva.
Q. She lives with you but goes to a girl's Yashiva?
A. Yes.
Q. Who pays her tuition?
A. Also the same thing, the first year maybe I paid a little bit, and the second year I paid something towards it, but I haven't paid anything in the past two years.
Q. Levi and Ahron?

Page 14

Ruben Elberg

A. The same thing.

Q. They live at home, they go to Yashiva but you're not paying tuition?

A. Unfortunately I'm unable to.

Q. Yisrael?

A. Yisrael, the same thing.

Q. Yisrael lives at home, goes to Yashiva, but you don't pay tuition?

A. Yes, sir.

Q. Moshe?

A. Moshe same thing. Moshe, the past two years I haven't paid tuition, but the last year now I paid some towards because he's out of town Yashiva, so you have to pay something. So I paid some money towards the tuition, but I still owe at least half of it, if not more.

Q. So there's tuition and there's also living expenses; is that right?

A. That's part of it, that's all inclusive.

Q. How much is that on an annual basis for Moshe for the last year?

A. I committed to approximately 65 or $6,000 completely.

Page 15

Ruben Elberg

Q. You committed, is that what they charge or is that what you said you would pay?

A. They generally charge, they wanted eight, and I committed to six, and I paid some of it, I didn't pay all of it yet.

Q. Where did you get the money to pay that?

A. I had borrowed money twice in the last two years because of the litigation, from personal loans and interest and basically paid legal expenses and other expenses that I've had to maintain myself going forward.

Q. Who loaned you the money and how much?

A. There was a friend whose name is Shalom Bahr, and I think his fund is called Kerem Menahem Fund, Kerem Menahem Trust, I think. I borrowed from him $350,000, interest to be paid at the end of the two-year period, and that would be like 420 by the time I have to pay it back.

Q. When is it due to be repaid?

A. In about six months to a year.

Q. From now?

Page 16

Ruben Elberg

A. Yes.

Q. But you don't know exactly?

A. I don't have the exact date. I can check.

Q. You're going to owe how much, 400 some odd thousand dollars?

A. 420, I'm paying ten percent interest a year which comes to 35,000 a year. So if you multiply by two, that's 70,000.

Q. Have you made any repayments yet?

A. No.

Q. When you say you have to pay him in six months to a year, is that the entire repayment --

A. He knows --

Q. Let me finish the question. Is it the first of a number of repayments? I'm not following what you're going to be doing in six months to a year.

A. I got the loan for litigation purposes, and he is flexible with me. He gave me a two-year period, but he can extend it for another year if it's necessary. I'm in discussions with him now, so there's no final

Page 17

Ruben Elberg

date that I have right now.

Q. Originally, did you sign a note?

A. Yes, I did. My house is good as a guarantee.

Q. Is there a due date on the note?

A. Yes, there are two stages. One was 250 and another hundred was given to me. The first loan was January, and the second loan was September of 2016, so it was two years per.

Q. So the first note is due if there's no extension in January of 2018, and then the next note is due --

A. In September.

Q. -- September of 2018; is that correct?

A. Yes.

Q. You said you guaranteed with the house, the house you live in?

A. I gave him my house as a guarantee to repay the loan because I have equity in the house, so I gave him that as a guarantee.

Q. Did you give him a mortgage on the house?

A. Yes, a second mortgage, I signed a

Ruben Elberg

note.

Q. You say a few thousand of that you've paid to the Westchester Yashiva?

A. Yes.

Q. You still owe them more money?

A. Yes.

Q. Shneur is in France you say?

A. Yes.

Q. Studying in Yashiva there?

A. Yes.

Q. Who is paying for that?

A. That's also a similar situation as Moshe. I paid some of it, I owe substantial money toward Yashiva tuition. And he's back and he won't be going back because I don't have the means to continue the Yashiva there, I don't have the money to keep the payments up.

Q. He's home now?

A. He came back yesterday, so he will be staying for now.

Q. How long was he in France for?

A. Just one year.

Q. How much did you pay for that?

A. That would be in the seven or

Ruben Elberg

$8,000 range plus travel expenses with the tickets back and forth. And I didn't pay it in full. I still owe money towards that as well.

Q. You paid seven or eight or you owe seven or eight?

A. The amount was, I believe, eight or nine if I remember correctly, and I paid maybe six towards it, five and a half.

Q. Where did you get that money from?

A. Part of the loan that I borrowed before.

Q. The moneys that you got from the loans, you got the proceeds from them. What did you do with the proceeds when you first received each of those loans?

A. I paid some of it in legal fees. Some of it I paid old debts that I had accrued before I had from someone else, I paid that off. And some of it I paid for ongoing expenses that I had.

Q. That's not what I meant. Let me clarify. When you got the first loan, the first loan was how much?

A. 250.

Ruben Elberg

Q. When you literally got the money, did you put it in a bank or was it in cash, how did you get it?

A. I put it in a bank. I didn't get it in cash, of course not.

Q. Was it a check?

A. Check.

Q. Where did you deposit the check?

A. To my recollection, my account, my personal account.

Q. Where is that?

A. Capital One.

Q. Any other account that you have, any other bank accounts that you have?

A. I might have deposited it in a business account.

Q. I'm sorry?

A. In a business account.

Q. You might have deposited that money in a business account?

A. Or a portion of it. I can't be sure now exactly where I deposited it. Some of it I deposited in personal, some of it I deposited in business. I can get that

Ruben Elberg

information for you if it's necessary.

Q. Where was that business account?

A. It was in Capital One.

Q. Both accounts are in Capital One?

A. Yes, and then I have another business account in Bank of America.

Q. So we're talking three accounts now?

A. Yes. It's a business account.

Q. The account that you said, the personal account, is that in your name?

A. Yes, I supplied the personal account information to you.

Q. That's in the name of Ruben Elberg?

A. Yes.

Q. Anybody else a signatory on that?

A. No.

Q. Just you?

A. Yes.

Q. The business account at Capital One, whose name is that in?

A. Business account, Capital One, it's in my name.

Q. Ruben Elberg?

Ruben Elberg

A. Three accounts are the Capital, those are Merill, Spindle and Jerub, those are in Capital One.

Q. J-E-R-U-B, Merill and Spindle. All right, let's take this a little more slowly. You got 250, $250,000 in a check?

A. Yes.

Q. When was this?

A. January of 2016.

Q. And you took that check and you deposited it where?

A. Into a business account, business account.

Q. Which business account?

A. N. Minue, Inc.

Q. N. Minue, Inc., N. M-I-N-U-E, Inc. Where was that account?

A. It was, one was in Capital One and I had also in Bank of America.

Q. Which of those two accounts did you deposit that $250,000 check in?

A. I don't remember. I believe it should have been -- I don't have the exact information. I would have to check back and

Ruben Elberg

give you that information.

Q. Where would you check?

A. The bank, which bank account I deposited it in and how much and when, I would have to check it.

Q. When you said you would check in the bank, what does that mean?

A. I have to check which deposits were made in which banks.

Q. I know that. How would you do that, would you go to a document, would you ask somebody, how would you find out?

A. I would go to the bank.

Q. You would literally physically go to the bank and ask them?

A. Or look at my statements and see where the deposits would be.

Q. So you do have statements for your bank accounts, correct?

A. Do I have statements from the bank accounts, yes, I do.

Q. Where do you keep those?

A. I have them in my home, I believe.

Q. I mean, do you have them in a

Ruben Elberg

special place like a file cabinet, do you keep them all together in an organized way?

A. I wouldn't say, it's not the most organized way.

Q. You would be able to find them without much trouble if you needed to?

A. I can always get a copy if I need to.

Q. I know that, but if you have it somewhere in your home, you know where to go to look to find it, correct?

A. Again, I don't have it in an organized way. I have to look for it. If it's in my home, I will give it to you. If it's not, I will locate it and give it to you. I will get a copy from the bank.

Q. It's not a big deal to do?

A. It's something that I would have to do.

Q. But you would be able to do it easily, correct, you can get me those statements, correct?

A. I will work on it.

Q. That's not my question. My

Ruben Elberg

question is, is it difficult for you to get these bank statements for me?

A. Why would you say it's difficult? I don't understand the question.

Q. I'm asking if you think it's a difficult task to get these bank statements.

A. No, I don't think so.

Q. So you would have to do that in order to tell me which of the accounts, which of the business accounts you deposited the $250,000 check into, correct?

A. Right.

Q. The loan that you took out, was it taken out in the name of some business or in your individual name?

A. I gave a personal guarantee. He gave it to me on my personal name.

Q. So the note you signed was you as an individual, not on behalf of N. Minue or any other entity, correct?

A. I don't believe so, no.

Q. Whatever account you put it into, how much of that $250,000 is still available to you somehow?

Ruben Elberg

A. I have $4,000 in the account.
Q. I'm not asking about the account. I'm asking about the sum of money. You had $250,000, you deposited it into some account. Whatever happened to the money, whether it moved to other accounts or you used it, how much of that sum is left to you available today?
A. $4,000.
Q. So you've paid 246,000 of it to various --
A. Yes.
Q. -- payees?
A. Yes.
Q. And you've told me that you used some to pay legal fees; is that right?
A. Yes.
Q. Do you know how much of that 246,000 went to legal fees?
A. I have to get a record from my lawyer to see how much I paid which law firm and when.
Q. Do you have any idea how much?
A. I would say more than $300,000. Remember, I told you I took an additional

Ruben Elberg

$100,000, so I would say more than $300,000 has gone to legal fees.
Q. I just want to know about that 250, where it went. I would assume most of it had to go to legal fees?
A. Most of the money went to legal fees.
Q. Which law firm did it go to?
A. It went to Kaye Scholer, Levi Huebner & Associates.
Q. What was it?
A. Kaye Scholer, Levi Huebner & Associates, some to Abrams & Fensterman. Again, I'm telling you this is all including the additional funds I took.
Q. Because you can't divide in your mind exactly how much you sent to each of one, I understand.
A. Yes.
Q. Anybody else?
A. Those are the three legal firms that I associated with.
Q. Are they all three still your lawyers?

Ruben Elberg

A. Two of them are. One of them I would say partially still advises me.
Q. So they're all still your lawyers?
A. Yes.
Q. Any other law firm besides those three?
A. No.
Q. I know you can't tell me exactly between the two loans, but where else did the money go besides you told me law firms, and you used it to pay for Shneur, sorry, I can't pronounce his name.
A. Shneur.
Q. Shneur, his expenses in France, Yashiva and so on?
A. Yes.
Q. Did you use some of that money to pay for some of the other Yashivas you've talked about?
A. Just a minor portion, yes.
Q. Anything else that money was used for?
A. Well, my wife works, so we don't have enough income. So if there's anything to

Ruben Elberg

offset the living expenses that we need, I used some of it towards that.
Q. Did any of it go to Capital One to reduce the judgment that Capital One has against you?
A. No, I made multiple efforts to meet with Capital One because I have over $100,000 sitting in the bank account. I wanted to offer to pay those funds in the three corporations, and Capital One refused to meet me.
They actually not only refused to meet but they colluded with my sister in order to deny me my right to access my bank accounts and be able to function properly, to be able to pay my bills.
Q. The second $100,000 installment of the loan, of the second loan, I'm not sure if it's a second loan, did you get that in cash or a check?
A. Check.
Q. What did you do with that check?
A. The same thing.
Q. You deposited it?
A. I deposited it in the bank.

Ruben Elberg

Q. Which bank account did you deposit it in?

A. I would have to check, I don't remember exactly.

Q. You would have to check the bank statements you have at home?

A. Yes.

Q. Again, that was used, as far as you know, for paying legal fees --

A. Yes.

Q. -- and some other expenses; is that right?

A. Yes.

Q. You just mentioned $100,000 sitting in three accounts?

A. Yes.

Q. Or an account for three companies, I couldn't quite get what you said.

A. Yes, Merill, Spindle and Jerub has been accruing income from the medallions in the taxi corporations, and I made an attempt to meet with Capital One. Judge Catterson reached out to meet with them, to set up a meeting and try to work something out.

Ruben Elberg

Q. What's the name?

A. James C-A-T-T-E-R-S-O-N.

Q. The money that's sitting in those accounts, you're talking about that's income from medallions owned by those entities?

A. Correct.

Q. That's the money that you were going to, you were proposing if you were able to meet with Capital One to pay to Capital One?

A. Pay and also negotiate some kind of a direction of resolution with these judgments because, you know, it's very difficult to function under a scenario where you have my sister saying she owns the assets of, not she, but the estate owns the assets of Jerub, Spindle and Merill, but the liabilities are mine.

And basically she's taking the position that those companies belong to the estate, and I have to pay the judgments on these accounts.

Q. Because you guaranteed their debt, correct?

A. Not only because I guaranteed it, but I actually borrowed money from these

Ruben Elberg

medallion companies, and I paid investments in other businesses. I have that money, the money that's owed us that was sold, and the money is available to be repaid but it's stuck in this unfortunate mess that we're in.

Q. Now, you say you borrowed money from these entities. You're talking about the entities that own the medallions?

A. Merill, Spindle and Jerub.

Q. So we don't have to say Merill, Spindle and Jerub every time, can we call them the medallion companies?

A. Yes.

MR. McCARTHY: I want to object. Potentially there may be confusion among other medallion companies, but for now you can do it.

A. I would say Spindle and Merill are solely owned by me, so I would rather focus when I speak about my total ownership with that, and Jerub is owned 50/50 with my father. One of those cabs have to be associated with the other company that you just mentioned.

Q. That's fine. Any time it becomes

Ruben Elberg

important to distinguish, please do so. We don't have to use a definition to override what you think the facts are.

So you said you borrowed money from these entities, these medallion entities. Which of them did you borrow money from?

A. Spindle, Merill and Jerub.

Q. All three?

A. All three, yes.

Q. When did you do that?

A. From 2003 through 2012 when we started diversifying into the real estate sector.

Q. So from 2003 to 2012, you borrowed money from each of those entities?

A. Yes.

Q. How did you do that?

A. We refinanced with Capital One, and we took some equity out and we invested it in real estate.

Q. So you took equity out?

A. Yes.

Q. But you view that as a loan from the company to you or as a capital distribution?

Page 34

Ruben Elberg

A. No, it was a loan, it was loans.

Q. How much did Merill loan you?

A. In total from 2003 to 2014, Merill, Spindle and Jerub lent $2,450,000 roughly.

Q. It lent that to you?

A. Lent, lent it to me, and my father was handling actually the finances. So we made those investments, we deposited them either in their own accounts directly, Mandel, Spindle or Jerub.

I can tell you the way the money was used, or it was deposited directly into the Royal One Real Estate Account or Royal Real Estate Management account, or it was directly wired to Rosenthal & Rosenthal who was a lender on some of those properties.

For example, a million dollars in 2011, 2012 was directly wired to pay a loan down on these two entities that I just described, RORE and RREM. Let's just abbreviate the companies, Royal One Real Estate will be abbreviated to RORE and Royal Real Estate management will be abbreviated to RREM, R-R-E-M.

Q. You said you borrowed the money.

Page 35

Ruben Elberg

Is there a loan agreement between you and these entities?

A. Yes.

Q. Do you have a copy of that?

A. Yes, the Capital One, the last 2012 loan agreement, we have it, sure, we can supply it.

Q. No, no, the loan from Merill, Spindle and Jerub to you of $2,450,000?

A. No.

Q. You said you borrowed money from these entities.

A. We borrowed it from Capital One.

Q. The loans, there were loans made to each of these medallion owning entities by Capital One, correct?

A. Correct.

Q. You said, and tell me if this is not what you meant, that then you borrowed money, you took money out --

A. We took money out.

Q. Who is we?

A. My father and me because Jerub is owned by Jacob and Ruben.

Page 36

Ruben Elberg

Q. But as far as Merill and Spindle go, you're the only owner?

A. Correct.

Q. So you took a loan from each of those entities?

A. Correct.

Q. So you have three loans?

A. Correct.

Q. Is there any loan documentation, a loan agreement or any other documents --

A. No.

MR. McCARTHY: Let him finish his question.

A. I apologize.

Q. That's all right. Otherwise, if we speak over each other, it's not going to come out in the transcript.

A. Please finish.

Q. Is there any document reflecting the loan between those entities and you and in one case those entities between you and your father?

A. No.

Q. Who made the decision to borrow

Page 37

Ruben Elberg

money from Merill?

A. I did.

Q. Who made the decision to borrow the money from Spindle?

A. I did.

Q. And who made the decision to borrow the money from Jerub?

A. Jacob and I.

Q. So you owe each of those entities moneys to pay back those loans?

A. Yes, sir.

Q. When is that due?

A. There was a problem that created the dispute between my sister and myself. The problem is very simple, in 2001 when we changed accountants, my father found a new accounting firm.

He was running the taxi medallion business, and he was operating it, and I gave him power of attorney to do everything, he was signatory on the bank accounts.

I was not involved day to day with those operations. I was handling the real estate end of the operations. So what happened

Ruben Elberg

was, when we changed from one accounting firm to another, the new accountant filed all the tax returns under Jacob Elberg 100 percent owner.

When we were borrowing money, it is reflected in the tax return as if Jacob borrowed the money from Spindle, Merill and Jerub as 100 percent owner, but all the loan documents and everything else, I borrowed it. I signed for it, I personally guaranteed for it.

Jacob also personally guaranteed the companies I owned because he was running it, and the money was being processed through JEB Management.

And because he was in control of the moneys, Capital One made JEB Management as an additional guarantor and Jacob Elberg as an additional guarantor on all those loans.

But I'm not a guarantor on any of Jacob Elberg's other medallion loans. He was a guarantor on mine.

Q. That's not my question. My question is when is the money that was borrowed by you from Merill and Spindle and borrowed by you and your father from Jerub, when is that due

Ruben Elberg

to be paid back to those entities?

A. It was due to be paid back after a refinancing of the hotel project that we were going to stabilize or a sale of the hotel project that we were going to stabilize.

Q. Is there anything in writing that says that's when it's due back?

A. No.

Q. Is there an interest rate?

A. The accountant was imputing two percent interest in the tax returns.

Q. How do you know that?

A. I know that.

Q. But how do you know that?

A. The accountant told me.

Q. Which accountant is that?

A. Fred Roth.

Q. Who negotiated the loan on behalf of Merill?

A. What do you mean by that? Please clarify.

Q. Who took Merill's interest into account and said I'm going to loan you money, to you Ruben?

Ruben Elberg

A. I don't understand who would negotiate that. I don't understand what you're saying.

Q. Did anybody take Merill's side of that discussion and the decision from Merill to loan you Ruben Elberg money?

A. No.

Q. That was just you, right?

A. Yes.

Q. You just made the decision all on your own?

A. Yes.

Q. You took money out and you decided there would be a loan?

A. I borrowed money from my corporation, and my father borrowed from his corporation, and actually we did capital contributions into the RORE and RREM.

And from there they were to be capital contributions to Royal CP and Royal HI entities.

Q. But my question is, who decided that it would be, for example, in the form of a loan as opposed to a distribution of equity?

Ruben Elberg

A. My father and I, we discussed it and we said that we were going to take this as a loan and then repay it back when we could to the companies.

Q. Why did you decide it would be a loan as opposed to an equity distribution?

A. I don't remember the reason behind it, but it was to be paid back to those companies.

Q. You said in a prior answer that Capital One colluded with your sister. What evidence do you have of the collusion?

A. My sister had a tendency to record people, and she basically recorded Mark Gallagher who was Capital One Bank's lawyer basically. I have a transcript of it, I submitted it in the case, and it's --

Q. Any evidence you had of what you call collusion you submitted to the court; is that right?

A. I'm sorry?

Q. Any evidence that you have of what you call collusion, did you submit that to the court in opposition to the summary judgment

Page 42

Ruben Elberg

motion made by Capital One?
A. Yes, I did.
MR. McCARTHY: Sorry, can you just read back the question, and I want to make sure the answer is correct.
(The record was read.)
MR. McCARTHY: Thank you.
Q. So there's no other facts or what you would think of as evidence of this collusion that you could point me to, other than what's already been submitted to the court?
A. There is an appeal on this case that is going to be perfected by the 29th of this month. So that's going to be filed by the 29th, and we'll see what happens.
Q. That's not my question. My question is, do you have any other facts you can point me to other than something --
A. I'm not going to get into the details of that litigation.
Q. Let me finish the question. Do you have any other fact which you can point me to, other than what you've already submitted to the court, not a legal argument, any other fact of

Page 43

Ruben Elberg

what you call collusion?
A. I choose not to go into that aspect because I'm not ready for it, for the discussion at this moment. My mind is not settled with those details right now.
Q. Who is your lawyer on that case?
A. I'm pro se right now.
Q. Do you get statements of the Merill, Spindle and Jerub accounts where this money has been building up?
A. Yes.
Q. I'm sorry, where are those accounts?
A. Capital One.
Q. So you're aware of how much is sitting in each one?
A. Yes.
Q. Do you know roughly how much is sitting in there right now?
A. I would say around 120,000 between the three accounts, if not more.
Q. That is income paid by --
A. Jerub, Spindle --
MR. McCARTHY: You just have to let

Page 44

Ruben Elberg

him finish his question.
THE WITNESS: I thought he was finished, I apologize.
MR. McCARTHY: I'm sorry.
MR. FORSTOT: Thanks.
Q. The income that goes into that account is from running the medallions, right?
A. Yes, sir.
Q. Who pays the money into each of those accounts?
A. Napersay Management is one, and if you give me a minute, I'll tell you the exact names, I apologize.
THE WITNESS: Is that okay?
MR. McCARTHY: He just wants to get the spelling.
MR. FORSTOT: That's fine.
A. It will take me a minute because I shut this off.
Q. That's all right. All you're trying to do is get the spelling of Napersay?
A. The two companies we get rental income from, that's what I'm searching.
Q. You can do that at a break and add

Page 45

Ruben Elberg

that. There are management companies to whom Merill, Spindle and Jerub lease the medallions; is that right?
A. Right. Merill and Spindle are leased with one organization, and Jerub is leased to Napersay Management.
Q. Is there a set monthly amount that gets deposited from running the medallions?
A. Yes.
Q. How much is it?
A. Right now it's 1,600.
Q. Per medallion per month?
A. Per medallion per month.
Q. Is that the money that has created this hundred and some odd thousand dollars?
A. Yes, sir.
Q. And is there any other income that those entities have besides those rental amounts?
A. No, they don't.
Q. Those leases, how long do they run for?
A. They are two- to three-year lease agreements and, you know, they have an option in

Page 46

Ruben Elberg

the lease where they can, if the market conditions are not proper, originally these leases, we were generating $3,500 a month per medallion. And they started dropping, dropping to a point where it's reached 1,600.

So they have a way where they can renegotiate with us. They will give us three months and they return to us the medallions, if we don't agree to the negotiated terms.

Q. Who is managing those medallion entities today?

A. I just told you, I can give you --

Q. I don't mean the managing companies. Let's say there's a renegotiation or a discussion about the medallion lease rates between whatever company it is and any of the three medallion entities, who talks to these companies on behalf of the medallion entities?

A. I was speaking to them until about a year ago, and a year ago, I think less than a year ago --

THE WITNESS: Excuse me.

(Witness and counsel confer.)

A. Recently one of the management

Page 47

Ruben Elberg

companies, my two companies told me that Pewzner's lawyer told her not to communicate with me any more under any negotiation terms, and to speak with Tamara in reference to those negotiations, because they had sent me a letter that they were returning those medallions to me because the market was not, you know, sustaining, they were paying me 2,500.

And when they sent me a letter, I said okay, I'll take them back because I had someone else who was willing to give us in the 2,000, $2,200 range. This was like six months ago, maybe more.

At that time, I was waiting for them to return the asset so I could give it to the new company which I had preliminary discussions with.

And my sister's lawyer interjected and told them not to give the taxicabs back, and they renegotiated the terms to 1,600 without my permission.

Now, I could start another litigation with these people, but I just don't have the means to litigate with all these

Page 48

Ruben Elberg

people. So I asked my lawyer to be in contact with them to see how we can work something out without -- I can't have my sister setting the terms on my medallions with what income I'm going to get, because I have obligations to Capital One and I can't do that. She interjected again like everywhere else to try to undermine my ownership.

Q. Is there a court order that says that she's got the right to do that as opposed to you?

A. No, there is no such court order.

THE WITNESS: Brian, can you explain the court order because I'm not legally savvy with what court orders there are.

MR. McCARTHY: We're here for your deposition, so if you don't understand it, that's fine.

Q. Other than receiving income and negotiating lease rates, is there anything else that needs to be done with regard to those entities as far as management of the companies go?

Page 49

Ruben Elberg

A. No, these are management companies. They do everything from A to Z.

Q. Do they file tax returns for each of the entities?

A. No, they do not.

Q. Who does that?

A. JEB Management, my father and I. Unfortunately, that's where the problem started. So in 2013, I found out that the tax returns were being written as my father as 100 percent owner, I challenged the accountant.

I said why are you doing this, you knew Mark Gallagher was clearly saying these are the assets. He said I'm sorry, I didn't know. From now on going forward, we're going to correct it.

I said I don't want to do it going forward. Now it's 2013, tax returns have to be filed. I want to file it the correct way.

He said no, I can't do that, I've already done, it's done and I can't change it and the next year we're going to do it the way you want it.

I said I don't want to file

Ruben Elberg

anything for 2013. I wrote him a letter from my lawyer not to file those returns as a mistake in the past.

And my lawyer asked him, he had claimed that Jacob Elberg had given him authority for E-filing, and my lawyer asked him to give him the E-filing notices for Spindle, Merill and Jerub that Jacob owns 100 percent, and he could not deliver on his words, whatever he said that Jacob gave him that authority and direction.

So I believe he never got that authority from my father. My father never claimed those assets to be his. He signed papers to the contrary of what my sister is claiming, and I just don't understand what I'm facing these challenges with. But I'm trying to work this through with the legal system. It's very costly and time consuming.

Q. Joseph Elberg, Josef Elberg, he's in Los Angeles?

A. Yes, he was sent by the Yashiva as an emissary. So that expense, there is no tuition there on my part, and even his travel

Ruben Elberg

expenses is paid by the Yashiva because he is sitting in a hall, and he's basically helping younger students with their learning process.

Q. Does he get paid for that?

A. No.

Q. But his expenses are covered. He's coming back you said from LA?

A. Yes.

Q. Is he going to continue to work in that role where he gets his expenses covered?

A. Probably, probably. He's just finishing his rabbinical ordination.

Q. What about David Elberg?

A. David Elberg is finishing, he's also finished his rabbinical ordination, and he's going to be starting out on his life now. He's going to start.

Q. He's been in the Yashiva for the last two to three years?

A. Yes.

Q. Who's been paying for that?

A. He had the same circumstances like Josef where he was an emissary for the last two, three years in Yashivas, and he was not paying

Ruben Elberg

anything. His expenses were being paid by the Yashiva.

Q. You say Mandel is married?

A. Yes.

Q. He's living elsewhere in Crown Heights?

A. Yes.

Q. Miriam lives at home with you?

A. Yes.

Q. She's a teacher?

A. Yes.

Q. She gets paid for that?

A. Yes.

Q. Does she use that money to support you and your children?

A. Yes, she helps us.

Q. Your other children?

A. Yes, she helps us a little.

Q. And Shterna?

A. Shterna is married.

Q. She lives elsewhere?

A. She lives elsewhere.

Q. Dina is married and lives elsewhere?

Ruben Elberg

A. Yes.

Q. Tsipora is married and lives at home?

A. Yes.

Q. She's also a teacher?

A. Yes.

Q. She gets paid for doing that?

A. Yes.

Q. Does she use part of that income to support you and your other children?

A. Yes.

Q. You said your wife works?

A. She's a teacher.

Q. She gets paid for that?

A. Yes.

Q. How much?

A. Less than 2,000 a month, around that range.

Q. Where does she work?

A. Beth Rifka schools in Crown Heights.

Q. How long has she worked at that school?

A. The past year.

Ruben Elberg

Q. So that's a new job?
A. She did part-time work before and, you know, recently we needed the income so she went out and started working.
Q. You said it's $2,000 a month?
A. Approximately.
Q. What about you, do you work?
A. No, I do not.
Q. You don't have a job?
A. No, I do not.
Q. What are your monthly expenses for you and all your children you support?
A. I have rent which is about, it's not rent, I apologize, it's a mortgage. I have a $400,000 mortgage on the house, and that's about $2,600 per month for mortgage. I have electric, gas, you know, basic household expenses, another five, $600 a month, approximately.
Q. And you need food?
A. We have food stamps.
Q. You qualify for food stamps?
A. Yes.
Q. Have you ever had a job?

Ruben Elberg

A. Yes.
Q. What jobs have you had?
A. I worked in the beginning of my career, I was a gemologist and mineralogist. I worked in the diamond district as a gemologist.
Q. Do you have some certification in that area?
A. I'm a certified gemologist.
Q. Okay, go ahead.
A. Thereafter I worked five years with my father in the taxi industry.
Q. In the taxi industry?
A. Managing the day-to-day operations of the medallions. It wasn't always leased to third parties like it is now.
Q. Any other jobs you've had?
A. I had a restaurant at one time.
Q. You owned a restaurant?
A. Yes.
Q. When was that?
A. '93 to 2000.
Q. You sold that business?
A. We got out of the business. It was not profitable.

Ruben Elberg

Q. Go ahead, so you managed the restaurant, is that what you did?
A. I was a partner in one of the restaurants.
Q. Did you actually manage it?
A. Yes, I worked there day to day.
Q. Go ahead, any other jobs?
A. In 2001 roughly we started diversifying into real estate, trying to find investment opportunities in real estate, and tried to build a portfolio in real estate.
Q. You managed that?
A. My father and myself.
Q. You said you were managing, what were you managing?
A. I was finding the assets, doing all the approvals that were needed, if it was a development site, raising capital, everything that needed to be done day-to-day to bring the project to fruition I was handling.
Q. Any other jobs?
A. No.
Q. Have you attempted to go back to work as a gemologist?

Ruben Elberg

A. I've looked into it, and all the people in the diamond industry are telling me don't waste your time, this is not an industry that you want to go back into.
Q. Have you looked for a job in any way recently in the last couple of years?
A. I'm contemplating going into brokerage because I do know the real estate sector very well, and I'm working on getting a license there. I'll see if that succeeds.
Q. Is there some kind of course? How do you get a license?
A. There are two stages. One is either you're a salesman and then you become a broker, or if you have had or you still have real estate holdings or interests in real estate holdings, you can get a broker's license without having to go through the steps of being a salesman and then going to brokerage.
Q. Where are you in that process?
A. In the beginning stages.
Q. Have you gotten any income from the real estate business other than when you were working with your father?

Ruben Elberg

A. No.

MR. FORSTOT: We've gone about an hour or so. Do you want to take a five-minute break?

MR. McCARTHY: That's fine.

(A recess was taken.)

(Subpoena duces tecum was hereby marked as Plaintiff's Exhibit 3 for identification, as of this date.)

A. Weiling Management.

Q. Weiling, how do you spell that?

A. W-E-I-L-I-N-G, Management and the principals are Rod and Steve Newman. I'm having a problem with Napersay Management.

I'll tell you what it is. My sister negotiated the deal terms with Napersay Management, and that was negotiated at $2,500 per month, and all the funds were supposed to go into the Jerub account at Capital One.

Only a small portion, a third of those funds are going into the mutual account that my mother and I have, and the balance of the money she redirected into another account that I have no understanding or knowledge of

Ruben Elberg

where it is.

That is moneys that belong to Jerub, and I have personal liabilities, as I see her here, being challenged by Capital One.

I just don't have the means to litigate about every little thing with everybody, you know what I mean. But I want to be clear that there are funds that are being diverted by Pewzner from Jerub that I have no knowledge of where it's going.

So the full 2,500 that the lease agreement was agreed to is not being deposited into the account, and I don't know where the money is going.

Q. How do you know that it's being diverted?

A. Because I looked at the account and I see the amount that's being deposited, and it's not the full amount that we're supposed to get.

Q. Do you see money going out of the account?

A. I just don't see the money coming in.

Ruben Elberg

Q. You used the name Pewzner, and that's your sister?

A. Tamara Pewzner, she's my co-executor.

Q. And your sister?

A. Yes.

Q. I just want to clarify something. Earlier I had asked you how much of the $250,000 was left, still available to you, and you said about $4,000.

Now I just want to make sure I get the whole $350,000 amount that you borrowed. How much of that whole amount is left and available to you somewhere?

A. $4,000.

Q. So it's the same 4,000?

A. Yes.

Q. So out of $350,000, 346,000 is out the door, being used to do something?

A. Yes.

Q. Being used to pay legal fees and other things you testified about?

A. Yes, yes.

Q. Your deposition was originally

Ruben Elberg

noticed for a subpoena of March 7th and you didn't show up. Why didn't you show up?

A. I had counsel communicating --

MR. McCARTHY: Sorry, I don't want him to disclose any communications he had between his counsel and himself. Other than conversations, please do not state any communications you had with counsel.

THE WITNESS: All right.

A. There was a demand that was sent to me, the response was supposed to be 2107, not 2017. So the year was 2107, I don't know if it was on the deposition or one of the other documents that you requested some response on it. The date was 100 years later, so I just didn't think it was timely.

You weren't asking me to come at a certain time and date. I don't remember which one of those documents was there, and I was not ready for whatever reason and I'm here now.

Q. It's your testimony under oath, sir, that because the date was 2107, you didn't have to comply with the subpoena for 100 years?

A. No, that's not my testimony.

Ruben Elberg

Q. So the date had nothing to do with it, did it --

MR. McCARTHY: Objection.

Q. -- why you didn't show up?

MR. McCARTHY: Objection.

Q. Is that right? You can answer.

A. I have nothing else to add.

Q. Let me ask you once again. Why didn't you show up on March 7th, what was the reason?

A. I misunderstood the document. I really didn't understand that I had to come on a certain date for some reason.

Q. We've already had two exhibits marked when you didn't show up, so we're going in sequence. This is Plaintiff's Exhibit 3, that's why it's 3 and not starting with 1.

MR. FORSTOT: Do you have a copy for counsel?

MR. McCARTHY: I'll take it.

Q. Exhibit 3 is a subpoena you were served with in this matter, and it requested that you produce documents. Do you see that document in front of you? Take your time and

Ruben Elberg

look at it. Have you looked at it?

A. Yes.

Q. And the date's right on that one, right?

A. No, that's the one 2107.

Q. But you understood that that was just a typo, correct?

A. No.

Q. You really didn't?

A. I understood what it said here.

Q. I'm sorry?

A. I understood what it said here.

Q. Did you read that you were supposed to produce documents, did you understand that part?

A. I read this document, yes, I did.

Q. Now, let's go through this. First, tax returns, federal and state for the years 2012 through 2015 and 2016 if available, do you see that?

MR. McCARTHY: I just want to, I know it's part of the record, but I just want to ask, the paragraph you're reading from starts with a sentence that says:

Ruben Elberg

"Now, therefore, we command you to produce for examination on February 27, 2107, at 12:00 p.m., at the offices of Troutman Sanders LLP, 875 Third Avenue, New York, New York 10022."

I just want the record to be clear, and I also want the record to reflect at this time that I've not been provided with copies of Exhibits 1 or 2. I would ask if I could see them.

Q. Anyway, you see where I'm talking about, the tax returns, do you see that?

A. Please refer to the paragraph, clarify what you're asking.

Q. Number 1 at the bottom of the first page. Tell me when you're there. Are you there?

A. I'm reading. Could I have a moment, please.

Q. Let me know when you're done. Have you read Number 1? You're on the second page.

A. Yes, I have.

Q. You understand it says tax returns, federal and state for the years 2012 through

Ruben Elberg

2015 and 2016 if available, correct?

A. Yes.

Q. Did you produce your tax returns?

A. I believe I've supplied one tax return for 2012.

Q. You produced it in response to this subpoena?

A. I don't know if it was this subpoena or some other subpoena, but I supplied it.

Q. Why else would you have supplied it?

A. Again --

Q. You supplied a tax return in response to this subpoena; is that right or not?

A. I don't know if it was to this subpoena. But I had discussions, again, I don't want to get into my discussions with my legal counsel, and I gave whatever I had available.

Q. You didn't think you had to wait 100 years for that?

A. (No verbal response.)

Q. You didn't think you had to wait 100 years for that, right?

Ruben Elberg

A. I supplied what I had.
Q. Which was a tax return for 2012?
A. Yes.
Q. What about 2013, where is that tax return?
A. We spoke before that I didn't, I don't know if I mentioned it, that I did not file starting 2013 because there was a problem with my accountant not giving me the proper documentation to file the tax returns.
So when I wanted to file 2013, I needed the K-1s for three corporations that I had interests in, and he said he already had filed it. I told him I wanted it corrected, and he would not cooperate.
So at that point I didn't want to file tax returns saying when I found out that there was a problem with his filing, I didn't want to continue filing with a mistaken filing that my father, he claims my father guided him to file in the past, Fred Roth claims he guided him to file in the past. So 2013 on, I have not filed anything.
Q. No federal tax returns?

Ruben Elberg

A. Nothing.
Q. No state tax returns?
A. Nothing.
Q. Because of that reason?
A. I just wanted to clarify when I file, I want to file it properly. There is a dispute about these corporations and all the income. I don't know how to file, who is the income to if it's not going to be decided in my favor or not. I don't know exactly what's going on, and I did not file based on that.
Q. Is there any other reason you haven't filed tax returns for 2013, '14, '15 or '16?
A. '14, '15 and '16, there was no income, I had no income, so I had really nothing to file, I wasn't working. But '13 to '14, I had what to file, you know, and this was the correction that I needed done, and my only accountant would not cooperate to do whatever was right.
Q. '14, '15 and '16 you had no income?
A. I haven't worked.
Q. Your wife didn't work in 2016?

Ruben Elberg

A. My wife did not work, she started working the last year now.
Q. In 2017?
A. 2016.
Q. How much income did she make in 2016?
A. She went to an accountant. She's dealing with that. I don't know exactly what's with her, if she's going to be filing alone or what's the situation with that.
Q. Before that, you filed joint returns with your wife?
A. Yes.
Q. You got an extension from both the State of New York and the federal government to file your 2013 and 2014 taxes?
A. I got a 2013 extension, but not the years after.
Q. When was the 2013 extension until?
A. I don't have the date, I don't remember.
Q. Is it still extant?
A. No, it's not.
Q. You just didn't file a tax return?

Ruben Elberg

A. I did not file it yet, no.
Q. And 2014, did you get an extension for that?
A. There was nothing to file in those years, I had no income to file.
Q. Number 2 on Page 2, records of all banks accounts owned by you for the years 2012 to date. So have you produced all bank accounts from 2012 to date?
A. Yes, I gave whatever I had.
Q. For all bank accounts?
A. What do you mean all bank accounts?
Q. All bank accounts opened by you.
A. Personal, are you talking about personal?
Q. Anything in your name.
A. In my name personally, yes.
Q. In any way, I don't care.
A. Yes.
Q. You have?
A. Yes.
Q. How many did you produce?
A. Whatever I had, I produced.
Q. Do you know?

Ruben Elberg

A. Please clarify what you're asking.

Q. How many statements did you produce for how many months for how many accounts?

A. I don't remember the amounts of statements, but whatever I had, I produced.

MR. FORSTOT: That's it?

MR. BUCK: That's it.

MR. FORSTOT: Mark that as the next exhibit.

(Eight pages of Capital One bank statements were hereby marked as Plaintiff's Exhibit 4 for identification, as of this date.)

Q. Take a look at Exhibit 4, and let me know when you're done.

A. Yes.

Q. Are those pages, those are the bank statements you produced, correct?

A. It's some of the bank statements. I also submitted, if I'm not mistaken, Capital One accounts possibly for the taxi corporations. If I did not, I have them, and what I described before, there is over $100,000 in three accounts, I can supply those accounts also.

Ruben Elberg

Q. What period of time are the statements in your hand from?

A. January 14th to February 13th.

Q. Of what year?

A. 2017.

Q. For what account?

A. Ruben Elberg.

Q. It's one account?

A. Yes.

Q. Do you remember how you testified earlier that it's not a problem to get copies of these accounts, statements, do you remember that, do you remember that?

A. Do I remember what?

Q. Testifying that it's not a problem for you to get copies of account statements for your accounts.

A. Okay.

Q. You have them either at home, correct; is that correct?

A. I don't know if I have all the records.

Q. Or you could easily ask the bank for them, right?

Ruben Elberg

A. Yes.

Q. What did you do to find all the records at home or ask the bank for your account statements to comply with this subpoena?

A. I gave you whatever I had handy and I supplied it.

Q. One month from this year, that's what you had, those are the only account statements you have in your house, bank accounts?

A. The ones I had recently.

Q. That's not my question. Those are the only account statements you have in your house for your bank account, right?

A. I have to check what else I have.

Q. What did you do to check to make sure you didn't have any others?

A. What do you mean what did I do to check?

Q. Did you look throughout your house, did you ask somebody else to look, what did you do?

A. The ones I had handy, I gave you.

Q. When you say handy, what does that

Ruben Elberg

mean?

A. Without having to make a major search. Whatever I had available at that time, I gave you.

Q. Did you make any search besides finding whatever you had handy?

A. I wouldn't say I made an extensive search, no.

Q. Did you ask the bank for any copies of statements from 2012 through today?

A. No.

Q. Why not?

A. I didn't understand that you wanted all the bank accounts from 2012 to now.

Q. Look at Page 1, sorry, Page 2, Number 2, records of all bank accounts owned by for the years 2012 to date, do you see that? Is that confusing to you?

A. No, it's not.

Q. You mentioned a Bank of America account, where are those statements?

A. I should have some at home.

Q. Why didn't you produce those?

A. Because it's a business account.

Ruben Elberg

Q. Is that in your name?
A. It's a business name.
Q. Any other accounts besides the account you produced one month's statement for and the Bank of America account that you have any control over?
A. No, I don't have any other moneys elsewhere in any other bank.
MR. McCARTHY: Can I just make one clarification and I'll just say, Exhibit 4 speaks for itself, and the number of months that are covered within the bank account statements.
I think the testimony for the questioning has been one month, but I believe there are multiple months.
MR. FORSTOT: How many months are there?
MR. McCARTHY: January 14, 2017 to February 13, 2017, two pages. February 14, 2017 to March 13, 2017, two pages. October 15, 2015 to November 13, 2015, four pages, and these are all Capital One bank account statements.

Ruben Elberg

MR. FORSTOT: Thank you.
Q. Have you owned any securities since 2012?
A. No.
Q. Any investments in mutual funds, stocks, bonds, anything?
A. No.
Q. Number 4 on the subpoena, you see that second page there, Number 4, records reflecting the ownership and/or transfer by you of any interest in real property, do you see that?
A. Yes.
Q. You own your house, correct?
A. Yes.
Q. You say you own it with your wife; is that right?
A. Yes.
Q. Since 2012, have you owned any other real estate besides that property?
A. I have partnership interests in RORE and RREM, and I have partnership interests in Royal CP and Royal HI.
Q. Got it.

Ruben Elberg

A. So other than my home, there's business interests that I have that I discussed with you before.
Q. Any other properties?
A. No.
Q. You never had an interest in the Crescent Street in Queens property, is that what you own through those?
A. Yes.
Q. Have you had a car since 2012?
A. Yes.
Q. Do you still have a car?
A. Yes.
Q. Did you produce ownership documents for owning that car?
A. I believe so. I notified -- I could be mistaken, a 2004 Honda Odyssey.
Q. You own that, do you pay any loans on that?
A. No, no loans.
Q. How much is the mortgage, the two mortgages on your house?
A. There is one mortgage that is being paid which is $2,600, and the other mortgage,

Ruben Elberg

the interest is due when the loan is due.
Q. Let me clarify. What I meant is how much is the entire amount of each mortgage.
A. There's $400,000 for, approximately $400,000 on the first mortgage, and there's another 420,000 roughly by the time it's due on the second mortgage.
Q. The second mortgage you told me about, that's from the loans you got in 2016, correct; is that correct?
A. Yes.
Q. The $400,000 mortgage --
A. It's 350 plus the interest that is being accrued that's going to be due upon --
Q. That's not my question. The first mortgage, the first lien.
A. Approximately 400, 390 maybe, something in that range, 390 to $400,000, I don't remember exactly.
Q. Who holds that mortgage presently?
A. Nation Star Mortgage is servicing it. It's probably Wells Fargo, if I'm not mistaken, but I could be wrong.
Q. Are you in default on that?

Page 78

Ruben Elberg

A. No.

Q. What's the source of payment of the 2,600 you said per month, where do you get the money to pay that?

A. My wife works, my daughters help me a little bit, my, one of my other daughters, Shterna had lent me over $30,000, a substantial amount of money over a period of time to help me pay my mortgage and, you know, some money that I borrowed, if I'm short, completed whatever the balance is.

But I didn't want to default on my home. I just don't want my credit to go bad because I've paid Capital One, I've been with Capital One for years.

I paid Capital One all along when my father was alive, and I never defaulted on anything, and I never had any bankruptcies or anything in my life.

The only thing, when my father passed away and my sister started causing all this trouble, and it's at a point that it's unbearable. So this is what I'm facing right now unfortunately.

Page 79

Ruben Elberg

Q. You used to own the address, I'm sorry, the property at 1523 President Street in your own name, correct?

A. No, it was initially in my wife's name alone when we purchased it. It was in 1999 or 2000, we purchased it and it was in my wife's name alone, it was Yocheved Michaelashvilli, it was under her name alone.

What happened in 2003, there was some financial difficulties and we had delays in payments on the mortgage, so my wife could not renew the mortgage. So she asked me to put it on my name and put her on the title as well when I get the refinancing done because I had good credit, so I did that.

But I never really corrected the deed to add her to the name, and then I added her name because it originally was hers and mine together.

Q. You're saying she owned the house?

A. Totally, her father gave her the money to buy the house.

Q. And she gave it to you in 2003?

A. 2003 I refinanced it, yes.

Page 80

Ruben Elberg

Q. But she transferred title to you?

A. What do you mean she transferred title?

Q. You owned the house after that.

A. No, she did not give me the house. She wanted me to refinance, to refinance to have current payments on the house.

Q. You are the hundred percent owner of the house from 2003 to 2016?

A. That was not the intent, that was not her intent. She did not give me the house as a gift, no.

Q. So when you look at the real estate records, who is the owner from that period of time?

A. It was under my name because the mortgage was under my name, but I'm telling you that she never gave me the house as a gift, no.

Q. And you only put her name on the title after you had already defaulted to Capital One, correct?

A. I don't think so. I corrected the deed. I don't think so, but I can check the record. That was a deed correction clearly.

Page 81

Ruben Elberg

Q. When did you do that?

A. I don't remember the date. I have to check.

Q. In fact, it was in September of 2016, wasn't it?

A. Again, I can't tell you the date. If you have the date, then you know for sure. I can't tell you, I would have to check.

Q. Do you know how much the house is appraised for, how much you could sell it for?

A. No.

Q. Do you think you have equity over and above the two mortgages in the house?

A. I don't know. I would have to check.

Q. Sorry, when were the financial troubles that you said your wife had or there were financial troubles, I forget how you put it, that caused her to transfer the title to you?

A. It was 2003, 2004, I don't remember exactly.

Q. When did the financial troubles end, if they did, that allowed you to put her

Page 82

Ruben Elberg

name back on?

A. I don't understand the question, why are you insinuating I had financial troubles?

Q. Why did you transfer -- maybe I misunderstood your testimony. Why did she transfer the title from her name to your name, why did that happen?

A. She had late payments on the mortgage, and basically we wanted to refinance the house because I don't know if the payment was coming due or I don't know exactly. I don't remember the reason why.

And when she tried to get the refinancing, she did not have the proper income or information, so she asked me to put it on my name and put her on and refinance because I had better credit.

Q. When you say add her on, what does that mean?

A. To put her together with me.

Q. On what?

A. On the deed.

Q. But you didn't do that?

Page 83

Ruben Elberg

A. I did not do that, I failed, yes.

Q. For quite awhile, years?

A. Whatever time, but I corrected it. In my mind, I corrected it. When the time came, I corrected it.

Q. You didn't think about it?

A. There was no need for it. I don't remember what was the reason why, but I failed to do whatever she had asked me, and I put her back on.

MR. FORSTOT: Mark that.

(Alma Bank Personal Financial Statement was hereby marked as Plaintiff's Exhibit 5 for identification, as of this date.)

Q. Here's Exhibit 5. Why don't you look at that and let me know when you're done.

A. Yes.

Q. This is a personal financial statement that you gave to Alma Bank in 2012, correct; is that correct?

A. Yes.

Q. You signed it, right?

A. Yes.

Page 84

Ruben Elberg

Q. And on Page 3 of this document, you list the President Street address, correct?

A. Yes.

Q. And you list it as 100 percent owned by you, right?

A. That's an error.

Q. But you list it as 100 percent owned by you, correct?

A. I didn't fill this out.

Q. You signed this document, right?

A. Yes.

Q. You wouldn't have signed a document you thought was incorrect, would you?

A. I didn't notice this. This is an error.

Q. The purpose of that financial statement was what?

A. We were trying to get financing for Royal HI Hotel Holdings LP.

Q. Who is we?

A. My father, Jacob Elberg and I.

Q. So looking at the same page on that personal financial statement, you have the value of your house as 900,000, right?

Page 85

Ruben Elberg

A. Yes.

Q. Again, it says 100 percent owned by you, correct, that's what it does say, right?

A. It's an error. I didn't fill this out. I signed it hoping that whatever the office manager filled out was correct, but it seems that she made an error. She actually never asked me that question.

(Capital One Bank Personal Financial Statement was hereby marked as Plaintiff's Exhibit 6 for identification, as of this date.)

Q. Here's Exhibit 6. Take a look at that.

A. Yes.

Q. This is also a personal financial statement from you, correct?

A. Yes.

Q. That's your handwriting?

A. No, Mark Gallagher's handwriting, Capital One's handwriting.

Q. You signed it?

A. Yes.

Q. Mark Gallagher's handwriting. Who

Ruben Elberg

is Mark Gallagher again?
A. Capital One Bank's lawyer.
Q. Why would he fill this out with all this information, how did he get that information?
A. I don't remember if Brenda gave it to him, our office manager or I did. The same person that filled this out probably gave him this information.
Q. This is 2013, correct?
A. Yes.
Q. The year after the last one we just looked at, right?
A. Yes.
Q. You signed it?
A. Yes.
Q. And on here it's got the $900,000 real estate value, right?
A. Yes.
Q. That's your house?
A. Yes.
Q. That's not half your house, that's the entire house, right?
A. Again, it was in my name so I

Ruben Elberg

listed it as a home that I own, but it wasn't all mine. And I don't know that I had to add my wife to this personal financial statement to show her interest in the house. I was not aware of that information.
Q. In fact, you filled out a number of personal financial statements where you list the value of your house as $900,000, and you never once mention anything about your wife's interest, do you?
A. I didn't think that I had to, you know, outline that information here. What Brenda wrote is definitely a mistake. I did not tell her to put in 100 percent owned by me, and here --
Q. Why would she have done that then?
A. I don't know.
Q. She guessed?
A. She guessed, I guess.
Q. She didn't ask if you and your wife owned it?
A. She did not ask me, no.
Q. How do you know, do you recall the conversations from 2012?

Ruben Elberg

A. I remember when someone asks me about my home ownership, yes, she did not ask me. I don't remember her asking me, honestly.
(Wilshire State Bank Personal Financial Statement was hereby marked as Plaintiff's Exhibit 7 for identification, as of this date.)
(Capital One Bank Personal Financial Statement was hereby marked as Plaintiff's Exhibit 8 for identification, as of this date.)
Q. Just look at 7 and 8 also, they are both financial statements. Let me know when you're finished.
A. Yes.
Q. Each one of those you signed, correct; is that right?
A. Yes.
Q. And they also list your real property value at 900,000, correct?
A. Yes.
Q. Those are references to your house, correct?
A. Yes.

Ruben Elberg

Q. There's nothing in there that says anything about your wife's interest in the house, right?
A. No, but it was solely owned by her.
Q. Now it's solely owned by her?
A. It was solely owned by her in the beginning.
Q. But she transferred it to you, right?
A. She transferred, as I explained, it was done for refinancing.
Q. It may have been for a purpose, but she transferred the title to you, is that right or not? You don't know, do you?
A. That was not her intent, to give the house to me, if that's what you're insinuating.
Q. I'm not asking her intent. Did she transfer the title of the house to you?
A. Not really, no. She allowed me to refinance the house, but she didn't mean to give me the house as a gift, no.
Q. You're under oath. Is it your testimony that the title, the name on the deed

Ruben Elberg

for your house was never solely in your name?

A. No, that's not my testimony.

Q. What is your testimony, was it ever solely in your name?

A. Yes, there was a period of time it was solely in my name.

Q. And before that, it was solely in your wife's name, is that what you're saying?

A. Yes.

Q. So she transferred on the deed at least, whatever her intent, I'm not asking you about that, she transferred it solely to your name, correct?

A. That's what your understanding is, yes.

Q. How did your name get on the deed all by itself if not from her?

A. I did not buy the house from her. I did not pay her to give, put the house in my name. I did not pay her a penny, you can prove that there's no transaction of funds.

Q. She transferred it to you during times of financial problems that she was having; is that right?

Ruben Elberg

A. She did not make payments. She could not refinance, so she allowed me to refinance the house, and I was supposed to put her back on the house, I did not.

Q. During financial problems with your wife, she transferred the house solely to your name, correct?

MR. McCARTHY: I'm going to object.

Q. Is that correct or not?

MR. McCARTHY: It's a mischaracterization of his testimony.

A. I said what I have to say. I don't have anything to add about what transpired, and I'm being clear as to what happened. You're trying to get to something that I don't understand what you're trying to get to.

Q. The facts are that she transferred the title on the deed to your name and then --

A. I can't explain.

Q. And then in 2016, you put her name back on it; is that correct?

A. I did a correction.

Q. And in the meantime, you signed financial statements that referred to, at least

Ruben Elberg

one that says you're the hundred percent owner; is that correct?

A. That was in error. I did not type that in.

Q. You also signed other financial statements that we've seen that are exhibits here that has the value of the house at $900,000 listed, right, that you gave to banks to show your assets, correct?

A. Yes, those are financial statements, yes.

Q. And you didn't say anything about that you owned it jointly with your wife, correct?

A. I didn't think that was part of the discussion.

Q. Why is your name on the deed if it's her house and she owned it and you didn't pay for it, why is your name still on the deed at all?

A. Why is my name on the deed?

Q. Why didn't you transfer it back to her?

A. We own it jointly.

Ruben Elberg

Q. So she did transfer it with the intention to give you title?

A. She did not intend that.

Q. So I ask you again, why is your name still on there is my question.

A. Because we're husband and wife and it's both of our house.

Q. Were you husband and wife before she transferred the house to you?

A. Yes.

Q. How long were you -- when were you married?

A. We bought the house in '99.

Q. We bought the house?

A. I mean, my wife's father gave her the money to buy the house, so together we bought the house in '99. And since then, until 2003, my wife had it in her name under Yocheved Michaelashvilli, that's her maiden name.

And in 2004, as I told you, there was a time that she did not make payments on time and we needed to refinance, so we did it under my name in order to be able to have a creditworthy borrower.

Ruben Elberg

MR. McCARTHY: Just one thing, Ruben, just for purposes of this particular question, he asked you when you were married.

A. Oh, I apologize.

MR. McCARTHY: Can you provide when you got married?

A. We got married in 1985, I apologize.

Q. Do you have Exhibit 5 still in front of you, the personal financial statement to Alma Bank?

A. Yes.

Q. Fred Roth is listed as your accountant. Is he still your accountant?

A. No, he's not anymore.

Q. When did he stop being your accountant?

A. In 2013 when he stopped, when I found out he made major mistakes, and I just could not continue with him.

Q. Do you have an accountant today?

A. No, not yet.

Q. Have you had any accountant since

Ruben Elberg

2013?

A. No.

Q. You filed for the extension yourself?

A. No, he did it, and since then he gave me tax returns without the proper information. And once I found out there were mistakes, I didn't want to file it.

Q. On Page 2 of that document, it says you have a Citibank checking account with $5,000 in it at that point, do you see that?

A. Yes.

Q. What became of that account?

A. We transferred it to Capital One. We don't have that anymore.

Q. Who is we?

A. I did.

Q. When did you transfer it to Capital One?

A. When I opened up at Capital One. I don't remember the date.

Q. Do you remember the year?

A. No.

Q. 104,000 consulting income, you see

Ruben Elberg

that?

A. Yes.

Q. What is that, why did you get $104,000, what year was that?

A. What year is this, this is 2012.

Q. Right. So in the 12 months before you signed this, you had $104,000 in consulting income?

A. I was working for JEB Management and running the real estate. Now, the income was for my portion of the cabs above and beyond Jacob's management fees that he was taking.

He was running JEB Management, my two and a half cab corporations, and some of that income that was above and beyond our mortgages that we had to pay for, you know, the Capital One mortgages that we had, I was getting the additional funds that was coming from JEB Management.

Q. This says it's for consulting.

A. There was a portion for like a W-2, a small portion of it, and that was for consulting, but most of the money was coming from is the taxicab companies from JEB

Ruben Elberg

Management.

Q. You have, a little higher on the page it says other investments, $703,000, you see that?

A. Yes.

Q. What's that?

A. I had purchased a ferry boat in N. Minue, Inc., the company I mentioned before, and I paid $126,000 for that. And originally it was destined to go back into service at Governors Island because it was the former ferry boat for Governors Island, but that got delayed in negotiations with the operator and did not come to fruition.

So we were looking for other uses, potentially to do a dockside for a food and beverage operation, restaurant, catering.

Q. What was the source of the $800,000?

A. I said I paid 126,000.

Q. I'm sorry, you said you paid $126,000 for it?

A. That's what I said.

Q. That was your money?

Ruben Elberg

A. That was my money.
Q. Where did you get that money?
A. It was either 1998, my father and I were thinking of investing in this venture, and my father had refinanced and he had given me the money to invest in this venture at that time.
Q. Your father gave it to you?
A. He gave it to me, and he was supposed to be a partner in this deal, but for whatever reason, he never came through in doing whatever the original plans were with it.
Q. You owned a ferry boat through N. Minue, Inc.?
A. Yes.
Q. You were the sole shareholder of N. Minue, Inc.?
A. Yes.
Q. Where did you get the value for the ferry boat for $703,000 in 2012?
A. When there was, you see a ferry boat is like, it's an asset. If you have a use for it and if it has a need, it has a value. If it has no need, it's a liability, right.
So at one time there was about 450

Ruben Elberg

or $500,000 offer from people at Governors Island, the operators of the other vessel, the sister vessel at Governors Island.
And for some reason, we were told that it was worth in the $700,000 range by other people who knew the market. We took basically what we were told by others in the industry, but we had a range of a $400,000 offer.
And now we have no offers, so it's just been sitting, unfortunately rotting away until we get a use service for it.
Q. Where is it?
A. Staten Island.
Q. Do you have to pay any money to keep it up?
A. Yes, I owe the dock alone over $100,000 just in dockage fees.
Q. Any other amounts you need to pay to keep it up?
A. No.
Q. Just dockage fees?
A. Yes.
Q. There's no maintenance or anything that needs to be done on it?

Ruben Elberg

A. No. I wouldn't put any money into it because it's just not productive. Even if I had money, I wouldn't put money into it.
Q. Do you own it personally now?
A. No, it was purchased in the corporate name.
Q. What's the status of that corporation?
A. What do you mean?
Q. Is it in good standing, is it an operating company?
A. There was no income in the company, so there's really nothing happening with it.
Q. But it's still an existing corporation?
A. I have to check that, if it was, if it was dissolved or it's still an existing corporation. I don't know, I haven't checked it recently.
Q. Did you take any steps to dissolve it?
A. No.
Q. Do you think it may be dissolved for failure to pay some tax or anything?

Ruben Elberg

A. I don't think so. I didn't have anything that I had to pay that I didn't pay, no.
Q. So why do you think it may be dissolved?
A. I just don't know.
Q. You're the sole shareholder of that company, right?
A. Yes.
Q. Does the owner of the dock have some kind of lien on the ferry?
A. Yes, he owed all this money, so he tells me all the time, the ferry is not worth anything, it's mine practically. He jokes around with me.
There's no official lien. We're on friendly terms. He knows when things turn around for me I'll pay him. I don't have any interest in hurting him. When I had money, I paid whatever I could. I've never hurt the man.
Q. You never what?
A. I never hurt the man.
MR. FORSTOT: Why don't we, since lunch has been brought in. We're going for

Ruben Elberg

about an hour, let's take a break.

MR. McCARTHY: Before we go off the record, there's a Social Security number that hasn't been redacted. Whenever we do the final exhibits, can we just redact it for future use?

MR. FORSTOT: I guess. All right. You brought your own lunch, I understand.

THE WITNESS: Yes.

MR. FORSTOT: And you want to grab something?

MR. McCARTHY: Sure.

MR. FORSTOT: There's a breakout room if you want to sit in there. We can go off the record.

(Whereupon at 12:09 p.m. a luncheon recess was taken.)

(1040 U.S. Individual Tax Return for 2012 was hereby marked as Plaintiff's Exhibit 9 for identification, as of this date.)

AFTERNOON SESSION

(Time noted: 12:46 p.m.)

Q. Tell me about your education.

Ruben Elberg

A. What specifically would you like to know?

Q. Did you go to school?

A. Yes.

Q. Tell me about where you went, when and for how long?

A. Until 13 years old I was, actually, until 11, 1973, so until 12 I was in Russia, and we came here in 1973, approximately.

I went to Yashiva here in Ocean Parkway. Then I went to Yashiva University on Avenue M thereafter.

MR. McCARTHY: Yashiva University you said?

THE WITNESS: Yes.

Q. Did you get a degree?

A. No.

Q. What did you study at Yashiva University?

A. I didn't get a degree. I left to go to 47th Street to start learning gemology and mineralogy to become a gemologist in 1977, early on, you know, in my life. And I became a gemologist and started working in the jewelry

Ruben Elberg

industry.

Q. Right, my question was, you said --

MR. McCARTHY: Yashiva University at Avenue M.

A. And East 14th Street. It was called BTA, but it was part of Yashiva University.

Q. What did you study when you were there?

A. It's a high school.

Q. Oh, it's a high school?

A. It's called the Yashiva University High School.

Q. I didn't understand that. Did you graduate?

A. No.

Q. Did you get a GED?

A. I don't think so. I don't have, I didn't need it for what I was doing.

Q. How long did you work in the jewelry or gem industry?

A. '77 to '88.

Q. So 11 years. Did you work at one place?

Ruben Elberg

A. No, initially I worked in 30 West -- I don't remember. EGL, EGL which was European Gem Labs, and I started out being trained as a gemologist, and then I became -- it was an important position there.

Q. A what?

A. I took an important position there. I was practically managing.

Q. Managing what?

A. The gem lab.

Q. What do they do at a gem lab?

A. They examine diamonds and colored stones and they give certifications.

Q. When did you leave there?

A. So three years, I would say '80, '81.

Q. What did you do after that?

A. '81 I became, I worked, I had Ruben Elberg Diamond Company.

Q. You had your own diamond company?

A. I was trying to broker and, you know.

Q. How long did you do that for?

A. '88, until 1988.

Ruben Elberg

Q. So from '77 through '88, you were in the gem industry. From '77 to '81, you worked for EGL?
A. EGL.
Q. And then from '81 to '88 you had your own business; is that right?
A. Yes, sir.
Q. How much was your salary, approximately, when you left EGL?
A. I don't remember the details now.
Q. Do you have any idea, a vague idea even of how much you were making, do you know how much?
A. Is it relevant here in this case?
MR. McCARTHY: If you have a recollection.
A. I don't have a recollection.
Q. For somebody with your experience, how much do you think you could make if you got a job in that area in the gem business today?
A. I don't know. I have not been in the industry since '88, so I don't know.
Q. Why did you stop being a broker of your own business Ruben Elberg Diamonds, was

Ruben Elberg

that what it was called?
A. Yes.
Q. Why did you stop doing that?
A. My father said it's not enough when you help someone with money, I need physical help. So I'm not managing here with the, you know, taxi business, and I need you to come in and help me physically.
Because all along, from '77 to '88, I was helping him financially to get started in the yellow cab business, and when anything, either to buy some of these corporations or whether they were, you know, short in his day-to-day operations, because he was always trying to grow, refinance and grow, that was the approach.
And he was always short in making payments, so I had income from the diamonds, and I was trying to help as much as I could throughout these years.
Q. How much did you make annually if you could estimate from your --
MR. FORSTOT: Let me withdraw that.
Q. The last year you worked in your

Ruben Elberg

own business, Ruben Elberg Diamonds, how much was your income?
A. I don't remember. It was too many years ago.
Q. No idea?
A. I don't remember it now.
Q. A million dollars?
A. No.
Q. Half a million?
A. No, less, less.
Q. 10,000, you have no idea?
A. It wasn't, it was somewhere in what I was making in 2012 tax return or slightly more, maybe. I can't remember, I can't say that for sure.
Q. Do you own any gems today?
A. No, I wish I did.
Q. Any kind of precious stones or metals at all?
A. No.
Q. Does your wife?
A. No.
Q. She doesn't even have a ring?
A. An engagement ring, but that's it.

Ruben Elberg

Q. Do you have a safe deposit box anywhere?
A. No.
Q. Does your wife?
A. No.
Q. Do any of your children have safe deposit boxes that you're aware of?
A. No, not that I know of. I should not say that. Not that I know of.
Q. This is Exhibit 9. Exhibit 9 is your 2012 tax return, correct?
A. Yes.
Q. You just referenced that as a way to understand how much you were making when you had your own business. So does that mean you were bringing in roughly $86,000?
A. Maybe more, maybe more in diamonds. I don't remember, I can't tell you for sure.
Q. Is this the last tax return you filed?
A. Yes.
Q. What is the source of the miscellaneous compensation of $86,000 reflected in this tax return?

Ruben Elberg

A. I told you that JEB Management had income from my cabs, he was giving me distribution from my three cab companies.

Q. You said he was giving, who he is?

A. My father through JEB Management, because I told you all the moneys were going into JEB Management, and JEB Management was the co-guarantor for these corporations.

So all the money was being funneled from the taxi companies into JEB Management, and it was all being distributed, mortgage payments and whatever had to be done. I don't know exactly, I can't tell you for sure how the money was being paid to Capital One.

I believe my father was transferring moneys from one account to another. He always had computer transfers that he was always doing, that's how he handled it.

Q. Did that amount stay the same, did it vary from year to year?

A. It ranged between 80 to $100,000, in that range, 120 maybe, I don't remember.

Q. That has now ended because of what you testified before --

Ruben Elberg

A. Yes.

Q. -- the dispute you're having with your sister about whether the estate owns those medallion entities or you do?

A. Yes.

Q. Just to be clear, is there a court order that says you can't be involved in the management at this point of those companies?

A. I don't want to misstate anything, but to my recollection, they said I can act as an executor, but not as a sole decision maker, if I understand correctly the court's recommendation or decision, whatever it was then.

Q. The court, meaning the Probate Court?

A. Yes, the Probate Court.

Q. Let's talk about the litigations then. You're involved in a litigation in Probate Court; is that right?

A. I don't know.

MR. McCARTHY: Surrogate's Court.

Q. Sorry, Surrogate's Court.

A. Forgive me, I don't know the

Ruben Elberg

difference between Surrogate's, is it the same thing?

Q. I'm using the wrong term. Surrogate's Court, the court that handles your father's estate.

A. Correct.

Q. And you're also involved in a litigation in Supreme Court with your sister?

A. Yes. Unfortunately, when she took control of these companies --

MR. McCARTHY: I'm going to, Ruben, to move it along, just answer the question that he's asking.

A. Just repeat the question.

Q. I'm trying to get the lay of the land on how many litigations you're involved with where the issue is who owns the medallion companies and whether you're entitled to a certain percentage interest in the entities that own the real estate where the hotels would be developed. Tell me how many litigations are involved there.

A. There is one litigation in the Surrogate's Court or maybe the second one she

Ruben Elberg

started to remove me as an executor, that's in the Surrogate's.

And then in the Supreme Court, there was one litigation that was not started by me, it was started by the limited partnership partners against me and the LLCs.

And there was a decision by Ramos, Judge Ramos to give control to a person that's not a member nor a partner in the limited partnerships, and that's on appeal with Judge Catterson in the First Department.

So those are the cases I can point to right now, other than the Capital One judgment that I have that's on a personal guarantee.

Q. Right. I'm just talking about the cases where there's, where it may be decided whether you have an interest or not in these entities or whether the estate is the right party, and then whether you have a 40 percent interest as a Class D member of these LLCs, sorry, LLPs.

A. I have to clarify that.

Q. Sure.

Ruben Elberg

A. In the Surrogate's Court, my sister moved for a turnover proceeding. Initially, Jacob was the sole owner of the taxicab corporations and Jacob was also the sole owner of RORE and RREM.

If you remember when I said before that the yellow cabs that took the loans to RORE, capital contributions or loans to RORE, RORE and RREM are the sole owners of everything. There is no new limited partnerships that I'm going to describe in a second.

So having said that, she said the Class C interest is all owned by Jacob, there is no 60/40. She claims the same thing in the limited partnership litigation as well.

So there's documentation, many documents on the level of RORE and RREM, that's where the money actually went, and she actually did not deposit those moneys into the RORE and RREM accounts, she took it to the estate account which is also inappropriate. That was not the intent of the Judge when he gave her that power.

Q. So in the Probate Court --

A. It's an LLC litigation about the

Ruben Elberg

LLC ownership.

Q. In the Probate Court?

A. In the Surrogate's Court.

Q. The Surrogate's Court. In the Surrogate's Court, what is the status of the litigation? And what I mean by that, you know, do you have any hearings coming up, is there a trial coming up, how and when is it going to be decided who owned these entities?

A. Pewzner moved that I should move for a turnover proceeding on these assets. The Judge said that I've shown prima facie evidence of my 40 percent ownership and the taxicab ownership. So she has to come and on law prove why I don't own these interests, and she has not pursued it further.

But what she had done, she moved then to remove me as an executor for using some of the proceeds from two taxi corporations to pay for legal fees.

The Judge allowed me to pay, to act as an executor and pay whatever fees are necessary as an executor.

So I said, I'm using my power as an

Ruben Elberg

executor to pay legal fees to protect the interests of Merill and Spindle. When I started using funds to pay for legal fees, she moved to remove me as an executor for spending moneys that don't belong to me. Those are the litigations in the Surrogate's Court, and that's the status, to my understanding.

Q. What has to be done to move that forward to a decision? I assume you're anxious to get a decision on that, aren't you?

A. I am, and I just changed my legal team, and I'm trying to get resolutions on these issues.

Q. You said you changed your legal team, what do you mean?

A. I had a single practitioner who was devoted and hard working, but he had limits. He told me, he was a friend --

MR. McCARTHY: Don't discuss what you discussed with him. Just again, answer the question as was asked.

Q. So did you replace -- who was the sole practitioner?

A. Levi Heubner.

Ruben Elberg

Q. You said he's still giving you advice even though he's no longer your counsel on the case; is that right?

A. I still talk to him because he's a friend, and he might be representing me in other things now.

Q. Who is representing you now in the Surrogate's Court?

A. Abrams Fensterman.

Q. Are there any court dates coming up in that case?

A. I don't have the records of that in front of me, but there's an appeal and a decision of the judge in Surrogate's Court, and I don't know if that's, how that's going to play out. I'm not sure on the status.

I'm still in discussions with my legal team how to proceed there, but we just gave an answer on the removal as an executor, we just responded to the documents.

Q. As of now, you're still an executor?

A. Yes.

Q. As of this point, you don't know if

Page 118

Ruben Elberg

there is some end of sight by date when all this will be resolved in the Surrogate's Court?

A. In the Surrogate's Court, it's difficult to say because that looks like a more complicated issue, but that's where all the money is, and that's where she claims that only Class C exists.

So whether it's Class C or not, moneys were borrowed from taxi corporations. It was put in the capital contributions into these companies, and it has to be paid back to these taxi corporations. She took it, she didn't even deposit it.

She represented in front of Ramos that she was going to put it in escrow, the whole amount of the sale she was going to put in escrow. She didn't do that.

She took the money and she put it into three, four different places, I don't know where exactly and how she distributed the money. I don't have the full detailed information. But she did not -- her lawyer made clear representations in front of Judge Ramos that she was going to put it all in escrow until this

Page 119

Ruben Elberg

issue is resolved.

She paid a substantial amount of money in taxes. She put moneys in escrow with the buyer because the buyer -- the seller, the buyer actually, he feels he's got exposure because the Judge never gave her authority to sell the Class D interests and she sold it anyway.

Also, we submitted a dissent letter not to allow her to sell the Class C interest or Class D as a 40 percent interest holder, and she went ahead and did it anyway.

Q. Let's put that on hold for a minute. I just want to get back to Surrogate's Court for a second. So in Surrogate's Court, is it your understanding that the issue of who owns the medallion entities we've been talking about today, is that one of the issues that the Surrogate's Court will decide, is being asked to decide?

A. She asked them to decide that, yes.

Q. As far as you know, there is no date by which that's going to happen, either through an argument on a motion or a trial?

Page 120

Ruben Elberg

A. I can't discuss our plans right now with our new team, but there are plans to get that resolved sooner rather than later.

Q. It's in your interest to get it resolved as soon as possible, right?

A. Yes.

Q. Because right now you have no income from them?

A. You see my position, I'm telling you the truth.

Q. You have to, you're under oath. So the issue of who owns or who did own or --

MR. FORSTOT: Let me withdraw that.

Q. The issue of whether you were entitled to a 40 percent interest in these entities that own the real estate --

A. The LLCs.

Q. The LLCs, LLPs?

A. There are two levels. Let's be clear. The LLC is very important because she claims that's the company that owns everything, right, and that's where the money was supposed to go but it didn't go there. It went into an estate account, it went into another account.

Page 121

Ruben Elberg

Q. Understood. Is that also something that the Surrogate's Court is being asked to decide?

A. Yes.

Q. Is there a date, either through argument or trial, argument on a motion or trial by which that is going to be decided?

A. I don't have a clear date, and I don't know.

Q. That's also in your interest to get if resolved quickly, right?

A. Yes.

Q. Although not quite as pressing because it's not the income, it's something in addition to what used to be the income you lived on?

A. Correct.

Q. So there's also the issue of whether you should be continued as co-executor, right?

A. Yes.

Q. Are there any other issues that you are aware of that would be decided by the Surrogate's Court?

Page 122

Ruben Elberg

A. No.

Q. Assuming you lose on all these things and it's decided that the estate is the real owner of the medallion entities and you're not entitled to 40 percent of the proceeds of the sale, you're still a beneficiary of the estate; is that right?

A. Yes.

Q. That's your understanding?

A. Yes.

Q. And you would be sharing pro rata with how many people?

A. Four.

Q. So there is a distribution that you think would be made to you?

A. Yes.

Q. It doesn't all go to your mother?

A. Well, the will was structured in such a manner that the yellow cabs, only the cabs that my father owned goes to my mother.

There are two trusts that were created simultaneously, one is a Q-tip trust, and I don't remember the second name, but it's in the will, it's in the papers.

Page 123

Ruben Elberg

The real estate holdings were supposed to be going into trusts, and the income from the real estate, 60 percent interest income of those real estate assets were supposed to go to my mother. And after 120 of hers, goes to the four siblings, the 60 percent is split four ways.

Q. After 120, what does that mean?

A. After she passes on. I hope she lives for a long time.

Q. So you wouldn't actually be entitled to any distribution until after that?

A. From the 60 percent interest, no. From the 40 percent interest, definitely right away.

Q. Right away, okay.

MR. McCARTHY: Are you claiming that the 40 percent interest is within the estate or that you own it personally?

THE WITNESS: Personally.

Q. The premise of my question is you lose on everything. I'm just trying to find out if you're still entitled to something.

A. Yes, there's a 25 percent interest

Page 124

Ruben Elberg

in the real estate portion of the estate.

Q. Because you're one of four?

A. Four siblings on Jacob's will.

Q. That's supposed to happen, that doesn't have to await your mother passing away?

A. It does.

Q. It doesn't?

A. It does.

Q. Oh, it does. So if you lose on everything, you're not going to be entitled to anything until that happens?

A. Right.

Q. That's your understanding?

A. Yes.

Q. Now, let's move to the Supreme Court action before Justice Ramos. What, if anything, is still to be decided there?

A. There was a decision by Judge Ramos that was decided that Pewzner becomes the manager of the LLCs, the limited partnerships, and she has to do -- he gave her broad rights without admitting in the court, the first thing he said, I didn't read the papers, I thought this was settled.

Page 125

Ruben Elberg

And then after 15 minutes of discussions, he just says, you guys are hindering the sale, and he gave her, he signed the order without reading the papers.

Q. That was an issue of whether she could go ahead with the sale or not?

A. Correct.

Q. Is there anything else in that case other than that, any other issue to be decided that you know of?

A. That case was brought by Crabapple, Inc. who was an EB-5 capital bundler who sued RORE or RREM for performance to make capital contributions to the limited partnerships that Crabapple invested $4 million of EB-5 funds brought in from China.

There was another lawsuit, there was another $50 million in another bank trying to build these projects, and those investors wanted us to perform, and Pewzner decided in Jacob's lifetime she was not interested in these projects to go forward.

Definitely when he's not here, she had some say. She did everything she could to

Ruben Elberg

try to undermine the projects.

Q. My question is, is there anything else to be decided on that case other than the issue that has been decided?

A. If it's overturned and brought back to Ramos, then this litigation, I guess, would, depending on what the decision is, would go back and be adjudicated either by Ramos or by someone else.

Q. Has that been fully briefed up at the Appellate Division?

A. Yes.

Q. Has there been an argument that's happened?

A. It's happened already and we're waiting.

Q. When was the argument?

A. On the 25th, not last month. I believe it was April 25th maybe.

Q. Any other litigation going on that will affect the issue of your ownership in the medallion entities or the LLCs?

A. No. I'm sorry, Judge Catterson brought a, I misspoke, I don't know if it's

Ruben Elberg

turnover, declaratory judgment in front of Ramos and the Class D does exist. She claims it does not exist.

And the partners, everybody claims it exists except her. She has no knowledge, she is not involved, but she claims it does not exist.

Q. That's a lawsuit that you started?

A. That's a lawsuit we started with Judge Catterson.

Q. What does that mean?

A. He is a former judge, I call him Judge Catterson, he is James Catterson.

Q. But he's acting as a lawyer?

A. He's acting as a lawyer, correct. He went in for a declaratory judgment, and Pewzner and the other party tried to avoid service on the EB-5 investors.

So Judge Ramos said you received the benefit in my court in your favor, and now you're trying to say that you're not going to accept the service for these foreign nationals who cannot be found and they're elsewhere.

So Judge Ramos forced Crabapple to

Ruben Elberg

accept the service for these nationals, but James Catterson is waiting for a decision in the First Department before he decides whether to go forward with the declaratory judgment or whether it's going to be a different circumstance after it's overturned.

Q. I see. So in that case that you brought, there were two separate cases, one in which there's an appeal and then the one you've brought by complaint. One's waiting the appeal outcome, and the other is stayed pending the appeal?

A. There's no stay. He wants to see if the appeal is done, then he can make a decision on how to proceed, because it doesn't make sense to pursue it until he gets the final decision in the First Department.

Q. Is there anything else, any other litigations where those issues are at issue?

A. No, not to my recollection. It's been so overwhelming that if I forget something, forgive me, it's not intentional.

Q. Mr. Catterson, what firm is he at?

A. He's at Kaye Scholer.

Ruben Elberg

Q. Kaye Scholer, right. Are you able to pay them their fees?

MR. McCARTHY: Objection.

A. I owe them money.

Q. Have you paid them?

A. Yes.

Q. You've already paid them?

A. Yes.

Q. You say you owe them. There's an outstanding bill that you owe?

A. Yes.

Q. Do you know whether they're not going to go forward with your case because of that?

MR. McCARTHY: Objection.

A. They're going forward, so far they're going forward.

Q. Has there been any settlement discussion between you and your sister about the issue of who owns the medallion entities or whether you have an interest in the LLCs?

MR. McCARTHY: Objection.

A. There have been many discussions. Unfortunately, she was committed to settle

Ruben Elberg

things, and then she, at the last minute she undermines the deal. Whatever settlement comes, she undermines it. And I've tried at least five, six times.

Q. Are there any discussions ongoing now?

MR. McCARTHY: Objection.

A. No.

Q. Other than Capital One and the two mortgage holders on your house, do you have any other creditors, do you owe money to anybody else, you have the Yeshivas, right?

A. I have many creditors, I can't even think about them.

Q. You have the law firms, who else?

A. I have many creditors. I don't have a settled head to remember all the details.

Q. Do you have any plans to file bankruptcy?

A. No.

Q. Have you considered doing so?

A. No.

Q. Do you have any claims against anybody, any legal claims where you are seeking

Ruben Elberg

payment from them? I'm not talking about the litigations between you and your sister. I'm talking about whether you have asserted -- well, it could be your sister, where you've asserted that somebody has broken a contract or harmed you in some way where you're suing them?

A. No, not yet.

MR. McCARTHY: Just to be clear, other than the estate litigation and the litigation against your sister and other entities.

THE WITNESS: No, nothing.

Q. Well, you could have a claim against your sister if you feel she's harmed you.

A. I have not asserted those claims yet. I have many claims, but I have not asserted.

Q. Do you have any claims against your sister?

A. Against my sister, estate, the EB-5 purchasers who are actually inside buyers.

Q. Are you saying you have a claim against the EB-5 investors, the people in China?

Ruben Elberg

A. No, the EB-5 bundler.

Q. Oh, the bundler.

A. Who actually worked the deal.

Q. Crabapple?

A. Crabapple, NYC MRC West Lead Capital.

Q. So you think you have claims against them?

A. That's for my legal team to decide, but I believe so.

Q. Are you going to assert them soon?

A. We'll make that decision when we get clarity on what's going on further.

Q. How much do you think they owe you or have harmed you by, how much money would you seek from them?

A. I don't have that number yet. I have to decide that with my legal team.

Q. Any other claims against anybody else that you can think of?

A. No.

Q. Whether you've asserted them or not.

A. No.

Ruben Elberg

Q. Do you have any 401-Ks or IRAs?

A. No.

Q. Any kind of retirement accounts?

A. No.

Q. Have you set up any trusts?

A. No.

Q. Have you transferred any assets that you haven't already talked about today?

A. No.

MR. McCARTHY: On the prior question, we're not talking about trusts that were created under the estate, we're talking about trusts he personally created?

MR. FORSTOT: Yes.

A. No.

Q. Have you in the last couple of years made any charitable contributions?

A. Practically none, very little, if any. I do the best I can, but nothing, nothing much.

Q. Have you transferred any assets to any family members in the last, say since 2012 that you can recall?

A. No.

Ruben Elberg

Q. Let's look back at the subpoena which is Exhibit 3. Now, there's a list as we started to look at on the second page, starting on the second page or the first page, and it goes on to the second page, you see that?
A. Yes, I'm looking.
Q. A list of documents. Hold on, let me get my copy. I've got it. Now, we talked about your bank account records.
What I want to know is what you did, what you've done or if more needs to be done to be able to find any of these documents. The bank account records you told me you still need to look in your house and to ask the banks for those records, right?
A. Yes.
Q. What about Number 3, balance sheets or other financial statements reflecting your assets and liabilities. What did you do to find any of those documents?
A. I gave you whatever I had, I believe so, but there's nothing else that I have that I can produce.
Q. I want to know what did you do, did

Ruben Elberg

you look in your house, do you have computers that have records?
A. Yes, I have a computer.
Q. Did you search your computer records?
A. I can search further, but financial statements and liabilities prepared for any reason from 2012 to date, I mean, you have some here that you showed us.
Q. Let me ask you this, did you go through this list very carefully and make sure you looked for everything that's on this list as best you could?
A. I did the best I could to supply you whatever I had.
Q. So is there anyplace that you still need to look to find anything in Number 3?
A. I don't think so.
Q. What about Number 4, records reflecting your ownership or transfer of your interest in real property or interest in any entity which owned real property?
A. Other than the assets that are outlined in 5?

Ruben Elberg

Q. I guess it's subsumed in that, but it's broader than that.
A. Well, I don't own anything but what is in Number 5.
Q. Okay.
A. So I believe those documents you have, and if you don't, I can supply those again.
Q. When you looked for records, where did you look for Number 4 or 5?
A. Whatever documents I gathered from my business relationship with my father, and I had records in my office of those documents.
Q. In your office, where is your office?
A. In my home office. I don't have an office now, I have a home office now. I work out of my home.
Q. What you did was you looked through your --
A. My documents and I supplied them.
Q. You looked through documents in your home office, and did you look on your computer?

Ruben Elberg

A. Yes.
Q. You gave us everything you had there?
A. Yes.
Q. Number 6, records reflecting the sale of property located at 42-31 and 42-37 Crescent Street, is that subsumed in Number 5?
A. Yes, she actually made, she took power from Judge Ramos, and she sold everything. So since she got that power, I have no knowledge.
I have very little knowledge of anything that she did, whether the sale and transfer of funds, and anything that she did, transferred assets, I have very little records.
MR. McCARTHY: Could you clarify who she is.
THE WITNESS: Tamara Pewzner.
Q. You talked about earlier that she was supposed to set up escrow.
A. Yes.
Q. Why don't you explain that.
A. If you look into the motion five, I believe it was, in front of Judge Ramos, and

Ruben Elberg

Pewzner's counsel Mr. Lehman made representations to Judge Ramos that we're not taking this money, we're going to sell this and we're just going to put it in an escrow that's controlled by both of us.

And in the merger documents, she outlined it was supposed to go into an escrow account by Chase, JPMorgan Chase.

And I checked with JPMorgan Chase, and they have no records of any escrow accounts opened.

Q. These are the proceeds from the sale of the real property?

A. Of the real assets, yes, of the limited partnership.

Q. Was it the real property or the entities?

A. Of the limited partnerships and of the LLCs which she claimed is the owner of everything.

Q. That sale is done and closed, right?

A. She closed on it. She actually did a merger. It's really a sale, but she merged

Ruben Elberg

the entities into a new corp that are called instead of Royal CP Hotel Holdings LP, Royal CP Two Hotel Holdings LP.

And instead of Royal HI Hotel Holdings LP, Royal HI Two Hotel Holdings LP. And the same thing, I think she did, Pewzner transferred the interests of the limited liability companies into RORE Two and RREM Two in the merger.

Q. The estate, when you say she, she was acting on behalf of the estate?

A. Right.

Q. The estate doesn't retain any interest in these entities, right?

A. Not to my knowledge. She was controlling the deal. She might have had side deals, I don't know, I can't say that.

Q. The proceeds of that were supposed to have been distributed to return the investments made by capital contributions made by the ultimate partners, and then the net proceeds were supposed to be distributed, either to you and your father or to your father after payment of the EB-5 investors and Crabapple,

Ruben Elberg

whatever, right; is that right?

A. So let's start with the limited partnerships where there's a declaratory judgment on the Class D, okay. That's the binding partnership that is in place now and effective. If it does get overturned, that will be the binding partnership.

There, if the sale happened, first the sale proceeds would be distributed to, there are four classes, Class A, B, C and D. Class A are the EB-5 investors. Class B is the EB-5 bundler. Class C was RORE and RREM, and Class D was Ruben Elberg.

So the first sale that transpired, the funds would have to go into the limited partnerships and then distributed accordingly how I just described.

Q. When you say the funds, does that mean all proceeds or the net proceeds of the original capital contributions?

A. All proceeds would go into this company, and this company would pay its liabilities, this limited partnership would pay its liabilities, and then each partner would get

Ruben Elberg

their share of the proceeds.

Q. But that's a net number before the partners get their share, right, it's net of liabilities?

A. Can you clarify what you're saying?

Q. I understood that the proceeds that would get distributed to these different classes was net of return of original investments.

A. Correct.

Q. Is that correct?

A. Correct.

Q. And there may be other liabilities.

A. Correct, correct.

Q. So those things have to get paid first?

A. Yes, that's what I said.

Q. Then there's a net amount that is disputed to how that gets distributed.

A. Correct.

Q. Do you know what that net amount is, the total net amount was?

A. Well, there were two capital contributions, RORE contributed into Royal CP and Royal HI, and I believe it was about

Page 142

Ruben Elberg

$11,800,000 that RORE and RREM contributed into the limited partnerships, the Class C partner.

When those contributions were paid back to RORE and RREM, and the $4 million invested by the EB-5 Class A partners got paid back, and the interest that was being charged by the Class B partner for bundling these Chinese investors was paid to the Class B partner, right, the profit proceeds were split.

If there was a consent on my part to sell my interest, which there was no consent, neither by me nor by Judge Ramos to sell the Class D interest in the limited partnership, then the profits proceeds would be split 60/40 between Class C and Class D interest.

Q. Understood. My question though is, what is that amount, the total amount, not the 60/40, the total amount of net proceeds, the profit proceeds you called them.

A. I don't know, I don't know what she did so I can't say for sure. She took power and did whatever she wanted, Pewzner.

Q. You have no idea?

A. I have no idea what she did.

Page 143

Ruben Elberg

Q. 500 million, 50 million, two million?

A. I don't know what she did.

Q. You don't know the magnitude at all?

A. I don't know what she did. I know she claims to have gotten $27 million.

Q. Total?

A. Total.

Q. And from there, that was used to repay capital contributions and liabilities?

A. No. Liabilities and EB-5 investors and, liabilities, EB-5 investors and Class B interests were above and beyond that number.

Q. So 27 was the net amount the estate took in?

A. That's what I would say.

Q. Leaving aside whether that's where it ultimately should go.

A. That's what she insinuated in the merger documents and in front of Judge Ramos.

Q. So your claim is for 40 percent of that number, whatever that actually is?

A. Class D has a 40 percent profit

Page 144

Ruben Elberg

sharing interest after the Class C gets paid.

Q. Right.

A. So the Class C has to get paid first.

Q. Sixty percent?

A. No, $11.8 million, and then the profit sharing would be there.

Q. So the 27 is not net of all return of capital?

A. No.

Q. So it really, the profit is, if 27 million is correct, you're talking about you're fighting over 16 million roughly; is that right?

A. (No verbal response.)

Q. You have to answer orally.

A. Yes.

Q. So the 40 percent would be 40 percent of that, what that actual number is?

A. Yes, but again, I did not authorize that sale, so I did not consent to that number or that sale.

Q. I'm just trying to get an understanding --

A. I don't know what she did. I don't

Page 145

Ruben Elberg

want to put myself in a position where I agreed to that number, I did not.

Q. I understand. I'm not suggesting you agreed to it. I just want to know the number you're fighting over.

You say that you did not, that she sold the Class D interests without your permission, correct?

A. Correct.

Q. Are you saying that there's an actual document somewhere that says the Class D interest is being sold?

A. What the outrageous thing is that, she, Pewzner and the EB-5 bundlers who actually bought out under a third-party corporation, not associated directly with them, they basically claimed they're buying 100 percent of all interests of the limited partnerships.

Q. So they just made a general statement without --

A. Without referring to Class D.

Q. And you think that was essentially a clever way of making sure they got everything without admitting there was a Class D?

Page 146

Ruben Elberg

A. That's what they thought.

Q. Okay, so back to where we started this conversation. You said that it was represented to Justice Ramos that that 16 million, let's call it --

A. No, they said the total amount, all the 27 million would go into.

Q. Are you disputing that the 11 million roughly contribution by RORE should not be taken off the top?

A. I'm not disputing that. All I'm saying is, since I'm a Class C partner -- I'm a partner in RORE and RREM as well, those moneys are in dispute in the Surrogate's level.

Q. But you're not only asking for 40 percent for the Class D interest, you're saying that part of the RORE and RREM moneys should also come into play?

A. Because that's where actual moneys were put from the taxi corporations to buy the real estate.

Q. And so you're actually therefore disputing and claiming part of the 11 million return?

Page 147

Ruben Elberg

A. I have to pay back Capital One.

Q. That I agree with.

A. I'm not hiding here. I'm trying to pay everybody, but I'm facing a problem.

Q. Understood. I'm just trying to figure out what you're fighting over and what your claim is.

Back again to where we started this discussion. You don't know where those moneys are right now, the $27 million?

A. I have a vague idea.

Q. What's the vague idea that you have?

A. Well, I'm an executor, so she put some of the moneys in the Chase accounts that is an estate account, and a small portion in a Shefa account, that's another estate account, really it was part of the transaction, but she put it in that account as well.

Q. Shefa, what's that?

A. Shefa Funding.

Q. Shefa Funding?

A. Yes, S-H-E-F-A.

Q. You're saying that's the name of an

Page 148

Ruben Elberg

account holder or the place where the account is?

A. It's a corporation. So in order for you to better understand the way the funds transferred from the taxi corporations into the LLCs, and then the LLCs were supposed to put capital contributions to the limited partnerships, so that's what I want to clarify. I think it's important.

MR. McCARTHY: To the extent you can, you're writing, to the extent you can, please make it oral so it's in the record.

A. So the $11.8 million, let's just call it $12 million, were borrowed from the taxi corporations. 2.4 was borrowed from the three corporations that I'm, my judgment is on, 2.450, and the balance was borrowed from my father's corporations.

So these moneys were capital contributions to RORE and RREM and to Shefa. And these three companies, there is a chart that outlines exactly these three companies, who owns exactly how much interest in the limited partnerships.

Page 149

Ruben Elberg

These companies were supposed to do capital contributions to the limited partnerships.

Q. Right.

A. So basically, she, Pewzner refused to put it in escrow as she agreed as she represented in front of the Judge, and she put it into an estate account, into a Shefa account.

She left about $5 million with the buyer because the buyer felt they had exposure and they wanted to secure their situation. And she paid about five or $6 million in taxes, I don't know exactly how much.

Q. How do you know all this?

A. This is information that I found out through friends who are close. But the two accounts I have access to.

Q. Friends that are close to who?

A. To the family.

Q. All right, so the only accounts you have access to would be the escrow?

A. The estate account and Shefa. Those I found going through the bank and finding those.

Ruben Elberg

Q. Are you a signatory, do you have access to the Shefa account?

A. I am a signatory, but I am not allowed to write alone a check from that account. She's actually written it alone, but I cannot myself.

Q. Who else?

A. Pewzner.

Q. Just your sister?

A. Yes.

Q. The Shefa account, that's not considered an estate account?

A. It's part of the estate's assets.

Q. Because your father owned Shefa?

A. Yes.

Q. Did you own Shefa, part of Shefa?

A. Shefa had received the moneys from the cab companies, from my refinancing, my father's refinancings, and that money was put into Shefa in order for us to buy a note back from Rosenthal & Rosenthal and to avoid paying double taxes on -- when you borrow money and you pay tax, like two and a quarter or two and three-quarter percent for loans that you take,

Ruben Elberg

there is a tax that you pay when you borrow money. I don't remember exactly.

But we tried to avoid that by buying the note back through Shefa by paying double taxes when we borrow money again.

Q. Okay.

A. It was supposed to be part of the capital contributions, so I actually own the interest of Shefa, but I don't have documents because my father and I trusted each other. We never nickel and dimed each other on paper, we trusted each other. He passed away suddenly and this situation became out of hand.

Q. How much money is in the two accounts you do have access to, the estate account and the Shefa account?

A. Around 15, $16 million.

Q. The rest is --

A. I don't know.

Q. Well, there's five million in the hands of the buyer?

A. They gave the buyer. They left that with the buyer.

MR. McCARTHY: Just to be clear,

Ruben Elberg

that's your understanding.

A. They left it with the buyer.

MR. McCARTHY: Were you a party to the sale?

THE WITNESS: No, I was not.

Q. And the rest?

A. I was told she paid some taxes.

Q. Do you know if those were estate taxes?

A. I don't know what they were for. I was not involved in the transaction so I can't say. I'm just giving you things that I have gotten, you know, really not full.

Q. The representation made to Justice Ramos that these would be in escrow, what was supposed to be the terms of the escrow?

A. That we were both controlling of those interests, and that once upon a decision came up, that's what the LOI said, that's what the merger document said, then we would distribute it accordingly. But as she did, she did not follow it.

Q. Have you gone back to Justice Ramos to complain that that wasn't done?

Ruben Elberg

A. We had mentioned it in front of Justice Ramos in one of our proceedings, and Justice Ramos, it was as if he didn't hear it.

She had a former law clerk of Justice Ramos working for her as a lawyer. She brought him on when she saw herself getting into trouble. And she brought in a law clerk, his name is Andrew Tulloch, T-U-L-L-O-C-H, and the Judge trusted his former law clerk to a point where whatever he said, he did for them.

Q. Do you have a transcript where a representation was made of the escrow?

A. Yes.

Q. Has that been shown to Justice Ramos?

A. I don't believe it was brought to his attention to show him the transcript, no, but he was told in a hearing. Clearly I remember, I was present at the hearing, that, the hearing after the sale -- I remember now.

They tried to discontinue the case, they said that now that everything is sold, they wanted to discontinue the case.

We argued against discontinuing the

Ruben Elberg

case, and one of the things we brought was that escrow was not established, and Judge Ramos did not even pay attention to it. And he discontinued the case, he gave them what they wanted.

Q. Even though it's not being held in escrow, do you have an understanding of the circumstances under which it will be distributed in the future? Is it still the same thing when there's a decision on what you're entitled to?

A. Can you clarify?

Q. The money is sitting there in an estate account and a Shefa account. Do you understand under what situation those moneys are to be distributed?

A. Well, I can't say there will be any distribution unless the court makes the decision or she comes to a settlement, Pewzner comes to a settlement.

Q. Let's say the court makes a decision. Is it your understanding that those moneys would then get paid to you from those accounts?

A. I don't know what the court will

Ruben Elberg

decide. I hope there is a favorable decision in my interests.

Q. Have you sent or anyone on your behalf sent any writings to your sister, a letter, anything saying the moneys have to be held in escrow?

A. We made the representations in court, they knew. They made the representations, we made representations the money is not in escrow, and it was ignored.

Q. My question is, did somebody send a letter or any other writing on your behalf to your sister or her representatives saying this money was supposed to be held in escrow?

A. No. I can't say for sure, I don't remember, possibly.

Q. Or demand they be put into escrow?

A. I don't remember. I can't say for sure.

Q. Can I get a copy of that transcript where they made that representation to Justice Ramos?

A. It's online, it's in Motion 6. Wait, I apologize. It should be online, Motion

Ruben Elberg

5 or Motion 6 or 7. These last three motions, there should be transcripts there, and there should be definitely clear understanding.

Look at the LOI, letter of intent, it's spelled out clearly that the money would be put in escrow. And it's also spelled out in the merger documents. It's spelled out in the transcript, Lieberman made a representation in front of the Judge.

Q. Has there been any statement by your sister as to why it's not in escrow?

A. Not to my knowledge.

Q. Has there been any statement --

A. They ignored it. When we brought it up in front of Judge Ramos, they didn't even address that issue.

Q. Well, when you say in escrow, what do you mean by that, are you talking about in a special type of account?

A. JPMorgan Chase was supposed to establish an account with all the money that's in dispute, and once there is a court decision, that the moneys would be distributed accordingly.

Ruben Elberg

She paid $5 million in taxes. She left a substantial amount of money with the buyers. She put the estate and me in jeopardy, and I don't know what else I can say, and all the people we owe money to.

Q. Somewhere you gone to the Surrogate's Court to complain about the issue?

A. I can't discuss that matter, but we will be taking action, whatever is necessary in due time.

Q. Well, back to my other question. What kind of account did you expect it to be in, one where you were a signatory?

A. Where I had control and she had control for the total amount of money.

Q. But you both had to sign for any money to come out?

A. Yes.

Q. But that hasn't been done?

A. No.

Q. What's your understanding of the money in the hands of the buyers, when will that be released?

A. They're concerned that they have

Page 158

Ruben Elberg

liabilities.

Q. I understand, but that could be just for a limited period?

A. I would say for a year or two or three, I don't know.

Q. You don't know?

A. I don't have what she agreed with them, this is not with my consent.

Q. Have you asked your sister, have you asked the buyer?

A. I have no communications with her.

Q. Have you asked the buyer?

A. I have no communications with them.

Q. Have you tried?

A. No, I have not.

Q. Going back to Exhibit 3, the one in front of you, the subpoena. Now, Number 7, I assume you didn't look for anything because you didn't have any securities?

A. I do not have any securities.

Q. You never had any securities?

A. I can't say that.

Q. Not since 2012?

A. No.

Page 159

Ruben Elberg

Q. Did you give us --

A. Excuse me, I might correct that, forgive me. Isn't a share ownership in a company a security?

Q. Yes.

A. Isn't that security? Well, then I do have, I don't want to misstate anything or deny my ownership. I own 200 shares in Merill, I own 200 shares in Spindle, and I own 100 shares in Jerub. So those are securities I believe I supplied you information on or you have that information because Capital One is the lender.

Q. Any other securities?

A. Nothing other than that, no.

MR. McCARTHY: Your ownership in the entities in Paragraph 5, if that is deemed a security.

A. Is that, they are not in share ownership, I don't know, is that deemed as securities?

Q. I think you could argue that.

A. What?

Q. I think you could argue that, but

Page 160

Ruben Elberg

I'm not asking that.

A. I don't want to deny my ownership of RORE or, RREM.

Q. I'm not asking you to that.

A. No, I just want to be clear.

Q. Records reflecting ownership of any vehicle, have you given us that?

A. I gave you the 2004 Honda Odyssey.

Q. You gave us documents on that?

A. I don't know if I did. If I didn't, I'll provide that I own the car.

Q. So you need to go back and find anything about any vehicles you've owned from 2012 to date?

A. That's my only vehicle.

Q. Records reflecting receipt of any dividend, partnership distribution, or any other form of income, including salary from 2012 to date. You gave us your 2012 tax return. What about any other documents showing, any other kind of income since then?

A. No, nothing.

Q. You've had zero, not one penny of income?

Page 161

Ruben Elberg

A. I told you I've been borrowing money from my family, my children unfortunately, and this $350,000.

Q. There have been no distributions out of the estate yet?

A. No.

MR. FORSTOT: Why don't we take a five-minute break and organize. I'm pretty much done, but I have a few more things. We'll go off the record.

(Whereupon, a discussion was held off the record.)

Q. Do you have to pay real estate taxes on your house?

A. Yes.

Q. How much is that per year?

A. It's part of the $2,600 payment. Insurance and taxes are part of the $2,600 payment.

Q. The mortgage servicer --

A. Collects that.

Q. -- collects that and pays it?

A. Yes.

Q. As far as you know, that's all

Ruben Elberg

up-to-date, no arrearages there?

A. No.

Q. You're still co-executor of the estate of your father, right?

A. Yes.

Q. The medallion entities that you don't claim an interest in, are those all out on the street and working?

A. Yes.

Q. Bringing in an income?

A. Yes.

Q. Do you know how much that is in total per month?

A. I want to address that. I'm not, just like she took the interests of, Pewzner took the interest of the real estate and sold it without my permission, when my father passed away, there was no borrower.

Since there was no borrower, I had to right away, as an executor, I had the obligation not to be in default with Capital One to transfer the medallions to my mother's name.

When I did that, I'm facing now a problem with potentially Capital One coming

Ruben Elberg

after the estate that I'm an executor of for transferring those assets that were, that had Jacob Elberg's personal guarantees of the loans of those assets.

She's been spending all those moneys for legal fees and all kinds of things that I don't know. I don't know if she's paying Capital One, I don't know what she's doing there. My mother is --

MR. McCARTHY: The question was, do you know what the medallions are generating.

A. No, I have no control over those assets, that's the problem.

Q. Are you aware of any of them that aren't actually on a car and producing income?

A. I don't have that information.

Q. Is your mother supervising that?

A. My mother has a very poor understanding of the real reality with the documents and understanding loans. She believes whatever she's being fed by my sister, unfortunately.

Q. I'm asking, is somebody overseeing

Ruben Elberg

that?

A. Except Pewzner, nobody.

Q. Is it your understanding as a co-executor of the estate that those other medallion entities are no longer part of the estate, they're owned by your mother?

A. They're owned by my mother, but if the estate as a guarantor owes something, I think those medallions are part of the guarantee, because if they owed money -- I don't know if I'm understanding you correctly what you're asking me.

Q. Those medallions are in individual companies?

A. Correct.

Q. The company equity is owned presently by the estate or your mother?

A. My mother.

Q. I understand the guarantee obligation is still with the estate, of course, is that what you're confusing?

A. I just don't want to be personally liable for anything for transferring those assets early to my mother, but I had to because

Ruben Elberg

I had no choice. There had to be a borrower or else those assets were in default. That's why I transferred it to my mother early on.

Q. Maybe that's why there's a confusion. What do you mean there had to be a borrower?

A. Capital One when my father died sent us a letter stating that we are in default because there is no borrower and there's no guarantor.

My father was the sole borrower and guarantor on those medallions. So in order to have a face behind the loans, it was eventually supposed to be transferred to my mother.

So we transferred them to my mother just to make sure there's a borrower and a guarantor for those loans.

And I don't have control over what transpires with expenditures, how Pewzner runs those companies.

Q. So that transfer was something you were involved with and you were okay with doing it at the time?

A. I consulted with Mark Gallagher who

Ruben Elberg

is Capital One's attorney, and he advised me we had to do this, so I followed his advice because I didn't want to be in default.

Q. Is there something he gave you in writing that shows that?

A. I might have emails. I would have to check.

Q. Other than Capital One, we know Capital One is a creditor of your father's estate. Are there any other creditors that you know of of your father's estate?

A. I have no control of what Pewzner paid or didn't pay. While I was involved, there were some creditors. I don't know what of those loans or obligations were paid or not, so I don't have control over that.

Q. I'm not asking you about control. What do you know of whether it's been paid or not, what did you know of the other creditors of the estate?

A. I don't have a recollection now. I might have a spreadsheet, but there were, as I told you, EB-5 investors, there were loans for the real estate with Rosenthal & Rosenthal.

Ruben Elberg

There were moneys that had to be paid back to the medallion companies once a sale or a refinancing took place in the real estate. Eventually some money had to go back to the taxi companies that were borrowed.

Q. You say the taxi companies, you mean the companies that owned the medallions?

A. Yes. I would say those are creditors.

Q. Any other creditors you're aware of?

A. I'm just telling you off the top of my head what I remember, but there might be more, I don't know.

Q. Do you have an amount in mind or did you understand what was owed in total to creditors other than Capital One of your father's estate?

A. I don't have a number, no. I don't remember.

Q. Did you ever know that?

A. Possibly, yes, I might have some information on that.

Q. Can you recall any information now?

Ruben Elberg

A. I don't recall right now. I'm just not settled, forgive me.

Q. The entities, the medallion entities you claim an ownership interest in, do they own any assets other than the medallions?

A. No.

Q. They don't own any vehicles?

A. Nothing, no.

Q. Do they have creditors other than Capital One?

A. No.

Q. Do you have an understanding how much the judgment Capital One has against you?

A. Yes.

Q. What do you understand that amount to be?

A. Eight percent, 4.4.

Q. And you understand interest, post judgment interest is running on that?

A. I want to pay you. Help me pay you.

Q. I'm asking if you know that.

A. I understand.

Q. Assuming you don't win on the

Ruben Elberg

contested issues between you and your sister, what's your thinking about how you might be able to pay your debt off to Capital One?

A. Whether I win or not, the fact is there's a trail that the medallions lent money to the LLCs, and the moneys were supposed to go back to the medallion companies.

So one way or another, Capital One has to get paid, and nobody is trying to duck. I want to make sure you get paid, but I need your help to be able to achieve that.

I've never defaulted with Capital One with anything until my father passed away, and I was continuing to make the payments.

Capital One sent me emails they were going to extend the loans, and instead of extending the loans, they started the foreclosure action.

Q. You say you have emails from Capital One?

A. From Capital One, clearly they were going to extend the loans, it was supposed to go through 2017. They sent me emails.

Q. Where are those emails today?

Ruben Elberg

A. I have them.

Q. Anything else as far as you're thinking about being able to pay the debt back?

A. Irrelevant of who owns those assets, whether the estate or Class C interest or RORE or RREM or the medallion companies, there's a track record how the money was flowed, the money has to be paid back. I have an interest to do that, but I'm being hindered.

Q. Do you have any thoughts about getting a job and paying part of your income toward your debts?

A. I don't think that's going to pay you so fast.

Q. It may not, but I'm asking if you have any thoughts about that.

A. I'm looking at potentially getting into the brokerage business, and I have a good understanding of real estate. And I'm seriously thinking of going into the brokerage, but the licensing has not been achieved yet, it's going to take a couple of months.

And I think sooner than that we can resolve these issues if we work together in a

Ruben Elberg

fair and amicable way to get the truth, and to get to the truth and to get you what you deserve.

Q. Have you asked for any loans from anybody to try to help pay the debt down?

A. No. I don't have any, all my assets are tied up. When people lend you money, they lend you money on assets. All my assets are tied up.

Q. You still have equity in your house, right?

A. Not really, it's practically gone.

Q. How do you know that if you don't know the value of the house?

A. It's somewhere in the million dollar range, you know. What equity do I have if I owe $800,000, what kind of equity do I have there, there's practically nothing left.

Q. Have you asked for a loan to be secured by whatever equity you have left?

A. No, I cannot, and that's because I don't have income to prove. I can't even refinance my house to prove that I have additional income so I can borrow against the

Ruben Elberg

house. I can't even borrow against the house now.

Q. Getting a job would get you some income.

A. That's what I'm working on. Unfortunately, being tied up with all these litigations, I don't want to start working for a few thousand dollars a month and not pay four and a half million dollars in debt that I have. And I have money that's sitting in an account that's eventually supposed to be repaying those loans.

Q. You're not going to get a job because?

A. The moneys are in the estate account and in the Shefa accounts. I want to resolve my obligations. I don't want to be haunted by people because I have never, ever, ever not paid my bills.

Q. But getting a job would actually help you by starting to reduce the debt a little bit.

A. I'm working on it, I'm working on it. Unfortunately, I've been overwhelmed with

Ruben Elberg

these things.

Q. When you say overwhelmed with these things --

A. With the litigations.

Q. It doesn't take up all day every day, you can actually work, right, do you agree?

A. I will work on that. Thank you for the recommendation, I will work on it.

Q. So there are documents you still need to get to us. I mean, I don't want to get into a dispute whether you made a good faith effort to find them.

MR. FORSTOT: So what I'll do then is hold this deposition open.

Q. When do you think you can get all the documents we talked about, the bank statements and the other documents to us?

A. Tell us what you need, and I'll try to work on getting it.

Q. We did send you a letter.

MR. FORSTOT: I'll send your counsel a letter saying these are the documents we talked about in the deposition. If you like, I can tell you we

Ruben Elberg

would like them in a week.

MR. McCARTHY: For scheduling purposes, I'm going to be out of the country from July 8th to July 18th, so we would like some time beyond that. If I can get them to you before --

MR. FORSTOT: If we get the letter to you this week, we can get some, if not all of them.

MR. McCARTHY: I'll try to get them to you.

MR. FORSTOT: What I'll do is I'll look at them, and if we don't really have any questions or any questions, we don't have to get together again. But if we do, then we do, just to finish this, all right.

Do you have any questions for your client?

MR. McCARTHY: No, I don't have any questions. I'm just going to put on the record that I'm going to state my objection to holding it open, but obviously we can come to an agreement.

MR. FORSTOT: That's it, we're off

Ruben Elberg

the record.

[TIME NOTED: 2:19 p.m.]

________________________

RUBEN ELBERG

Subscribed and sworn to before me this ____ day of _________________, 2017.

__________________________________

NOTARY PUBLIC

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Ruben Elberg | Mr. Forstot | 4 |

E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Subpoena duces tecum | 58 |
| Exhibit 4 | Eight pages of Capital One bank statements | 70 |
| Exhibit 5 | Alma Bank Personal Financial Statement | 83 |
| Exhibit 6 | Capital One Bank Personal Financial Statement | 85 |
| Exhibit 7 | Wilshire State Bank Personal Financial Statement | 88 |
| Exhibit 8 | Capital One Bank Personal Financial Statement | 88 |
| Exhibit 9 | 2012 1040 U.S. Individual Income Tax Return | 102 |

REQUESTS

| PAGE | LINE |
|---|---|
| 155 | 22 |

CERTIFICATION

I, Alice Schulman, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of June, 2017.

Alice Schulman

ALICE SCHULMAN