# EXHIBIT B

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (the "Agreement") is entered into effectively as of January 22, 2024 (the "Execution Date"), by and among Bracha Cab Corp., Dovber Cab Corp., Tamar Cab Corp., NY Genesis Taxi Corp., Dabri Trans Corp., Merab Cab Corp., Fit Taxi Corp., Somyash Taxi Corp., NY Tint Taxi Corp., NY Stance Taxi Corp., NY Canteen Taxi Corp., NY Energy Taxi Corp., Jackhel Cab Corp., Lechaim Cab Corp., and Jarub Trans. Corp ("Jarub") (collectively, the "Debtor Borrowers"); Merill Transit Inc. ("Merill") and Spindle Cab Corp. ("Spindle" and together with Merill, the "Non-Debtor Borrowers" and, with the Debtor Borrowers, the "Borrowers"); Tamara Pewzner ("Tamara") and Ruben Elberg ("Ruben"), personally and as a beneficiary of the Estate of Jacob Elberg, and Tamara and Ruben in their capacities as Co-Executors of the Estate of Jacob Elberg; Esma Elberg ("Esma"), personally; Sholom (Sam) Elberg ("Sam"), personally and as a beneficiary of the Estate of Jacob Elberg; Michael Elberg ("Michael"), personally and as a beneficiary of the Estate of Jacob Elberg; Faivish Pewzner ("Faivish"), personally and as the spouse of Tamara; JEB Management Corp. ("JEB"); SHEFA Funding LLC ("SHEFA"); and the Estate of Jacob Elberg (collectively with the Borrowers, Tamara, Ruben, Esma, Sam, Michael, Faivish, JEB, and SHEFA, the "Elberg Parties" or "Parties").

## RECITALS

**WHEREAS,** Jacob Elberg ("Jacob") was a resident of Kings County, New York and passed away on December 20, 2013;

**WHEREAS,** Jacob at the time of his death was married to Esma and they had four children, Ruben, Tamara, Sam, and Michael;

**WHEREAS,** Ruben and Tamara were the nominated Co-Executors of the Estate of Jacob Elberg and Co-Trustees of a trust u/w/o Jacob Elberg, and received Letters Testamentary and Letters of Trusteeship pursuant to Decree Granting Probate, dated January 16, 2014, which were issued by the Surrogate's Court, Kings County (the "Kings County Surrogate's Court");

**WHEREAS,** by the decision and order of Justice Andrew Borrok, dated January 20, 2021, it was determined that, at the time of his death, Jacob was the holder of a sixty (60%) percent ownership interest in each of Royal One Real Estate LLC ("RORE"), a New York limited liability company, and Royal Real Estate Management, LLC ("RREM"), a New York limited liability company, and Ruben was the holder of a forty (40%) percent ownership interest in each of RORE and RREM;

**WHEREAS,** Tamara had disputed the validity of Ruben's forty (40%) percent ownership interest in each of RORE and RREM;

**WHEREAS,** by this Settlement, it is agreed that Ruben shall receive the property located in the Bronx, New York, Block 3211, Lot 118 (the "Bronx Property");

**WHEREAS,** Ruben is the titular owner of a land lease for property in Israel located at Block 7188, Lot 32 (old Lot 171), which is located in Kfar Chabad Israel (the "Israel Property") and by this Agreement, Ruben's ownership will no longer be contested;

## THE MERGER TRANSACTION:

**WHEREAS,** Tamara has represented that she did not receive any financial or other benefit, directly or indirectly, including through any family member or other relative, in connection with the merger of Royal CP Hotel Holdings, LP, a New York limited partnership ("Royal CP"), and Royal HI Hotel Holdings, LP, a New York limited partnership ("Royal HI") with and into an entity affiliated with certain buyers for total consideration (cash and the assumption of indebtedness) valued at $35,777,210, which closed on or about August 25, 2016 (the "Merger Transaction"). Set forth on **Schedule A** hereto and made a part hereof is the Flow of Funds Memorandum reflecting the way in which all consideration of the Merger Transaction was paid or distributed;

**WHEREAS,** Ruben did not receive any payment or distribution of the proceeds of the Merger Transaction in either his individual capacity as a Class D partner of Royal CP and/or Royal HI or as a 40% minority owner of each of RORE and RREM (Class C Partners) even though the Merger Transaction was classified as a Capital Event under both the Limited Partnership Agreement for Royal HI , dated November 30, 2012, and the Limited Partnership Agreement for Royal CP, dated November 30, 2012 (collectively, the "November Limited Partnership Agreements"), although pursuant to the decisions arising from the DJ Action (as defined below), Ruben was determined to be entitled to a portion of such proceeds;

**WHEREAS,** on August 24, 2022, Ruben filed an action against the International Bank of Chicago, Frank Wang, Westland Bridge LLC d/b/a Westland Capital Inc., Raymond Ku, New Fund, LLP, NYC Metro Regional New Fund LLP, Law Offices of Joe Zhenghong Zhou and Associates PLLC, and Joe Zhenghong Zhou, as purchasers in the Merger Transaction, in the Supreme Court of the State of New York, County of New York, bearing index number 653079/2022 (the "Purchasers' Action");

## ACTION FOR DECLARATORY JUDGEMENT:

**WHEREAS,** on June 24, 2016, Ruben commenced a Declaratory Judgment Action in the Supreme Court of the State of New York, New York County, Index No. 653373/2016 (the "DJ Action"), a copy of is attached hereto as **Schedule B** and incorporated herein by reference as if fully set forth herein, which addressed whether the Limited Partnership Agreements for Royal CP and Royal HI, each entered into on August 10, 2012 (collectively, the "August Limited Partnership Agreements"), or the November Limited Partnership Agreements were the governing partnership agreements for Royal CP and Royal HI;

**WHEREAS,** Ruben and Tamara actively litigated the DJ Action through discovery and motion practice and ultimately filed cross-motions for summary judgment, which were fully submitted on or about May 18, 2020;

**WHEREAS,** by Decision and Order, dated January 20, 2021, Supreme Court Justice Andrew Borrok, denied Tamara's motion for summary judgment in the DJ Action and granted Ruben's motion for summary judgment in the same action;

**WHEREAS,** Tamara appealed the Decision and Order, dated January 20, 2021, to the Appellate Division, First Department, and on March 3, 2022, the First Department affirmed the Decision and Order, dated January 20, 2021;

WHEREAS, Tamara requested reconsideration and requested leave to appeal the decision of the Appellate Division, First Department to the New York Court of Appeals and the motion was denied and leave to further appeal was not granted;

## ACTION FOR MONEY JUDGMENT

WHEREAS, on June 22, 2022, Ruben moved for summary judgment in lieu of complaint under CPLR 3213 (captioned Ruben Elberg v. Tamara Pewzner, Index No. 657021/2022 (the "3213 Action"));

WHEREAS, Tamara and Sam opposed Ruben's motion for summary judgment;

WHEREAS, on September 20, 2022, a Decision and Order by Justice Andrew Borrok on this Motion was issued, that granted Ruben's summary judgment motion (the "September 2022 Supreme Court Order");

WHEREAS, on October 3, 2022, the New York County Clerk entered a money judgment in favor of Ruben and against Tamara, individually, as Co-Executor and Co-Trustee of the Estate of Jacob Elberg and as court-designated manager of each of ROBE, RREM and Royal LIC, in the amount of $19,969,505.56, with interest thereon at 9% per annum from the 25th day of August, 2016 totaling $10,980,492.51, along with motion costs of $45.00, and disbursements as to be taxed by the Clerk of $237.50, for a total of $30,950,235.57, and further awarding legal fees in the amount of $4,208,728.28 with interest thereon at 9% per annum from the 20th day of January, 2021, totaling $644,454.31, and disbursements as to be taxed by the Clerk of this Court upon the presentation of the proper papers of $282.50, for a total of $4,853,465.09 (the "Ruben Money Judgment");

WHEREAS, a copy of the Ruben Money Judgment is attached hereto as **Schedule C** and incorporated herein by reference as if fully set forth herein;

WHEREAS, Tamara has appealed from all parts of the September 20, 2022 Supreme Court Order and from the Ruben Money Judgment, dated October 3, 2022, and these appeals have not yet been perfected to the Appellate Division, First Department;

## NEW YORK CITY MEDALLIONS AND THE TURNOVER PROCEEDING:

WHEREAS, the Borrowers collectively own 35 licenses to operate taxicabs within the city of New York (the "Medallions");

WHEREAS, at the time of his death, Jacob was the sole stockholder of the Borrowers that owned an aggregate of 29 Medallions and Jacob owned fifty (50%) percent of Jarah, which owned 2 Medallions. Ruben contended that he owned and is the current owner of the other fifty (50%) percent ownership interest in Jarah;

WHEREAS, Ruben contended that he was and currently is the sole stockholder of two (2) corporations (the Non-Debtor Borrowers) that own an aggregate of 4 Medallions;

**WHEREAS,** the equity interests of the Borrowers beneficially owned by Jacob at the time of his death (including 50% of Jarub) were transferred by the Estate of Jacob Elberg to Esma in early 2014;

**WHEREAS,** Tamara disputed that Ruben owned any of the Borrowers, and also disputed Ruben's ownership interests in RORE, RREM, Royal CP and Royal HL and, in connection therewith, filed a petition in the Kings County Surrogate's Court (the "Kings County Turnover Proceeding");

**WHEREAS,** Ruben defended against the claims made by Tamara in the Kings County Turnover Proceeding, which remains pending;

**WHEREAS,** by Order to Show Cause, dated August 28, 2014, filed in Kings County Surrogate's Court, that Court enjoined Ruben individually, without his co-executory, from transferring and/or conveying any right, title or interest in RORE, RREM, Merill, Jarub and Spindle and further stayed, enjoined and restrained Ruben from withdrawing and transferring any monies from accounts maintained by Merill, Jarub, Spindle, JEB and SHEFA;

**WHEREAS,** by Decision and Order, dated April 21, 2015, Ruben's motion to dismiss the Kings County Turnover Proceeding and motion to post an undertaking was denied and the order on the Order to Show Cause, dated August 28, 2015, was modified by the Kings County Surrogate's Court, *sua sponte*, to allow Ruben Elberg to pay estate administrative expenses in fulfillment of his duties as Co-Executor of the Estate of Jacob Elberg;

**WHEREAS,** Ruben appealed the Decision and Order, dated April 21, 2015, and by Decision and Order, dated August 1, 2018, the Appellate Division, Second Department, modified the Order and directed the Kings County Surrogate's Court, to fix an appropriate undertaking pursuant to CPLR 6312;

**WHEREAS,** on August 27, 2018, Ruben settled a Decree for the fixing of an undertaking in the amount of $25,000,000.00, by the Kings County Surrogate's Court;

**WHEREAS,** the Kings County Surrogate's Court has taken no action in connection with the aforesaid proposed decree;

**WHEREAS,** the Kings County Turnover Proceeding was transferred to Surrogate's Court, Queens County ("Queens Surrogate's Court") by Administrative Order dated December 3, 2021, where it remains pending;

**WHEREAS,** by Petition, dated July 27, 2015, Tamara filed a proceeding in the Kings County Surrogate's Court, alleging that Ruben violated the Court's Decision and Order, dated April 21, 2015, and furthermore requested that Ruben's Letters Testamentary and Letters of Trusteeship be revoked;

**WHEREAS,** Ruben denied the allegations made in the Petition, dated July 27, 2015, and has defended himself in this proceeding;

**WHEREAS,** the Kings County Surrogate's Court, on July 30, 2015, signed an Order to Show Cause, which, pending adjudication of the proceeding commenced pursuant to the Petition,

dated July 27, 2015, stayed, enjoined and restrained Ruben from individually, and without his co-executor, withdrawing or transferring any monies, or issuing any checks from the accounts of any entity, partnership or asset in which the Estate of Jacob Elberg asserted an interest in a proceeding before this Court, including but not limited to RORE, RREM, Royal LIC, Royal CP, Royal HI, Merill, Jarub, Spindle, JEB and SHEFA, and further, stayed, enjoined and restrained Ruben in any manner whatsoever from individually transferring, selling, conveying or causing any loan, mortgage or other charge of any nature to be placed upon, against or in any manner offering for sale or investment or otherwise affecting the membership interests, shares, assets, or income of the Estate of Jacob Elberg, Trust, RORE, RREM, Royal LIC, Royal CP, Royal HI, Merill, Jarub, Spindle, JEB, and SHEFA;

**WHEREAS,** on September 1, 2015, Ruben moved to dismiss this Petition seeking his removal as Co-Executor and Co-Trustee of the Estate of Jacob Elberg and that motion was denied by Decision and Order, dated March 28, 2016;

**WHEREAS,** by Petition dated December 8, 2017, Ruben moved to suspend and remove Tamara as Co-Executor and Co-Trustee of the Estate of Jacob Elberg, to have the Public Administrator appointed as co-fiduciary and to remove the restrictions placed on Ruben by the Order to Show Cause, dated July 30, 2015 (the "Suspension and Removal Proceeding");

**WHEREAS,** on December 13, 2017, Kings County Surrogate's Court signed an Order to Show Cause for the relief sought by Ruben in his Petition, dated December 8, 2017;

**WHEREAS,** the Suspension and Removal Proceeding was transferred to Queens Surrogate's Court by Administrative Order dated December 3, 2021;

**WHEREAS,** by Petition, dated May 8, 2021, Sam commenced a proceeding in Kings County Surrogate's Court to compel Ruben and Tamara to account for the Estate of Jacob Elberg (the "Accounting Proceeding");

**WHEREAS,** the Accounting Proceeding was transferred to Queens Surrogate's Court by Administrative Order dated December 3, 2021;

**WHEREAS,** as part of the Settlement, the Elberg Parties agree that the Borrowers (not owned by Ruben) or the Medallions are being transferred to Ruben in consideration of his claim to a contingent interest in the Estate of Jacob Elberg in the event the Chapter 11 Plan is confirmed;

## CAPITAL ONE:

**WHEREAS,** on or about August 1, 2012, Capital One made a loan to each of the Borrowers in the principal amounts set forth on **Schedule D** hereto and thereafter made certain additional loans to certain Borrowers as more fully identified on **Schedule D** (each a "Loan", collectively, the "Loans");

**WHEREAS,** each of the Borrowers granted to Capital One security interests in the Medallions, all proceeds thereof, and other personal property owned by such Borrower (collectively, the "Capital One Liens") as security for the Loan(s) to it;

**WHEREAS**, Jacob and JEB guaranteed all Loans, and Ruben personally guaranteed the Loans to Jarub (owned 50% by Ruben) and the Non-Debtor Borrowers (the "Ruben Elberg Personal Guaranty");

**WHEREAS**, the Loans matured on January 1, 2015, upon which all amounts due under the terms of each Loan (and the obligations due and owing under Loans, collectively, the "Loan Obligations") became immediately due and payable;

**WHEREAS**, each of the Borrowers has failed to fully repay the Loan or Loans made to it;

**WHEREAS**, on or about June 9, 2015, Capital One presented a claim against the Estate of Jacob Elberg to the Co-Executors in respect of Jacob's liability as a personal guarantor of the Loans in the amount of $23,140,074.86 (the "Estate Claim");

**WHEREAS**, on July 27, 2015, Capital One commenced an action against JEB and Ruben in the Supreme Court of New York, Suffolk County, bearing index number 608014/2015 (the "JEB Action");

**WHEREAS**, on November 4, 2015, Capital One commenced an action against the Estate of Jacob Elberg, Ruben, and JEB in the Supreme Court of New York, Suffolk County, bearing index number 611751/2015 (the "Executor Action");

**WHEREAS**, on February 1, 2016, Capital One entered into a forbearance agreement with Debtor Borrowers, the Estate of Jacob Elberg, and JEB, which was later amended;

**WHEREAS**, on April 27, 2016, Capital One voluntarily discontinued the Executor Action in its entirety without prejudice;

**WHEREAS**, on April 27, 2016, Capital One voluntarily discontinued the JEB Action solely against JEB without prejudice;

**WHEREAS**, on November 22, 2016, a judgment was entered against Ruben, individually, in the JEB Action in favor of Capital One in the amount of $4,399,541.72 (the "Ruben Elberg Judgment");

**WHEREAS**, since the Ruben Elberg Judgment was entered, post-judgment interest has been accruing at the statutory rate of 9% per annum;

**WHEREAS**, Ruben took an appeal of the judgment entered against him in the JEB Action to the Appellate Division, Second Department, which appeal was denied by order entered on March 31, 2021;

**WHEREAS**, on or about February 6, 2017, to enforce the Ruben Elberg Judgment, Capital One served a restraining notice on the Estate of Jacob Elberg;

**WHEREAS**, on or about May 9, 2017, to enforce the Ruben Elberg Judgment, Capital One issued an execution against property with notice to garnishee (the "Execution"), and the Sheriff of Nassau County "levied on" the Execution (the "Levy") by serving the Execution on

Tamara, in her capacity as a co-executor of the Estate of Jacob Elberg and fiduciary for certain entities related to the Estate of Jacob Elberg;

**WHEREAS**, the Levy was extended by a court order dated July 21, 2017 and entered in the JEB Action;

**WHEREAS**, on December 8, 2017 (the "Petition Date"), the Debtor Borrowers each commenced a case under title 11 of chapter 11 of the United States Code (as amended, the "Bankruptcy Code") before the United States Bankruptcy Court, Eastern District of New York (the "Bankruptcy Court"), which cases are jointly administered under Case No. 17-46613-nhl (the "Chapter 11 Cases");

**WHEREAS**, on or about May 3, 2018, Capital One filed a proof of claim in each of Debtor Borrower's Chapter 11 Cases for the amounts due and owing under the Loans to the Debtor Borrowers as of the Petition Date (collectively, the "Bankruptcy Claims"), which Bankruptcy Claims aggregated $23,090,309.51 as of the Petition Date;

**WHEREAS**, since the Petition Date, default rate interest and other amounts have been accruing with respect to the Bankruptcy Claims and continue to accrue;

**WHEREAS**, on or about May 4, 2018, Ruben filed a proof of claim in the Chapter 11 Cases for the amounts due and owing him as of the Petition Date, which totaled $4,987,311.35 as of the Petition Date;

**WHEREAS**, by order dated June 30, 2019, the Bankruptcy Court approved and authorized the Debtor Borrowers to enter into and consummate a global settlement agreement among certain of the Parties hereto and others, excluding, however, the Non-Debtor Borrowers, Jacob Trans. Corp, and Ruben (the "Prior Settlement");

**WHEREAS**, on July 17, 2019, Tamara filed a petition with the Kings County Surrogate's Court pursuant to New York Surrogate Court Procedure Act ("SCPA") § 2102(6) for approval of the Prior Settlement, which was transferred to Queens Surrogate's Court on December 3, 2021 by Administrative Order, where it remains pending;

**WHEREAS**, on August 24, 2022, Ruben Elberg filed an action against Capital One and others in the Supreme Court of New York, New York County, bearing index number 653076/2022 (the "Fraud Action");

**WHEREAS**, on October 1, 2022, Capital One commenced a special proceeding pursuant to CPLR § 5227 against Tamara, in her personal and representative capacities, and Ruben, solely in his representative capacities, in the Supreme Court of New York, Nassau County, bearing index number 613186/2022 (the "Nassau County Turnover Proceeding") to prevent the release of funds held by the Estate of Jacob Elberg;

## QUEENS SURROGATE'S COURT:

**WHEREAS**, Sam filed the Accounting Proceeding and the Queens Surrogate's Court ordered Tamara and Ruben to file their accountings as Co-Executors;

7

**WHEREAS**, Tamara and Ruben filed accountings with the Queens Surrogate's Court, which accountings are pending;

**WHEREAS**, the Queens Surrogate's Court on or about October 25, 2022 stayed the parties from continuing any further litigation in any court, which included staying Ruben from enforcing the Ruben Money Judgment;

**WHEREAS**, on October 26, 2022, the Queens Surrogate's Court denied, without prejudice, the petitions of Ruben seeking the removal of Tamara as co-Executor of the Estate of Jacob Elberg and the appointment of the Public Administrator as administrator c.t.a.;

**WHEREAS**, on October 26, 2022, the Queens Surrogate's Court denied, without prejudice, the petitions of Tamara seeking the removal of Ruben as co-Executor and co-Trustee of the Estate of Jacob Elberg and the appointment of Tamara as sole executor and trustee;

**WHEREAS**, on October 26, 2022, the Queens Surrogate's Court denied the petition by Tamara seeking the written consent of Ruben to release the sum of $50,000 from the Estate of Jacob Elberg in order to engage accountants and attorneys;

**WHEREAS**, on October 26, 2022, the Queens Surrogate's Court denied, without prejudice, the petitions of Sam seeking the removal of Ruben and Tamara as co-Executors and co-Trustees of the Estate of Jacob Elberg and the appointment of Sam as administrator c.t.a.;

**WHEREAS**, the only proceedings that are still active in the Queens Surrogate's Court are: Petition to Settle Dispute with Secured Creditor (File 2022-211/H); Petition to Compel an Accounting (File 2022/I); Petition filed by Sam to remove Tamara and Ruben as Co-Executors and Co-Trustee and appoint the Public Administrator (File 2022-211/M); Petition for Judicial Settlement of Account of Ruben (File 2022-211/N); Petition for Judicial Settlement of Account of Tamara (File 2011/O); and Petition for Turnover of Estate Property (File 2022-211/C) (collectively, the "Active Queens Surrogate's Court Actions");

**WHEREAS**, the Queens Surrogate's Court is authorized pursuant to SCPA 2110 to fix and determine the compensation of an attorney for services rendered to a fiduciary or to a devisee, legatee, distributee, or any person interested or of an attorney who has rendered legal services in connection with the performance of his duties as a fiduciary or in proceedings to compel the delivery of papers or funds in the hands of an attorney;

**WHEREAS**, SCPA 1811 authorizes the payments of debts and funeral expenses by the fiduciary of an Estate and preference for payments of debts and claims;

### RECENT ACTIONS BY THE PARTIES:

**WHEREAS**, prior to the date of this Agreement, pursuant to a certain Agreement for Advance of $1,550,000 from the Estate of Jacob Elberg Bank Account Ending x3370, by and between Tamara and Ruben, personally and in their capacities as co-Executors of the Estate of Jacob Elberg (the "Advancement of $1,550,000 Agreement"), Tamara and Ruben caused the Estate of Jacob Elberg to deposit into escrow with Abrams Fensterman, LLP ("Abrams

Fensterman"), as escrow agent, a total of $1,550,000 from the funds held in the bank account of the Estate of Jacob Elberg (JP Morgan Chase Bank, N.A. Account ending x3570) (the "Estate Bank Account"). The Advancement of $1,550,000 Agreement expressly authorized Abrams Fensterman to make the following payments from escrow for and on behalf of the Estate of Jacob Elberg (the "Prior Settlement Payments"): (i) an aggregate of $50,000 towards the payment of fees required to be made to certain professionals retained by Ruben to assist in finalizing the Settlement, including Ruben's accountant, bankruptcy attorney, corporate tax attorney, and a broker registered with the New York City Taxi and Limousine Commission, which expenses are viewed as expenses of the Estate of Jacob Elberg under SCPA 1811 and 2110; (ii) an aggregate of approximately $1,000,000 to the law firms and lawyers in partial payment of attorneys' fees for legal services rendered that benefited the Estate of Jacob Elberg and the fiduciaries, beneficiaries, and other interested persons, as contemplated by SCPA 2110; and (iii) up to $500,000 to the Estate of Alfred E. Locascio, a Marshal for the City of New York, in payment of all applicable poundage fees incurred on behalf of Ruben in his attempt to execute a money judgment issued by the County Clerk, New York County, dated October 5, 2022, in an action captioned Ruben Elberg v. Tamara Pewzner, New York County Index No. 657021/2022, as further reflected in a separate agreement between Ruben and the New York City Marshal and others;

**WHEREAS**, pursuant to the Advancement of $1,550,000 Agreement, any balance of such funds remaining in escrow with Abrams Fensterman following payment in full of the Prior Settlement Payments shall be paid as directed by Ruben, pursuant to and consistent with the Queens Surrogate's Court's determination, on or after the Settlement Effective Date pursuant to the terms of this Agreement (and for clarity such remaining funds shall be deemed to be part of the Remaining Estate Funds (as defined in Section 2(d) below));

**WHEREAS**, the Elberg Parties acknowledge and agree that the matters set forth herein are unusual and complex in that they involve multiple parties and actions before by multiple courts, including the state, federal, trial, appellate and bankruptcy courts, and that to avoid any further expenditure of time, effort and money and the uncertainty attendant to litigation, the Elberg Parties desire to settle and fully resolve, with prejudice, the Estate Claim, the Bankruptcy Claims, the Loan Obligations, JEB Action, the Active Queens Surrogate's Court Actions, the Executor Action, the Nassau County Turnover Proceeding, the Kings County Turnover Proceeding, the Fraud Action, the Ruben Elberg Judgment, the Ruben Money Judgment, and all other claims, liabilities, and causes of action among the Elberg Parties or as otherwise set forth herein, subject to the terms and conditions of this Agreement (the "Settlement");

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, certain of the Elberg Parties are entering into a Settlement Agreement with Capital One, dated as of the Execution Date (the "Capital One Settlement Agreement"), a copy of which is attached hereto as **Schedule E**, to fully and finally settle and resolve certain claims, liabilities, causes of action, and other matters with Capital One which are contingent, in part, upon consummation of this Settlement among the Elberg Parties as contemplated by this Agreement; and

**WHEREAS**, in view of the foregoing, the Elberg Parties desire to enter into this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     <u>Escrow Transfer Date; Settlement Effective Date; Chapter 11 Plan</u>.

    (a)    "<u>Escrow Deposit Date</u>" means the earliest date upon which all of the following have occurred: (i) this Agreement is fully executed by all Parties; (ii) the Capital One Settlement Agreement is executed by all parties thereto; (iii) the Queens Surrogate's Court has entered an order approving the terms of this Agreement and the Capital One Settlement Agreement, authorizing Lori Sullivan, as Guardian ad Litem for Esma, to execute each such agreement on Esma's behalf, and lifting any stays previously put in place by the Queens Surrogate's Court, other than the stay of litigation entered by Queens Surrogate's Court in October 2022 (the "<u>Stay Order</u>"), *provided, however,* that notwithstanding the foregoing, all proceedings in Bankruptcy Court and/or any other cases or proceedings beyond the scope of the Stay Order may proceed and shall not be affected or restricted by this provision; and (iv) restrictions placed on the funds held in accounts of SHEFA (JP Morgan Chase Bank, N.A. account ending x2760), Old Republic National Title Insurance Company (JP Morgan Chase Bank, N.A. accounts ending x4707, x4723, x4774, X4731), Royal One Real Estate LLC (Capital One, N.A. account ending x6305), Royal Real Estate Management, LLC (Capital One, N.A. account ending x5314), escrow by Old Republic National Title Insurance Company (JP Morgan Chase Bank, N.A. accounts ending x4707, x4723, x4774, X4731) (collectively, the "<u>Restricted Accounts</u>") are removed and, subject to the terms of this Agreement, the Capital One Settlement Agreement, and the still extant Capital One Liens, the Estate of Jacob Elberg shall have access to all funds in the Restricted Accounts (once the restrictions are removed, the monies held in such accounts shall be referred to herein as the "<u>Unrestricted Estate Funds</u>").

    (b)    "<u>Settlement Effective Date</u>" means the earliest date upon which all of the following have occurred: (i) the Escrow Deposit Date and all actions and obligations of the Elberg Parties under <u>Section 2</u> of this Agreement which must be completed within five (5) business days following the Escrow Deposit Date are fulfilled; (ii) the date on which all Capital One Requirements (as defined in the Capital One Settlement Agreement) are fulfilled or completed; (iii) entry of an order by the Bankruptcy Court approving this Agreement (the "<u>Bankruptcy Approval Order</u>"); (iv) the earlier of (A) one hundred and eighty (180) days from entry of the Bankruptcy Approval Order, and (B) entry of any order by the Bankruptcy Court of the Chapter 11 Plan (as defined below), which, among other things, shall incorporate the terms of this Agreement, discharge the debts of Debtor Borrowers (including the Loans and Loan Obligations), release and terminate the Capital One Liens, and, in either case, be followed immediately by (v) (A) delivery by Lori Sullivan, as Guardian ad Litem for Esma, of Borrowers to Ruben in consideration of his claim to a contingent interest in the Estate of Jacob Elberg or (B) in the event the Chapter 11 Plan is not confirmed, the transaction contemplated by <u>Section 4(b)</u>, in each case free and clear of all liens, charges, claims, taxes, fees and penalties (including those incurred by or on behalf of the Debtor Borrowers' respective management companies or their respective employees, contractors, or agents and any tax liability for debt forgiveness for the Debtor Borrowers), restrictions, security interests, rights of first refusal, mortgages, deeds of trust, pledges, and all other encumbrances (collectively, "<u>Liens</u>", including without limitation Capital One Liens.

(c)     Debtor Borrowers shall, and Esma and Tamara shall cause the Debtor Borrowers to, obtain approval of this Agreement and the Capital One Settlement Agreement by the Bankruptcy Court and confirmation by the Bankruptcy Court of a Chapter 11 Plan which is consistent with the terms of this Agreement and the Capital One Settlement Agreement (the "Chapter 11 Plan"). The Elberg Parties agree to use their best efforts and act in good faith to obtain confirmation of the Chapter 11 Plan as promptly as possible. The Elberg Parties further agree and shall allow any non-material changes to this Settlement to facilitate the confirmation of the Chapter 11 Plan. The Chapter 11 Plan will account for satisfaction of allowable Outstanding Debtor Borrower Liabilities (as defined below) and to the extent Outstanding Debtor Borrower Liabilities are required to be paid, they shall be paid by in accordance with terms of this Agreement. The Chapter 11 Plan shall not provide for the liquidation of all or substantially all of the property of the bankruptcy estate of the Debtor Borrowers, and the Debtor Borrowers shall engage in business after consummation of the Chapter 11 Plan. The Chapter 11 Plan shall qualify for discharge pursuant to Section 1141 of the Bankruptcy Code and will not be subject to the exceptions to discharge in that Section (specifically Section 1141(d)(3) of the Bankruptcy Code) and the Elberg Parties agree that the Loans, Loan Obligations and any other claims against the Debtor Borrowers will be discharged pursuant to a plan under title 11 of the Bankruptcy Code within the meaning of Sections 108(a)(1)(A) and (d)(2) of the Internal Revenue Code of 1986, as amended. The Chapter 11 Plan shall also provide that the estate of the Debtor Borrowers shall be fully administered upon payment of the Loans and any other Loan Obligations to Capital One as contemplated by the Capital One Settlement Agreement and that a motion for a final decree closing the Chapter 11 Cases shall be brought by the Debtor Borrowers pursuant to the Federal Rules of Bankruptcy Procedure, Rule 3022. The Elberg Parties agree to take all actions necessary and execute and deliver all documents, instruments and agreements needed, to obtain entry of the final decree of the Bankruptcy Court to close the Chapter 11 Cases. Tamara and Faivish agree to pay all legal fees and court expenses, including but not limited to fees ordered to be paid to the US Trustee, associated with the implementation of the foregoing. The Elberg Parties agree time is of the essence in the performance of this provision.

(d)     Ruben (and Capital One pursuant to the Capital One Settlement Agreement) will consent to and not object to the Chapter 11 Plan consistent with the terms of this Agreement and will not object to the discharge of all debt of (or claims against) the Debtor Borrowers pursuant to the Chapter 11 Plan and will cast a ballot in favor of the Chapter 11 Plan, assuming it comports with the terms of this Agreement and the Capital One Settlement Agreement. Ruben will also consent to and not object to any other Bankruptcy Court proceedings, including but not limited to a 9019 motion in furtherance of confirmation of the Chapter 11 Plan. Upon confirmation of the Chapter 11 Plan, Ruben agrees that his claim will be withdrawn and expunged with prejudice.

(e)     In addition, the Elberg Parties agree to sign all documents and authorize the Co-Executors to take all actions to gain access to all available funds being held in the Restricted Accounts, and to discontinue the action captioned Old Republic National Title Insurance Company v. Ruben Elberg et al, New York County Supreme Court Index No. 159450/2022, promptly after the funds in the Restricted Account are released of restriction. The Elberg Parties who have appeared in the Bankruptcy Court proceedings may use the funds currently in the Debtor Borrowers' bank accounts (the "Debtor Borrowers' Accounts"), which Tamara represents and agrees is no more than a total of approximately $69,000 in the Debtor Borrowers' Accounts, to compensate Brenda Whitaers, make required quarterly payments to the U.S. Bankruptcy Trustee,

and to pay the fees of, and disbursements incurred by professionals hired previously to represent and perform services for the Debtor Borrowers (attorneys and accountants) (to the extent there are sufficient funds in the Debtor Borrowers' Accounts to do so), provided that appropriate documentation of such compensation and/or expenses is presented to Ruben. Subject to receipt of such documentation, Ruben agrees not to contest using the Debtor Borrowers' Accounts for said expenditures or any applications for and payments of fee awards, or any future applications for fees and disbursements incurred or awards of fees or disbursements, whether addressed in the Chapter 11 Plan or otherwise.

(f)    For purposes of this Agreement, (i) the Unrestricted Estate Funds, *plus* (ii) the funds (if any) remaining in the Estate Bank Account, *plus* (iii) the funds (if any) remaining in the Debtor Borrowers' Accounts, *plus* (iv) any funds held in escrow by Abrams Fensterman as contemplated by this Agreement following payment in full of the Prior Settlement Payments, shall be referred to herein as the "**Remaining Estate Funds**". The Parties acknowledge and agree that the Remaining Estate Funds are for the benefit of Ruben and will be distributed in accordance with the terms of this Agreement and the Capital One Settlement Agreement to consummate the Settlement among the Parties following the Settlement Effective Date.

2.    Escrow

(a)    Pursuant to the Capital One Settlement Agreement, no later than five (5) business days following the Escrow Deposit Date, the Estate of Jacob Elberg will deposit (i) a total of $8,450,000 (the "**Capital One Escrow Amount**"), for the benefit of Capital One, in escrow to be held by the attorneys for Capital One, as escrow agent ("**CO Escrow Agent**"), in accordance with an escrow agreement to be entered into by Capital One, the Estate of Jacob Elberg, Ruben, and the CO Escrow Agent. Said funds will be transferred to the CO Escrow Agent using the Remaining Estate Funds. The balance of the Remaining Estate Funds (collectively, the "**Ruben Elberg Remainder Amount**") is for the benefit of Ruben Elberg and will held in escrow by Abrams Fensterman, as escrow agent, in accordance with an escrow agreement to be entered into by Ruben and Abrams Fensterman, as escrow agent, and in compliance with Section 4 hereof.

(b)    No later than five (5) business days following the Escrow Deposit Date, Faivish will deposit a total of $1,490,000 in escrow to be held by Greenfield Stein & Senior, as escrow agent ("**GSS**"), in accordance with an escrow agreement to be entered into by the Faivish, Ruben, and GSS, as escrow agent. The escrowed funds shall be used as follows: (i) to cover the payment of all fees, costs, and expenses for transfers and reregistration of the Medallions to Ruben up to a maximum of $50,000; GSS will be required to pay all such fees, costs, and expenses for the transfer of the Borrowers to Ruben in accordance with the written instructions provided by Ruben up to $50,000; (ii) $710,000 shall be paid to Sam in accordance with Section 4(e) hereof; (iii) $410,000 shall be paid to Michael in accordance with Section 4(f) hereof, and (iv) $320,000 shall be used towards Faivish's responsibility to make payment of the Outstanding Debtor Borrower Liabilities as defined in and contemplated by Section 5(c) hereof.

(c)    No later than five (5) business days following the Escrow Deposit Date, counsel for plaintiffs in each of the pending matters set forth on **Schedule F** attached hereto (other than the Fraud Action, which is addressed below), shall deliver to each of the attorneys representing a defendant in each such action a stipulation of discontinuance or voluntary dismissal, with prejudice, to be held in escrow, for each of the pending matters set forth on **Schedule F**. No

earlier than two (2) business days following the Settlement Effective Date, each such stipulation of discontinuance or of voluntary dismissal shall be released from escrow and filed with the appropriate court. In addition, the Elberg Parties agree that no earlier than two (2) business days following the Settlement Effective Date, the decisions of the Queens Surrogate's Court on October 26, 2022, relating to (i) the petitions of Ruben seeking the removal of Tamara as Co-Executor of the Estate of Jacob Elberg and the appointment of the Public Administrator as administrator c.t.a. and (ii) the petitions of Tamara seeking the removal of Ruben as Co-Executor and Co-Trustee of the Estate of Jacob Elberg and the appointment of Tamara as sole Executor and Trustee, each of which were denied by the Queens Surrogate's Court without prejudice, shall each be converted to discontinuances with prejudice.

(d)     No later than five (5) business days following the Escrow Deposit Date, Ruben shall deliver to GSS a stipulation discontinuing the Fraud Action with prejudice, which shall be held in escrow by GSS pursuant to an escrow agreement pending the Settlement Effective Date. No earlier than two (2) business days following the Settlement Effective Date, the stipulation discontinuing the Fraud Action with prejudice may be filed with the Court.

(e)     No later than five (5) business days following the Settlement Effective Date, Ruben shall deposit with GSS, $108,000 to be held in escrow, which funds may be used solely to reimburse Tamara for documented, reasonable attorneys' fees incurred by Tamara in the event there is an action by the current identified defendants in the Purchasers' Action against Tamara for indemnification or contribution, or other claim against Tamara by any of the current identified defendants in the Purchasers' Action, which action or claim is brought by such defendants solely as a consequence of claims asserted by Ruben against the identified defendants in the Purchasers' Action (a "Resultant Claim Against Tamara"). GSS may pay its own bills (if it is representing Tamara in the defense of a Resultant Claim Against Tamara) or reimburse Tamara for fees she has paid to other counsel who may be representing her in said claim upon presentation of documentation that she has paid such bills of other counsel. At the conclusion of Ruben's action against the identified defendants in the Purchaser's Action, if such action settles or concludes without a judgment against the identified defendants in that action, then any remaining funds being held in escrow for legal fees in the defense of Tamara pursuant to this Section shall be returned to Ruben upon such settlement or conclusion. If there is a money judgment or money verdict in favor of Ruben and against one or more defendants in the Purchasers' Action, the funds in escrow will remain in escrow for a period of the earlier of (i) six (6) years from the date of the money judgment or money verdict in favor of Ruben, or (ii) until the statute of limitations on a Resultant Claim Against Tamara expires, at which time the remaining funds held in escrow shall be released to Ruben. In the event of a money judgment against or monetary settlement by one or more defendants in the Purchasers' Action in favor of Ruben, Ruben agrees to pay up to an additional 10% of the cash portion of Ruben's judgment or settlement actually received by Ruben net of Ruben's legal fees, costs, and expenses, up to a maximum of an additional $142,000 ("Additional Consideration"), to Tamara as reimbursement for her documented, reasonable attorneys' fees incurred in connection with a Resultant Claim Against Tamara by the identified defendants in the Purchasers' Action. Notwithstanding anything herein to the contrary, in no event shall Ruben be required to reimburse Tamara more than an aggregate of $250,000 (inclusive of the $108,000 being held in escrow and the Additional Consideration) for documented, reasonable attorneys' fees actually incurred by Tamara in defending against a Resultant Claim Against Tamara as

contemplated by this provision. Ruben shall pay the Additional Contribution to Tamara no later than three (3) days following his receipt of any money judgment or settlement.

(f)     No later than five (5) business days following the Escrow Deposit Date, Ruben (and his counsel, with respect to any judgment for legal fees) shall deposit in escrow with the respective attorneys for each of the judgment debtors against whom Ruben has a judgment, a satisfaction of judgment required to satisfy any such judgments set forth on **Schedule F** attached hereto and documents releasing, withdrawing and vacating any and all judgment enforcement devices, including but not limited to restraining notices, executions and levies (the "Enforcement Documents"). No earlier than two (2) business days following the Settlement Effective Date, the satisfactions of judgment and Enforcement Documents may be released from escrow and filed with each applicable County Clerk or other appropriate officer or entity in order to expunge each such judgment and ensure the withdrawal of each such judgment enforcement device. **Schedule F** lists each judgment enforcement device that Ruben has served or caused to be served, and which shall be vacated, removed, and released as a result hereof.

(g)     No later than five (5) business days following the Escrow Deposit Date, (i) Ruben shall deliver to GSS, to be held in escrow, a general release in favor of the legal counsel named as defendants in the Fraud Action, namely, Charles Liebman, Johnson Liebman, LLP, Howard Garfinkel, Lauterbach, Garfinkel, Damast, Hollander, LLP, Skadden Arps, Slate, Meagher & Flom, LLP, Troutman Pepper, and Fox Rothschild LLP, and Brett Berman (the "Released Legal Counsel"); and, as a condition to obtaining such general release, (ii) each of the Released Legal Counsel shall deliver to Abrams Fensterman, to be held in escrow, a general release given by each of them and their respective law firms in favor of Ruben, the Borrowers, and Ruben's legal counsel, including Abrams Fensterman. On the Settlement Effective Date, the general releases shall be released from escrow and deemed automatically effective.

3.     Other Actions of the Elberg Parties.

(a)     The Elberg Parties desire to ensure that Esma is well taken care of and will no longer be burdened by the litigation between and among herself, her children and the Estate of Jacob Elberg. In furtherance of the foregoing, no later than five (5) business days following the Settlement Effective Date, Faivish will, in partial consideration of Ruben agreeing to effectuate the Settlement, establish a supplemental needs trust (the "SNT") and fund the SNT in the amount of $1,000,000 for the benefit of Esma. Faivish and Tamara agree that, in consideration of the Settlement, should the funds in the SNT be depleted, they shall continue to care for Esma in the same manner, for the remainder of Esma's life, comparable to the way she had been taken care of by the Trustee of the SNT. In accordance with the terms of the SNT, the Elberg Parties agree that Peter D.C. Mason shall be appointed as an independent trustee of the SNT and Tamara shall be appointed as the "Special Trustee" to serve as the liaison between Esma and the independent trustee. The independent trustee shall have the sole authority to make all decisions as to discretionary distributions out of the trust for Esma or on her behalf. Any assets remaining in the SNT at Esma's death shall be distributed to Tamara. Notwithstanding anything to the contrary herein, it is the intent of the Elberg Parties that the SNT be established and administered in strict adherence to the federal and state guidelines and no person shall take any action in respect thereof which could reasonably be expected to jeopardize Esma's eligibility for Medicaid, which she is receiving as of the Execution Date.

(b)     Effective no later than ten (10) business days following the Settlement Effective Date, the Esma Elberg Irrevocable Trust (the "Irrevocable Trust") shall be amended by Esma with the consent of all of the beneficiaries as herein provided in accordance with Section 7-1.9 of the Estates, Powers and Trusts Law ("EPTL") by deleting Article IV of the Irrevocable Trust in its entirety and substituting in its place a new Article IV to be and read as follows:

"ARTICLE IV

Upon the death of the Grantor, the Trust shall terminate and the Trust principal and any undistributed income (less amounts to be paid to the Grantor's estate, executor, duly appointed fiduciaries or the tax authorities on account of any estates taxes attributable to the Trust Corpus) shall be distributed to the Grantor's son-in-law, Paivish Pewzner."

In connection with the amendment of the Irrevocable Trust, Tamara, as Trustee of the Irrevocable Trust, will take reasonable steps to obtain the consent to the amendment of the charitable entity currently designated to receive a portion of the remainder of the trust, said charity identified by Tamara pursuant to the provisions of Article IV(A)(1) of the trust agreement of Irrevocable Trust prior to amendment.

(c)     Sam and Michael, as beneficiaries of the Irrevocable Trust, shall execute the consents attached hereto as **Exhibit I**, on the Escrow Deposit Date, and such consents shall be held in escrow by GSS until on or before ten (10) business days following the Settlement Effective Date. To the extent that the current beneficiaries of the Irrevocable Trust are called upon to execute any further documents to effectuate the amendment, such beneficiaries shall do so within three (3) business days of the written request.

(d)     Effective as of the Settlement Effective Date, Tamara shall, to the extent that she has not previously resigned therefrom, automatically be deemed to have resigned as manager and/or from any other position held by Tamara, as applicable, of all Borrowers, JEB, SHEFA, RORE, Royal LHC, RRFM, Royal CP, Royal HI, and any other corporate entities related to the Estate of Jacob Elberg, and all of such resignations will be reflected in writing delivered by Tamara (copies of which will be provided to Ruben's legal counsel).

(e)     No later than fifteen (15) days after the Settlement Effective Date, Tamara shall deliver (or cause to be delivered) all corporate books and records for all Borrower entities that are within Esma's or any other Elberg Party's possession, custody, or control to Ruben at the address provided below for him as to notices to be received by him. Tamara and Esma shall request that Brenda Whitacre, the bookkeeper for the Estate of Jacob Elberg, cooperate with all reasonable requests for books, records, and information made by Ruben. Tamara shall be responsible for all fees, costs and expenses associated therewith up to the date of delivery of all such books, records, and information to Ruben, including without limitation related to the payment of salary, bonus and other compensation or benefits of Brenda Whitacre.

(f)     Effective no later than five (5) business days following the Escrow Deposit Date, Ruben shall provide Tamara with a deed for the transfer of the Bronx Property to Ruben which Tamara shall cause to be executed and delivered to Abrams Fensterman to hold in escrow until the Settlement Effective Date. On the Settlement Effective Date, Abrams Fensterman may release the deed from escrow and arrange for its recording. As stated in Section 3(b) of this

Agreement, Faivish is responsible for 60% of the property taxes, fees, and penalties due in arrears on the Bronx Property and 100% of all transfer taxes, fees, costs, and expenses associated with the transfer of the Bronx Property to Ruben.

(g) The Elberg Parties shall, and shall cause their respective legal counsel to, take any additional steps to ensure that all actions and proceedings contemplated by this Section 3 are dismissed, withdrawn, and/or discontinued with prejudice, and all judgments satisfied. All court costs related to each such dismissal, withdrawal, and/or discontinuance shall be borne by the plaintiff in the applicable action. Other than as expressly set forth in this Agreement, no action shall be taken by Tamara in respect of the Estate of Jacob Elberg without the prior written consent or approval of Ruben.

4. **Settlement Payments.** Promptly following the Settlement Effective Date, the Parties hereby expressly authorize the following payments without the consent of any other person or entity being required (collectively, the "Settlement Payments"):

(a) Abrams Fensterman shall release from the Ruben Elberg Remainder Amount being held in escrow, a total of $1,600,000 to Ruben or those persons specified in writing by Ruben in payment of the costs and expenses incurred in connection with activities performed on behalf of the Estate of Jacob Elberg. The payments contemplated hereby shall be made by wire transfer of immediately available funds pursuant to written wiring instructions or in payoff letters provided by any such person.

(b) Pursuant to Section 4 of the Capital One Settlement Agreement, CO Escrow Agent will release $8,450,000 to Capital One. The Elberg Parties acknowledge and agree that the payment of $8,450,000 to Capital One is being applied *first*, to the unpaid principal balance of the Loan Obligations owed to Capital One by Non-Debtor Borrowers, *second*, to the unpaid principal balance of the Loan Obligations owed to Capital One by Jacob, and *third*, to the unpaid principal balance of the Loan Obligations owed to Capital One by the Debtor Borrowers (other than Jacob). Such amount as are applied pursuant to the foregoing sentence in clauses *first* and *second* shall be treated by the Elberg Parties as paid by the Estate of Jacob Elberg to Ruben and paid to Capital One on behalf of the Non-Debtor Borrowers and Jacob as set forth therein. The Elberg Parties further agree that the payments and other concessions made pursuant to the Capital One Settlement Agreement satisfied the Ruben Elberg Judgment because all Loan Obligations and any other amounts due from the Borrowers on the underlying debt evidenced by the Loans are received by the Capital One Settlement Agreement. Notwithstanding the foregoing, in the event that Ruben purchases the Loan Obligations of the Debtor Borrowers and associated Capital One Liens as contemplated by Section 4(b) of the Capital One Settlement Agreement, Ruben, Tamara, and the Guardian ad Litem, on behalf of Esma, shall take all actions necessary, within 10 business days of Ruben notifying them of such purchase and sale, to effectuate the intents and purposes of Section 4(b) of the Capital One Settlement Agreement, including the execution of Strict Foreclosure Agreements for all Debtor Borrowers.

(c) Abrams Fensterman shall release from the Ruben Elberg Remainder Amount being held in escrow an amount required for payment of legal services rendered by Abrams Fensterman and other counsel that benefited the Estate of Jacob Elberg and the fiduciaries, beneficiaries, and other interested persons, as contemplated by SCPA 2110.

(d)      Abrams Fensterman is expressly authorized to release $6,400,000 to Ruben in consideration of proceeds of the Merger Transaction to which Ruben (as a Class C Partner of RORE and RREM) was entitled. The payments contemplated hereby shall be made by electronic wire transfer of immediately available funds pursuant to wiring instructions provided by Ruben.

(e)      Sam will receive the sum of $850,000 which Sam hereby accepts as full and complete satisfaction of his contingent interest in the Estate of Jacob Elberg and his interest in the Irrevocable Trust. The payment to Sam will be made as follows: $710,000 by Faivish from the funds being held by GSS in escrow and $140,000 by the Estate of Jacob Elberg from the Ruben Elberg Remainder Amount being held by Abrams Fensterman in escrow. No later than ten (10) business days following the Settlement Effective Date, such payments shall be made out of escrow by the escrow agents by electronic wire transfer of immediately available funds pursuant to wiring instructions provided by Sam. Simultaneously with and contingent upon payment being made, Sam authorizes the release from escrow of the consent (**Exhibit 1**), given in accordance with Section 7-1.9 of the Estates, Powers and Trusts Law ("**EPTL**"), to the amendment of the Irrevocable Trust as described hereinabove and thereby relinquishing his interest as a remainder beneficiary of the Irrevocable Trust.

(f)      Michael will receive the sum of $500,000 which Michael hereby accepts as full and complete payment of his contingent interest in the Estate of Jacob Elberg and his interest in the Irrevocable Trust. The payment to Michael will be made as follows: $410,000 by Faivish from the funds being held by GSS in escrow and $90,000 by the Estate of Jacob Elberg from the Ruben Elberg Remainder Amount being held by Abrams Fensterman in escrow. Such payments shall be made out of escrow by the escrow agents by electronic wire transfer of immediately available funds pursuant to wiring instructions provided by Michael. Simultaneously with and contingent upon payment being made, Michael authorizes the release from escrow of the consent (**Exhibit 1**), given in accordance with Section 7-1.9 of the EPTL, to the amendment of the Irrevocable Trust as described hereinabove and thereby relinquishing his interest as a remainder beneficiary of the Irrevocable Trust.

(g)      Each of the Elberg Parties agrees to severally indemnify, defend and hold harmless Abrams Fensterman and GSS and their respective agents and representatives from all losses, damages, claims, liabilities, costs, and expenses incurred by them, or any of them, as a result of their performance of duties as escrow agent in accordance with this Agreement for each Elberg Party in accordance with this Agreement.

5.      **Payment by Faivish of Certain Costs and Expenses**. As consideration in part for Ruben discontinuing the Fraud Action, in which Faivish is a defendant:

(a)      Faivish has agreed to establish the SNT for Esma, as described hereinabove, and to pay and be responsible for payment of, any and all taxes, fees, costs, and expenses (including attorneys' fees) in connection with the establishment of the SNT for Esma, including without limitation, fees of the Guardian ad Litem for Esma. The Elberg Parties agree that no further accountings need to be filed with the Queens Surrogate's Court. Faivish will also pay all taxes, fees, costs, and expenses incurred with respect to the release of funds being held in three (3) separate escrow accounts by Old Republic National Title Insurance Company pursuant to the Merger Transaction.

(b)     Faivish shall be responsible for payment of (i) 60% of the property taxes, fees and penalties due in arrears on the Bronx Property (approximately $21,600) and 100% of all transfer taxes, fees, costs and expenses associated with the transfer of the Bronx Property to Ruben as contemplated by this Agreement, and (ii) up to a maximum of $50,000 towards all fees, costs and expenses associated the transfer and reregistration of the Medallions to Ruben. Upon presentment of proper documentation for fees, costs, and expenses incurred or to be incurred in connection with the transfer and reregistration of the Medallions, GSS shall release the $50,000 of funds being held in escrow to Ruben as payment or reimbursement therefor.

(c)     Tamara and Faivish acknowledge and agree that there is at least $400,000 (the "Threshold Liability Amount") of claims against the Debtor Borrowers in respect of Outstanding Debtor Borrower Liabilities (as defined below). The Parties agree that to the extent any Outstanding Debtor Borrower Liabilities are required to be paid, (i) Ruben is responsible for payment of 20% of any Outstanding Debtor Borrower Liabilities up to a maximum aggregate amount of $80,000, and (ii) Tamara and Faivish are responsible for (A) 80% of any Outstanding Debtor Borrower Liabilities up to and including the Threshold Liability Amount (or $320,000) and (B) 100% of all Outstanding Debtor Borrower Liabilities in excess of the Threshold Liability Amount. For purposes hereof, "Outstanding Debtor Borrower Liabilities" means all taxes, fees, charges, costs, penalties and other amounts due and owing by any of the Debtor Borrowers, including without limitation to release any Liens imposed on the Medallions and with respect to claims made to the Bankruptcy Court, including without limitation claims by the New York State Department of Taxation and Finance, and claims which are otherwise known or should be known by the Debtor Borrowers, including claims of the Taxi and Limousine Commission. Ruben hereby authorizes Abrams Fensterman to release up to $80,000 from the amount then being held by it in escrow in satisfaction of Ruben's obligation under this Section 5(c) and Faivish hereby authorizes GSS to release $320,000 from the amount being held by it in escrow in satisfaction (in whole or in part) of Faivish's obligations under this Section 5(c). Tamara and Faivish shall have the right to challenge any Outstanding Debtor Borrower Liabilities and any refunds of amount previously paid will be split pro rata between Ruben (20%), on the one hand, and Tamara and Faivish (80%), on the other hand.

6.     Releases

(a)     Effective on the Settlement Effective Date, and subject to Section 6(b), each of the Elberg Parties, on behalf of themselves and each of their respective current and former parent companies, subsidiaries, members, affiliates, predecessors, successors, insurers, reinsurers, trusts, heirs, beneficiaries, assigns, including any bankruptcy estate or trustee (subject to approval of the Bankruptcy Court), and any of their past or present officers directors, employees, executors, attorneys, accountants, members, shareholders, partners, principals, representatives, and agents (the "Elberg Releasing Parties") (subject to approval of the Bankruptcy Court for the Debtor Borrowers), and each of them, hereby release and forever discharge each other Elberg Party and each of their respective current and former parent companies, subsidiaries, members, affiliates, predecessors, successors, insurers, reinsurers, trusts, heirs, beneficiaries, assigns, including any bankruptcy estate or trustee (subject to approval of the Bankruptcy Court), and any of their past or present officers directors, employees, executors, attorneys, accountants, members, shareholders, partners, principals, representatives, agents and any Guardian ad Litem appointed by the Surrogate's Court, Queens County (collectively, the "Elberg Releasees") of and from any and all

claims, counterclaims, demands, judgments, obligations, actions or causes of action, set offs, rights, Liens, liabilities, damages, costs, expenses (including reasonable attorneys' fees), and compensation (collectively, "Claims") whatsoever, whether in law or in equity or otherwise, whether arising under contract, tort, statute, or any other legal theory or basis of any nature whatsoever, which any such Elberg Releasing Party ever had, now has, or may have against the Elberg Releasees or any of them based upon any act, omission, transaction, agreement, event, or other occurrence taking place or existing on or prior to the effective date of this release, whether known or unknown, suspected or unsuspected, claimed or concealed, contingent or non-contingent, asserted or not asserted (the "Elberg Released Claims").

(b)     Notwithstanding anything to the contrary herein or in the Capital One Settlement Agreement or any other agreement, document, instrument executed in connection herewith or therewith, the releases contained in this Section 6 shall have no effect upon and are not intended to release any person or entity of (i) its rights, obligations or Claims arising under or relating to this Agreement, the Capital One Settlement Agreement, or Claims arising under or relating to this Agreement or the Capital One Settlement Agreement or any document, instrument, or agreement entered into in connection with this Agreement or contemplated hereby, including the enforcement of such person's or entity's rights, obligations or Claims thereof, and (ii) any Claims which Ruben has brought (including the Purchasers' Action) or may in the future bring against International Bank of Chicago, Frank Wang, Westlead Bridge LLC d/b/a Westlead Capital Inc., Raymond Ku, New Fund, LLP, NYC Metro Regional New Fund LLP, Law Offices of Joe Zhenghong Zhou and Associates PLLC, Joe Zhenghong Zhou, Royal HI, Royal CP, or any one of them, or their successors and assigns.

(c)     Covenant Not to Sue. Each of the Elberg Parties covenants that such person or entity shall not commence any action or proceeding against (i) any of the Elberg Releasees relating to, addressing or encompassing any Elberg Released Claims, or (ii) unless otherwise expressly set forth in this Agreement, any Elberg Party relating to the Purchasers' Action (and for clarity, this provision shall in no way effect, directly or indirectly, the purpose and intent of Section 6(b) hereof).

7.     Prior Settlement Void. Effective as of the Settlement Effective Date, the Prior Settlement and any other proposed settlements prior to such date shall be deemed null and void ab initio and without further force or effect.

8.     Representations and Warranties. Knowing each Elberg Party is relying thereon, and as a material inducement to each Elberg Party to consummate the Settlement and the other transactions contemplated hereby, each of the Elberg Parties represents and warrants that the statements contained in this Section 8 are true and correct as of the Execution Date and the Settlement Effective Date:

(a)     Each of the Elberg Parties represents and warrants to the other Elberg Parties that:

(i)     such Elberg Party is the legal and beneficial owner of all Claims released by such Elberg Party herein;

(ii)     such Elberg Party has not assigned, pledged, or contracted to assign or pledge any of the Claims released by such Elberg Party herein;

(iii)     subject to the approval of the Bankruptcy Court and the Queens Surrogate's Court (as applicable), such Elberg Party possesses all requisite authority and power to enter into and comply with the terms of this Agreement, the Settlement and the other transactions contemplated hereby;

(iv)     subject to the approval of the Bankruptcy Court and the Queens Surrogate's Court (as applicable), such Elberg Party has obtained all authorizations, consents, and approvals that are required with respect to performance and execution of this Agreement; and

(v)     subject to the approval of the Bankruptcy Court and the Queens Surrogate's Court (as applicable), no further action, other than as expressly provided in this Agreement, is necessary to make this Agreement a valid and binding obligation of such Elberg Party.

(b)     Each individual signing this Agreement on behalf of any Elberg Party hereby represents and warrants that such individual has been duly authorized to sign this Agreement on behalf of the Elberg Party for whom such individual is signing.

(c)     For purposes of this Settlement, the Elberg Parties acknowledge and agree and do not contest that Ruben is the title owner of the Israel Property.

(d)     Tamara and Ruben, as Co-Executors of the Estate of Jacob Elberg, represent and agree to each other that they will diligently seek approval of this Agreement and the Capital One Settlement Agreement by the Queens Surrogate's Court in order to bind the Estate of Jacob Elberg to the terms of this Agreement and the Capital One Settlement Agreement.

(e)     Tamara represents, warrants, and agrees that all federal, state, and local tax returns required to have been filed by Royal CP, Royal HI, RORE, RREM, Royal LIC, the Estate of Jacob Elberg, and the Borrowers, with the advice and assistance of Citrin Cooperman, as the accountants for each of the foregoing entities, have been filed and all federal, state, and local taxes, assessments and other charges which were due and owing by any of the aforesaid entities (whether or not reflected on the tax returns) have been timely paid to the appropriate taxing authority. Tamara does not know or have reason to know of any basis for any additional assessment or charge in respect of any such taxes. Tamara shall indemnify Ruben with respect to any tax liability of the Estate of Jacob Elberg or any of the foregoing entities, whether direct or derivative.

(f)     Tamara agrees to file all federal, state, and local tax returns of the Estate of Jacob Elberg in a manner consistent with the terms and provisions of this Agreement.

(g)     Tamara, as Co-Executor of the Estate of Jacob Elberg, represents and warrants that the Borrowers are and have been since the date of Jacob Elberg's death, S-Corporations for U.S. federal and New York State income tax purposes and all tax returns for Borrowers have been timely filed.

(h) The Elberg Parties acknowledge and agree that Ruben has not been a participant in and will not, except as required by this Agreement or the Capital One Settlement Agreement, participate in the management or administration of the Estate of Jacob Elberg.

(i) Tamara represents and agrees that Tamara and Faivish did not receive, directly or indirectly, including through any family member or other relative, any financial or other benefit or incentive from the purchasers or any other third parties in connection with the Merger Transaction which has not been disclosed on the Flow of Funds Memorandum attached hereto as **Schedule A** and made a part hereof. Faivish represents and agrees that neither he nor, to the best of his knowledge, Tamara received, directly or indirectly, any financial benefit or incentive from the purchasers or any other third parties in connection with the Merger Transaction which has not been disclosed on the Flow of Funds Memorandum attached hereto as **Schedule A** and made a part hereof.

(j) The Guardian ad Litem for Esma Elberg, Lori Sullivan, Esq., has discussed the terms of this Agreement and the Settlement with Esma, and Lori Sullivan, Esq., pursuant to the authority granted to her by Queens Surrogate's Court, agrees to execute this Agreement and consummate the Settlement pursuant to the terms hereof and the other applicable transactions contemplated hereby.

(k) Tamara and Ruben agree that as of August 11, 2023 there was $9,446,429.76 in the Estate Bank Account and $4,416,801.83 in the SHEFA bank account, and, based on the information provided by Old Republic, a total of $4,998,898.87 in the Old Republic escrow accounts. Tamara further represents and agrees the following are the correct amounts held in the following accounts: (i) TD Ameritrade Account No: 755-041362 - $2,367.00; (ii) Royal One Real Estate LLC – Estate Cash Account, Capital One Bank Account No: 9554006305 - $69,744.90; (iii) Royal Real Estate Management LLC, Estate Cash Account, Capital One Bank Account No: 7044045314 - $65,011.44; (iv) Capital One Account No: 7014016273 - $1,728.00; and (v) Capital One Account No: 7040728656 - $1,546.00. To the knowledge of the Elberg Parties, no funds have been withdrawn from any of these accounts after August 11, 2023 other than pursuant to the Agreement for Advance of $1,350,000.

9. **Obligation to Proceed in Good Faith and Further Assurances.** Each of the Elberg Parties shall take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable to implement the Settlement and the transactions contemplated by this Agreement at any time on or after the Execution Date, including without limitation proceeding in good faith and cooperating with one another by furnishing any additional information, records or data, or executing and delivering any additional documents, instruments, releases, assignments, undertakings, approvals, opinions, financing statements and/or the like (whether or not expressly referenced herein) as may be reasonably requested by any of the Elberg Parties or their counsel to consummate or otherwise implement the Settlement and the transactions contemplated by this Agreement. If any legal or structural impediment arises that would prevent, hinder, or delay consummation and implementation of the Settlement, the Elberg Parties agree to take all steps reasonably necessary to address any such impediment so that each of the Elberg Parties receives the full benefit of the Settlement to which they are entitled hereunder.

10. **Confidentiality.** The Elberg Parties agree (and shall cause each of their respective officers, directors, agents, affiliates, agents, representatives, heirs, successors and assigns) (a) to

maintain in strict confidence and not to use or disclose any aspect of this Agreement and the discussions, negotiations, terms, status or conditions relating to the transactions contemplated by this Agreement and any and all confidential or sensitive information, whether written or oral or any other format, concerning any of the Elberg Parties (collectively, the "Confidential Information") to any person or entity other than each such Elberg Party's respective officers, directors, and authorized representatives (including legal advisers), and then in all cases only on a need to know basis; and (b) to cause and require all such persons or entities to whom such Confidential Information is disclosed to abide by the provisions of this Section 10. The Elberg Parties shall protect the Confidential Information of the other Elberg Parties with the same degree of care with which such Elberg Party protects such Elberg Party's own information of like importance. Nothing contained in this Section shall prevent any Elberg Party from making such disclosures as necessary (i) in order to comply with this Agreement, (ii) in order to comply with reporting, disclosure, filing or other requirements imposed on such Elberg Party by any governmental authority, (iii) in order to advise a court of the status and general terms of this Agreement, or (iv) in order to otherwise comply with applicable law, regulation, or legal subpoena or compel litigation or other legal action or proceeding; provided, however, that if any Elberg Party receives notice of an attempt to compel them by applicable law or legal process to disclose any Confidential Information, then such Elberg Party shall promptly notify the other Elberg Parties in writing (but in no event later than two (2) business days of receipt of such notice) and shall take all steps to postpone such disclosure until all Elberg Parties have had an opportunity to consider such notice, and shall further, if they are required to make such a disclosure notwithstanding such efforts, to disclose only that portion of such information which such Elberg Party is advised by legal counsel is required to be disclosed. The restrictions contained in this Section 10 shall apply regardless of whether such Confidential Information has been labeled, marked, or otherwise identified as confidential.

11.     Adequate Representation. Each of Elberg Parties has been represented by legal counsel of their choice and understands and is fully aware of the terms contained in this Agreement and this Agreement's legal effect. Each of the Elberg Parties has voluntarily, without coercion, duress or undue influence of any kind, entered into this Agreement and the documents executed in connection with this Agreement. No Elberg Party is relying upon and has not relied upon any representation, warranty or statement made by any of the other Elberg Parties in connection with such Elberg Party's execution, delivery, and performance of this Agreement, other than the representations, warranties, and statements expressly made by such other Elberg Party in this Agreement.

12.     Severability. If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, in whole or in part, for any reason, such term or provision shall be ineffective to the extent of such invalidity or unenforceability only and shall not impair or invalidate the remainder of this Agreement which shall continue in full force and effect. Any term or provision determined to be over broad in any manner shall be interpreted or reformed to give that term or provision the maximum effect permissible by applicable law and equity, and the Elberg Parties agree to the enforcement of the term or provision as so modified.

13.     No Admission of Liability. This Agreement is a good faith, negotiated resolution of disputed claims. Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement is admissible in any court proceeding, except those

proceedings, if any, leading to judicial approval of the transactions contemplated by this Agreement, and any proceeding brought to enforce this Agreement. No Elberg Party, by signing this Agreement, admits liability or fault, or admits the validity of any claim made by any other Elberg Party or person or entity with respect to any matter that is the subject of this Agreement.

14. **Equitable Relief.** Each of the Elberg Parties acknowledges and agrees that irreparable injury to the other Elberg Party(ies) would occur in the event any of the provisions of this Agreement were not performed in any material way or in accordance with their specific terms or were otherwise materially breached and that such injury would not be adequately compensable by the remedies available at law (including the payment of money damages). It is accordingly agreed that, notwithstanding any provision herein to the contrary, in addition to any remedies at law, each Elberg Party shall also be entitled to specific enforcement of, and injunctive relief to prevent any violation of, the terms hereof without the necessity of posting bond or proving actual damages. The other Elberg Parties will not take action, directly or indirectly, in opposition of such Elberg Party seeking such relief on the grounds that any other remedy or relief is available at law or in equity.

15. **Non-Disparagement.** Each of the Elberg Parties covenants and agrees that such Elberg Party shall not, directly or indirectly through any person or entity, in any way disparage, call into disrepute, or otherwise defame or slander the other Elberg Parties or such other Elberg Parties' owners, officers, directors, employees, agents, representatives, affiliates, heirs, successors and assigns in any manner that would damage the business or reputation of such other Elberg Parties or their respective owners, officers, directors, employees, agents, representatives, affiliates, heirs, successors and assigns.

16. **Counterparts.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic means shall be as effective as delivery of a manually executed counterpart of this Agreement.

17. **Entire Agreement; Exhibits and Schedules.** The Elberg Parties acknowledge that this Agreement and the Capital One Settlement Agreement constitute the entire agreement on the matters addressed herein and therein, except as set forth herein or therein, supersedes all prior agreements or understandings between the Elberg Parties, oral or written, including without limitation the Prior Settlement. Each of the exhibits and schedules attached hereto is expressly incorporated herein by reference and made a part of this Agreement, and all references to this Agreement shall include the exhibits and schedules.

18. **Binding Effect; Failure to Be Approved.** This Agreement shall be binding upon and inure to the benefit of the Elberg Parties and their respective heirs, successors, and assigns. In the event this Agreement and the Capital One Settlement Agreement are both not approved by the Queens Surrogate's Court and the Bankruptcy Court, this Agreement and the Capital One Settlement Agreement shall be of no force or effect and may not be used by any Elberg Party for any purpose.

19. **Governing Law; Jurisdiction; Waiver of Jury Trial.** The governing law of this Agreement shall be the substantive and procedural law of the State of New York without regard

to choice-of-law or conflicts-of-law principles. Any action based on this Agreement or to enforce any of its terms shall be brought in the Queens Surrogate's Court or the Bankruptcy Court, as applicable. Each of the Elberg Parties (i) submits to the personal jurisdiction of the Queens Surrogate's Court and the Bankruptcy Court, and (ii) hereby knowingly, voluntarily, and intentionally waives any right it may have to a trial by jury of any dispute arising under or relating to this Agreement and agrees that any such dispute shall be tried before a judge sitting without a jury.

20.    Fees and Expenses. Except as expressly set forth herein, each of the Elberg Parties will be responsible for their own fees, costs, and expenses, including, without limitation, legal, accounting, and out-of-pocket expenses incurred in connection with negotiating and entering into this Agreement and any other agreements entered into as a result of the same.

21.    Construction. This Agreement shall be construed as if the Elberg Parties jointly prepared this Agreement, and any uncertainty or ambiguity shall not on that ground be interpreted against any one Elberg Party.

22.    Amendment and Modification. This Agreement cannot be amended, modified, or supplemented orally. The Elberg Parties may amend, modify, or supplement this Agreement only by a writing signed by each of the Elberg Parties.

23.    Notices. Any notice, request, demand, claim or other communication required or permitted to be delivered, given or otherwise provided hereunder or under any other agreement entered into in connection herewith must be in writing and (a) delivered in person (in which case, it will be effective upon delivery), (b) transmitted by electronic (email) transmission (in which case, it will be effective upon receipt of confirmation of successful transmission to recipient), or (c) sent by overnight delivery by Express Mail, Federal Express or other nationally recognized carrier (in which case, it will be effective upon delivery), in each case to the intended recipient at its last known address reflected in the records of the Elberg Parties and (i) if to Ruben, with a copy (which shall not constitute notice) to Abrams Fensterman, LLP, 3 Dakota Drive, Suite 300, Lake Success, New York 11042; Attn: Robert Abrams, Esq.; and (ii) if to Tamara and/or Falvish, with a copy (which shall not constitute notice) to Greenfield Stein & Senior, LLP, 600 Third Avenue, New York, New York 10016; Attn: Gary B. Freidman, Esq.

24.    Survival. The terms, conditions, representations, and warranties contained in this Agreement shall survive the execution and delivery of this Agreement and the dissolution of any Elberg Party, and shall be fully binding upon the respective successors or assigns of each Elberg Party.

25.    Headings. The section headings in this Agreement are for convenience only and may not be used in construing this Agreement.

26.    No Third Party Beneficiaries. This Agreement is intended for the benefit of the Elberg Parties and their respective successors and assigns, and except as expressly set forth in Section 6, is not for the benefit of, nor may any provision hereof be enforced by, any other person or entity. For clarity, nothing in the Agreement shall prevent or impact any Elberg Party's right to proceed against any third party.

27.     Status Quo Ante. In the event the Settlement Effective Date (under this Agreement and/or the Capital One Settlement Agreement) does not occur, each of the Elberg Parties shall return to its status quo ante as of immediately prior to the Execution Date and for clarity, the releases of Elberg Parties set forth in Section 6 of this Agreement shall be void automatically and without further act by any Elberg Party, and each of the Elberg Parties shall have all of its Claims against the other Elberg Parties preserved and shall be entitled to pursue all rights and remedies, whether at law or in equity, available. This Section 27 shall become null and void and of no force and effect immediately upon the Settlement Effective Date.

28.     Waiver; Exercise of Remedies.   No waiver of any term or condition of this Agreement or any of the rights of an Elberg Party hereunder shall be effective or binding unless such waiver shall be in writing and signed by the Elberg Party claimed to have given or consented thereto. Except to the extent otherwise agreed in writing, no waiver of any term or condition of this Agreement by any Elberg Party shall be construed as a waiver of a subsequent breach or failure of the same term or condition, or waiver of any other term or condition of this Agreement. No failure or delay by any Elberg Party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

[Signature Pages Follow]

25

IN WITNESS WHEREOF, the Elberg Parties have executed this Agreement as of the Execution Date.

**BRACHA CAB CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**DABRI TRANS CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**DOVBER CAB CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**FIT TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**JACKBEL CAB CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**MERAB CAB CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**LECHAIM CAB CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**N. Y. ENERGY TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**N.Y. CANTEEN TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**N. Y. GENESIS TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**N.Y. STANCE TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**SOMYASH TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**JARUB TRANS. CORP**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**SHEFA FUNDING LLC**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**MERILL TRANSIT, INC.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**N.Y. TINT TAXI CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**TAMAR CAR CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**JEB MANAGEMENT CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**SPINDLE CAB CORP.**

By: _Lori Sullivan_

Esma Elberg, by Lori Sullivan, as Guardian ad Litem, pursuant to attached orders of Surrogate's Court, Queens County, dated January 24, 2023 and September 25, 2023

**TAMAR PEWZNER, individually**

_Tamar Pewzner_

Tamar Pewzner

**RUBEN ELBERG, individually**

_Ruben Elberg_

Ruben Elberg

**THE ESTATE OF JACOB ELBERG,**
**by and through its co-executors,**
**Tamar Pewzner and Ruben Elberg**

By: _____
Name: Tamar Pewzner
Title: Co-Executor

By: _____
Name: Ruben Elberg
Title: Co-Executor

**SHALOM ELBERG (SAM), individually**

_____
Shalom Elberg (Sam)

**MICHAEL ELBERG, individually**

_____
Michael Elberg

**FAIVISH PEWZNER, individually**

_____
Faivish Pewzner

**ESMA ELBERG, individually**

_____
Esma Elberg by Lori Sullivan, as Guardian ad
Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023 and
the order of the Surrogate's Court, Queens
County, dated January 22, 2024.

The Court has reviewed and approves the
terms of this Stipulation of Settlement and
authorizes the Guardian ad Litem to execute
same pursuant to SCPA 2106:

_____
**Honorable Peter J. Kelly, Surrogate**

THE ESTATE OF JACOB ELBERG,
by and through its co-executors,
Tamar Pewzner and Reuben Elberg

By: _____
Name: Tamar Pewzner
Title: Co-Executor

By: _____
Name: Ruben Elberg
Title: Co-Executor

SHALOM ELBERG (SAM), individually

_____
Shalom Elberg (Sam)

MICHAEL ELBERG, individually

_____
Michael Elberg

FAIVISH PEWZNER, individually

_____
Faivish Pewzner

ESMA ELBERG, individually

_____
Esma Elberg/by Lori Sullivan, as Guardian ad
Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023 and
the order of the Surrogate's Court, Queens
County, dated January 22, 2024.

The Court has reviewed and approved the
terms of this Stipulation of Settlement and
authorizes the Guardian ad Litem to execute
same pursuant to SCPA 2106.

_____
Honorable Peter J. Kelly, Surrogate

## Schedule A

## Flow of Funds Memorandum

(See Attached)

CROWNE PLAZA
FLOW OF FUNDS MEMORANDUM
August 25, 2016

Reference is made hereby to that certain Agreement and Plan of Merger dated August ___, 2016 (the "Agreement"), between and among Royal One Real Estate II, LLC, a New York limited liability company (the "Buyer"), Royal CP Hotel Holdings, L.P., a New York limited partnership ("Royal CP"), Royal HI Hotel Holdings, L.P., a New York limited partnership ("Royal HI") (Royal CP and Royal HI are each individually referred to herein as a "Limited Partnership" and collectively as the "Limited Partnerships"), Crabapple Corp., a New York corporation ("Crabapple"), Royal One Real Estate, LLC, a New York limited liability company ("RORE"), Royal LIC Real Estate Management, LLC, a New York limited liability company ("RLIC"), Royal Real Estate Management, LLC, a New York limited liability company ("RREM") (RORE, RLIC, ROR, and RREM are sometimes individually referred to herein as a "LLC" and collectively as the "LLCs"), NYC Fund, L.P, a New York limited partnership ("NYC Fund"), NYC Metro Regional Center, LLC, a New York limited liability company ("NYCMRC"), and Westlead Capital, a British Virgin Island corporation ("Westlead") (NYC Fund, NYCMRC and Westlead are sometimes collectively referred to herein as the "Interested Third Parties). Capitalized terms used but not otherwise defined herein will have the meanings set forth in the Agreement.

I. SOURCES OF FUNDS

On the Closing Date, the Buyer shall send by wire transfer to Chicago Title and Trust ("CT&T") the following sums for disbursement as set forth below.

A. Breakdown of Incoming Wire Transfers

| Item | Amount |
|---|---|
| Remainder Interest Purchase Price | $ 27,000,000.00 |
| Class B Consideration | $ 800,000.00 |
| Payoff of Mortgages (as of 8/25/16) | $ 4,334,587.29 |
| Buyer Share: Title Expense | $ _____ |

II. CLOSING DATE PAYMENTS

On the Closing Date, the Buyer through its authorized representative, Judy Pan Chang (the "Buyer's Representative") and the LLCs through their authorized representative, Tamara Pewtner (the "Class C Representative") shall direct CT&T to make the following payments to the following parties.

## A. Breakdown of Payments to be made on the Closing Date

| Item | Payment Amount | Payee | Wire Transfer Instructions |
|---|---|---|---|
| Class II Consideration (Net of Transfer Tax of $24,230 paid to CT&T pursuant to closing documents) | $775,800.00 | Crabapple Corp. | Bank: JP Morgan Chase<br>ABA No.: 021000021<br>Account No.: 200939303<br>Account Name: Crabapple Corp. |
| Indemnification Escrow | $2,700,000.00 | Old Republic National Title Insurance Co. | Bank: JP Morgan<br>ABA No.: 021000021<br>Account No.: 838190676<br>Account Name: Old Republic National Title Insurance Co. |
| Environmental Escrow | $50,000.00 | Old Republic National Title Insurance Co. | Bank: JP Morgan<br>ABA No.: 021000021<br>Account No.: 838190676<br>Account Name: Old Republic National Title Insurance Co. |
| Purchase Price Escrow | $2,124,045.60 | Old Republic National Title Insurance Co. | Bank: JP Morgan<br>ABA No.: 021000021<br>Account No.: 838190676<br>Account Name: Old Republic National Title Insurance Co. |
| Payoff of Mortgage Amount | $4,334,987.29 | Westford Bridge, LLC | Bank: International Bank of Chicago<br>ABA No.: 9710-0065-1<br>Account No.: 1009222<br>Account Name: Westford Bridge, LLC |
| Closing Payments on the List which is attached hereto and made a part hereof as Exhibit A | | | |

# EXHIBIT A

## List of Payment of Excluded Liabilities/Closing Payments

| Item | Payment Amount | Payer | Wire Transfer Instructions |
|------|----------------|-------|----------------------------|
| Accrued Expenses | $ 28,103.37 | Atwal Engineering, PC | Bank: **CHECK REQ.** Address.: 171 Madison Ave., Ste. 308 New York, NY 10016 |
| Accrued Expenses | $ 21,698.37 | Axis Design Group Int. LLC | Bank: Citibank ABA No. 023272655 Account No. 759714025 Account Name: Axis Design Group International, LLC |
| Accrued Expenses | $ 5,350.00 | Best Buy Demo, Inc. | Bank: Citibank ABA No.: 021000089 Account No. 4991085073 Account Name: Best Buy Demo, Inc. |
| Accrued Expenses | $ 1,361.18 | Clevenger Frable LaVallet | Bank: Chase ABA No.: 021000021 Account No. 1080950810 Account Name: Clevenger Frable LaVallet |
| Accrued Expenses | $ 1,339.84 | Environatics | Bank: TD Bank ABA No.: 031201360 Account No. 4302591220 Account Name: Environatics |
| Accrued Expenses | $ 4,279.00 | Goldfarb & Fleece LLP | Bank: Bank of America ABA No.: 026009593 Account No.: 2156830018 Account Name: Goldfarb & Fleece LLP |

| Item | Payment Amount | Payee | Wire Transfer Instruction |
|---|---|---|---|
| Accrued Expenses | $ 26,132.30 | Lauterbach Garfield Damast & Hollander LLP | Bank: JP Morgan Chase<br>ABA No.: 021000021<br>Account No. 530889145<br>Account Name: Lauterbach Garfield Damast & Hollander LLP Attorney Operating Account |
| Accrued Expenses | $ 7,733.00 | McElroy Deutsch Mulvaney & Carpenter LLP | Bank: Capital One Bank<br>ABA No.: 021407912<br>Account No. 703-7148963<br>Account Name: McElroy Deutsch Mulvaney & Carpenter Attorney Trust Account |
| Accrued Expenses | $ 52,875.30 | Nobutaka Ashihara Architect PC | Bank: Savoy Bank<br>ABA No.: 026014407<br>Account No.: 2005163<br>Account Name: Nobutaka Ashihara Architect, PC. |
| Accrued Expenses | $ 3,000.00 | P Webb Consultants, Inc. | Bank: **CHECK REQ.**<br>Address:<br>291 Broadway, Ste. 200<br>New York, NY 10007 |
| Accrued Expenses | $ 3,700.00 | S.M.C. Group, Inc. | Bank: Citibank<br>ABA No.: 021000089<br>Account No.9033110871?<br>Account Name:<br>S.M.C. Group, Inc. |
| Accrued Expenses | $ 2,273.00 | Stamatios P. Lykos | Bank: Citibank<br>ABA No.: 021000089<br>Account No. 02005911<br>Account Name: Stamatios P. Lykos |
| Accrued Expenses | $ 5,000.00 | Brenda K. Wittmer | Bank: **CHECK REQ.**<br>Address:<br>120 Buckingham Ave.<br>Trenton, NJ 08618 |

| Item | Payment Amount | Payee | Wire Transfer Instructions |
|---|---|---|---|
| Accrued Expenses | $ 3,450.00 | Zarabram Architectural Design, LLC | Bank: JP Morgan Chase<br>ABA No. 021000021<br>Account No. 1853849158<br>Account Name: Zarabram Architectural Design, LLC |
| Accrued Expenses – Royal III | $ 11,900.00 | U.S. Treasury | Bank: Bank: **CHECK REQ.**<br>Address:<br>Internal Revenue Service<br>PO Box 9941,<br>STOP 65525300<br>Ogden, UT 84409-0941 |
| Accrued Expenses – Royal CP | $ 11,900.00 | U.S. Treasury | Bank: Bank: **CHECK REQ.**<br>Address:<br>Internal Revenue Service<br>PO Box 9941,<br>STOP 65525300<br>Ogden, UT 84409-0941 |
| Reimbursement for Accounting Fees | $ 183,503.00 | Citrin Cooperman & Company, LLP | Bank: Signature Bank<br>ABA No.: 026013576<br>Account No. 1500628193<br>Account Name: Citrin Cooperman & Company, LLP |
| Legal Fees | $ 73,143.00 | Nesenoff & Miltenberg, LLP | Bank: JP Morgan Chase<br>ABA No.: 021000021<br>Account No.737591862<br>Account Name: Nesenoff & Miltenberg, LLP |
| Legal Fees | $ 28,628.00 | Andrew Tulloch, Esq. | Bank: Citibank<br>ABA No.: 021000089<br>Account No. 4998716609<br>Account Name: Andrew Tulloch, Esq. |
| Legal Fees | $ 77,142.00 | Johnson Liebman LLP | Bank: Santander<br>ABA No.: 231572691<br>Account No.: 0516106531<br>Account Name: Johnson Liebman LLP |

| Item | Payment Amount | Payee | Wire Transfer Instructions |
|---|---|---|---|
| Loan Payable | $565,468.00 | Estate of Jacob Elberg | Bank: JP Morgan Chase<br>ABA No.: 021000021<br>Account No. 424803570<br>Account Name: Estate of Jacob Elberg |
| Loan Payable | $10,071,582.00 | Estate of Jacob Elberg | Bank: JP Morgan Chase<br>ABA No.: 021000021<br>Account No. 424803570<br>Account Name: Estate of Jacob Elberg |
| Loan Payable | $473,805.19 | Estate of Jacob Elberg | Bank: JP Morgan Chase<br>ABA No.: 021000021<br>Account No. 424803570<br>Account Name: Estate of Jacob Elberg |
| Loan Payable | $357,033.00 | Esma Elberg | Bank: Capital One Bank<br>ABA No. 065000090<br>Account No.1621287849<br>Account Name: Esma Elberg |
| Loan Payable | $98,945.00 | Tamara Pevzner | Bank: Citibank<br>ABA No.: 021000089<br>Account No. 80438468<br>Account Tamara Pevzner |
| Shefa Funding | $4,415,609.60 | Shefa Funding LLC | Bank: JP Morgan Chase<br>ABA No.: 02100021<br>Account No.: 129252760<br>Account Name:<br>Shefa Funding, LLC |
| Reserved for Future Operating Expenses | $178,000.00 | Royal One Real Estate, LLC | Bank: Capital One Bank<br>ABA No.: 021407912<br>Account No. 9554006305<br>Account Name: Royal One Real Estate LLC |
| Reserved for Future Operating Expenses | $22,000.00 | Royal Real Estate Management, LLC | Bank: Capital One Bank<br>ABA No. 021407912<br>Account No. 7044045314<br>Account Name: Royal One Real Estate LLC |

| Item | Payment Amount | Payee | Wire Transfer Instructions |
|---|---|---|---|
| Escrow for Additional Attorney's Fees | $200,000.00 | Escrow Account/ IDLA Johnson Liebman LLP | Bank: Santander<br>ABA No.: 231372691<br>Account No.: 0041116852<br>Account Name: Escrow Account/ IDLA Johnson Liebman LLP |
| Reimbursement to Buyer for Seller's Share of Title Fees | $54,000.00 | Royal CP Hotel Holdings, LP | Bank: International Bank of Chicago<br>ABA No.: 0710-0665-1<br>Account No. 100004126<br>Account Name: Royal CP Hotel Holdings, LP |
| Plus Credit to Seller for Prepaid Real Estate Taxes<br>Less Credit to Buyer for Security Deposits<br>Net Credit to Buyer | $4,835.21<br><br>-$5,000.00<br><br>$-164.79 | Royal CP Hotel Holdings, LP | Bank: International Bank of Chicago<br>ABA No.:0710-0665-1<br>Account No. 100004126<br>Account Name: Royal CP Hotel Holdings, LP |
|  |  |  |  |
| Federal Corporation Tax (wire to Royal One to pay federal income taxes) | $2,350,000.00 | Royal One Real Estate, LLC | Bank: Capital One Bank<br>ABA No.: 021407912<br>Account No. 955406305<br>Account Name: Royal One Real Estate LLC |
| New York State Corporation Tax — Royal One | $750,000.00 | NYS Corporation Tax | Bank: CHECK REQ.<br>Address:<br>NYS Estimated Corporation Tax<br>P.O. Box 4136<br>Binghamton NY 13902-4136 |
| New York State Corporation Tax — Royal Real Estate | $3,000.00 | NYS Corporation Tax | Bank: CHECK REQ.<br>Address:<br>NYS Estimated Corporation Tax<br>P.O. Box 4136<br>Binghamton NY 13902-4136 |

| Item | Payment Amount | Payee | Wire Transfer Instructions |
|---|---|---|---|
| New York City Corporation Tax – Royal One | $800,000.00 | NYC Department of Finance | Bank: **CHECK REQ.** Address: NYC Department of Finance P.O. Box 3922 New York, NY 10008 -3922 |
| New York City Corporation Tax – Royal Real Estate | $227,000.00 | NYC Department of Finance | Bank: **CHECK REQ.** NYC Department of Finance P.O. Box 3922 New York, NY 10008 -3922 |
| Transfer Taxes & Real Estate Taxes | $1,143,756.79 | CT&T | Bank: ABA No.: Account No.: Account Name: |

# Schedule B

## Declaratory Judgment Action

(See Attached)

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:   **HON. ANDREW BORROK**

*Justice*

| | |
|---|---|
| PART | **IAS MOTION 53EFM** |

--------------------------------------------------------------------X

RUBEN ELBERG,

Plaintiff,

- v -

CRABAPPLE CORP., TAMARA PEWZNER, ROYAL ONE
REAL ESTATE, LLC,ROYAL REAL ESTATE
MANAGEMENT LLC,ROYAL LIC REAL ESTATE
MANAGEMENT LLC,ROYAL HOTEL & RESORTS
LLC,ROYAL CP HOTEL HOLDINGS LP, ROYAL HI HOTEL
HOLDINGS LP, ZHU QING, FENG LI, MENGSHA CHEN,
RUIZHEN WANG, HONG GE, QIN SI, YANG ZHANG, ZHE
FANG, XU NING,

Defendant.

--------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 653373/2016 |
| MOTION DATE | 02/14/2020, 02/18/2020 |
| MOTION SEQ. NO. | 006 007 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 006) 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264, 305, 306, 307, 308, 309, 310, 311

were read on this motion to/for _____ JUDGMENT - SUMMARY _____.

The following e-filed documents, listed by NYSCEF document number (Motion 007) 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 337, 338

were read on this motion to/for _____ JUDGMENT - DECLARATORY _____.

The gravamen of the dispute between the parties concerns whether certain August LP

Agreements (hereinafter defined) or November LP Agreements (hereinafter defined) are the

governing partnership agreements for Royal CP Hotel Holdings LP (**Royal CP**) and Royal HI

Hotel Holdings LP (**Royal HI;** Royal CP and Royal HI, hereinafter, collectively, the **LPs**).

Upon the foregoing documents, for the reasons set forth on the record (1/14/2021) and as

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.                              Page 1 of 17
Motion No.  006 007

1 of 17

otherwise set forth below, because the parties treated the November LP Agreements as the operative documents and because there was no cut-off as to when the November LP Agreements needed to be accepted by or termination of the offer of the November LP Agreements, which Mr. Jensen accepted by performance and executed, the November LP Agreements are the governing agreements for the LPs. The record does not support the sanction sought by the defendants of striking of the complaint. Therefore, Ms. Pewzner's motion for summary judgment and/or to strike the complaint (Mtn. Seq. No. 006) is denied and Mr. Elberg's motion for summary judgment (Mtn. Seq. No. 007) is granted.

The LPs were organized in connection with the development of two hotels in Long Island City, New York, undertaken by Jacob Elberg (now deceased) and Ruben Elberg, his son. The August 10, 2012 limited partnership agreement of Royal CP (NYSCEF Doc. No. 167; the **CP August Agreement**) and the August 3, 2012 limited partnership agreement of Royal HI (NYSCEF Doc. No. 166; the **HI August Agreement;** the CP August Agreement and the HI August Agreement, hereinafter, collectively, the **August LP Agreements**), were each by and between Royal One Real Estate LLC (**RORE**) as the General Partner, each person who was admitted as a Class A Limited Partner, as reflected on the books and records of the Partnership, Crabapple, Inc. (**Crabapple**) as the Class B Limited Partner, and RORE as the Class C Limited Partner. Jacob Elberg, as President of RORE, signed the August LP Agreements, Peter Jensen signed the August LP Agreements as President of Crabapple, and the signature page of the August LP Agreements acknowledges that the Class A Limited Partner is deemed to have executed the August LP Agreements by their signature of a subscription agreement accepted by the General Partner.

The November 30, 2012 Limited Partnership Agreement of CP (NYSCEF Doc. No. 168; the **CP November Agreement**) was by and between RORE as General Partner, each person who was admitted as a Class A Limited Partner, as reflected on the books and records of the Partnership, Crabapple as the Class B Limited Partner, RORE and Royal Real Estate Management LLC (**RREM**) as the Class C Limited Partners and Reuben Elberg as the Class D Limited Partner. The November 30, 2012 Limited Partnership Agreement of HI (NYSCEF Doc. No. 169; the **HI November Agreement;** the CP November Agreement and the HI November Agreement, hereinafter, collectively, the **November LP Agreements**), was by and between Royal LIC Real Estate Management LLC (**Royal LIC**), each person who was admitted as a Class A Limited Partner, as reflected on the books and records of the Partnership, Crabapple as the Class B Limited Partner, RORE as the Class C Limited Partner and "Reuben" Elberg as the Class D Limited Partner. Jacob Elberg signed the November LP Agreements as the Managing Member and Sole Member of RORE, (and [x] with respect to the CP November Agreement, as the Manager and sole Member of RREM and [y] with respect to the HI November Agreement, as the Manager and sole Member of Royal LIC), Ruben Elberg signed on behalf of himself, and Mr. Jensen signed as President on behalf of Crabapple. Just like the August LP Agreements, the signature page of the November LP Agreements acknowledges that the Class A Limited Partner was deemed to have executed the November LP Agreements by their signature on a Subscription Agreement accepted by the General Partner.

With respect to distributions in the event of a Capital Event or from Dissolution, Section 3.4.2 of the November LP Agreements provides as follows:

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.                         Page 3 of 17
Motion No.  006 007

3 of 17

The Net Proceeds from a Capital Event and/or distribution resulting from the dissolution of the Partnership shall be distributed within one hundred twenty (120) days of such Capital Event or dissolution of the Partnership in the following order and priority:

(a) First, to the Class A Limited Partners, pro rata in accordance with the Adjusted Capital Contributions, up to their unpaid Class A Preferred Return;

(b) Second, to the Class A Limited Partners, pro rata up to their Adjusted Capital Contributions;

(c) Third, to the Class B Limited Partner, up to its accrued unpaid Class B Preferred Return;

(d) Fourth, to the Class B Limited Partner, up to its Adjusted Capital Contributions, if any;

(e) Fifth, to the Class C Limited Partners, pro rata in accordance with their Adjusted Capital Contributions, up to their Adjusted Capital Contributions; and

(f) Sixth[,] the remaining amount 59% to the Class C Limited Partners, pro rata in accordance with their Adjusted Capital Accounts immediately prior to the distribution provided in clause (e) of this Section 3.4.2, *40% to the Class D Limited Partner* and 1% to the General Partner

(NYSCEF Doc. Nos. 168-169, §§ 3.4 [emphasis added]).

"Capital Event" is defined in the November LP Agreements as "the sale, refinancing, or other disposition by the Partnership of all of substantially all of its assets" (*id.* at 3, Definitions). For the avoidance of doubt, Ruben Elberg, as the Class D Limited Partner under the November LP Agreements, would be entitled to 40% distribution of the "remaining amount" of the "Net Proceeds of a Capital Event if the November LP Agreements are the operative agreements.

The LPs' limited partnership agreements contemplated investments in the hotels by interested EB-5 investors. The EB-5 program administered by United States Customs and Immigration Services (**USCIS**) allows foreign investors who invest at least $500,000 in projects creating at

653373/2016 **ELBERG, RUBEN vs. CRABAPPLE CORP.**
Motion No. 006 007

Page 4 of 17

4 of 17

least ten jobs each to obtain a visa to come to and remain in the United States. After the jobs

created by such investment are shown to be productive, the visa may be converted to convey

permanent residency to its applicant. The foreign EB-5 investors who invested in the hotel

projects under the LP Agreements were to be Class A Limited Partners and Mr. Jensen, through

his wholly owned entity, Crabapple, would serve as their bundler and representative, holding a

Class B Limited Partner interest.

Although the August LP Agreements provided that the LPs would continue in perpetuity

(NYSCEF Doc. No. 166, § 1.4; NYSCEF Doc. No. 167, § 1.4), Crabapple was to recruit $1.5

million of EB-5 investment for Royal HI and $6 million for Royal CP by September 30, 2012 or

the LPs were required to return the capital contributions of the Class A Limited Partners by

October 31, 2012 (NYSCEF Doc. No. 166, § 2.13; NYSCEF Doc. No. 167, § 2.13). It is

undisputed that sufficient EB-5 money was not raised by September 30, 2012 or returned, to the

extent raised, by October 31, 2012 (NYSCEF Doc. No. 187 at 27:l5-22, 28:4-5).

Following the failure of this condition in the August LP Agreements, the November LP

Agreements were drafted and signed by the Elbergs and sent to Mr. Jensen for signature.

According to Catherine Holmes, the lawyer for the LPs, the parties treated the November LP

Agreements as replacement agreements and not amendments of the August LP Agreements

because there had been a failure of condition under the August LP Agreements.

> Q:   To your knowledge, was there ever any written approval provided to you from the
> general partner of majority and interest of the Class A limited partners, the Class
> B and the Class C limited partners regarding approval of a decision to amend this
> agreement?

**653373/2016 ELBERG, RUBEN vs. CRABAPPLE CORP.**
**Motion No. 006 007**

**Page 5 of 17**

5 of 17

A:      No. ***I believe what happened is that they decided to treat this as never having – having formally gone into effect*** because we did not call it an amendment.  As you pointed out – well, as you can see in the document that we just read in the November document, we were treating it as a new agreement, not as an amendment.

(NYSCEF Doc. No. 319 at 51:20-25, 52:3-10).

On the record before the court, although it is not clear ***when*** Mr. Jensen signed the November LP Agreements (NYSCEF Doc. No. 290 at 71-72) and notwithstanding that Mr. Jensen sent back emails in March 2013 that appear to be an attempt to renegotiate certain terms of the November LP Agreements, Mr. Jensen not only signed the agreements, but also in fact accepted the November LP Agreements when he (x) represented to the United State Government (NYSCEF Doc. No. 324; the **December 2012 USCIS Letter**) in ***December of 2012***, that the November LP Agreements were the governing agreements in connection with the EB-5 application for Ms. Ruizhen Wang and (y) brought a lawsuit in 2015 based on the November LP Agreements against RORE, RREM, Mr. Elberg, Royal CP and Royal HI, attaching the November LP Agreements as exhibits A and B to the verified complaint in that action (the **Crabapple Litigation**; *Crabapple Corp. v Royal One Real Estate LLC et al.*, Index No. 650492/2015; NYSCEF Doc. No. 263, ¶¶ 18, 30 ["Crabapple, each of the Royal HI [or Royal CP] Investors, RORE, and Reuben Elberg are each a party to the Limited Partnership Agreement of Royal HI [or Royal CP] Hotel Holdings, L.P. dated November 30, 2012") where he verified to the court that the November LP Agreements were the operative and controlling partnership agreements for Royal CP and Royal HI (*id.*)

Mr. Jensen was not the only person who represented to the USCIS that the November LP Agreements were the governing documents.  By letter, dated November 25, 2013 (NYSCEF

**653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.**
**Motion No.  006 007**

**Page 6 of 17**

6 of 17

Doc. No. 325; **the EB-5 USCIS Letter**), Curt D. Schmidt of the Law Offices of Joe Zheng Hong Zho and Associates, PLLC, in response to a Request for Evidence represented to the USCIS that the November LP Agreements were, in fact, the operative agreements.

In fact, other than Ms. Pewzner and her revised position since the position that she took in the Foreclosure Action (defined below) as to whether the November LP Agreements are the operative agreements (discussed below), who was not a partner or otherwise involved in the project prior to Jacob Elberg's death, it does not appear that any person regarded the August LP Agreements as the operative documents.

For completeness, according to the affidavit of Brenda Whitacre (NYSCEF Doc. No. 382), Jacob Elberg's secretary, no hardcopy of the November LP Agreements were returned to the office and, while she had access to Jacob Elberg's email account, he did not receive a copy of the executed November LP Agreements from Mr. Jensen. Significantly, however, the record does not include a single communication from the Elbergs indicating that if Mr. Jensen failed to execute the November LP Agreements by a date certain, the offer of the November LP Agreements terminated. In fact, the record indicates that in response to Mr. Jensen's attempt to renegotiate the November LP Agreements, the Elbergs indicated that they were not prepared to renegotiate the terms of the November LP Agreements and that Mr. Jensen could either accept them or not. By email, dated March 22, 2013, from Ms. Holmes to Mr. Jensen, copying both Jacob and Ruben Elberg, Ms. Holmes wrote:

> Jacob and Ruben do not want to change the terms of the transactions that they have with you and your investors *as previously agreed upon* in the Royal CP and Royal HI Partnership Agreements.

653373/2016 ELBERG, RUBEN vs. CRABAPPLE CORP.
Motion No. 006 007

Page 7 of 17

If you intend to keep your investors funds in the two projects, Jacob and Ruben ask that you please send the fully signed copies of the two partnership agreements to them.

If your investors do not [] intend to keep their investment funds in the Crowne Plaza project, Jacob and Ruben ask that you please advise them that you desire to receive a return of those funds to your investors. Jacob and Ruben do not wish to take any actions that would harm the investors, and want to receive your direction regarding what should be done with their funds. If the investors want their funds returned, Jacob and Ruben would like to discuss a timeframe for return of the funds.

(NYSCEF Doc. No. 175 [emphasis added]).

Similarly, although she now contests the validity of the November LP Agreements and argues that she should not be judicially estopped from contesting the validity of the November LP Agreements, Ms. Pewzner, previously submitted to the court the November LP Agreements as the operative agreements for the LPs in connection with a foreclosure action in Queens County captioned *New Fund LP v Royal One Real Estate, LLC* (the **Foreclosure Action**; Index No. 709631-2014, NYSCEF Doc. Nos. 91-92, 95-96, ***executed and filed on November 9, 2015***). In fact, in connection with the LP Agreements submitted in the Foreclosure Action, Ms. Pewzner attested that RREM and RORE entered into the November LP Agreements (NYSCEF Doc. No. 92, ¶¶ 4-5).

Indeed, all of the signatories of the LPs (Mr. Jensen – the person's whose acceptance of the November LP Agreements is at issue, Jacob Elberg and Ruben Elberg) and including Ms. Pewzner, herself, has at one time or another either agreed to the terms of the November LP Agreements or otherwise taken the position that the November LP Agreements were the operative limited partnership agreements of the LPs.

**653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.**                                        **Page 8 of 17**
**Motion No.  006 007**

8 of 17

However, Ms. Pewzner now argues that her position in the Foreclosure Action resulted solely from Ruben Elberg cutting her off from her father's email account and otherwise not disclosing certain communications (NYSCEF Doc. No. 175) from Mr. Jensen to her father's email account, which she incorrectly argues (as discussed above) indicate that Mr. Jensen rejected the November LP Agreements and terminated the Elbergs' offer to enter into such agreements. To wit, after Jacob Elberg's death in 2013 (i.e., after Mr. Jensen's December 2012 USCIS letter), Ruben Elberg and his sister, Ms. Pewzner, were appointed co-executors of their father's Estate. As noted above, Ms. Pewzner claims that she initially relied on Ruben Elberg to guide her through their father's affairs as Ruben Elberg worked with their father on a daily basis and had knowledge of all of his dealings, but at some point, Ms. Pewzner claims (NYSCEF Doc. No. 161) that she realized that Ruben Elberg was acting to take control of Jacob Elberg's assets for himself and that he misrepresented the state of the LPs' affairs accordingly. Among other things, Ms. Pewzner claims that Ruben Elberg changed the password to Jacob Elberg's email account so that his office secretary could no longer gain access to email communications after his passing. Ms. Pewzner asserts that this was done to prevent her from gaining access to emails showing that, in fact, Mr. Jensen repudiated the November LP Agreements. As discussed above, this is not what they show. What they show is Mr. Jensen's unsuccessful attempt to renegotiate certain terms of the November LP Agreements that he had accepted.

In addition, the record does not support the notion that the email accounts of Jacob Elberg were not available to Ms. Pewzner prior to her submission in the Foreclosure Action. According to Ms. Whitacre, because Jacob Elberg's email account had been hacked, Ms. Whitacre had to change Jacob Elberg's password twice, she provided that changed password to both Ms. Pewzner

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.                    Page 9 of 17
Motion No.  006 007

9 of 17

and Ruben Elberg, she never deleted documents from Jacob Elberg's account and to her knowledge Ms. Pewzner never checked Jacob Elberg's email account (NYSCEF Doc. No. 387, ¶ 8). On *January 11, 2016*, *two months after Mr. Pewzner had already submitted her affidavit and the November LP Agreements as the operative agreements in the Foreclosure Action*, when Jacob Elberg's email account was hacked again, Ms. Whitacre indicates that she contacted Ruben Elberg and asked him to change the password again and that he did not give the password to her at that time and she did not believe he had given it to anyone else (*id.,* ¶ 9). In other words, at all times prior to the submission of her affidavit in the Foreclosure Action, where she indicated the November LP Agreements were the operative agreements, the record indicates that Ms. Pewzner had unfettered access to her father Jacob Elberg's email account. In support of her motion, Ms. Pewzner adduces the testimony of Ruben Elberg where he testified that he did not remember whether he had changed the password of Jacob Elberg's email account (NYSCEF Doc. No. 251 at 342:18-20). She does not, however, otherwise adduce any evidence of deletions from Jacob Elberg's email account or a forensic examination of such email account. Prior to the filing of the Note of Issue and her motion for summary judgment, she also did not ask this court for relief arising from this discovery dispute so that the record could be adequately developed, and, in any event, the record is not sufficiently developed to warrant sanctions.

After Jacob Elberg's death, his will was admitted to probate, and on January 16, 2014, the Kings County Surrogate's Court issued letters testamentary to Ms. Pewzner and Ruben Elberg as co-executors for the Estate (Estate of Elberg, File No. 46-2014; the **Surrogate Court Action**). At least as of August 28, 2014, the relationship of Ms. Pewzner and Ruben Elberg turned sour and Ms. Pewzner moved by order to show cause in the Surrogate's Court for a declaration, inter alia,

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.
Motion No.  006 007

Page 10 of 17

10 of 17

that the Estate of Jacob Elberg be declared the sole member and owner of RREM and RORE and

to require Ruben Elberg to deliver such documentation to Ms. Pewsner as may be required to

confirm and establish that the Estate was the sole member and owner of such entities (NYSCEF

Doc. 88). Ruben Elberg moved to dismiss Ms. Pewzner's claims. The Surrogate's Court denied

the motion and granted Ms. Pewzner's relief to the extent of preliminarily enjoining distribution

of the assets in question (164 AD3d 497 [2d Dept 2018] [modifying Surrogate's Court order only

insofar as it did not require Ms. Pewzner to post an undertaking]).

The court notes two other agreements between the parties. First, as evidenced by emails, dated

December 31, 2012, and January 1 and 3, 2013 (NYSCEF Doc. 170), at some point Mr. Jensen

agreed to provide $2 million toward the purchase of the hotel lots (the **Loan**). Ms. Pewzner

claims this was a stand-alone loan transaction and that no other agreement, including the

November LP Agreements, were ever fully executed by the parties. Ruben Elberg, on the other

hand, argues that this is further evidence of the parties' acknowledgment that the November LP

Agreements were the operative documents for the LPs and Mr. Jensen's intent to perform.

Second, there came a time subsequent to Jacob Elberg's death and following the filing of this

lawsuit where the parties did enter into an Agreement and Plan of Merger dated as of August 25,

2016 (NYSCEF Doc. No. 241; the **Merger Agreement**) by and among Royal One Real Estate II,

LLC and Royal CP, Royal HI, Crabapple, RORE, Royal LIC, RREM and NYC Fund, L.P. and

NYC Metro Regional Center, LLC and Westlead Capital, which reflects that there was a dispute

as to whether the August LP Agreements or the November LP Agreements were the governing

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.          Page 11 of 17
Motion No.  006 007

11 of 17

documents and, as such, whether Ruben Elberg was a Class D Limited Partner (NYSCEF Doc.

No. 242, Recitals at 2, §§ 2.1, 2.3, 3.2[a]).

I.    **Ms. Pewzner's Motion to Strike the Complaint and/or for Summary Judgment is Denied**

To prevail on a motion for sanctions for spoliation of evidence, the moving party must establish:

> [1] that the party having control over the evidence possessed an obligation to preserve it at the time of its destruction, [2] that the evidence was destroyed with a "culpable state of mind," and [3] "that the destroyed evidence was relevant to the party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense"

(*Pegasus Aviation I, Inc. v Varig Logistica S.A.*, 26 NY3d 543, 547 [2015], quoting *VOOM HD*

*Holdings LLC v EchoStar Satellite LLC*, 93 AD3d 33, 45 [1st Dept 2012]). A "culpable state of

mind" includes ordinary negligence for purposes of a motion for spoliation sanctions (*VOOM*, 93

AD3d at 45). Trial courts in the exercise of discretion may impose sanctions to the affected party

including (i) preclusion of evidence favorable to the spoliating party, (ii) awarding costs

associated with obtaining replacement evidence, or (iii) employing an adverse inference

instruction at trial (*id.* at 551, *citing* CPLR § 3126 ["If any party…refuses to obey an order for

disclosure or willfully fails to disclose information which the court finds ought to have been

disclosed…the court may make such orders with regard to the failure or refusal as are just"]).

Spoliation sanctions are not appropriate in this case on the record before the court. Ms. Pewzner

fails to identify any destruction of evidence that occurred or to show that she otherwise did not

have access to the email account for the years of litigation that predated this lawsuit including

prior to her submissions in the Foreclosure Action, which she now seeks to disavow and during

the Surrogate Court Action. To be sure, Ruben Elberg's recollection as to whether he changed

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.
Motion No.  006 007

Page 12 of 17

12 of 17

the password to his father's email account raises concerns, but the record is simply not developed

to support the notion that Ms. Pewzner did not otherwise have the universe of information

available to her. No forensic analysis of Jacob Elberg's email account was requested or

performed. Nor have any emails or documents been produced that she otherwise did not have

available to her. Thus, the branch of the motion seeking to have the complaint struck is denied.

Ms. Pewzner is also not entitled to summary judgment. Summary judgment should be granted

when the movant presents evidentiary proof in admissible form that there are no triable issues of

material fact (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). Contrary to Ms. Pewzner's

position, there was no repudiation and rejection of the November LP Agreements by Mr. Jensen.

As discussed above, Mr. Jensen's emails reflect nothing more than an attempt to renegotiate

terms. Although it may not be clear when he actually signed the November LP Agreements, Mr.

Jensen accepted the agreements when he performed under the November LP Agreements by (x)

representing to the United States Government in the December 2012 USCIS Letter that the

November LP Agreements were the operative agreements when he applied for the EB-5 visa for

Ms. Ruizhen Wang and (y) when he represented that the November LP Agreements were the

operative agreements in the Crabapple Litigation. It is of no moment that he testified that often

EB-5 applications are presented without fully executed agreements or that he can't recall when

he signed the November LP Agreements. The fact is that although he may have tried to

renegotiate the November LP Agreements, he executed them, no one ever rescinded the offer to

enter such agreements and the offer to enter into such November LP Agreements did not have a

sunset provision. Equally significant, as it relates to the dispute between the parties, he does not

object to the November LP Agreements and it is beyond cavil that the other signatories to those

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.
Motion No.  006 007

Page 13 of 17

13 of 17

agreements (i.e., Jacob Elberg and Ruben Elberg) executed them. Indeed, it was in all of their economic interests (including, ultimately, Ms. Pewzner's as the successor to Jacob Elberg's position) to enter into the November LP Agreements as the EB-5 fundraising for the Class A Limited Partners was not achieved in accordance with the August LP Agreements.

In addition, Ms. Pewzner's argument that to the extent that Mr. Jensen's conduct can be viewed as acceptance by performance, it should be viewed as acceptance by performance of the Loan only and not the November LP Agreements, fails. The $2 million loan to the project for the purchase of the hold-out lots for the hotels, does not in any way negate his acceptance of the November LP Agreements by signing the same and by representing that they were the operative documents to the USCIS in the December 2012 USCIS Letter and by subsequently bringing the Crabapple Litigation.

Moreover, Ms. Pewzner cannot so easily whisk away the submissions that she made in the Foreclosure Action. The doctrine of "judicial estoppel," also known as the doctrine of inconsistent positions, precludes a party who assumed a certain position in a prior litigation and secured a judgment in its favor from assuming a contrary position in another action simply because their interest may have changed (*Baje Realty Corp. v Cutler*, 32 AD3d 307 [1st Dept 2006]). At the time of her submissions to the court in that action, according to Ms. Whitacre, Ms. Pewzner had access to Jacob Elberg's email account as she had been provided the password by Ms. Whitacre (and Ruben Elberg had not yet been asked to change the password and had not changed the password to address the hacking issues raised by Ms. Whitacre). Thus, the record suggests that Ms. Pewzner's position in the Foreclosure Action resulted simply from her failure

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.
Motion No.  006 007

Page 14 of 17

to do her own due diligence (i.e., to the extent that she suggests she might have submitted the August LP Agreements and not the November LP Agreements). In any event, as discussed above, the emails in Jacob Elberg's email account only suggest Mr. Jensen's attempt to renegotiate terms of the November LP Agreements – and are not a repudiation and rejection of the same, having previously accepted them.

Finally, Ms. Pewzner's argument that the November LP Agreements are not effective because Section 12.3 of the August LP Agreements (NYSCEF Doc. Nos. 166-167, §12.3) required written approval of the Class A Limited Partners, which she argues was not obtained, also fails. As discussed above, and per Ms. Holmes' testimony, because of the failure to raise the EB-5 funds in accordance with the terms of the August LP Agreements, all of the parties involved in the Royal CP and the Royal HI, including (i) the Elbergs, (ii) Mr. Jensen (who accepted the November LP Agreement by both [x] representing that the November LP Agreements were the operative agreements to USCIS and [y] bringing the Crabapple Lawsuit based on the November LP Agreement), (iii) Mr. Schmidt who sent the EB-5 USCIS Letter representing to USCIS the November LP Agreements as the operative documents (and including the November LP Agreements and the subscription agreements as exhibits to such EB-5 USCIS Letter) and (iv) the Class A Limited Partners by virtue of their subscription agreements (NYSCEF Doc. No. 326) referring to such November LP Agreements (i.e., and not the August LP Agreements) treated the November LP Agreements as the operative agreements.

## II. Ruben Elberg's Motion for Summary Judgment is Granted

653373/2016 ELBERG, RUBEN vs. CRABAPPLE CORP.
Motion No. 006 007

Page 15 of 17

15 of 17

For the reasons set forth above, inasmuch as the November LP Agreements are the governing

agreements, Ruben Elberg's motion for summary judgment seeking declaration that (i) the

November LP Agreements are the governing agreements for the LPs must be granted, and (ii) as

a Class D Limited Partner, he is entitled to receive 40% of the Net Proceeds from a Capital Event

or dissolution from Royal CP Royal HI consistent with Article 3.4 of the November LP

Agreements, is granted.

Accordingly, it is

ORDERED that the defendant's motion (seq. no. 006) for sanctions and summary judgment is

denied in its entirety, and it is further

ORDERED that the plaintiff's motion (seq. no. 007) for summary judgment is granted and it is

further,

ADJUDGED and DECLARED that the Limited Partnership Agreements, dated November 30,

2012 are valid and govern the affairs of Royal CP Hotel Holdings, LP and Royal HI Hotel

Holdings, LP; and it is further

ADJUDGED and DECLARED that under the Limited Partnership Agreements, dated November

30, 2012, that Ruben Elberg is a Class D Limited Partner of Royal CP Hotel Holdings, LP and

Royal HI Hotel Holdings, LP and as such is entitled to receive 40% of the Net Proceeds from a

Capital Event or dissolution from Royal CP Hotel Holdings, LP and Royal HI Hotel Holdings,

LP consistent with Article 3.4 of the November LP Agreements.

653373/2016  ELBERG, RUBEN vs. CRABAPPLE CORP.                          Page 16 of 17
Motion No.  006 007

16 of 17

| 1/20/2021 | | | | ANDREW BORROK, J.S.C. | |
|---|---|---|---|---|---|
| **DATE** | | | | | |

| CHECK ONE: | | **X** | CASE DISPOSED | | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | | GRANTED | | DENIED | **X** | GRANTED IN PART | | OTHER |
| APPLICATION: | | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

653373/2016   ELBERG, RUBEN vs. CRABAPPLE CORP.                                    Page 17 of 17
Motion No.  006 007

17 of 17

## Schedule C

**Raben Money Judgment**

(See Attached)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 53

---------------------------------------------------------------X

RUBEN ELBERG,

                              Plaintiff,

              - v -

TAMARA PEWZNER,

                            Defendant.

| | |
|---|---|
| INDEX NO. | 657021/2022 |
| MOTION DATE | N/A, N/A |
| MOTION SEQ. NO. | 001 002 |

**DECISION + ORDER ON MOTION**

---------------------------------------------------------------X

HON. ANDREW S. BORROK:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 2, 17, 18, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85

were read on this motion for/to        JUDGMENT - SUMMARY IN LIEU OF COMPLAINT

The following e-filed documents, listed by NYSCEF document number (Motion 002) 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69

were read on this motion for/to               CHANGE VENUE

Upon the foregoing documents, Ruben Elberg's motion for summary judgment in lieu of

complaint (Mtn. Seq. No. 001) must be granted.

Reference is made to (i) an action captioned *Ruben Elberg v Crabapple Corp. et al*, Index No.

653373/2016 (the **2016 Action**), (ii) an action captioned *Crabapple v Elberg*, Index No.

650492/2015, (the **2015 Action**), (iii) a Decision and Order of the Appellate Division (the

**Appellate Division LLC Decision**; NYSCEF Doc. No 397), (iv) a Decision and Order (the

**Prior Decision**; Index No. 653373/2016, NYSCEF Doc. No. 34) dated January 20, 2021, (v) a

Decision and Order dated March 23, 2021 (the **First Supplemental Order**; Index No.

653373/2016, NYSCEF Doc. No. 370) (vi) an Order to Show Cause (**the Order to Show Cause**)

657021/2022 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 1 of 13

1 of 13

Index No. 653373/2016, NYSCEF Doc. No. 427 at 2-3), dated July 25, 2022, seeking (a) a
declaration that Tamara Pewzner was in contempt for violating post-judgment subpoenas issued
by the plaintiff, (b) sanctions against Ms. Pewzner and (c) an order directing Ms. Pewzner to
comply with post-judgment subpoenas and requiring her to transfer all gross compensation
received following the Capital Event and dissolution of the LPs to an account designated by the
Court, where the funds would be held until the Court ordered distribution consistent with Article
3.4 of the November LP Agreements which this Court declined to sign solely until this Court
heard this Summary Judgment in Lieu of Complaint Motion (and which is being signed
simultaneously herewith), (vii) an action (the **Kings County Action**) captioned *Tamara Pewzner
v Levi Hunter et al*, Index No. 519693/2022, (viii) a Supplemental Order dated July 29, 2022 (the
**Second Supplemental Order**; Index No. 653373/2016, NYSCEF Doc. No. 450), and (ix) an
action captioned *Estate of Jacob Elberg*, File No. 2022-211/C-4, (the **Surrogate Action**) pending
in the Surrogate's Court (Kelly, J.), Queens County.[1]

In the 2016 Action, Mr. Elberg asserted a single cause of action for a declaratory judgment that
the November LP Agreements are valid and that Mr. Elberg is therefore entitled to 40% of the
Net Proceeds from a Capital Event or dissolution from Royal CP and Royal HI. The Court
granted Mr. Elberg's motion for summary judgment on its sole cause of action for a declaratory
judgment in the Prior Decision:

> ADJUDGED and DECLARED that the Limited Partnership Agreements, dated
> November 30, 2012 are valid and govern the affairs of Royal CP Hotel Holdings,
> LP and Royal HI Hotel Holdings, LP, and it is further

---

[1] The Surrogate Action involves the Estate of Jacob Elberg. It was transferred from Kings County to Queens County pursuant to Administrative Transfer Order #110, dated December 1, 2021 (see 2016 Action, NYSCEF Doc. No. 460).

657021/2022 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 2 of 10

ADJUDGED and DECLARED that under the Limited Partnership Agreements, dated November 30, 2012, Ruben Elberg is a Class D Limited Partner of Royal CP Hotel Holdings, LP and Royal HI Hotel Holdings, LP and as such is entitled to receive 40% of the Net Proceeds from a Capital Event or dissolution from Royal CP Hotel Holdings, LP and Royal HI Hotel Holdings, LP consistent with Article 3.4 of the November LP Agreements

(id., at 16).

On March 3, 2021 (2016 Action, NYSCEF Doc. No. 352) and months after this Court issued the Prior Decision declaring that the November LP Agreements are the governing agreements and that Mr. Elberg was entitled to receive 40% of the Net Proceeds of a Capital Event, Mr. Elberg made a demand for distributions pursuant Paragraph 3.1.4 of November LP Agreements because a Capital Event had occurred. On the record before the court, Ms. Pewzner did not respond.

Mr. Elberg then moved by order to show cause to require that the relevant funds be moved into an account designated by the Court. Ms. Pewzner opposed the motion. In her opposition, notwithstanding the Appellate Division LLC Decision, Ms. Pewzner falsely argued that the issue of ownership of the relevant LLCs had never been before the Appellate Division. It had. In response, this Court issued its First Supplemental Order quoting the Appellate Division LLC Decision:

> . Elberg was not removed as the sole "managing member" of the LLCs. *The record demonstrates that he was a 40% minority member*, not a managing member with the power to act unilaterally on the LLCs' behalf. The relevant agreements contained no provision regarding the succession of management of the LLCs in the event of the death of Jacob, the majority member. Thus, Jacob's controlling interest in the LLCs passed to his estate upon his death, and Elberg and Pewzner, the co-executors of the estate, had the authority to act as co-managers of the LLCs (Limited Liability Company Law [LLC] § 608, *see also New Prospect v Stadman*, 305 AD2d 588, 589 [2d Dept 2003]); LLC § 608 provides that the executor of a deceased member "may exercise all of the member's rights for the purpose of settling his or her estate"

657021/2022 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 3 of 10

(2016 Action, NYSCEF Doc. No. 370, citing 153 AD3d 434 [1st Dept 2017] [emphasis in original]).

The Appellate Division recently reaffirmed this understanding when it reversed the court (Ramos, J.)'s order which had removed Mr. Elberg as a co-manager of the LPs and LLCs and indicated that in fact the issue had been squarely presented in a prior action:

> The issue decided by the motion court – namely, plaintiff's fitness to co-manage the LLC and LP defendants – *was squarely presented in a prior action* (see Crabapple Corp. v Elberg, 153 AD3d 434 [1st Dept 2017]), which was voluntarily discontinued with prejudice. The stipulation of discontinuance did not preserve Pewzner's right to raise this issue. Nor was the issue raised in this case as here Elberg simply seeks a declaration that certain amended partnership agreements are valid.

(2016 Action, NYSCEF Doc. No. 397, at 1; Elberg v Crabapple Corp., 201 AD3d 546, 546 [1st Dept 2022] [emphasis added]).

Subsequently, Mr. Elberg again made requests for distributions (NYSCEF Doc. Nos. 431-436) pursuant to the November LP Agreements and ultimately served post-judgment subpoenas as to the money he is owed pursuant to the November LP Agreements. In response (and instead of returning to this Court which issued the Prior Decision), Ms. Pewzner filed the Kings County Action frivolously arguing that service of the subpoenas was an abuse of process. When Ms. Pewzner continued to fail to respond to the subpoenas notwithstanding (i) the Appellate Division LLC Decision, (ii) the Prior Decision, and (iii) the First Supplemental Order, Mr. Elberg brought the instant action and the Order to Show Cause in the 2016 Action (2016 Action, NYSCEF Doc. No. 427).

657021/2022 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 4 of 10

4 of 13

At the appearance for the temporary restraining order in the Order to Show Cause, for the reasons set forth in the Second Supplemental Order (and when such motion was pending), it became clear that another supplemental order was necessary:

> [T]he Court previously adjudged and declared that the November LP Agreements are valid and govern the affairs of the LPs. Thus, the plaintiff is entitled to a further declaration that the total consideration realized from the August 25, 2016 merger should be distributed in accordance with section 3.4.2 of the November LP Agreements.

Section 3.4.2 of the November LP Agreements provide:

> The Net Proceeds from a Capital Event and/or a distribution resulting from the dissolution of the Partnership shall be distributed within one hundred twenty (120) days of such Capital Event or dissolution of the Partnership, in the following order and priority:
> (a) First, to the Class A Limited Partners, pro rata in accordance with their Adjusted Capital Contributions, up to their unpaid Class A Preferred Return;
> (b) Second, to the Class A Limited Partners, pro rata up to their Adjusted Capital Contributions;
> (c) Third, to the Class B Limited Partner, up to its accrued unpaid Class B Preferred Return;
> (d) Fourth, to the Class B Limited Partner, up to its Adjusted Capital Contributions, if any;
> (e) Fifth, to the Class C Limited Partners, pro rata in accordance with their Adjusted Capital Contributions, up to their Adjusted Capital Contributions; and (f) Sixth the remaining amount 59% to the Class C Limited Partners, pro rata in accordance with their Adjusted Capital Accounts immediately prior to the distribution provided in clause (c) of this Section 3.4.2, 40% to the Class D Limited Partner and 1% to the General Partner.

(NYSCEF Doc. Nos. 270 and 271, ¶ 3.4.2).

Following the issuance of the Prior Decision and the First Supplemental Order, by letter (NYSCEF Doc. No. 352), dated March 1, 2021, from Robert Abrams to Charles Lieberman, Mr. Abrams demanded distribution of Mr. Elberg's share of the Net Proceeds. This amount remains unpaid.

As such, the plaintiff is entitled to this Additional Supplemental Order and clarification that the declaration that the plaintiff is also a Class D Limited Partner necessarily means that the total consideration of $35,777,210 should be allocated (1) $11,800,000 to the Class C Partners for their Capital Contributions to Royal HI and Royal CP, (2) the remaining net proceeds of $23,977,210.00 should be

657021/2022 ELBERG, RUBEN vs. PERENER, TAMARA. Motion No. 001 002

Page 5 of 10

distributed 59% to the Class C Partners (i.e., $14,146,553.90 to Royal One Real Estate LLC [RORE] and Royal Real Estate Management [RREM]), 40% to the Class D partner (i.e., $9,590,884.00 to the plaintiff) and 1% to the General Partner (i.e., $239,772.10), and (3) in addition to his Class D interest of $9,590,884.00, the plaintiff is entitled to be paid 40% of the $11,800.00 (i.e., $4,720,000), plus 40% of $14,146,553.90 (i.e., $5,658,621.56) or a total payment to the plaintiff of $19,969,505.56

(2016 Action, NYSCEF Doc. No. 450, at 5-6).

As discussed in the Second Supplemental Order, the amount of the total consideration subject to distribution pursuant to the terms of the November LP Agreements was not hatched from Mr. Elberg. This amount comes from Ms. Pewzner. Indeed, her attorney sent out the Notice of Special Meeting and Proxy Statement (2016 Action, NYSCEF Doc. No. 354) with this amount in connection with the August 23, 2016 merger. Having done this, she can not now disavow the amount sent to the partners and argue that an issue of fact exists or that Mr. Elberg is the source of this information. It is simply another false statement by Ms. Pewzner.

Inasmuch as the Appellate Division has already determined that Mr. Elberg is a 40% owner of Royal CP Hotel Holdings, LP and Royal HT Hotel Holdings, LP and that the November LP Agreements govern, and as discussed in the Second Supplemental Order, the November LP Agreements make clear the waterfall of distribution of the proceeds, there simply are no issues of fact as to (i) the amount of the proceeds, (ii) how the proceeds should be distributed including how much should have been distributed to Mr. Elberg pursuant to the terms of the November LP Agreements, (iii) that Mr. Elberg has made a demand for his share of the proceeds and (iv) that they have not been paid. Thus, summary judgment in lieu of complaint must be granted.

03/03/2020 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 6 of 10

Sholem Elberg's motion (Mtn. Seq. No. 002) to transfer the case to Queens County, Surrogate Court, or, in the alternative, to intervene in this action is denied. This transparent attempt to litigate the issues in front of this Court in a different department fails. The 2016 Action revolves the partnership and it is the partnership agreements which govern the distribution of proceeds pursuant to those agreements.

It is hereby ORDERED that Mr. Elberg's motion for summary judgment in lieu of complaint is granted, and it is further

ORDERED that Sholem Elberg's motion to transfer the case is denied, and it is further

ORDERED that a copy of this Decision and Order shall be filed in the 2016 Action and shall be brought to the attention of the court (Kelly, J.) in the Surrogate Action; and it is further

ORDERED, ADJUDGED and DECREED that the Plaintiff, RUBEN ELBERG, is granted judgment against the ROYAL CP HOTEL HOLDINGS LP and all its successors upholding that the Limited Partnership Agreement for ROYAL CP HOTEL HOLDINGS LP, dated November 30, 2012 (NYSCEF Doc. No. 255), is valid and binding on ROYAL CP HOTEL HOLDINGS LP and all its successors including TAMARA PEWZNER, individually, as co-executor and co-trustee of the Estate of Jacob Elberg, and as co-Manager of ROYAL ONE REAL ESTATE, LLC, ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIC REAL ESTATE MANAGEMENT, LLC; and it is further

657021/2022 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 7 of 13

ORDERED, ADJUDGED and DECREED that the Plaintiff, RUBEN ELBERG, is granted judgment against ROYAL III HOTEL HOLDINGS LP and all its successors upholding that the Limited Partnership Agreement for ROYAL III HOTEL HOLDINGS LP, dated November 30, 2012 (NYSCEF Doc. No. 236), is valid and binding on ROYAL III HOTEL HOLDINGS LP and all its successors including TAMARA PEWZNER, individually, as co-executor and co-trustee of the Estate of Jacob Elberg, and as co-Manager of ROYAL ONE REAL ESTATE, LLC, ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIC REAL ESTATE MANAGEMENT, LLC; and it is further

ORDERED, ADJUDGED and DECREED that the Plaintiff, RUBEN ELBERG, is granted judgment against ROYAL ONE REAL ESTATE, LLC and all its successors upholding that the operating agreement, dated March 2, 2005 (NYSCEF Doc. No. 232), is valid and binding on ROYAL ONE REAL ESTATE, LLC and all its successors including TAMARA PEWZNER, individually, as co-executor and co-trustee of the Estate of Jacob Elberg, and as co-Manager of ROYAL ONE REAL ESTATE, LLC, ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIC REAL ESTATE MANAGEMENT, LLC; and ORDERED, ADJUDGED and DECREED that the Plaintiff, RUBEN ELBERG, is granted judgment against ROYAL REAL ESTATE MANAGEMENT, LLC and all its successors upholding that the operating agreement, dated June 13, 2001 (NYSCEF Doc. No. 233), is valid and binding on ROYAL REAL ESTATE MANAGEMENT, LLC and all its successors including TAMARA PEWZNER, individually, as co-executor and co-trustee of the Estate of Jacob Elberg, and as co-Manager of ROYAL ONE

657021/2022 ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 002

Page 8 of 13



F I L E D

Oct 03 2022

NEW YORK
COUNTY CLERK'S OFFICE

REAL ESTATE, LLC, ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIC REAL

ESTATE MANAGEMENT, LLC, and it is further

**A**

ORDERED, ADJUDGED and DECREED that the Plaintiff, RUBEN ELBERG, is granted

**B**

judgment against the Defendant, TAMARA PEWZNER, individually, as co-executor and co-

trustee of the Estate of Jacob Elberg; and as co-Manager of ROYAL ONE REAL ESTATE,

LLC, ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIC REAL ESTATE

MANAGEMENT, LLC, in the amount of $19,969,595.56, with interest thereon at 9% per annum
**of $10,980,492.51,**

from the 25th day of August, 2018, along with motion costs of $45.00, and disbursements as to
**X** ^                    **of $237.50, for a total of $30,950,235.57,**

be taxed by the Clerk of this Court upon the presentation of the proper papers, and that the
^

Plaintiff have execution therefor; and it is further

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Plaintiff, RUBEN

ELBERG, is granted judgment against the Defendant, TAMARA PEWZNER, individually, as

co- executor and co-trustee of the Estate of Jacob Elberg; and as co- Manager of ROYAL ONE

REAL ESTATE, LLC, ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIC REAL

ESTATE MANAGEMENT, LLC, in the amount of $4,206,728.28 with interest thereon at 9%
**of $644,454.31**

per annum from the 20th day of January, 2021, and disbursements as to be taxed by the Clerk of
**X**            **of $282.50, for a total of $4,853,465.09,**

this Court upon the presentation of the proper papers, and that the Plaintiff have execution
^

therefor.

6/20/2022
DATE

657021/2022  ELBERG, RUBEN vs. PEWZNER, TAMARA
Motion No. 001 005

ANDREW S. BORROK, J.S.C.

3 rd      Oct.   2022

**A 1523 President St., Brooklyn, NY 11213**

**B 23 Waverly Pl., Lawrence, NY 11559**

**CLERK**

CHECK ONE:
- [X] CASE DISPOSED
- [ ] GRANTED      [ ] DENIED
- [ ] NON-FINAL DISPOSITION
- [X] GRANTED IN PART
- [ ] OTHER

APPLICATION:
- [ ] SETTLE ORDER
- [ ] SUBMIT ORDER

CHECK IF APPROPRIATE:
- [ ] INCLUDES TRANSFER/REASSIGN
- [ ] FIDUCIARY APPOINTMENT
- [ ] REFERENCE

657021/2022  FELDBERG, RUBEN vs. PENZNER, TAMARA
Motion No. 001 002

Page 10 of 10

10 of 13

SUPREME COURT IN THE STATE OF NEW YORK

COUNTY OF NEW YORK

REUBEN ELBERG, individually and derivatively on behalf of
ROYAL CP HOTEL HOLDINGS LP and ROYAL HI
HOTEL HOLDINGS LP,

Plaintiff,

Index No.: 657021/2021

**BILL OF COSTS**

against

TAMARA PEWZNER, individually, as co-executor and co-trustee of the
Estate of Jacob Elberg, and as Co-Manager of ROYAL OPI REAL ESTATE, LLC,
ROYAL REAL ESTATE MANAGEMENT LLC, ROYAL LIE REAL ESTATE
MANAGEMENT, LLC

Defendants.

| | | | | |
|---|---|---|---|---|
| Costs before note of issue | $.200 | Fee for index number  CPLR §8018(a) | $.230 | .00 |
| CPLR § 8201 subd. 1 | | Referee's fee CPLR 8439 (a) | | |
| Costs after note of issue | | Commissioner's compensation  CPLR 8101 (a2) | | |
| CPLR § 8201 subd. 2 | | | | |
| Trial of issue | | Clerk's fee, filing notice of pend. or attach. | | |
| CPLR § 8201 subd. 3 | | CPLR 8019(a) 8011(a)(2) | | |
| Allowance by statute | | Clerk's fee cancel  notice of pend.  CPLR 8021(c)(1) | | |
| CPLR § 8302 (a) (d) | | Entering and docketing judgment  CPLR 8016(a)? | | |
| Additional allowance | | Paid for transfer  CPLR 8019(a)19 | | |
| CPLR § 8303 (6) | | Affidavits & acknowledgments  CPLR 3899 | | |
| Motion costs | | Serving copy summons & complaint CPLR 8011 (c) | | **15.00** |
| CPLR § 8302 | | Note of issue  CPLR 2003(a) | | |
| Appeal to App. Div. or App. Term | | Paid Referee's report  CPLR 8903(a) | | |
| before argument | | Certified copies of papers  CPLR § 8301(a)4 | | |
| CPLR § 8303 subd. 1 | | Interlocutory proof  CPLR § 8104(c) | | |
| Appeal to App. Div. to App. Term | | Transcript and filing  CPLR § 8021 | | |
| before argument | | Certified copy of judgment  CPLR 8021 | | |
| CPLR § 8303 subd. 2 | | Postage  CPLR § 8301(a)12 | | |
| Appeal to Court of Appeals | | Jury fee  CPLR § 8020(a)1 | | |
| before argument | | Stenographers' fee  CPLR § 8002 § 8301 | | |
| CPLR § 8303 subd. 1 | | Sheriff's fees  CPLR § 8011(b), § 8012 | | |
| Appeal to Court of Appeals | | | | |
| before argument | | Sheriff's fees, complaint, arrest, etc. | | |
| CPLR § 8303 subd. 3 | | CPLR § 80-11(c)(d), 2(g) | | |
| | | Paid printing case  CPLR § 8301 (a)6 | | |
| | | Paid printing case  CPLR § 8301 (a)9 | | |
| | | Clerk's fees Court of Appeals  CPLR § 8301 | | |
| | | Paid copies of papers  CPLR § 8301 (a)4 | | |
| | | Motion expenses  CPLR § 8301 (a) | | |
| | | Fees for publication  CPLR § 8301 (a)5 | | |
| | | Serving subpoena  CPLR § 8011 (a)1 § 8301 (d) | | |
| | | Paid for Register's Search  CPLR § 8301 (a) (d) | | |
| | | "County Clerk's Search | | |
| | | "Loan Commissioner's Search | | |
| | | "U.S. District Court Search | | |
| | | "U.S. Circuit Court Search | | |
| | | "Tax Search | | |
| | | "Referee's Report | | |
| | | Attendance of Witnesses  CPLR § 8001 § 8301 (a)4 | | |
| | | Amount for Judicial Intervention | $.95 | .00 |

OCTOBER 03 2022
I HEREBY CERTIFY THAT I HAVE
ADJUSTED THIS BILL OF COSTS AT

**$565.00**

| | |
|---|---|
| COSTS | **$245.00** |
| DISBURSEMENT | **320.00** |
| TOTAL | **$565.00** |

**$320.00**





# BILL OF COSTS



PROPOSED JUDGMENT

FILED AND DOCKETED
Oct 03 2022
AT 12:27 P M
N.Y. CO. CLK'S OFFICE

<u>Schedule D</u>

**Description of Capital One Loans and Medallion Collateral**

| Borrower | Original Principal Amount | Medallion Nos. |
|---|---|---|
| BRACHA CAB CORP. | $1,210,000 | 2L35, 2L36 |
| BRACHA CAB CORP. | $250,000 | 2L35, 2L36 |
| DABRI TRANS CORP. | $1,210,000 | 5J10, 5J11 |
| DABRI TRANS CORP. | $250,000 | 5J10, 5J11 |
| DOVBER CAB CORP. | $1,210,000 | 2J71, 2J72 |
| DOVBER CAB CORP. | $250,000 | 2J71, 2J72 |
| FIT TAXI CORP. | $1,525,000 | 3M78, 3M79, 3M80 |
| JACKHEL CAB CORP. | $1,210,000 | 8M42, 8M43 |
| JACKHEL CAB CORP. | $250,000 | 8M42, 8M43 |
| LECHAIM CAB CORP. | $1,210,000 | 1K66, 1K67 |
| MERAB CAB CORP | $1,210,000 | 7J22, 7J23 |
| N. Y. ENERGY TAXI CORP. | $1,210,000 | 2Y39, 2Y43 |
| N.Y. CANTEEN TAXI CORP. | $1,210,000 | 2Y37, 2Y38 |
| N.Y. GENESIS TAXI CORP | $1,210,000 | 2Y44, 2Y45 |
| N.Y. STANCE TAXI CORP. | $1,210,000 | 3P15, 3P16 |
| NY TINT TAXI CORP | $1,210,000 | 8M46, 8M47 |
| SOMYASH TAXI CORP. | $1,210,000 | 4J18, 4J19 |
| TAMAR CAB CORP. | $1,210,000 | 1H60, 1H78 |
| JARUB TRANS CORP. | $1,210,000.00 | 9J67, 9J68 |
| MERILL TRANSIT INC. | $1,190,000.00 | 5P65, 5P66 |
| SPINDLE CAB CORP. | $1,190,000.00 | 1K44, 1K47 |

## Schedule E

Capital One Settlement Agreement

(See Attached)

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "Agreement") is entered into as of April ___, 2024 (the "Execution Date"), by and among Bruche Cab Corp., Dredut Cab Corp., Tamar Cab Corp., NY Genesis Taxi Corp., Dabri Trans Corp., Merab Cab Corp., Fit Taxi Corp., Sontyush Taxi Corp., NY Tint Taxi Corp., NY Starex Taxi Corp., NY Carmon Taxi Corp., NY Energy Taxi Corp., Jackbul Cab Corp., Lechaim Cab Corp., and Jarob Trans. Corp (collectively, the "Debtor Borrowers"), Meril Transit Inc. and Spindle Cab Corp. (together, the "Non-Debtor Borrowers" and, with the Debtor Borrowers, the "Borrowers"); Tamar Pewzner ("Tamara") and Ruben Elberg ("Ruben"), personally and as beneficiary of the Estate of Jacob Elberg; and Tamara and Ruben in their capacities as Co-Executors of the Estate of Jacob Elberg ("Co-Executors"); Esma Elberg ("Esma"), personally, Sholom (Sam) Elberg ("Sam"), personally and as a beneficiary of the Estate of Jacob Elberg; Michael Elberg ("Michael"), personally and as a beneficiary of the Estate of Jacob Elberg; JEB Management Corp. ("JEB"); SHEFA Funding LLC ("SHEFA"); and the Estate of Jacob Elberg (collectively with the Borrowers, Tamara, Ruben, Sam, Michael, Esma, JEB, and SHEFA, the "Elberg Parties"); and Capital One Taxi Medallion Finance, a trade name of Capital One Equipment Finance Corp. ("Capital One"). Capital One and the Elberg Parties may collectively be referred to herein as the "Parties" and individually, a "Party".

## RECITALS

**WHEREAS,** the Borrowers collectively own 15 licenses to operate taxicabs within the City of New York (each a "Medallion"; collectively, the "Medallions"), which are more specifically identified on **Schedule A** hereto;

**WHEREAS,** on or about August 1, 2012, Capital One made a loan to each of the Borrowers in the principal amounts set forth on **Schedule A** hereto and thereafter made certain additional loans to certain Borrowers as more fully identified on **Schedule A** (each a "Loan"; collectively, the "Loans");

**WHEREAS,** each of the Borrowers granted to Capital One security interests in the Medallions, all proceeds thereof, and other personal property owned by such Borrower (collectively, the "Capital One Liens") as security for the Loan(s) to it;

**WHEREAS,** Jacob Elberg and JEB guaranteed all Loans, and Ruben Elberg guaranteed the Loans to Jarob Trans. Corp (owned 50% by Ruben) and the Non-Debtor Borrowers (the "Ruben Elberg Personal Guaranty");

**WHEREAS,** Jacob Elberg died on December 20, 2013;

**WHEREAS,** at the time of his death, Jacob Elberg was married to Esma, and they had four children, Ruben, Tamara, Sam, and Michael;

**WHEREAS,** pursuant to the terms of Jacob Elberg's will, Tamara and Ruben were nominated co-Executors of the Estate of Jacob Elberg and co-Trustees of a trust u/w/o Jacob Elberg, and received Letters Testamentary and Letters of Trusteeship pursuant to a Decree granting Probate, dated January 16, 2014, which were issued by the Surrogate's Court of the State of New York, County of Kings (the "Kings Surrogate's Court");

**WHEREAS**, the equity interests of Borrowers beneficially owned by Jacob Elberg at the time of his death (including 50% of Jacob Trans. Corp.) were transferred by the Estate of Jacob Elberg to Esma in early 2014;

**WHEREAS**, the Loans matured on January 1, 2015, upon which date all amounts due under the terms of each Loan (inclusive of all outstanding principal, interest, costs, and any other amounts and obligations due and owing under the Loans at any time, collectively, the "Loan Obligations") became immediately due and payable;

**WHEREAS**, each of the Borrowers has failed to repay the Loan or Loans made to it in full;

**WHEREAS,** on or about June 9, 2015, Capital One presented a claim against the Estate of Jacob Elberg to the Co-Executors in respect of Jacob Elberg's liability as a personal guarantor of the Loans in the amount of $23,140,074.86 (the "Estate Claim");

**WHEREAS**, on July 27, 2015, Capital One commenced an action against JEB and Ruben in the Supreme Court of New York, Suffolk County, bearing index number 608014/2015 (the "JEB Action");

**WHEREAS**, on November 4, 2015, Capital One commenced an action against the Co-Executors, in their capacities as executors of the Estate of Jacob Elberg, in the Supreme Court of New York, Suffolk County, bearing index number 611751/2015 (the "Executor Action");

**WHEREAS**, Capital One entered into a forbearance agreement dated February 1, 2016 with the Debtor Borrowers, Tamara, as Executor of the Estate of Jacob Elberg, and JEB (the "Forbearance Agreement");

**WHEREAS**, on April 27, 2016, Capital One voluntarily discontinued the Executor Action in its entirety without prejudice;

**WHEREAS**, on April 27, 2016, Capital One voluntarily discontinued the JEB Action solely against JEB without prejudice;

**WHEREAS**, on August 1, 2016, the Forbearance Agreement expired by its terms, and the Loan Obligations remain outstanding;

**WHEREAS**, on November 22, 2016, a judgment was entered against Ruben, individually, in the JEB Action in favor of Capital One in the amount of $4,399,541.72 (the "Ruben Elberg Judgment");

**WHEREAS**, since the Ruben Elberg Judgment was entered, post-judgment interest has been accruing thereon at the statutory rate of 9% per annum;

**WHEREAS**, Ruben took an appeal of the Ruben Elberg Judgment entered against him in the JEB Action to the Appellate Division, Second Department, which appeal was denied by order entered on March 31, 2021;

**WHEREAS**, on or about February 6, 2017, to enforce the Ruben Elberg Judgment, Capital One served a restraining notice on the Estate of Jacob Elberg;

**WHEREAS**, on or about May 9, 2017, to enforce the Ruben Elberg Judgment, Capital One issued an execution against property with notice to garnishee (the "Execution"), and the Sheriff of Nassau County "levied on" the Execution (the "Levy") by serving the Execution on Tamara, in her capacity as a co-executor of the Estate of Jacob Elberg and fiduciary for certain entities related to the Estate of Jacob Elberg;

**WHEREAS**, the Levy was extended by a court order dated July 21, 2017 and entered in the JEB Action;

**WHEREAS**, on the dates specified on **Schedule C** hereto (each a "Petition Date"), the Debtor Borrowers each commenced a case under title 11 of chapter 11 of the United States Code (as amended, the "Bankruptcy Code") before the United States Bankruptcy Court, Eastern District of New York (the "Bankruptcy Court"), which cases are jointly administered under Case No. 17-46613-nhl (the "Chapter 11 Cases");

**WHEREAS**, on or about May 3, 2018, Capital One filed a proof of claim in each Debtor Borrower's Chapter 11 Case for the amounts due and owing under the Loans to the Debtor Borrowers as of the applicable Petition Date (collectively, the "Bankruptcy Claims"), which Bankruptcy Claims are secured claims (in whole or part) and aggregated $23,090,309.51;

**WHEREAS**, since the applicable Petition Date, default rate interest and other amounts have been accruing with respect to the Bankruptcy Claims and continue to accrue;

**WHEREAS**, on or about May 4, 2018, Ruben filed a proof of claim for an unsecured claim in the Chapter 11 Cases for the amounts due and owing to him as of the applicable Petition Date, which totaled $4,987,513.35;

**WHEREAS**, by order dated June 30, 2019, the Bankruptcy Court approved and authorized the Debtor Borrowers to enter into and consummate a global settlement agreement among certain of the Parties hereto and others, excluding, however, the Non-Debtor Borrowers, Jacob Trans. Corp, and Ruben (the "Prior Settlement");

**WHEREAS**, on July 17, 2019, Tamara filed a petition with the Kings Surrogate's Court pursuant to New York Surrogate Court Procedure Act ("SCPA") § 2102(6) for approval of the Prior Settlement, which was transferred to Surrogate's Court, Queens County ("Queens Surrogate's Court") on December 3, 2021 by Administrative Order, where it remains pending;

**WHEREAS**, on August 24, 2022, Ruben filed an action against Capital One and others in the Supreme Court of New York, New York County, bearing index number 653076/2022 (the "Fraud Action");

**WHEREAS**, on October 1, 2022, Capital One commenced a special proceeding pursuant to CPLR § 5227 against Tamara, in her personal and representative capacities, and Ruben, solely in his representative capacity, in the Supreme Court of New York, Nassau County, bearing index number 611186/2022 (the "Turnover Proceeding");

**WHEREAS**, the Parties acknowledge and agree that the matters set forth herein are unusual and complex in that they involve multiple parties and actions before multiple courts, including the state, federal, trial, appellate, and bankruptcy courts, and that to avoid any further expenditure of time, effort, and money and the uncertainty attendant to litigation, the Parties desire to settle and fully resolve, with prejudice, those matters subject to the terms and conditions of this Agreement (the "Settlement");

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, the Elberg Parties and other related parties are entering into a Settlement Agreement, dated as of the Execution Date (the "Elberg Parties' Settlement Agreement"), to fully and finally settle and resolve certain claims, liabilities, causes of action, and other matters among the Elberg Parties and other parties thereto which are contingent, in part, upon consummation of the Settlement between Capital One and the Elberg Parties as contemplated by this Agreement; and

**WHEREAS**, in view of the foregoing, the Parties desire to enter into this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     Incorporation of Recitals. The Parties hereby incorporate the Recitals by reference as if fully set forth in the body of this Agreement and agree that the Recitals are true and accurate.

2.     Escrow Transfer Date; Settlement Effective Date; Chapter 11 Plan.

    (a)     "Escrow Deposit Date" means the earliest date upon which all of the following have occurred: (i) this Agreement is fully executed by all Parties; (ii) the Elberg Parties' Settlement Agreement is executed by all parties thereto; (iii) the Queens Surrogate's Court has entered an order approving the terms of this Agreement and the Elberg Parties' Settlement Agreement, authorizing Lori Sullivan, as Guardian ad Litem for Esma, to execute each such agreement on Esma's behalf, and lifting any stays previously put in place by the Queens Surrogate's Court, other than the stay of litigation entered by Queens Surrogate's Court in October 2022 (the "Stay Order"), provided, however, that notwithstanding the foregoing, all proceedings in Bankruptcy Court and/or any other cases or proceedings beyond the scope of the Stay Order may proceed and shall not be effected or restricted by this provision; and (iv) restrictions placed on the funds held in accounts of SHEFA (JP Morgan Chase Bank, N.A. account ending x2760), Old Republic National Title Insurance Company (JP Morgan Chase Bank, N.A. accounts ending x4787, x4723, x4774, X04731), Royal One Real Estate LLC (Capital One, N.A. account ending x6305), Royal Real Estate Management, LLC (Capital One, N.A. account ending x3314), escrow by Old Republic National Title Insurance Company (JP Morgan Chase Bank, N.A. accounts ending x4787, x4723, x4774, X04731) (collectively, the "Restricted Accounts") are removed and, subject to the terms of this Agreement, the Elberg Parties' Settlement Agreement, and the still extant Capital One Liens, the Estate of Jacob Elberg shall have access to all funds in the Restricted Accounts.

    (b)     The Elberg Parties agree that, promptly following the earliest date by which this Agreement and the Elberg Parties' Settlement Agreement are fully executed, the Co-Executors will file all documents and take all actions reasonably and respectively required to obtain approval

of such Agreements by the Queens Surrogate's Court and the Bankruptcy Court at the Co-Executors' sole cost and expense. The Elberg Parties further agree that, following the entry of an order approving the terms of this Agreement by Queens Surrogate's Court, the Co-Executors will take all actions necessary to have the restrictions on the Restricted Accounts lifted at their sole cost and expense.

(ii)    "Settlement Effective Date" means the earliest date upon which all of the following have occurred: (i) the Escrow Deposit Date and all actions and obligations of the Elberg Parties under Section 2 of the Elberg Parties' Settlement Agreement, which must be completed within five (5) business days following the Escrow Deposit Date under the Elberg Parties' Settlement Agreement and this Agreement, are fulfilled or completed; (ii) the date on which all Capital One Requirements (as defined below) are fulfilled or completed; (iii) entry of an order by the Bankruptcy Court approving this Agreement (the "Bankruptcy Approval Order"); and (iii) the earlier of (A) one hundred and eighty (180) days from entry of the Bankruptcy Approval Order, or (B) entry of an order by the Bankruptcy Court confirming the Chapter 11 Plan (as defined below), which, among other things, shall incorporate the terms of this Agreement, discharge the debts of Debtor Borrowers (including the Loans and Loan Obligations), release and terminate the Capital One Liens, and be followed immediately by the transfer or sale, as applicable, of Debtor Borrowers or the Medallions, as the case may be, to Ruben (in consideration of his claim to a contingent interest in the Estate of Jacob Elberg), free and clear of all liens, charges, claims, taxes, fees and penalties (including those incurred by or on behalf of the Debtor Borrowers' respective management companies or their respective employees, contractors, or agents and any tax liability for debt forgiveness for the Debtor Borrowers), restrictions, security interests, rights of first refusal, mortgages, deeds of trust, pledges, and all other encumbrances (collectively, "Liens") (including for clarity, the Capital One Liens).

(d)    Debtor Borrowers shall, and Uzma and Tamara shall cause the Debtor Borrowers to, seek approval of this Agreement and the Elberg Parties' Settlement Agreement by the Bankruptcy Court and confirmation by the Bankruptcy Court of a Chapter 11 Plan which is consistent with the terms of this Agreement and the Elberg Parties' Settlement Agreement (the "Chapter 11 Plan"). Uzma, Ruben, and Debtor Borrowers agree to use their best efforts and act in good faith to move for approval of this Agreement and the Elberg Parties' Settlement Agreement promptly following execution of these agreements and to obtain confirmation of the Chapter 11 Plan. The Parties further consent to any non-material changes to this Settlement to the extent such changes are necessary to facilitate the confirmation of the Chapter 11 Plan. The Chapter 11 Plan will account for satisfaction of allowable Outstanding Debtor Borrower Liabilities (as defined below) and to the extent Outstanding Debtor Borrower Liabilities are required to be paid, they shall be paid by in accordance with terms of the Elberg Parties' Settlement Agreement. For purposes hereof, "Outstanding Debtor Borrower Liabilities" means all taxes, fees, charges, costs, penalties and other amounts due and owing by any of the Debtor Borrowers, including without limitation to release any Liens imposed on the Medallions and/or the Debtor Borrowers and with respect to claims made to the Bankruptcy Court, including claims by the New York State Department of Taxation and Finance and a personal injury claim, and claims which are otherwise known or should be known by the Debtor Borrowers, including claims of the Taxi and Limousine Commission; provided, however, Outstanding Debtor Borrower Liabilities do not include the Bankruptcy Claims, Loan Obligations, or Capital One Liens. The Chapter 11 Plan shall not provide for the liquidation of all or substantially all of the property of the bankruptcy estate of the Debtor

Borrowers, and the Debtor Borrowers shall engage in business after consummation of the Chapter 11 Plan. The Chapter 11 Plan shall qualify for discharge pursuant to Section 1141 of the Bankruptcy Code and will not be subject to the exceptions to discharge in that Section (specifically Section 1141(d)(3) of the Bankruptcy Code), and the Parties agree that, if the Chapter 11 Plan is confirmed, the Loans, any Loan Obligations, and any other claims against Debtor Borrowers will be discharged pursuant to a plan under title 11 of the Bankruptcy Code within the meaning of Sections 108(a)(1)(A) and (d)(7) of the Internal Revenue Code of 1986, as amended; provided, however, the Parties represent and warrant that no tax advice has been offered or given by any Party in the course of the negotiations of this Agreement, and the Parties are relying upon the advice of their own tax consultant with regard to any tax consequences that may arise as a result of the execution of this Agreement. The Chapter 11 Plan shall also provide that the estate of the Debtor Borrowers shall be fully administered upon payment of the Loan and any other Loan Obligations to Capital One as contemplated by this Agreement and that a motion for a final decree closing the Chapter 11 Cases shall be brought by the Debtor Borrowers pursuant to the Federal Rules of Bankruptcy Procedure, Rule 3022. The Elberg Parties agree to take all actions necessary and execute and deliver all documents, instruments and agreements needed, to obtain entry of the final decree of the Bankruptcy Court to close the Chapter 11 Cases. The Parties agree to use best efforts and act expeditiously in the performance of this provision.

(d)     Provided that the Chapter 11 Plan, confirmation order, and any motions or requests made by the Debtor Borrowers or their agents in the Chapter 11 Cases (collectively, "Bankruptcy Proceedings") do not contain any provisions or seek relief inconsistent with the express terms and conditions of this Agreement or materially diminish the rights of Capital One under this Agreement, Capital One and Ruben (as applicable) will each do the following: (i) consent to and not object to confirmation of the Chapter 11 Plan (or to the taking of any steps to obtain confirmation of the Chapter 11 Plan, such as the consolidation of the individual Debtor Borrowers' proceedings) and the discharge of all Loans and the Loan Obligations and any other debt of (or claims against) the Debtor Borrowers pursuant to the Chapter 11 Plan; and (ii) not object to any other Bankruptcy Proceedings. Simultaneously with execution of this Agreement, (i) Capital One shall execute the ballot attached as **Exhibit 1** to this Agreement, and deliver such ballot to Schoeman Updike & Kaufman LLP, to be held in escrow pending solicitation of votes on the Chapter 11 Plan provided for herein, and (ii) Schoeman Updike & Kaufman LLP will execute an escrow letter agreement in a form reasonably satisfactory to Capital One pursuant to which Schoeman Updike & Kaufman LLP will hold Capital One's executed ballot in escrow. Notwithstanding the foregoing, nothing herein shall prevent Capital One from filing a reservation of rights prior to the Settlement Effective Date in connection with the Bankruptcy Proceedings. The Parties acknowledge that Capital One may issue an IRS Form 1099-C for any Borrower whose debt to Capital One has been discharged and is above the applicable reporting threshold as required by applicable law. Upon confirmation of the Chapter 11 Plan, Ruben agrees that his claim will be withdrawn and expunged with prejudice.

(f)     All fees and expenses associated with or related to the implementation of this Section 2 shall be the responsibility of the appropriate person(s) consistent with the terms of the Elberg Parties' Settlement Agreement and not Capital One (other than their own legal, fees, costs, and expenses consistent with Section 20 of this Agreement). Following the Escrow Deposit Date and subject to the *Stipulation and Consent Order Authorizing Debtors' Interim Use of Cash Collateral* in the Chapter 11 Cases at ECF No. 73 (the "Cash Collateral Order"), the Elberg Parties

who have appeared in the Bankruptcy Court proceedings may use the funds currently in the Debtor Borrowers' bank accounts (the "Debtor Borrowers' Accounts"), which Esros and Tamara represent and agree is no more than a total of $69,000 in the Debtor Borrowers' Accounts, to compensate Brenda Whitacre, make required quarterly payments to the U.S. Bankruptcy Trustee, and to pay the fees of, and disbursements incurred by professionals hired previously to represent and perform services for the Debtor Borrowers (attorneys and accountants) (to the extent there are sufficient funds in the Debtor Borrowers' Accounts to do so). Capital One and Ruben agree not to contest using the Debtor Borrowers' Accounts for said expenditures or any applications for and payments of fee awards, or any future applications for fees and disbursements incurred or awards of fees or disbursements, whether addressed in the Chapter 11 Plan or otherwise, so long as such use otherwise complies with the terms of the Cash Collateral Order.

3.      **Escrow; Actions of Capital One.**

    (a)    No later than five (5) business days following the Escrow Deposit Date, the Estate of Jacob Elberg will deposit a total of $8,450,000 (the "Capital One Escrow Amount"), for the benefit of Capital One, in escrow to be held by the attorneys for Capital One, as escrow agent ("Capital One Escrow Agent"), in accordance with an escrow agreement (to be entered into by Capital One, the Estate of Jacob Elberg, Ruben, and the Capital One Escrow Agent (the "Escrow Agreement") and executed by the foregoing parties on the Execution Date or promptly thereafter. Said funds will be transferred to the Capital One Escrow Agent from the Restricted Accounts.

    (b)    No later than five (5) business days following Capital One's receipt of notice from the Elberg Parties of the Escrow Deposit Date, Capital One shall do (or cause to be done) each of the following; provided, however, that any person or entity identified hereunder as an escrow agent to hold any documents delivered by Capital One must execute on the Execution Date or promptly thereafter an escrow letter agreement in a form reasonably satisfactory to Capital One, and Capital One shall have no obligation to deliver any documents into escrow unless such escrow letter agreements have been signed by the applicable parties: (i) deliver to the attorneys listed on **Schedule B**, as escrow agents, a stipulation of discontinuance or voluntary dismissal, all with prejudice, for the actions identified thereon to be held by such attorney in escrow in accordance with Section 5(b) of this Agreement and the applicable escrow letter agreements; and (ii) deliver to Abrams Fensterman, LLP ("Abrams Fensterman"), as escrow agent, the following to be held in escrow in accordance with Section 5(b) of this Agreement and the applicable escrow letter agreement: (A) UCC-3 termination statements terminating the UCC-1 statements Capital One had filed (and continued) against Borrowers; and (B) a Satisfaction of the Ruben Elberg Judgment in the form of **Exhibit 2** to this Agreement (the foregoing clauses (i) and (ii), collectively, the "Capital One Requirements").

    (c)    No later than five (5) business days following the Escrow Deposit Date, Ruben shall deliver to the Capital One Escrow Agent a stipulation discontinuing the Fraud Action against all defendants, including (i) Capital One (and all Capital One-related entities), (ii) Troutman Pepper Hamilton Sanders LLP, and (iii) Skadden, Arps, Slate, Meagher & Flom LLP, with prejudice.

4.      **Payment to Capital One.**

(a)  Upon the Settlement Effective Date, and in accordance with the Escrow Agreement, the Capital One Escrow Agent shall release the Capital One Escrow Amount ($8,450,000) being held in escrow to Capital One (the "Settlement Payment"). The Settlement Payment shall be made by electronic wire transfer pursuant to wiring instructions to be delivered by Capital One to the Capital One Escrow Agent. Subject to Section 4(b) below, upon the release from escrow of the Capital One Escrow Amount to Capital One, the Loans and the Loan Obligations shall automatically be deemed satisfied and paid in full and, as such, the Capital One Liens shall be automatically terminated and released, and the Bankruptcy Claims shall be deemed satisfied in full. The Parties acknowledge and agree that the Settlement Payment is being applied *first*, to the unpaid principal balance of the Loan Obligations owed to Capital One by the Non-Debtor Borrowers, *second*, to the unpaid principal balance of the Loan Obligations owed to Capital One by Jarah Trans, Corp., and *third*, to the unpaid principal balance of the Loan Obligations owed to Capital One by the Debtor Borrowers (other than Jarah Trans. Corp). Such amount applied pursuant to the foregoing sentence in clauses *first* and *second* shall be treated by the Parties as paid by the Estate to Ruben and paid to Capital One on behalf of the Non-Debtor Borrowers and Jarah Trans. Corp as set forth therein. Capital One agrees that, upon its receipt of the Settlement Payment and other concessions made pursuant to this Agreement, the Ruben Elberg Judgment shall be deemed satisfied in full.

(b)  (i)  In the event that entry of an order confirming the Chapter 11 Plan has not occurred prior to one hundred eighty (180) days from entry of the Bankruptcy Approval Order, the Loan Obligations of the Debtor Borrowers will not have been forgiven or discharged. In such instance, the Parties agree that the Settlement Payment shall be released from escrow to Capital One and, upon Capital One's confirmed receipt of the Settlement Payment in full, $2,000,000 of the Settlement Payment will be deemed to have been paid by Ruben for the purchase from Capital One of the notes evidencing the Loan Obligations of the Debtor Borrowers and all rights thereunder and under the related Loan Documents (as defined below) and the Capital One Liens associated therewith. For the avoidance of doubt, Capital One's confirmed receipt of the full Settlement Payment is an express condition precedent to the sale described in the preceding sentence, and such sale, if it occurs, shall be made **"as is", "where is", "with all faults", and without recourse to Capital One and without representation or warranty, express or implied, of any type, kind, or character**. Without limiting the generality of the forgoing, Ruben acknowledges that Capital One has not made any representations or warranties concerning the validity or enforceability of the Capital One Liens, the collectability of the Loan Obligations or any portion thereof, or the value of the Medallions and/or other collateral. Upon its receipt of the full Settlement Payment, Capital One agrees that it shall no longer have any security interest in, lien upon, or claim against any of the Debtor Borrowers or their properties.

(ii)  Within ten (10) days of the purchase from Capital One, the notes evidencing the Loan Obligations of the Debtor Borrowers and all rights thereunder and under the related Loan Documents, Ruben, Tamara, and the Guardian ad Litem, on behalf of Esma, shall execute Strict Foreclosure Agreements for all Debtor Borrowers, the form of which is attached hereto as **Exhibit 3**.

5.  Dismissal of Fraud Action; Etc.

(a)  No earlier than two (2) business days following the Settlement Effective Date, and in accordance with the Escrow Agreement, the stipulation discontinuing the Fraud

Action against all defendants, including (i) Capital One (and all Capital One-related entities), (ii) Troutman Pepper Hamilton Sanders LLP, and (iii) Skadden, Arps, Slate, Meagher & Flom LLP, with prejudice shall be released from escrow to Capital One or its counsel to be filed with the applicable court, provided, however, in the event that either (i) Troutman Pepper Hamilton Sanders LLP or (ii) Skadden, Arps, Slate, Meagher & Flom LLP sue Ruben with respect to the Fraud Action, then, notwithstanding anything to the contrary herein or in any other agreement, instrument, or document executed in connection herewith, the release contemplated by Section 8(b) of this Agreement shall be null and void and of no force or effect solely as to the entity that commences such suit.

(b)     No earlier than two (2) business days following the Settlement Effective Date, and in accordance with the applicable escrow letter agreement, (i) each notice of discontinuance or voluntary dismissal of the Turnover Proceeding, the Executor Action, and the JHB Action, all with prejudice, shall be released from escrow and filed by any of the attorneys representing a defendant in each such action or proceeding with the appropriate court; (ii) all UCC-3 termination statements and all other documents held by Abrams Fensterman shall be released from escrow and filed with the appropriate governmental authority to evidence the termination of such Capital One Liens on the Medallions and Borrowers' other property; provided, however, that, if entry of an order confirming the Chapter 11 Plan has not occurred on or prior to one hundred eighty (180) days from entry of the Bankruptcy Approval Order, then all UCC-3 termination statements and other documents held by Abrams Fensterman relating to the Capital One Liens on the Medallions and Borrowers' other property, shall be destroyed by Abrams Fensterman, and (iii) the Satisfaction of the Ruben Elberg Judgment shall be released from escrow and filed with each applicable County Clerk or other appropriate officer or entity in order to expunge such judgment.

(c)     The Parties shall, and shall cause their respective legal counsel to, take any additional steps reasonably necessary to ensure that all actions contemplated by this Section 5 are timely completed.

6.     Releases.

(a)     Effective on the Settlement Effective Date, and subject to Section 6(d) hereof, Capital One, on its own behalf and on behalf of its affiliates, successors and assigns (collectively, "Capital One Releasing Parties"), releases and forever discharges each of (i) the Elberg Parties (including Tamara and Ruben, personally and individually in their capacities as Co-Executors of the Estate of Jacob Elberg), and each of their respective heirs, successors, attorneys, accountants, representatives, agents, affiliates, assigns, and any Guardian ad Litem appointed by the Surrogate's Court, Queens County (collectively, the "Elberg Releasees") and (ii) Royal One Real Estate, LLC, Royal Real Estate Management LLC, and Royal LLC Real Estate Management, LLC (collectively, "Royal") and each of their respective heirs, successors, attorneys, accountants, representatives, agents, affiliates, assigns (collectively, the "Royal Releasees"), of and from any and all claims, counterclaims, demands, judgments, obligations, actions or causes of action, set offs, rights, Liens, liabilities, damages, costs, expenses (including reasonable attorneys' fees), and compensation (collectively, "Claims"), relating to, in connection with, or arising from (A) the Loans, Loan Obligations, Loan Documents (as defined below), and the Prior Settlement, and (B) the Fraud Action, Estate Claim, the JHB Action, the Executor Action, the Ruben Elberg Judgment, the Ruben Elberg Personal Guarantee, the Bankruptcy Claims, the Chapter 11 Cases, and the Turnover Proceeding and any allegations made or proceedings therein, whether in law or in equity

9

or otherwise, whether arising under contract, tort, statute, or any other legal theory or basis of any nature whatsoever, which the Capital One Releasing Parties or any of them ever had, now has, or may ever have against the Elberg Releasees or the Royal Releasees or any of them based upon any act, omission, transaction, agreement, event, or other occurrence taking place or existing on or prior to the effective date of this release, whether known or unknown, suspected or unsuspected, claimed or concealed, contingent or non-contingent, asserted or not asserted.

(h)     Effective as of the Settlement Effective Date, and subject to Section 8(d) hereof, each of (i) the Elberg Parties, on its own behalf and on behalf of its affiliates, successors, and assigns, including, without limitation, any bankruptcy estate or trustee (the "Elberg Releasing Parties") and (ii) Royal, releases and forever discharges Capital One and its successors, parent companies, subsidiaries, attorneys, accountants, representatives, agents, affiliates, and assigns (the "Capital One Releasees") of and from any and all Claims, whether in law or in equity or otherwise, whether arising under contract, tort, statute, or any other legal theory or basis of any nature whatsoever, which the Elberg Releasing Parties or Royal or any of them ever had, now has, or may ever have against the Capital One Releasees or any of them based upon any act, omission, transaction, agreement, event, or other occurrence taking place or existing on or prior to the effective date of this release, whether known or unknown, suspected or unsuspected, claimed or concealed, contingent or non-contingent, asserted or not asserted, including, but not limited to, Claims relating to any matter to (A) the Loans, Loan Obligations, Loan Documents, and Prior Settlement, and (B) the Fraud Action, Estate Claim, the JEB Action, the Executor Action, the Ruben Elberg Judgment, the Bankruptcy Claims, the Chapter 11 Cases, and the Turnover Proceeding and any allegations made or proceedings therein.

(i)     Effective as of the Settlement Effective Date, and subject to the last sentence of this subsection (a) and Section 8(d) hereof, each of the Elberg Releasing Parties and Royal, releases and forever discharges Troutman Pepper Hamilton Sanders LLP and Skadden, Arps, Slate, Meagher & Flom LLP, and each of their respective successors, parent companies, subsidiaries, partners, employees, attorneys, accountants, representatives, agents, affiliates, and assigns (collectively, the "Troutman/Skadden Releasees") of and from any Claims relating to any matter to (i) the Loans, Loan Obligations, Loan Documents, and Prior Settlement, and (ii) the Fraud Action, Estate Claim, the JEB Action, the Executor Action, the Ruben Elberg Judgment, the Bankruptcy Claims, the Chapter 11 Cases, and the Turnover Proceeding and any allegations made or proceedings therein, which the Elberg Releasing Parties and Royal or any of them ever had, now has, or may ever have against the Troutman/Skadden Releasees or any of them based upon any act, omission, transaction, agreement, event, or other occurrence taking place or existing on or prior to the effective date of this release, whether known or unknown, suspected or unsuspected, claimed or concealed, contingent or non-contingent, asserted or not asserted. Notwithstanding the foregoing or anything to the contrary herein, (A) the release in favor of Troutman Pepper Hamilton Sanders LLP and its successors, parent companies, subsidiaries, partners, employees, attorneys, accountants, representatives, agents, affiliates, and assigns contemplated by this Section 8(i) shall not be effective unless and until Troutman Pepper Hamilton Sanders LLP provides a mutual release (containing a covenant not to sue on any Claims that are the subject of this release) in favor of the Elberg Releasees and Royal Releasees, and (B) the release in favor of Skadden, Arps, Slate, Meagher & Flom LLP and its successors, parent companies, subsidiaries, partners, employees, attorneys, accountants, representatives, agents, affiliates, and assigns contemplated by this Section 8(i) shall not be effective unless and until Skadden, Arps, Slate, Meagher & Flom LLP provides a

mutual release (containing a covenant not to sue on any Claims that are the subject of this release) in favor of the Elberg Releasees and Royal Releasees.

(d)     Notwithstanding anything to the contrary herein or in any other agreement, document, or instrument executed in connection herewith, the releases granted under Section 6 are not intended to release (i) any Elberg Releasee's or Royal Releasee's existing obligations under or relating to any loan, transaction, document, agreement, mortgage loan, account agreement, or credit card agreement with any Capital One Releasing Parties other than the Loans and Loan Documents, or (ii) any person's or entity's rights, obligations or Claims arising under or relating to this Agreement or any document, instrument, or agreement entered into in connection herewith or contemplated hereby.

(e)     Effective as of the Settlement Effective Date, subject to Section 4(h), Capital One and the Elberg Parties (as applicable) shall have no further liability or obligations under the notes, loan agreements, security agreements, guarantee (including the Ruben Elberg Personal Guarantee), or any other document, agreement, or instrument executed in connection with the Loans (collectively, the "Loan Documents"), and the Loan Documents shall automatically be released and terminated without any further action by Capital One.

(f)     The Elberg Parties, on behalf of themselves and the other Elberg Releasing Parties, and Royal absolutely, unconditionally, and irrevocably covenant and agree that they will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Capital One Releasee on the basis of any Claim released, remised, and discharged pursuant to Section 6(b) of this Agreement. If any Elberg Party, Royal, or any of the other Elberg Releasing Parties violates the foregoing covenant (a "Breaching Party"), such Breaching Party agrees to pay such actual out-of-pocket damages as any Capital One Releasee may sustain as a direct result of such violation, including documented reasonable attorneys' fees and costs incurred by any Capital One Releasee as a direct result of such violation.

(g)     Capital One, on its own behalf and the other Capital One Releasing Parties, absolutely, unconditionally, and irrevocably covenant and agree that they will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Elberg Releasees or Royal Releasees on the basis of any Claim released, remised, and discharged pursuant to Section 6(a) of this Agreement. If Capital One or any of the other Capital One Releasing Parties violates the foregoing covenant, Capital One agrees to pay such actual out-of-pocket damages as any Elberg Releasee or Royal Releasee may sustain as a direct result of such violation, including documented reasonably attorneys' fees and costs incurred by any Elberg Releasee or Royal Releasee as a direct result of such violation.

7.     Intentionally Omitted.

8.     Representations and Warranties.

(a)     Each of the Parties represents and warrants that as of the Execution Date and the Settlement Effective Date:

(i)     Such Party is the current legal and beneficial owner of all Claims released by such Party herein;

(ii)    Such Party has not assigned, pledged, or contracted to assign or pledge any of the Claims released by such Party herein except as provided in Section 4(b) of this Agreement;

(iii)    Subject to the approval of the Bankruptcy Court and the Queens Surrogate's Court (as applicable), such Party possesses all requisite authority and power to enter into and comply with the terms of this Agreement and the transactions contemplated hereby;

(iv)    Subject to the approval of the Bankruptcy Court and the Queens Surrogate's Court (as applicable), such Party has obtained all authorizations, consents, and approvals that are required with respect to performance and execution of this Agreement; and

(v)    Subject to the approval of the Bankruptcy Court and the Queens Surrogate's Court (as applicable), no further action, other than as expressly provided in this Agreement, is necessary to make this Agreement a valid and binding obligation of each of the Parties.

(b)    Each individual signing this Agreement on behalf of any Party hereby represents and warrants that such individual has been duly authorized to sign this Agreement on behalf of the Party for whom such individual is signing.

(c)    The Co-Executors represent and agree that they will diligently seek approval of this Agreement by the Queens Surrogate's Court and Bankruptcy Court in order to bind the Estate of Jacob Elberg and the Debtor Borrowers, respectively, to the terms of this Agreement.

(d)    The Guardian ad Litem for Ilana Elberg, Lori Sullivan, Esq., has discussed the terms of this Agreement and the Settlement with Ilana, and Lori Sullivan, Esq., pursuant to the authority granted to her by the Queens Surrogate's Court, agrees to execute this Agreement and consummate the Settlement pursuant to the terms hereof and the other applicable transactions contemplated hereby.

9.    Obligation to Proceed in Good Faith and Further Assurances. Each of the Parties shall take or cause to be taken all actions, and do or cause to be done all things reasonably necessary, proper or advisable to implement the Settlement and the other transactions contemplated by this Agreement, including without limitation proceeding in good faith and cooperating with one another by furnishing any additional information, records or data, or executing and delivering any additional documents, instruments, releases, assignments, undertakings, approvals, opinions, financing statements and/or the like (whether or not expressly referenced herein) as may be reasonably requested by any of the Parties or their counsel to consummate or otherwise implement the Settlement and the transactions contemplated by this Agreement. If any legal or structural impediment arises that would prevent, hinder, or delay consummation and implementation of the Settlement, the Parties agree to take all steps reasonably necessary to address any such impediment so that each of the Parties receives the full benefit of the Settlement to which they are entitled hereunder.

10.    Confidentiality.

(a)     Except as provided in Section 10(b) of this Agreement, the Parties agree (and shall cause each of their respective officers, directors, agents, affiliates, agents, representatives, heirs, successors and assigns) (i) to maintain in strict confidence and not to use or disclose any aspect of this Agreement and the Settlement and the discussions, negotiations, terms, status or conditions relating to Settlement and the other transactions contemplated by this Agreement and any and all confidential or sensitive information, whether written or oral or any other format, concerning any of the Parties (collectively, the "Confidential Information") to any person or entity other than such such Party's respective officers, directors, and authorized representatives (including legal and other advisers); and (ii) to cause and require all such persons or entities to whom such Confidential Information is disclosed to abide by the provisions of this Section 10. The Parties shall protect the Confidential Information of the other Parties with the same degree of care with which such Party protects such Party's own information of like importance.

(b)     Nothing contained in Section 10(a) above shall prevent any Party from making such disclosures as necessary (i) to comply with or enforce this Agreement, (ii) to comply with reporting, disclosure, filing or other requirements imposed on such Party by any governmental authority, (iii) to obtain approval of this Agreement by the Queens Surrogate's Court and Bankruptcy Court, or (iv) to otherwise comply with applicable law, regulation, audit, or legal subpoena or other legal action or proceeding. For the avoidance of doubt, Capital One may disclose the status and terms of this Agreement to their retained legal counsel, and Troutman Pepper Hamilton Sanders LLP and Skadden, Arps, Slate, Meagher & Flom LLP, and/or their respective legal counsel under a duty of confidentiality to Capital One. If any Party or their respective representatives are compelled to disclose any Confidential Information by judicial or administrative process or by other requirements of applicable law, such Party shall disclose only that portion of such Confidential Information which such Party is advised by its counsel in writing is legally required to be disclosed, provided that such Party shall use its best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

11.     Adequate Representation. The Parties have each been represented by legal counsel of their choice, understand and are fully aware of the terms contained in this Agreement, and have voluntarily, without coercion or duress of any kind, entered into this Agreement and the documents executed in connection with this Agreement. Neither Capital One, on the one hand, nor any Elberg Parties, on the other hand, is relying upon and has not relied upon any representation, warranty or statement made by any of the other Parties in connection with such Party's execution, delivery, and performance of this Agreement, other than the representations, warranties, and statements expressly made by such other Party in this Agreement.

12.     Severability. If any term or provision of this Agreement, excluding, however, those provisions governing the Settlement Payment and release of any of the Parties, is held by a court of competent jurisdiction to be invalid or unenforceable, in whole or in part, for any reason, such term or provision shall be ineffective to the extent of such invalidity or unenforceability only, and shall not impair or invalidate the remainder of this Agreement which shall continue in full force and effect. Any term or provision determined by a court of competent jurisdiction to be over broad in any manner shall be interpreted or reformed to give that term or provision the maximum effect

permissible by applicable law and equity, and the Parties agree to enforcement of the term or provision as so modified.

13.　No Admission of Liability. This Agreement is a good faith, negotiated resolution of disputed claims. Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement is admissible in any court proceeding, except those proceedings, if any, leading to judicial approval of the Settlement and the transactions contemplated by this Agreement, and any proceeding brought to enforce this Agreement. No Party, by signing this Agreement, admits liability or fault, or admits the validity of any claim made by any other Party or person with respect to any matter that is the subject of this Agreement.

14.　Equitable Relief. Each of the Elberg Parties, on the one hand, and Capital One, on the other hand, acknowledges and agrees that irreparable injury to the other Party or Parties would occur in the event any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that such injury would not be adequately compensable by the remedies available at law (including the payment of money damages). It is accordingly agreed that in addition to any remedies at law, each Party shall also be entitled to specific enforcement of the terms hereof without the necessity of posting bond or proving actual damages. The other Parties will not take action, directly or indirectly, in opposition of such Party seeking such relief on the grounds that any other remedy or relief is available at law or in equity.

15.　Non-Disparagement. Each of the Parties covenants and agrees that such Party shall not, directly or indirectly through any person or entity, in any way disparage, call into disrepute, or otherwise defame or slander the other Parties or such other Parties' owners, officers, directors, agents, representatives, affiliates, successors and assigns in any manner that would damage the business or reputation of such other Parties or their respective owners, officers, directors, agents, representatives, affiliates, successors and assigns.

16.　Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic means shall be as effective as delivery of a manually executed counterpart of this Agreement.

17.　Entire Agreement. The Parties acknowledge that this Agreement and the Elberg Parties' Settlement Agreement constitute the entire agreement on the matters addressed herein and, except as set forth herein or therein, supersedes all prior agreements or understandings between the Parties, oral or written, including without limitation the Prior Settlement.

18.　Binding Effect; Failure to be Approved. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors and assigns. This Agreement shall also (a) survive conversion, dismissal, and/or closing of the Chapter 11 Cases, appointment of a Chapter 11 trustee and/or confirmation of a plan of reorganization, and (b) be binding upon a Chapter 7 trustee or a Chapter 11 trustee that may be appointed or elected in the Chapter 11 Cases or any succeeding Chapter 7 case. Notwithstanding the foregoing, in the event this Agreement and the Elberg Parties' Settlement Agreement are not both approved by the Queens Surrogate's Court and the Bankruptcy Court by July 31, 2024, this Agreement and the Elberg Parties' Settlement Agreement shall be of no force or effect, may not be used by any Party for any purpose, and each

of the Parties shall return to its status quo ante as of immediately prior to the Execution Date. For clarity, the foregoing means that any and all monies paid or released to a Party pursuant to this Agreement shall be returned to the original source of payment, the releases set forth in Section 6 of this Agreement shall be void automatically without further act by any Party, and each of the Parties shall have all of its Claims against the other Parties preserved and shall be entitled to pursue all rights and remedies, whether at law or in equity, available.

19. **Governing Law; Jurisdiction; Waiver of Jury Trial.** The governing law of this Agreement shall be the substantive and procedural law of the State of New York without regard to choice-of-law or conflicts-of-law principles. Any action based on this Agreement or to enforce any of its terms shall be brought in the Queens Surrogate's Court or the Bankruptcy Court, as applicable. Each of the Parties (i) submits to the personal jurisdiction of the Queens Surrogate's Court and the Bankruptcy Court, and (ii) hereby knowingly, voluntarily, and intentionally waives any right it may have to a trial by jury of any dispute arising under or relating to this Agreement and agrees that any such dispute shall be tried before a judge sitting without a jury.

20. **Fees and Expenses.** Except as expressly set forth herein, each of the Parties will be responsible for their own fees, costs, and expenses, including, without limitation, legal, accounting, and out-of-pocket expenses incurred in connection with negotiating and entering into this Agreement and any other agreements entered into as a result of the same.

21. **Construction.** This Agreement shall be construed as if the Parties jointly prepared this Agreement, and any uncertainty or ambiguity shall not on that ground be interpreted against any one Party.

22. **Amendment and Modification.** This Agreement cannot be amended, modified, or supplemented orally. The Parties may amend, modify, or supplement this Agreement only by a writing signed by each of the Parties.

23. **Notices.** Any notice, request, demand, claim or other communication required or permitted to be delivered, given or otherwise provided hereunder or under any other agreement entered into in connection herewith must be in writing and (a) delivered in person (in which case, it will be effective upon delivery), (b) transmitted by electronic (email) transmission (in which case, it will be effective upon receipt of confirmation of successful transmission to recipient), or (c) sent by overnight delivery by Express Mail, Federal Express or other nationally recognized carrier (in which case, it will be effective upon delivery), in each case to the intended recipient at its last known address reflected in the records of the Parties, and (i) if to Ruben, with a copy (which shall not constitute notice) to Abrams Fensterman, LLP, 3 Dakota Drive, Suite 300, Lake Success, New York 11042; Attn: Robert Abrams, Esq.; (ii) if to Tamara, with a copy (which shall not constitute notice) to Greenfield Stein & Senior, LLP, 600 Third Avenue, New York, New York 10016, Attn: Gary B. Freidman, Esq.; and (iii) if to Capital One, with a copy (which shall not constitute notice) to Reed Smith LLP, 599 Lexington Avenue, New York, New York 10022; Attn: Alina K. Piccione.

24. **No Third-Party Beneficiaries.** This Agreement is intended for the benefit of the Parties and their respective successors and assigns and, except as expressly set forth in Section 6 (and subject to the express terms and provisions thereof), is not for the benefit of, nor may any

15

provision hereof be enforced by, any other person or entity. For clarity, nothing in the Agreement shall prevent or impact any Party's right to proceed against any third party.

25.    Headings.  The section headings in this Agreement are for convenience only and may not be used in construing this Agreement.

26.    Waiver; Exercise of Remedies.  No waiver of any term or condition of this Agreement or any of the rights of a Party hereunder shall be effective or binding unless such waiver shall be in writing and signed by the Party claimed to have given or consented thereto. Except to the extent otherwise agreed in writing, no waiver of any term or condition of this Agreement by any Party shall be construed as a waiver of a subsequent breach or failure of the same term or condition, or waiver of any other term or condition of this Agreement. No failure or delay by any Party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

[Signatures Pages Follow]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**CAPITAL ONE TAXI MEDALLION FINANCE, a trade name of Capital One Equipment Finance Corp.**

By: _____

Name: Tausif Hossain

Title: Vice President

**ELBERG PARTIES**

**BRACHA CAB CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**DAHRI TRANS CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**DOVBER CAB CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**FIT TAXI CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JACKBEL CAB CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**MERAB CAB CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**LECHAIM CAB CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**N. Y. ENERGY TAXI CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**N.Y. CANTEEN TAXI CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**N. Y. GENESIS TAXI CORP.**

By: _[signature]_
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**N.Y. STANCE TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SOMYASH TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JAHUB TRANS. CORP**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SHEFA FUNDING LLC**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**MERILL TRANSIT INC.**

By: _____
Ruben Elberg, Authorized Representative

**N.Y. TINT TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**TAMAR CAB CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JEB MANAGEMENT CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SPINDLE CAB CORP.**

By: _____
Ruben Elberg, Authorized Representative

**TAMARA PEWZNER, individually**

_____
Tamara Pewzner

**RUBEN ELBERG, individually**

_____
Ruben Elberg

**SHALOM ELBERG (SAM), individually**

_____
Shalom Elberg (Sam)

**N.Y. STANCE TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SOMVASH TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JARUB TRANS. CORP**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SHEFA FUNDING LLC**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**MERILL TRANSIT INC.**

By: _____
Ruben Elberg, Authorized Representative

**N.Y. TINT TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**TAMAR CAB CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JEB MANAGEMENT CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SPINDLE CAB CORP.**

By: _____
Ruben Elberg, Authorized Representative

**TAMARA PEWZNER, individually**

_____
Tamara Pewzner

**RUBEN ELBERG, individually**

_____
Ruben Elberg

**SHALOM ELBERG (SAM), individually**

_____
Shalom Elberg (Sam)

**N.Y. STANCE TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SOMYASH TAXI CORP.**

By _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JAHUB TRANS. CORP**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SHIFA FUNDING LLC**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**MERILL TRANSIT INC.**

By: _____
Ruben Elberg, Authorized Representative

**N.Y. TINT TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**TAMAR CAB CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JEB MANAGEMENT CORP.**

By _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SPINDLE CAB CORP.**

By: _____
Ruben Elberg, Authorized Representative

**TAMARA PEWZNER, individually**

_____
Tamara Pewzner

**RUBEN ELBERG, individually**

_____
Ruben Elberg

**SHALOM ELBERG (SAM), individually**

_____
Shalom Elberg (Sam)

Signature Page to Settlement Agreement, Elberg Parties

**N.Y. STANCE TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SOMYASH TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JABUB TRANS. CORP**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SHEFA FUNDING LLC**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**MERILL TRANSIT INC.**

By: _____
Ruben Elberg, Authorized Representative

**N.Y. TINT TAXI CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**TAMAR CAB CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**JEB MANAGEMENT CORP.**

By: _____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023

**SPINDLE CAB CORP.**

By: _____
Ruben Elberg, Authorized Representative

**TAMARA PEWZNER, individually**

_____
Tamara Pewzner

**RUBEN ELBERG, individually**

_____
Ruben Elberg

**SHALOM ELBERG (SAM), individually**

_____
Shalom Elberg (Sam)

Signature Page to Settlement Agreement, Elberg Parties

THE ESTATE OF JACOB ELBERG,
by and through its co-executors,
Tamara Pelvzner and Ruben Elberg

By: _____
Name: Tamara Pewzner
Title: Co-Executor

By: _____
Name: Ruben Elberg
Title: Co-Executor

*ACKNOWLEDGED AND AGREED
TO SOLELY WITH RESPECT TO
SECTIONS 1 and 8*

ROYAL ONE REAL ESTATE, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

ROYAL LIC REAL ESTATE
MANAGEMENT, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

ROYAL REAL ESTATE
MANAGEMENT, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

MICHAEL ELBERG, individually

_____
Michael Elberg

ESMA ELBERG, individually

_____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023 and
the order of the Surrogate's Court, Queens
County, dated January 22, 2024.

The Court has reviewed and approves the
terms of this Stipulation of Settlement and
authorizes the Guardian ad Litem to execute
same pursuant to SCPA 2106:

_____
Honorable Peter J. Kelly, Surrogate

THE ESTATE OF JACOB ELBERG,
by and through its co-executors,
Tamara Pewzner and Ruben Elberg

By: _____
Name: Tamara Pewzner
Title: Co-Executor

By: _____
Name: Ruben Elberg
Title: Co-Executor

***ACKNOWLEDGED AND AGREED
TO SOLELY WITH RESPECT TO
SECTIONS 1 and 6:***

ROYAL ONE REAL ESTATE, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

ROYAL LIC REAL ESTATE
MANAGEMENT, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

ROYAL REAL ESTATE
MANAGEMENT, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

MICHAEL ELBERG, individually

_____
Michael Elberg

ESMA ELBERG, individually

_____

Esma Elberg, by Lisi Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023 and
the order of the Surrogate's Court, Queens
County, dated January 22, 2024.

The Court has reviewed and approves the
terms of this Stipulation of Settlement and
authorizes the Guardian ad Litem to execute
same pursuant to SCPA 2106:

_____
Honorable Peter J. Kelly, Surrogate

THE ESTATE OF JACOB ELBERG,
by and through its co-executors,
Tamara Pewzner and Ruben Elberg

By: _____
Name: Tamara Pewzner
Title: Co-Executor

By: _____
Name: Ruben Elberg
Title: Co-Executor

*ACKNOWLEDGED AND AGREED*
*TO SOLELY WITH RESPECT TO*
*SECTIONS 1 and 6:*

ROYAL ONE REAL ESTATE, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

ROYAL LIC REAL ESTATE
MANAGEMENT, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

ROYAL REAL ESTATE
MANAGEMENT, LLC

By: _____
Name: Tamara Pewzner
Title: Co-Manager

MICHAEL ELBERG, individually

_____
Michael Elberg

ESMA ELBERG, individually

_____
Esma Elberg, by Lori Sullivan, as Guardian
ad Litem, pursuant to attached orders of
Surrogate's Court, Queens County, dated
January 24, 2023 and September 25, 2023 and
the order of the Surrogate's Court, Queens
County, dated January 22, 2024.

The Court has reviewed and approves the
terms of this Stipulation of Settlement and
authorizes the Guardian ad Litem to execute
same pursuant to SCPA 2106:

_____
Honorable Peter J. Kelly, Surrogate

Signature Page to Settlement Agreement, Elberg Parties

## Schedule A
### Description of Loans and Medallion Collateral

| Borrower | Original Principal Amount | Medallion Nos. |
|---|---|---|
| BRACHA CAB CORP. | $1,210,000 | 2L35, 2L36 |
| BRACHA CAB CORP. | $250,000 | 2L35, 2L36 |
| DABRI TRANS CORP. | $1,210,000 | 5J10, 5J11 |
| DABRI TRANS CORP. | $250,000 | 5J10, 5J11 |
| DOVBER CAB CORP. | $1,210,000 | 2J71, 2J72 |
| DOVBER CAB CORP. | $250,000 | 2J71, 2J72 |
| FIT TAXI CORP. | $1,525,000 | 3M78, 3M79, 3M80 |
| JACKHEL CAB CORP. | $1,210,000 | 8M42, 8M43 |
| JACKHEL CAB CORP. | $250,000 | 8M42, 8M43 |
| LECHAIM CAB CORP. | $1,210,000 | 1K66, 1K67 |
| MERAB CAB CORP | $1,210,000 | 7J22, 7J25 |
| N. Y. ENERGY TAXI CORP. | $1,210,000 | 2Y39, 2Y43 |
| N.Y. CANTEEN TAXI CORP. | $1,210,000 | 2Y37, 2Y38 |
| N.Y. GENESIS TAXI CORP | $1,210,000 | 2Y44, 2Y45 |
| N.Y. STANCE TAXI CORP. | $1,210,000 | 3P15, 3P16 |
| NY TINT TAXI CORP. | $1,210,000 | 8M46, 8M47 |
| SOMYASH TAXI CORP. | $1,210,000 | 4J18, 4J19 |
| TAMAR CAB CORP. | $1,210,000 | 11J60, 11J78 |
| JABUB TRANS CORP. | $1,210,000.00 | 9J67, 9J68 |
| MERILL TRANSIT INC. | $1,190,000.00 | 5P65, 5P66 |
| SPINDLE CAB CORP. | $1,190,000.00 | 1K44, 1K47 |

## Schedule B

| Escrow Agent | Defendants | Litigations |
|---|---|---|
| Abrams Fensterman, LLP | Ruben Elberg (representative and personal capacities)<br><br>JER Management Corp. | *Capital One Taxi Medallion Finance v. JER Management Corp., et al.,* Index No. 608014/2015 (N.Y. Sup., Suffolk Cnty.) |
| | | *Capital One Taxi Medallion Finance v. Tamara Pewzner et al.,* Index No. 611751/2015 (N.Y. Sup., Suffolk Cnty.) |
| | | *Capital One Taxi Medallion Finance v. Tamara Pewzner et al.,* Index No. 613186/2022 (N.Y. Sup., Nassau Cnty.) |
| Schuerman Updike & Kaufman LLP | Tamara Pewzner (representative and personal capacities) | *Capital One Taxi Medallion Finance v. Tamara Pewzner et al.,* Index No. 611751/2015 (N.Y. Sup., Suffolk Cnty.) |
| | | *Capital One Taxi Medallion Finance v. Tamara Pewzner et al.,* Index No. 613186/2022 (N.Y. Sup., Nassau Cnty.) |

## Schedule C

| Debtor Borrower | Date of Filing & Docket Number |
|---|---|
| BRACHA CAB CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46613 |
| DABRI TRANS CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46618 |
| DOVBER CAB CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46614 |
| FIT TAXI CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46620 |
| MERAB CAB CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46619 |
| N.Y. GENESIS TAXI CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46617 |
| TAMAR CAB CORP. | 12/08/17; Bankr. E.D.N.Y. Case No. 17-46616 |
| JACKBEL CAB CORP. | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46646 |
| JARUB TRANS. CORP. | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46639 |
| LECHAIM CAB CORP. | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46647 |
| N. Y. ENERGY TAXI CORP. | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46645 |
| N.Y. CANTEEN TAXI CORP. | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46644 |
| N.Y. STANCE TAXI CORP. | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46642 |
| NY TINT TAXI CORP | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46641 |
| SOMYASH TAXI INC | 12/11/17; Bankr. E.D.N.Y. Case No. 17-46640 |

Exhibit 1

Ballots

(See Attached)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

Bracha Cab Corp, *et al.,*                                    Chapter 11

                                                             Case No.: 17-46613-nhl
                              Debtors.                        Jointly Administered
--------------------------------------------------------x

## CLASS [  ] BALLOT FOR
## ACCEPTING or REJECTING PLAN OF REORGANIZATION

Bracha Cab Corp., Dovber Cab Corp., Dabri Trans Corp., Merab Cab Corp., Fit Taxi Corp., Jarub Trans Corp., Somyash Taxi Corp., NY Canteen Taxi Corp., Lechaim Cab Corp., Tamar Cab Corp., NY Genesis Taxi Corp., NY Tint Taxi Corp., NY Stance Taxi Corp., NY Energy Taxi Corp., Jackhel Cab Corp. ("Debtors") filed a plan of reorganization dated          2024 (the Plan) for the Debtors in these cases. The Court has approved a disclosure statement with respect to the Plan. The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from Schoeman Updike & Kaufman, LLP.

Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

**You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in class   under the Plan. If you hold claims or equity interests in more than one class, you will receive a ballot for each in which you are entitled to vote.**

**If your ballot is not received by Schoeman Updike & Kaufman, LLP, 551 Fifth Avenue, New York, New York 10176 on or before          and such deadline is not extended, your vote will not count as either an acceptance or rejection of this Plan.**

**If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.**

**Acceptance or Rejection of the Plan**

The undersigned, the holder of a Class  claim against the Debtors in the unpaid amount of Dollars $_____

[In each case, the following language should be included:]

*Check one box only*

☐  **Accepts the Plan**

☐  **Rejects the Plan**

Dated: _____

Print or type name: _____

Signature: _____ Title (if corporation or partnership) _____

Address: _____
         _____
         _____

_____

**Return this ballot to:**

Schoeman Updike & Kaufman, LLP
551 Fifth Avenue
New York, New York 10176

## Exhibit 2

## Satisfaction of Ruben Elberg Judgment

(See Attached)

SUPREME COURT, STATE OF NEW YORK
COUNTY OF SUFFOLK
------------------------------------------------------------x
**Capital One Taxi Medallion Finance**                        **SATISFACTION OF JUDGMENT**

Plaintiff(s)


-against-                                            Index No. **608014/2015**

**JEB Management Corp. and Ruben Elberg**

Defendant(s)
------------------------------------------------------------x

WHEREAS, a judgment was on the **22** day of **November** , **2016** , recovered by the


Plaintiff, **Capital One Taxi Medallion Finance**          against the Defendant, **Ruben Elberg**


in the above entitled action for the sum of $ **4,399,541.72**   Dollars,  which judgment was, on the **22** ,

day of **December** , **2016**   , duly docketed and entered in the office of  the Clerk of the County of

Suffolk, and whereas said judgment has been wholly paid.


THEREFORE, full satisfaction of said judgment is hereby acknowledged, and the Clerk of the

County of Suffolk is hereby authorized and directed to make an entry of full satisfaction of the

docket of said  judgment.



Dated: _____          _____

(The name signed must be printed beneath)



STATE OF NEW YORK          )
                          )ss.:
COUNTY OF _____          )


On the _____day of_____in the year_____before me, the undersigned,

personally appeared _____

personally known to me or proved to me on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon behalf of which the
individual(s) acted, executed the instrument.


_____

Notary Public

<u>Exhibit 3</u>

<u>Form of Strict Foreclosure Agreement</u>

(See Attached)

<u>**EXHIBIT 3**</u>

**FORM OF STRICT FORECLOSURE AGREEMENT**

THIS STRICT FORECLOSURE AGREEMENT, dated as of _____ \_\_\_\_, 2024 (this "**Agreement**"), by and among [BORROWER'S NAME] (the "**Borrower**"), a New York corporation having an address of _____, the Estate of Jacob Elberg (the "**Guarantor**") and, together with the Borrower, the "**Obligors**"), and Ruben Elberg (the "**Lender**" and, together with the Obligors, the "**Parties**"), having his address at _____.

**Recitals:**

A. The Lender is the holder of those certain loans to the Borrower identified on <u>Schedule 1</u> attached hereto (the "**Loans**"). Each of the Loans was absolutely and unconditionally guaranteed by the Guarantor. All documents, instruments and agreements executed and delivered in connection with the Loans, each as amended, restated, supplemented or otherwise modified from time to time, are collectively referred to in this Agreement as the "**Loan Documents**". Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Loan Documents.

B. Repayment of the Loans is secured by, among other things, valid, perfected, first-priority liens in the New York City Taxi Medallions (the "**Medallions**") identified on <u>Schedule 1</u> attached hereto.

C. The Parties entered into that certain Settlement Agreement, dated as of January 22, 2024 (the "**Settlement Agreement**"), pursuant to which, among other things, Lender agreed to accept the Obligors' turnover, surrender, or assign of the Medallions to Lender and a cash payment in satisfaction of the Loans as contemplated by the Settlement Agreement.

D. To permit Lender the option of proceeding to take title to the Medallions through a strict foreclosure of liens, the Parties have agreed to enter into this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the Parties intending to be legally bound, agree as follows:

1. <u>Incorporation of Recitals</u>. The Parties hereby acknowledge and agree that the foregoing recitals are true and correct and are incorporated herein by reference.

2. <u>Agreement to Provide Information</u>. Obligors agree to provide Lender with any documents and information in their possession, custody or control, or reasonably obtained by them relating to the Medallions, or relating to any liens, claims, interests, or encumbrances relating to the Medallions that is required by Lender.

3. <u>Strict Foreclosure</u>. Obligors agree that Lender may, without further notice to Obligors, proceed under Section 9-620 of the New York Uniform Commercial Code (the "**NY UCC**") by accepting all or some of the Medallions in partial satisfaction of the amounts due under the Loans ("**Strict Foreclosure**"). This Agreement is intended to establish a procedure by which Lender may take title to the Medallions and is not intended to modify the Settlement Agreement. Obligors acknowledge and agree that by executing this Agreement, proper notice shall be deemed to have

been given both under the Loan Documents and pursuant to Section 9-620 of the NY UCC. The Obligors further acknowledge and agree that Lender's willingness to acquire the Medallions through Strict Foreclosure is done solely as an accommodation to the Borrower and is not an agreement by the Lender as to the value of a Medallion. Borrower agrees that it will not, directly or indirectly, seek any form of relief from any court seeking to stay, impede, or otherwise delay the Lender's exercise of Strict Foreclosure.

4. <u>Borrower's Acceptance of Lender's Proposal</u>. This agreement constitutes Borrower's acceptance of Lender's proposal to accept the Medallions in partial satisfaction of the Loans secured thereby in an authenticated record after default as provided in Section 9-620( c )( l) of the NY UCC.

5. <u>Guarantor's Acceptance of Lender's Proposal</u>. This Agreement constitutes the Guarantor's acceptance of Lender's proposal, described in Section 9-621(b) of the NY UCC, to accept the Medallions in partial satisfaction of the Loans secured thereby.

6. <u>Transfer to Third Parties</u>. The Obligors acknowledge and agree that the Lender may transfer its rights to acquire any Medallion hereunder to such third party as designated by the Lender, in its sole discretion and that Lender may assign this Agreement and any Bill of Sale (as defined below) or other document or instrument executed in connection with this Agreement in whole or in part to one or more assignees, designees, or transferees.

7. <u>Effective Date, Bill of Sale</u>. Concurrently with the execution of this Agreement, the Borrower shall execute undated General Assignments and Bills of Sale in a form agreed to by the Parties (each, a "**Bill of Sale**"). The Bill of Sale shall not be effective until a date is inserted by the Lender or its designee. The Bill of Sale will be dated and the transfer of all right, title, and interest in the Medallions to Lender or its designee under this proposal shall be deemed consummated as of that date (the "**Effective Date**"). The Borrower expressly authorizes Lender or its designee to fill in the Effective Date and name of the applicable Borrower.

8. <u>Notices of Strict Foreclosure to Third Parties</u>. Obligors acknowledge that Lender may send notices to interested parties as required under Section 9-621 of the NY UCC.

9. <u>Inconsistent Agreements</u>. In the event any provision of this Agreement conflicts with any provision of the Settlement Agreement, the provisions of the Settlement Agreement shall govern and control.

10. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Immediately Follows]*

**BORROWER:**

(Individual Medallion Company)

By:_____

Esma Elberg, by Lori Sullivan,
*Guardian ad Litem*, pursuant to
attached orders of Surrogate's
Court, Queens County, dated
January 24, 2023 and September
25, 2023

**GUARANTOR:**

Estate of Jacob Elberg

By: _____

Tamara Pewzner,
Co-Executor of the Estate of
Jacob Elberg

**LENDER:**

Ruben Elberg

_____

Ruben Elberg

## Schedule F

### Stipulations and Notices of Discontinuance and Voluntary
### Dismissal and Satisfaction of Judgment

1. Stipulation of Discontinuance and Satisfaction of Judgment for the declaratory judgment action in the Supreme Court of the State of New York, New York County, Index No. 653373/2016.

2. Stipulation of Discontinuance and Satisfaction of Judgment for the money judgment action in the Supreme Court of the State of New York, New York County, Index No. 657021/2022.

3. Stipulation of Discontinuance of the appeals related to the money judgment action (listed in No. 2 above) in the Appellate Division, First Department, Case Numbers 2022-04570, 2022-03814 and 2022-03815.

4. Stipulation of Discontinuance and Satisfaction of Judgment of the guaranty recovery action in the Supreme Court of the State of New York, Suffolk County, Index No. 608014/2015.

5. Consent to Change Counsel and Stipulation of Discontinuance of executor action in the Supreme Court of the State of New York, Suffolk County, Index No. 611751/2015.

6. Notice of Discontinuance of fraud action in the Supreme Court of the State of New York, New York County, Index No. 653076/2022.

7. Notice of Discontinuance of special proceeding in the Supreme Court of the State of New York, Nassau County, Index No. 613186/2022.

8. Notice of Discontinuance of title action in the in the Supreme Court of the State of New York, New York County, Index No. 159450/2022.

9. Stipulations of Discontinuance of estate actions in the Surrogate's Court of the State of New York, Queens County, under File Number File 2022-211, sub matters I.

## Exhibit 1

**Consent to Amendment Regarding the Irrevocable Trust**

# THE ESMA ELBERG IRREVOCABLE TRUST
## DATED JANUARY 23, 2017

### Amendment of Trust Pursuant to EPTL § 7-1.9

WHEREAS, by agreement made and delivered on January 23, 2017 (the "Agreement") between Esma Elberg, as Grantor, and Tamar Pewzner, as Trustee, the Grantor created the The Esma Elberg Irrevocable Trust Dated January 23, 2017 (the "Trust") for the purposes set forth in the Agreement; and

WHEREAS, the Trust is governed by the laws of the State of New York; and

WHEREAS, Section 7-1.9 of the New York Estates, Powers and Trusts Law (the "EPTL") authorizes the creator of a trust to amend the whole or any part thereof by an acknowledged written instrument upon the acknowledged written consent of all persons beneficially interested in such trust; and

WHEREAS, the Grantor wishes to amend the Trust in certain respects; and

WHEREAS, the persons who are beneficially interested in the Trust are: (i) three of the Grantor's children, Michael Elberg, Tamar Pewzner and Sam Elberg (also known as Sholom Elberg), and (ii) one or more charitable organizations of Chabad Lubavitch selected by the Trustee in the Trustee's discretion; and

WHEREAS, all of said children of the Grantor are of full age and competent (collectively, the "Individual Beneficiaries"); and

WHEREAS, the Trustee has selected Merkos Linyonei Chinuch Inc., Brooklyn, New York (the "Charitable Beneficiary"), as the Chabad Lubavitch charitable organization to have a beneficial interest in the Trust.

NOW, THEREFORE, in accordance with EPTL Section 7-1.9 and effective upon the acknowledged written consent of all of the Individual Beneficiaries and the Charitable Beneficiary, the Grantor hereby amends the Agreement as follows (the "Trust Amendment"):

FIRST:     Article IV of the Agreement is hereby deleted in its entirety and a new Article IV is substituted in its place to read as follows:

"ARTICLE IV

Upon the death of the Grantor, the Trust shall terminate and the Trust principal and any undistributed income (less amounts to be paid to the Grantor's estate, executor, duly appointed fiduciaries or the tax authorities on account of any estate taxes attributable to the Trust Corpus) shall be distributed to the Grantor's son-in-law, FAIVISH PEWZNER, or if she shall fail to survive the Grantor, then to his issue who shall survive the Grantor, per stirpes."

SECOND:     Except as hereinabove set forth, all of the provisions, terms and conditions set forth in the Agreement are hereby ratified and confirmed and shall continue in full force and effect.

*[signature page follows]*

00069853v3

IN WITNESS WHEREOF, each of the Grantor, the Trustee, and the Individual Beneficiaries and the Charitable Beneficiary of the Trust has hereunto set her, his or its hand and seal on the date set forth below.

Date:_____, 2023          _____
                                  ESMA ELBERG, Grantor


Date:_____, 2023          _____
                                  MICHAEL ELBERG, Individual
                                  Beneficiary


Date:_____, 2023          _____
                                  TAMAR PEWZNER, Trustee and
                                  Individual Beneficiary


Date:_____, 2023          _____
                                  SAM ELBERG, Individual Beneficiary


Date:_____, 2023          MERKOS LINYONEI CHINUCH INC.,
                                  Charitable Beneficiary


                                  By:_____
                                     Name: Rabbi Mendel Kotlarsky
                                     Title:  _____

00069853v3

STATE OF NEW YORK )
                           :  ss.:
COUNTY OF )

On _____, 2023, before me, the undersigned, personally appeared ESMA ELBERG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
(signature and office of person
taking acknowledgment)


STATE OF NEW YORK )
                           :  ss.:
COUNTY OF )

On _____, 2023, before me, the undersigned, personally appeared MICHAEL ELBERG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
(signature and office of person
taking acknowledgment)

STATE OF NEW YORK          )
                          :   ss.:
COUNTY OF                  )

On _____, 2023, before me, the undersigned, personally appeared TAMAR PEWZNER, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
(signature and office of person taking acknowledgment)

STATE OF NEW YORK          )
                          :   ss.:
COUNTY OF                  )

On _____, 2023, before me, the undersigned, personally appeared SAM ELBERG (also known as SHOLOM ELBERG), personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
(signature and office of person taking acknowledgment)

STATE OF NEW YORK          )
                          :   ss.:
COUNTY OF                  )

On _____, 2023, before me, the undersigned, personally appeared MENDEL KOTLARSKY, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
(signature and office of person
taking acknowledgment